IN THE CIRCUIT COUT OF OUACHITA COUNTY, ARKANSAS
SIXTH DIVISION

ADDIE EDWARDS AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF OZIE EDWARDS, AND ON
BEHALF OF THE WRONGFUL DEATH BENEFICIARIES
OF OZIE EDWARDS                                                    **PLAINTIFFS**

**VS.**                          **CASE NO. CV-2014-203-6**

DIVERSICARE LEASING CORP. D/B/A OUACHITA
NURSING AND REHABILITATION CENTER;
DIVERSICARE HEALTHCARE SERVICES, INC.;
DIVERSICARE MANAGEMENT SERVICES CO.;
ADVOCAT ANCILLARY SERVICES, LLC; OMEGA
HEALTHCARE INVESTORS, INC.; CAMDEN
OPERATIONS, LLC D/B/A OUACHITA NURSING
AND REHABILITATION CENTER; JEJ INVESTMENTS,
LLC; SUB-TEN HOLDINGS, LLC; MASTERTEN, LLC;
ADVANCED PRACTICE SOLUTIONS, LLC; PROCARE
THERAPY SERVICES, LLC; SOUTHERN ADMINISTRATIVE
SERVICES, LLC; PONTHIE HOLDINGS, LLC; PROFESSIONAL
NURSING SOLUTIONS, LLC; JOHN PONTHIE; ROSS
PONTHIE; MARK THOMPSON; AND JENNIE JEANETTE
GOSS HASSAN IN HER CAPACITY AS ADMINISTRATOR
OF OUACHITA NURSING AND REHABILITATION CENTER          **DEFENDANTS**



## ANSWER TO COMPLAINT

Comes now the Separate Defendant, Jeanette Goss, in her capacity as Administrator of

Diversicare Leasing Corp., d/b/a Ouachita Nursing and Rehabilitation Center (hereinafter "Ms.

Goss" or "Defendant"), by and through her attorneys, Hardin, Jesson & Terry, PLC, and for her

Answer to Plaintiff's Complaint, with respect to the allegations against her arising prior to

September 1, 2013, states as follows:

1.  Defendant admits that an Order appointing Plaintiff as Personal Representative for the

Estate of Ozie Edwards is attached as Exhibit A to Plaintiff's Complaint, and that document speaks

for itself.  Defendant is without sufficient information, knowledge, or belief to admit or deny the

remaining allegations set forth in Paragraph 1 of Plaintiff's Complaint and, therefore, those allegations are denied.  Defendant denies that Plaintiff is entitled to any damages.

2.   Upon information and belief, Defendant admits the allegations set forth in Paragraph 2 of Plaintiff's Complaint.

3.   Mr. Edwards's facility charts and medical records most accurately reflect his dates of residency in any long-term care facility, including Diversicare Leasing Corp., d/b/a Ouachita Nursing and Rehabilitation Center, and his date of death.  To the extent the allegations contained in Paragraph 3 of Plaintiff's Complaint are inconsistent with those documents, the allegations are denied.

4.   The allegations set forth in Paragraph 4 of Plaintiff's Complaint are directed toward another Defendant in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

5.   The allegations set forth in Paragraph 5 of Plaintiff's Complaint are directed toward another Defendant in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

6.   The allegations set forth in Paragraph 6 of Plaintiff's Complaint are directed toward another Defendant in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

7.   The allegations set forth in Paragraph 7 of Plaintiff's Complaint are directed toward another Defendant in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

8. The allegations set forth in Paragraph 8 of Plaintiff's Complaint are directed toward another Defendant in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

9. The allegations set forth in Paragraph 9 of Plaintiff's Complaint are directed toward another Defendant in this action, and therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

10. The allegations set forth in Paragraph 10 of Plaintiff's Complaint are directed toward another Defendant in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

11. The allegations set forth in Paragraph 11 of Plaintiff's Complaint are directed toward another Defendant in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

12. The allegations set forth in Paragraph 12 of Plaintiff's Complaint are directed toward another Defendant in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

13. The allegations set forth in Paragraph 13 of Plaintiff's Complaint are directed toward another Defendant in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

14. The allegations set forth in Paragraph 14 of Plaintiff's Complaint are directed toward another Defendant in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

15. The allegations set forth in Paragraph 15 of Plaintiff's Complaint are directed toward another Defendant in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

16. The allegations set forth in Paragraph 16 of Plaintiff's Complaint are directed toward another Defendant in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

17. The allegations set forth in Paragraph 17 of Plaintiff's Complaint are directed toward another Defendant in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

18. The allegations set forth in Paragraph 18 of Plaintiff's Complaint are directed toward another Defendant in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

19. The allegations set forth in Paragraph 19 of Plaintiff's Complaint are directed toward another Defendant in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

20. The allegations set forth in Paragraph 20 of Plaintiff's Complaint are directed toward another Defendant in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

21. Defendant admits that she was the administrator of Diversicare Leasing Corp., d/b/a Ouachita Nursing and Rehabilitation Center, during the residency of Mr. Edwards, through and including August 31, 2013.  Defendant also admits the service of process allegations in Paragraph 21 of Plaintiff's Complaint.  Defendant denies the remaining allegations in this paragraph.

22. Paragraph 22 of Plaintiff's Complaint fails to state facts against Defendant as required by Rule 8 of the Arkansas Rules of Civil Procedure and, therefore, no response is required from Defendant. To the extent Paragraph 22 is construed to state facts as against Defendant, the allegations are denied.

23. Paragraph 23 of Plaintiff's Complaint fails to state facts against Defendant as required by Rule 8 of the Arkansas Rules of Civil Procedure and, therefore, no response is required from Defendant. To the extent Paragraph 23 is construed to state facts against Defendant, the allegations are denied.

24. Paragraph 24 of Plaintiff's Complaint fails to state facts against Defendant as required by Rule 8 of the Arkansas Rules of Civil Procedure and, therefore, no response is required from Defendant. To the extent Paragraph 24 is construed to state facts against Defendant, the allegations are denied.

25. Defendant has no objection to jurisdiction and venue in this Court.

26. Mr. Edwards's facility charts and medical records most accurately reflect his dates of residency in any long-term care facility, including Diversicare Leasing Corp., d/b/a Ouachita Nursing and Rehabilitation Center, or hospital and his date of death. To the extent the allegations contained in Paragraph 26 of Plaintiff's Complaint are inconsistent with those documents, the allegations are denied.

27. The allegations contained in Paragraph 27 of Plaintiff's Complaint are denied.

28. Defendant admits that Diversicare Leasing Corp., d/b/a Ouachita Nursing and Rehabilitation Center, was certified for participation in the Medicaid-Medicare program, and was, therefore, required to comply with certain federal regulations applicable to such certification. The remaining allegations contained in Paragraph 28 of Plaintiff's Complaint, including sub-parts (a)

through (d), consist of legal conclusions and arguments of counsel to which no responsive pleading is required.  To the extent that any additional responsive pleading may be required, the allegations are denied.

29. The allegations contained in the first sentence of Paragraph 29 of Plaintiff's Complaint are denied.  With respect to the remaining allegations in this paragraph, including sub-parts (a) through (d), Defendant states affirmatively that the surveys in question speak for themselves.  To the extent the remaining allegations in this paragraph are inconsistent with the surveys referenced, the allegations are denied.  Defendant denies that the deficiencies referenced in this paragraph are relevant to the alleged injuries suffered by Mr. Edwards.

30. The first three sentences of Paragraph 30 of Plaintiff's Complaint consist of legal arguments and conclusions of counsel to which no response is required by Defendant.  To the extent a response is required, the allegations are denied.  With respect to the fourth sentence of this paragraph, Defendant admits that as Administrator, she was a member of the governing body of Diversicare Leasing Corp., d/b/a Ouachita Nursing and Rehabilitation Center.   The remaining allegations in the fourth sentence of this paragraph consist of legal conclusions and arguments of counsel to which no responsive pleading is required.  To the extent that any responsive pleading may be required, the allegations are denied.

31. The allegations contained in Paragraph 31 of Plaintiff's Complaint are denied, including sub-parts (a) through (h).

32. The allegations contained in Paragraph 32 of Plaintiff's Complaint are denied.

33. The allegations contained in Paragraph 33 of Plaintiff's Complaint are denied.

34. The allegations contained in Paragraph 34 of Plaintiff's Complaint are denied.

35. The allegations contained in Paragraph 35 of Plaintiff's Complaint are denied.

36. The allegations contained in Paragraph 36 of Plaintiff's Complaint are denied.

37. The allegations contained in Paragraph 37 of Plaintiff's Complaint are denied.

38. With respect to the allegations contained in Paragraph 38 of Plaintiff's Complaint, Defendant incorporates by this reference all allegations and denials previously set forth in this Answer.

39. The allegations set forth in Paragraphs 39, 40, 41, 42, 43, 44, 45, 46, 47, 48 and 49 of Plaintiff's Complaint, together with all subparts, are directed toward other Defendants in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

40. With respect to the allegations contained in Paragraph 50 of Plaintiff's Complaint, Defendant incorporates by this reference all allegations and denials previously set forth in this Answer.

41. The allegations set forth in Paragraphs 51, 52, 53, 54, 55, 56 and 57 of Plaintiff's Complaint, together with all subparts, are directed toward other Defendants in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

42. With respect to the allegations contained in Paragraph 58 of Plaintiff's Complaint, Defendant incorporates by this reference all allegations and denials previously set forth in this Answer.

43. The allegations set forth in Paragraphs 59, 60, 61, 62, 63 and 64 of Plaintiff's Complaint, together with all subparts, are directed toward other Defendants in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

44. With respect to the allegations contained in Paragraph 65 of Plaintiff's Complaint, Defendant incorporates by this reference all allegations and denials previously set forth in this Answer.

45. The allegations set forth in Paragraphs 66, 67, 68, 69, 70, 71, 72, 73 and 74 of Plaintiff's Complaint, together with all subparts, are directed toward other Defendants in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

46. With respect to the allegations contained in Paragraph 75 of Plaintiff's Complaint, Defendant incorporates by this reference all allegations and denials previously set forth in this Answer.

47. The allegations set forth in Paragraphs 76, 77, 78, 79, 80 and 81 of Plaintiff's Complaint, together with all subparts, are directed toward other Defendants in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

48. With respect to the allegations contained in Paragraph 82 of Plaintiff's Complaint, Defendant incorporates by this reference all allegations and denials previously set forth in this Answer.

49. In response to Paragraph 83 of Plaintiff's Complaint, Defendant admits that she served as Administrator of Diversicare Leasing Corp., d/b/a Ouachita Nursing and Rehabilitation Center, during Mr. Edwards's residency, through and including August 31, 2013.

50. The allegations in the first four sentences of Paragraph 84 of Plaintiff's Complaint consist of legal conclusions and arguments of counsel to which no responsive pleading is required.

To the extent that any responsive pleading may be required, the allegations are denied. Defendant denies the remaining allegations in this paragraph.

51. With respect to the allegations contained in Paragraph 85 of Plaintiff's Complaint, Defendant incorporates by this reference all allegations and denials previously set forth in this Answer.

52. The allegations set forth in Paragraph 86 of Plaintiff's Complaint consist of legal conclusions and arguments of counsel to which no responsive pleading is required. To the extent that any responsive pleading may be required, the allegations are denied.

53. Defendant denies the allegations set forth in Paragraph 87 of Plaintiff's Complaint, including sub-parts (a) through (h).

54. Defendant denies the allegations set forth in Paragraph 88 of Plaintiff's Complaint.

55. Defendant denies the allegations in Paragraph 89 of Plaintiff's Complaint. Defendant further denies that Plaintiff is entitled to the relief requested in this paragraph.

56. With respect to the allegations contained in Paragraph 90 of Plaintiff's Complaint, Defendant incorporates by this reference all allegations and denials previously set forth in this Answer.

57. The allegations set forth in Paragraphs 91, 92, 93 and 94 of Plaintiff's Complaint are directed toward other Defendants in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

58. With respect to the allegations contained in Paragraph 95 of Plaintiff's Complaint, Defendant incorporates by this reference all allegations and denials previously set forth in this Answer.

59. The allegations set forth in Paragraphs 96, 97, 98 and 99 of Plaintiff's Complaint are directed toward another Defendant in this action and, therefore, no response is required by this Defendant. To the extent a response is deemed required, the allegations are denied.

60. All allegations contained in the WHEREFORE or Prayer for Relief paragraph of Plaintiff's Complaint are denied, including subparts (1) through (6) thereof.

61. Defendant denies that she was negligent in any respect.  Additionally, Defendant denies all allegations contained in Plaintiff's Complaint that are not specifically admitted herein.

62. Defendant denies that Plaintiff is entitled to any damages.

63. Pleading further, and in the affirmative, Defendant assert the defenses of statute of limitation, comparative negligence, intervening cause, Act of God, waiver, estoppel, laches and negligence or intentional acts of third parties over whom Defendant exercises no dominion or control as complete and/or partial bars to any recovery by the Plaintiff herein.  Defendant further states in the affirmative that all of Plaintiff's claims are subsumed by the Arkansas Medical Malpractice Act.

64. Defendant affirmatively asserts that Plaintiff's claims are barred, in whole or in part, because any damages allegedly suffered were not proximately caused by Defendant's conduct.

65. Defendant affirmatively asserts the right to plead further, including reservation of all affirmative defenses allowed under Arkansas law which are required to be pled in the initial pleading and all third party claims which may be appropriate.

66. Without alleging fault on behalf of any named Defendant, Defendant affirmatively asserts the application of the Arkansas Uniform Contribution Among Joint Tortfeasors Act, Ark. Code Ann. § 16-61-201 *et seq.*, and Arkansas joint and several liability law and contribution law, to the extent appropriate at the trial of this matter.

67. Defendant affirmatively pleads that Plaintiff's Complaint fails to state facts sufficient to justify an award of punitive damages.

68. Defendant affirmatively pleads and asserts that any claim for punitive damages is pre-empted by the federal statutory and regulatory scheme related to nursing homes.

69. Defendant affirmatively pleads that Plaintiff's claim for punitive damages cannot be sustained because an award of punitive damages under Arkansas law by a jury does not provide constitutionally adequate standards of sufficient clarity for determining the appropriate imposition of, and the appropriate size of, a punitive damages award.

70. Defendant affirmatively pleads that Plaintiff's claim for punitive damages against Defendant is barred, in whole or in part, because an award of punitive damages under Arkansas law would violate the Defendant's due process rights and equal protection rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 2, 3 and 8 of the Arkansas Constitution.

71. Defendant affirmatively pleads that Plaintiff's claim for punitive damages cannot be sustained because Arkansas law regarding the standards for determining liability for and the amount of punitive damages fail to give Defendant prior notice of the conduct for which punitive damages may be imposed, and the severity of the penalty that may be imposed, and are void for vagueness in violation of Defendant's due process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 2, 3 and 8 of the Arkansas Constitution.

72. Defendant affirmatively asserts that Plaintiff's claims for punitive damages against Defendant cannot be sustained, because an award of punitive damages under Arkansas law, subject to no predetermined limit, such as a maximum multiple of compensatory damages, or a maximum amount on the amount of punitive damages that may be imposed, would violate Defendant's due

11

process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 2, 3 and 8 of the Arkansas Constitution.

73. Defendant affirmatively pleads that Plaintiff's claims for punitive damages against Defendant cannot be sustained, because an award of punitive damages under Arkansas law which allows Plaintiff to prejudicially emphasize the corporate status of any Defendant violates such Defendant's due process and equal protection rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 2, 3 and 8 of the Arkansas Constitution, and would be improper under the common law and public policy of Arkansas.

74. Defendant affirmatively asserts that Plaintiff's claim for punitive damages against Defendant cannot be sustained because any award of punitive damages made under a process which fails to bifurcate the issue of punitive damages from the remaining issues would violate Defendant's due process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 2, 3 and 8 of the Arkansas Constitution, and would be improper under the common law and public policy of Arkansas.

75. Defendant affirmatively asserts that Plaintiff's claim for punitive damages cannot be sustained because an award of punitive damages under Arkansas law by a jury that (1) is not provided constitutionally adequate standards of sufficient clarity for determining the appropriate imposition of, and the appropriate size of, a punitive damages award, (2) is not adequately instructed on the limits of punitive damages imposed by the applicable principles of deterrence and punishment, (3) is not expressly prohibited from awarding punitive damages, or determining the amount of an award for punitive damages, in whole or in part on the basis of invidiously discriminatory characteristics, including without limitation the residence, wealth and corporate status of any Defendant, (4) is permitted to award punitive damages under a standard for

determining liability for punitive damages that is vague and arbitrary and does not define with sufficient clarity the conduct or mental state that makes punitive damages permissible, (5) is not properly instructed regarding Plaintiff's burden of proof with respect to each and every element of a claim for punitive damages, and (6) is not subject to trial court and appellate judicial review for reasonableness and furtherance of legitimate purposes on the basis of constitutionally adequate and objective standards.   This would violate Defendant's due process and equal protection rights guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution and Article II, Sections 2, 3 and 8 of the Arkansas Constitution, and would be improper under the common law and public policy of Arkansas.

76. Plaintiff's claim for punitive damages against Defendant cannot be sustained, because an award of punitive damages in this case, combined with any prior, contemporaneous, or subsequent judgments against Defendant for punitive damages, would constitute impermissible multiple punishments in violation of Defendant's due process and equal protection rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, and Article II, Sections 2, 3 and 8 of the Arkansas Constitution.

77. Defendant affirmatively asserts that the claim against her fails to state a cause of action upon which relief can be granted and should be dismissed as a matter of law.

78. Defendant affirmatively asserts that Plaintiff's claim of negligence is drafted as a medical negligence claim and is, therefore, superseded by the Arkansas Medical Malpractice Act and should be dismissed.

79. Defendant denies that her conduct was grossly negligent, flagrant, willful, wanton, reckless, malicious, intentional, or conducted with conscious indifference to the rights of any resident, including Mr. Edwards.

WHEREFORE, Defendant prays that Plaintiff's Complaint be dismissed, for her costs herein expended, and for all other proper relief to which she is entitled.

Respectfully submitted,

HARDIN, JESSON & TERRY, PLC
Attorneys at Law
5000 Rogers Avenue, Suite 500
P. O. Box 10127
Fort Smith, AR  72917-0127
(479) 452-2200 – Phone
(479) 452-9097 – Fax

By: _____
Kirkman T. Dougherty
Arkansas Bar No. 91133

Stephanie I. Randall
Arkansas Bar No. 2000124

Attorneys for Separate Defendant

14

## CERTIFICATE OF SERVICE

I, Stephanie I. Randall, one of the attorneys for the Separate Defendant herein, do hereby certify that a true and correct copy of the above and foregoing pleading has been served upon counsel by depositing the same in the United States Postal Mail Service, postage prepaid, addressed to:

Mr. Brian D. Reddick
**Reddick Moss, PLLC**
One Information Way, Suite 105
Little Rock, Arkansas 72202

Mr. Robert M. Sexton
**Rainwater Holt & Sexton**
6315 Ranch Drive
Little Rock, AR  72223

Ms. Vicki Bronson
**CONNER & WINTERS, LLP**
4375 N. Vantage Dr., Suite 405
Fayetteville, AR  72703

on this 2nd day of February, 2015.

Stephanie I. Randall

**IN THE CIRCUIT COURT OF OUACHITA COUNTY, ARKANSAS**
**6th DIVISION**

Addie Edwards as Personal Representative of the
Estate of Ozie Edwards, and on behalf of the
wrongful death beneficiaries of Ozie Edwards                    **PLAINTIFFS**


vs.                                    **CASE NO. CV-2014-203-6**

Diversicare Leasing Corp. d/b/a Ouachita Nursing
and Rehabilitation Center; Diversicare Healthcare
Services, Inc.; Diversicare Management Services Co.;
Advocat Ancillary Services, LLC; Omega
Healthcare Investors, Inc.; Camden Operations, LLC
d/b/a Ouachita Nursing and Rehabilitation Center;
JEJ Investments, LLC; Sub-Ten Holdings, LLC; MasterTen,
LLC; Advanced Practice Solutions, LLC; ProCare
Therapy Services, LLC; Southern Administrative Services,
LLC; Ponthie Holdings, LLC; Professional Nursing
Solutions, LLC; John Ponthie; Ross Ponthie;
Mark Thompson; and Jennie Jeanette Goss Hassan
in her capacity as Administrator of
Ouachita Nursing and Rehabilitation Center                    **DEFENDANTS**



**SEPARATE DEFENDANT JENNIE JEANETTE GOSS HASSAN'S**
**ANSWER TO COMPLAINT FOR THE PERIOD ON OR AFTER**
**SEPTEMBER 1, 2013**

COMES NOW the Separate Defendant, Jennie Jeanette Goss Hassan, in her

capacity as Administrator of Ouachita Nursing and Rehabilitation Center (for the time

period on and after September 1, 2013) ("GOSS"), by and through her attorneys,

Conner & Winters, LLP, and for her Answer to the Plaintiff's Complaint, states the

following to-wit:

<u>JURISDICITONAL STATEMENT</u>

1.      The allegations contained in paragraphs 1 and 2 of the Plaintiff's

Complaint are not directed toward GOSS and therefore, do not call for a response on

her behalf.   To the extent that a response is required, or to the extent that these

1

allegations purport to show liability on the part of any Defendant, they are specifically denied.

2.      GOSS admits the allegations contained in paragraph 3.

3.      The allegations contained in paragraphs 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19 and 20 of the Plaintiff's Complaint are not directed toward GOSS and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

4.      In response to the allegations of paragraph 21 of Plaintiff's Complaint, GOSS admits that she was the Administrator of Ouachita Nursing and Rehabilitation Center during the residency of Ozie Edwards.  GOSS denies the remaining allegations contained in paragraph 21 of the Plaintiff's Complaint.

5.      The allegations contained in paragraph 22 of the Plaintiff's Complaint are not directed toward GOSS and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

6.      The allegations contained in paragraph 23 of Plaintiff's Complaint do not require a response.

7.      In response to the allegations of paragraph 24 of Plaintiff's Complaint object to the Plaintiffs "lumping" of all defendants together as "Defendants".  Each Defendant is entitled to proper notice of the claims against her as a matter of due process and under the Arkansas pleading requirements.  To the extent the statements

2

contained in paragraph 24 of Plaintiffs' Complaint purport to show liability on the part of any Defendant, they are specifically denied.

8.    GOSS admits the allegations contained in paragraph 25 of Plaintiff's Complaint.

<u>FACTUAL ALLEGATIONS</u>

9.    Upon information and belief, GOSS admits the allegations contained in paragraphs 26 of the Plaintiff's Complaint.

10.    In response to the allegations paragraph 27 of the Plaintiffs' Complaint, GOSS defers to the medical records reflecting Mr. Edwards' medical condition and associated treatment and state the medical records speak for themselves.  To the extent the allegations of paragraph 27 purport to show liability on the part of any Defendant, they are denied.

11.    GOSS admits the allegations contained in paragraph 28 of Plaintiff's Complaint.

12.    GOSS denies the allegations contained in paragraph 29 of the Plaintiff's Complaint.

13.    In response to the allegations contained in paragraph 30 of Plaintiff's Complaint, GOSS states that the Rules and Regulations of the Arkansas Office of Long Term Care and Code of Federal Regulations speak for themselves, and to the extent the allegations contained in paragraph 30 of the Plaintiff's Complaint seek to expand or interpret the terms thereof beyond those set forth therein, such allegations are denied. To the extent the allegations of paragraph 30 purport to show liability on the part of any Defendant, GOSS denies the same.

14.     GOSS denies the allegations contained in paragraph 31 of the Plaintiff's Complaint.

15.     GOSS denies the allegations contained in paragraphs 32, 33, 34, 35, 36, and 37 of the Plaintiff's Complaint.

<u>CAUSES OF ACTION AGAINST THE NURSING HOME DEFENDANTS</u>

<u>COUNT ONE:  NEGLIGENCE</u>

16.     In response to paragraph 38, GOSS incorporates each of her responses to paragraphs 1-37 herein.

17.     The allegations contained in paragraphs 39, 40, 41, 42, and 43 of the Plaintiff's Complaint are non-factual in nature and allege issues of law.  To the extent a response is required or to the extent the allegations of paragraphs 39, 40, 41, 42, and 43 purport to show liability on the part of any Defendant, GOSS denies the same.

18.     The allegations contained in paragraph 44, including subparts (a) through (n) of the Plaintiff's Complaint are not directed toward GOSS and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

19.     The allegations contained in paragraph 45 of the Plaintiff's Complaint are non-factual in nature and allege issues of law.  To the extent a response is required or to the extent the allegations of paragraph 45 purport to show liability on the part of any Defendant, GOSS denies the same.

20.     The allegations contained in paragraphs 46, 47, and 48 of Plaintiff's Complaint are not directed toward GOSS and therefore, do not call for a response on

her behalf.   To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

21.    GOSS denies the allegations of paragraph 49 of Plaintiff's Complaint.

<u>COUNT TWO:  MEDICAL MALPRACTICE</u>

22.    In response to paragraph 50, GOSS incorporates each of her responses to paragraphs 1-49 herein.

23.    The allegations contained in paragraphs 51, 52, and 53 of the Plaintiff's Complaint are non-factual in nature and allege issues of law.  To the extent a response is required or to the extent the allegations of paragraphs 51, 52, and 53 purport to show liability on the part of any Defendant, GOSS denies the same.

24.    The allegations contained in paragraphs 54, 55, 56, and 57 of the Plaintiff's Complaint are not directed toward GOSS and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

<u>COUNT THREE:  BREACH OF THE ADMISSION AGREEMENT</u>

25.    In response to paragraph 58, GOSS incorporates each of her responses to paragraphs 1-57 herein.

26.    GOSS is without sufficient information to admit or deny the allegations contained in paragraphs 59 and 60 of the Plaintiff's Complaint, and accordingly denies the same and demands strict proof thereof.

27.    The allegations contained in paragraphs 61, 62, 63, and 64 of the Plaintiff's Complaint are not directed toward GOSS and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

<u>COUNT FOUR:  BREACH OF THE PROVIDER AGREEMENT</u>

28.    In response to paragraph 65, GOSS incorporates each of her responses to paragraphs 1-64 herein.

29.    The allegations contained in paragraphs 66, 67, 68, 69, 70, 71, 72, 73, and 74 of the Plaintiff's Complaint are not directed toward GOSS and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

<u>COUNT FIVE:  DECEPTIVE TRADE PRACTICES</u>

30.    In response to paragraph 75, GOSS incorporates each of her responses to paragraphs 1-74 herein.

31.    The allegations contained in paragraphs 76, 77, and 78 of the Plaintiff's Complaint are non-factual in nature and allege issues of law.  The Arkansas Deceptive Trade Practices Act speaks for itself, and to the extent the allegations contained in paragraphs 76, 77, and 78 of the Plaintiff's Complaint seek to expand or interpret the terms thereof beyond those set forth therein, such allegations are denied.  To the extent the allegations of paragraphs 76, 77, and 78 purport to show liability on the part of any Defendant, GOSS denies the same.

32.     The allegations contained in paragraphs 79, 80, and 81 of the Plaintiff's Complaint are not directed toward GOSS and therefore, do not call for a response on her behalf.   To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

## CAUSES OF ACTION AGAINST THE ADMINISTRATOR DEFENDANT

### FACTUAL ALLEGATIONS

33.     In response to paragraph 82, GOSS incorporates each of her responses to paragraphs 1-81 herein.

34.     GOSS admits the allegations contained in paragraph 83 of the Plaintiff's Complaint.

35.     GOSS denies the allegations contained in paragraph 84 of the Plaintiff's Complaint.

### NEGLIGENCE

36.     In response to paragraph 85, GOSS incorporates each of her responses to paragraphs 1-84 herein.

37.     The allegations contained in paragraph 86 of the Plaintiff's Complaint are non-factual in nature and allege issues of law.   To the extent a response is required or to the extent the allegations of paragraph 86 purport to show liability on the part of any Defendant, GOSS denies the same.

38.      GOSS denies the allegations contained in paragraph 87, 88, and 89 of the Plaintiff's Complaint.

## CAUSES OF ACTION AGAINST OMEGA HEALTHCARE INVESTORS, INC.

## FACTUAL ALLEGATIONS

39.    In response to paragraph 90, GOSS incorporates each of her responses to paragraphs 1-89 herein.

40.    The allegations contained in paragraphs 91, 92, 93, and 94 of the Plaintiff's Complaint are not directed toward GOSS and therefore, do not call for a response on her behalf.   To the extent a response is required or to the extent the allegations of paragraphs 91, 92, 93, and 94 purport to show liability on the part of any Defendant, GOSS denies the same.

## NEGLIGENCE

41.    In response to paragraph 95, GOSS incorporates each of her responses to paragraphs 1-94 above.

42.    The allegations contained in paragraphs 96, 97, 98, and 99 of the Plaintiff's Complaint are not directed toward GOSS and therefore, do not call for a response on her behalf. To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

## PRAYER FOR RELIEF

43.    GOSS denies all allegations contained in the Plaintiff's Prayer for Relief.

44.    GOSS denies all allegations contained in the Plaintiff's Complaint not specifically admitted herein.

45.    GOSS denies all allegations contained in any subsequent amendment to the Plaintiff's Complaint unless specifically admitted by GOSS in a responsive pleading thereto.

46.     GOSS asserts that Plaintiff's Complaint fails to state a cause of action against her and should be dismissed pursuant to Arkansas Rule of Civil Procedure 12(b)(6).

47.     In the event applicable and pending further investigation of this matter, GOSS asserts all affirmative defenses and all defensive motions allowed under Arkansas law and the Arkansas Rules of Civil Procedure, including but not limited to:

a.      Insufficiency of process;
b.      Insufficiency of service of process;
c.      Failure to perfect service of process within the time allowed by Rule 4 of the Arkansas Rules of Civil Procedure;
d.      Failure to join an indispensable party pursuant to Rule 19 of the Arkansas Rules of Civil Procedure;
e.      Failure to prosecute in the name of the real party in interest;
f.      Failure to states facts upon which relief may be granted;
g.      Waiver;
h.      Estoppel;
i.      Failure of consideration;
j.      Unclean hands;
k.      Set-off;
l.      Impossibility;
m.      Plaintiff's prevention of performance;
n.      Release;
o.      Statute of limitations;
p.      Election of remedies; and
q.      All other available contract defenses.

48.     Pleading in the affirmative, GOSS states that any damages suffered by the Plaintiff, the same being denied, were proximately caused by third parties for whom GOSS is not legally responsible.

49.     It is denied that GOSS engaged in any act or omission that would give rise to an actionable claim on the part of Plaintiff.

50.     GOSS pleads the affirmative defenses of independent intervening cause as the sole and/or concurring proximate cause for this accident; comparative fault on

the part of Plaintiff which was a proximate result of Plaintiff's loss or damage; contributory negligence on the part of Plaintiff or others over whom GOSS held no control, including the failure to avoid a known condition, which was a proximate result of Plaintiff's loss or damage; assumption of risk on the part of Plaintiff; failure to mitigate damages on the part of Plaintiff; the acts or omissions of other parties for whom GOSS is not responsible which was a proximate result of Plaintiff's loss or damages, all of which serve as a bar to any recovery against GOSS or in the alternative, in diminution of any alleged damages; and for the proration of fault, including the right to recover contribution from co-Defendants or Plaintiff and for which GOSS hereby makes a claim for contribution recovery if she is required to pay more than her prorata share, to the extent supported by current facts or those facts developed in the course of this lawsuit.

51. GOSS pleads all provisions of the Civil Justice Reform Act of 2003, A.C.A. § 16-55-201, et seq, including all of its provisions, as a prohibition of, reduction of, or bar to the claims in this case against GOSS.

52. GOSS states that an Arbitration Agreement may exist between the parties. GOSS reserves the right to enforce any applicable Arbitration Agreement after conducting an initial investigation. GOSS files this Answer in accordance with the Arkansas Rules of Civil Procedure. The filing of this Answer should neither be construed as GOSS invoking the litigation process nor as a waiver of GOSS's right to compel arbitration in this matter.

53. GOSS affirmatively pleads that the Complaint fails to state facts sufficient to justify an award of punitive damages.

54.     GOSS denies that her conduct was grossly negligent, willful, wanton, reckless, malicious, intentional, or conducted with conscious indifference to the rights of the Plaintiff.

55.     GOSS affirmatively pleads that any claim for punitive damages is preempted by the federal statutory and regulatory scheme related to nursing homes.

56.     GOSS affirmatively pleads that Plaintiff's claim for punitive damages cannot be sustained because an award of punitive damages under Arkansas law by a jury does not provide constitutionally adequate standards of sufficient clarity for determining the appropriate size of a punitive damages award.

57.     GOSS affirmatively pleads that Plaintiff's claim for punitive damages against GOSS is barred, in whole or in part, because an award of punitive damages under Arkansas law would violate GOSS's due process rights and equal protection rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article II, §§ 2, 3, and 8 of the Arkansas Constitution.

58.     GOSS affirmatively pleads that Plaintiff's claim for punitive damages cannot be sustained because Arkansas law regarding the standards for determining liability for and the amount of punitive damages fails to give GOSS prior notice of the conduct for which punitive damages may be imposed, and the severity of the penalty that may be imposed, and are void for vagueness in violation of GOSS's due process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article II, §§ 2, 3, and 8 of the Arkansas Constitution.

59.     GOSS affirmatively asserts that Plaintiff's claims for punitive damages against GOSS cannot be sustained, because an award of punitive damages under

11

Arkansas law, subject to no predetermined limit, such as a maximum multiple of compensatory damages, or a maximum amount on the amount of punitive damages that may be imposed, would violate GOSS's due process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article II, §§ 2, 3, and 8 of the Arkansas Constitution.

60.    GOSS affirmatively asserts that Plaintiff's claim for punitive damages cannot be sustained by a jury that (1) is not provided constitutionally adequate standards of sufficient clarity for determining the appropriate imposition of, and the appropriate size of, a punitive damages award, (2) is not adequately instructed on the limits of punitive damages imposed by the applicable principles of deterrence and punishment, (3) is not expressly prohibited from awarding punitive damages, or determining the amount of an award for punitive damages, in whole or in part on the basis of invidiously discriminatory characteristics, including without limitation the residence, wealth and corporate status of the Defendants, (4) is not expressly prohibited from awarding punitive damages, or determining the amount of an award of punitive damages, in whole or in part directly on the basis of injury upon non-parties, (5) is not provided constitutionally adequate procedures to protect against the risk of an award of punitive damages that seeks to punish a defendant for having caused injury to others, (6) is permitted to award punitive damages under a standard for determining liability for punitive damages that is vague and arbitrary and does not define with sufficient clarity the conduct or mental states that makes punitive damages permissible, (7) is not properly instructed regarding Plaintiff's burden of proof with respect to each and every element of a claim for punitive damages, and (8) is not subject to trial court and

appellate judicial review for reasonableness and furtherance of legitimate purposes on the basis of constitutionally adequate and objective standards. This would violate GOSS's due process and equal protection rights guaranteed by the Fifth and Fourteenth Amendments of the United States Constitution and Article II, §§ 2, 3 and 8 of the Arkansas Constitution, and would be improper under the common law and public policy of Arkansas.

61. GOSS affirmatively asserts that Plaintiff's claim for punitive damages against GOSS cannot be sustained because any award of punitive damages made under a process which fails to protect against the risk of a jury awarding punitive damages, or determining the amount of an award of punitive damages, in whole or in part, to punish GOSS for having caused injury to non-parties would violate GOSS's due process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article II, §§ 2, 3, and 8 of the Arkansas Constitution, and would be improper under the common law and public policy of Arkansas. *See Philip Morris USA v. Williams*, 127 S. Ct. 1057 (2007).

62. Plaintiff's claim for punitive damages against GOSS cannot be sustained, because an award of punitive damages in this case, combined with any prior, contemporaneous, or subsequent judgments against GOSS for punitive damages, would constitute impermissible multiple punishments in violation of GOSS's due process and equal protection rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, and Article II, §§ 2, 3, and 8 of the Arkansas Constitution.

63. Pleading in the affirmative, GOSS states that any claim for punitive damages asserted by the Plaintiff cannot be sustained because any award of punitive

13

damages without bifurcating the trial as to all punitive damages issues, would violate GOSS's due process rights guaranteed by the Fourteenth Amendment to the United States Constitution, the Civil Justice Reform Act of 2003, and similar applicable provisions of the Arkansas Constitution.

64.    GOSS reserves the right to amend this Answer, and to raise such other defenses, join such additional parties, and raise such additional claims as investigation of the facts alleged herein may warrant.

WHEREFORE, the Separate Defendant, Jennie Jeanette Goss Hassan, in her capacity as Administrator of Ouachita Nursing and Rehabilitation Center (for the time period on and after September 1, 2013), respectfully prays that the Plaintiff's Complaint be dismissed in its entirety and that she take nothing thereby, for her costs and attorney's fees in defending this matter, and for all other relief to which she may be entitled.

Respectfully submitted,

JENNIE JEANETTE GOSS HASSSAN, IN HER CAPACITY AS ADMINISTRATOR OF OUACHITA NURSING AND REHABILITATION CENTER (for the time period on and after September 1, 2013)

By: _____
Amy M. Wilbourn (Ark. Bar No. 2003166)
Vicki Bronson (Ark. Bar No. 97058)
 4375 N. Vantage Dr., Suite 405
 Fayetteville, AR 72703
 (479) 582-5711 Telephone
 (479) 587-1426 Facsimile
 Email:  awilbourn@cwlaw.com
 Email:  vbronson@cwlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was mailed to the following on this the 3rd day of February, 2015:

Brian D. Reddick
Brent L. Moss
Robert W. Francis
Matthew D. Swindle
REDDICK MOSS, PLLC
One Information Way, Suite 105
Little Rock, AR  72202

Robert M. Sexton
RAINWATER, HOLT & SEXTON
6315 Ranch Drive
Little Rock, AR  72223

Stephanie Randall
HARDIN, JESSON & TERRY, PLC
P.O. Box 10127
Fort Smith, AR 72917-0127

Vicki Bronson

**IN THE CIRCUIT COURT OF OUACHITA COUNTY, ARKANSAS**
**SIXTH DIVISION**

FILED

2015 JUN 23 PM 4 04

*Kathy Bass*

OUACHITA COUNTY, ARK
BETTY WILSON
CIRCUIT CLERK

Addie Edwards, as Personal Representative of the
Estate of Ozie Edwards, and on behalf of the
wrongful death beneficiaries of Ozie Edwards;
Gaile Wolfe, as Personal Representative of the
Estate of Myrtle Key, and on behalf of the wrongful
death beneficiaries of Myrtle Key;
and All Others Similarly Situated                                            PLAINTIFFS


vs.                              CASE NO. CV-2014-203-6


Diversicare Leasing Corp. d/b/a Ouachita Nursing
and Rehabilitation Center; Diversicare Healthcare
Services, Inc.; Diversicare Management Services Co.;
Advocat Ancillary Services, LLC; and Jennie Jeanette Goss Hassan
in her capacity as Administrator of
Ouachita Nursing and Rehabilitation Center                                  DEFENDANTS


**CLASS ACTION COMPLAINT**
**AND FIRST AMENDED COMPLAINT**

COMES NOW, the Plaintiffs, on behalf of themselves and all others similarly situated,
by and through their attorneys, Reddick Moss, PLLC, and the Campbell Law Firm, P.A., and for
their causes of action against the Defendants, state as follows:

**INTRODUCTION**

1.      The class claims of this Complaint are that the Defendants were chronically
understaffed so as to breach the residents' statutory and contractual rights and constituting
negligence. This complaint includes a request that a class be certified consisting of all residents
and estates of residents who resided at Ouachita Nursing and Rehabilitation Center("the
Facility") from November 24, 2009 through September 1, 2013, as well as a prayer for
compensatory, economic and punitive damages, attorney's fees, interest, and costs.

## CLASS ACTION COMPLAINT

### PARTIES

2.     Addie Edwards is Ozie Edwards's wife and the Personal Representative of the Estate of Ozie Edwards pursuant to an Order of the Ouachita County Circuit Court dated October 20, 2014, a copy of which is attached hereto as **Exhibit A.**

3.     Addie Edwards brings this action on behalf of Ozie Edwards, on behalf of the wrongful death beneficiaries of Ozie Edwards, and all other residents of Ouachita Nursing and Rehabilitation Center ("Plaintiff Class") for the period November 24, 2009, to September 1, 2013 ("Class Period").

4.     Other than hospitalizations, Ozie Edwards was a resident of Ouachita Nursing and Rehabilitation Center, a nursing home located at 1411 Country Club Road, Camden, Ouachita County, Arkansas, from approximately November 24, 2012 until September 1, 2013. Ozie Edwards died on November 12, 2013.

5.     Gaile Wolfe is Myrtle Key's daughter and the Personal Representative of the Estate of Myrtle Key pursuant to an Order of the Ouachita County Circuit Court dated June 23, 2015, a copy of which is attached hereto as **Exhibit B.**

6.     Gaile Wolfe brings this action on behalf of Myrtle Key, on behalf of the wrongful death beneficiaries of Myrtle Key, and all other residents of Ouachita Nursing and Rehabilitation Center ("Plaintiff Class") for the period November 24, 2009, to September 1, 2013 ("Class Period").

7.     Other than hospitalizations, Myrtle Key was a resident of Ouachita Nursing and Rehabilitation Center, a nursing home located at 1411 Country Club Road, Camden, Ouachita

County, Arkansas, from approximately May 2013 until August 2013. Myrtle Key died on August 22, 2013.

8.      Defendant Diversicare Leasing Corp. d/b/a Ouachita Nursing and Rehabilitation Center is a foreign corporation that owned, operated, managed, and held the license for the nursing home located at 1411 Country Club Road, Camden, Ouachita County, Arkansas known as Ouachita Nursing and Rehabilitation Center. The causes of action made the basis of this suit arise out of such business conducted by Defendant Diversicare Leasing Corp. d/b/a Ouachita Nursing and Rehabilitation Center in the ownership, operation, management, licensing and/or control of the facility during the Class Period. The agent for service of process for Defendant Diversicare Leasing Corp. is Corporation Service Company, 300 Spring Building, Suite 900, 300 S. Springs Street, Little Rock, Arkansas 72201, or any officer thereof.

9.      Defendant Diversicare Healthcare Services, Inc. is a foreign corporation and did business in the State of Arkansas by operating, managing and/or providing services for Ouachita Nursing and Rehabilitation Center. The causes of action made the basis of this suit arise out of such business conducted by Diversicare Healthcare Services, Inc. in the ownership, operation, control, management, and provision of services for the facility during the Class Period. The agent for service of process for Diversicare Healthcare Services, Inc. is Robert E. Rice, 1621 Galleria Boulevard, Brentwood, Tennessee 37027.

10.      Defendant Diversicare Management Services Co. is a foreign corporation and was authorized to do business and did business in the State of Arkansas by operating, managing, owning and providing services for Ouachita Nursing and Rehabilitation Center. The causes of action made the basis of this suit arise out of such business conducted by Diversicare Management Services Co. in the ownership, operation, control, management, and provision of

3

services for the facility during the Class Period. At all times material to this action, Diversicare Management Services Co. was a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiffs' damages. The agent for service of process for Diversicare Management Services Co. is Corporation Service Company, 300 Spring Building, Suite 900, 300 S. Springs Street, Little Rock, Arkansas 72201, or any officer thereof.

11.     Defendant Advocat Ancillary Services, Inc. is a foreign corporation and was authorized to do business and did business in the State of Arkansas by operating, managing, and providing services for Ouachita Nursing and Rehabilitation Center. The causes of action made the basis of this suit arise out of such business conducted by Advocat Ancillary Services, Inc. in the ownership, operation, control, management, and provision of services for the facility during the Class Period. At all times material to this action, Advocat Ancillary Services, Inc. was a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiffs' damages. The agent for service of process for Advocat Ancillary Services, Inc. is Corporation Service Company, 300 Spring Building, Suite 900, 300 S. Springs Street, Little Rock, Arkansas 72201, or any officer thereof.

12.     Upon information and belief, Defendant Jennie Jeanette Goss Hassan was the Administrator of Ouachita Nursing and Rehabilitation Center during the residency of Ozie Edwards. The causes of action made the basis of this suit arise out of Ms. Goss Hassan's administration of Ouachita Nursing and Rehabilitation Center during the Class Period. At all times material to this action, Jennie Jeanette Goss Hassan was a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiffs' damages. Defendant Jennie Jeanette Goss Hassan may be served with process at her last known address: 4381 Highway 7, Bismark, Arkansas 71929.

13.     The Defendants collectively controlled the operation, planning, management, and staffing of the Facility. The authority exercised by the Defendants over the Facility included, but was not limited to, control of marketing, human resources management, training, staffing, creation and implementation of policies and procedures used by the Facility, federal and state Medicare and Medicaid reimbursement, quality care assessment and compliance, licensure and certification, legal services, and financial, tax, and accounting control through fiscal policies established by the Defendants.

14.     The Defendants operated as a joint venture/enterprise for the purpose of streamlining and efficiency furthering their similar business interests, as the Facility, Diversicare Healthcare Services, Inc.; Diversicare Management Services Co.; and Advocat Ancillary Services, LLC were owned by and controlled by the same owners, managers, and decision makers.

15.     At all relevant times mentioned herein, the Defendants owned, operated and/or controlled the operation of the Facility, either directly or through the agency of each other and/or other agents, subsidiaries, servants, or employees.

16.     Because the Defendants named herein and others were engaged in a joint venture/enterprise during relevant times, the acts and omissions of each participant in the joint venture/enterprise are imputable to all other participants.  The actions of the Defendants and each of its servants, agents and employees as set forth herein, are imputed to each of the Defendants, jointly and severally.

### JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter and the parties to this action, and venue is proper in this Court.

## BACKGROUND AND FACTUAL ALLEGATIONS

18.     This case arises from Defendants' systemic failures to have sufficient staff at Ouachita Nursing and Rehabilitation Center to meet the needs of their residents which caused Plaintiffs and the proposed Plaintiff Class to suffer economic damages and the injuries described in more detail below.

19.     Persons admitted to the Facility have limitations caused by physical deterioration, cognitive decline, the onset or exacerbation of an acute or chronic illness or condition, or other related factors. They need nursing care, medical treatment, and rehabilitation to maintain functional status, increase functional status, or live safely from day to day. Many such residents are elderly, disabled, confined to their beds or unable to rise from a bed or chair independently, and unable to groom, feed, toilet, or clean themselves. Consequently, many nursing home residents rely upon nursing home staff for not only skilled nursing care and treatment, but also essential primary care (herein "Basic Care") including:

    (a)     Toileting assistance;

    (b)     Incontinence are and changing of wet and soiled clothing and linen;

    (c)     Assistance transferring to and from bed and wheelchair;

    (d)     Assistance with dressing and personal hygiene;

    (e)     Assistance with bathing;

    (f)     Assistance with turning and repositioning residents in bed or chair;

    (g)     Feeding assistance; and

    (h)     Exercises/passive range of motion ("ROM") exercises.

20.     Basic Care is primarily delivered by Certified Nursing Aides or "CNAs."

21.    Defendants limited the number of CNA staff on duty at Ouachita Nursing and Rehabilitation Center which rendered the Facility incapable of meeting the needs of the residents. With the limited budgets for CNA staffing, the supply of CNA hours fell far short of the hours needed to adequately care for the residents.

22.    The difference between the services that Defendants promised in their admission agreement and required by Arkansas statutory law and the services that Ouachita Nursing and Rehabilitation Centerwere capable of providing is profound.

23.    Analysis of survey results reported by the Office of Long Term Care confirm the chronic understaffing at Ouachita Nursing and Rehabilitation Center and the Defendants inability to provide the Basic Care services for which they were paid.

24.    More specifically, CNA understaffing led to a pattern and practice of failing to provide Basic Care Services at Ouachita Nursing and Rehabilitation Center to the residents during the Class Period. For example, Ouachita Nursing and Rehabilitation Center failed to provide adequate staff:

(a)    To regularly provide toileting, incontinence care, and basic hygiene care, leaving dependent residents in dirty diapers, dirty clothes, and dirty beds for hours at a time.

(b)    To timely respond to call lights rung by residents. Residents were left to soil themselves while waiting for assistance; others fell while attempting to walk to the bathroom unaided.

(c)    To re-position bed-bound and immobile residents; many residents remained in the same position for hours at a time, which can and sometimes did result in painful, infection-prone pressure sores.

(d)    To undertake ROM exercises – moving their joints and limbs, and assisting vulnerable residents who could walk or exercise. Without this assistance, residents lost mobility, rendering them even less independent.

(e)    To wash and bathe dependent residents;

(f)    To get dependent residents up, dressed, and out of bed.

(g)    To assist dependent residents with meals. Without help, some residents were unable to eat or drink in the time allotted, and some of them suffered weight loss and dehydration.

25.    These practices confirm that Ouachita Nursing and Rehabilitation Center did not provide the Basic Care that was required and paid for, and highlight the very human toll of understaffing the Facility. Defendants' understaffing practices saved them millions of dollars at the expense of the residents' dignity and comfort, and jeopardized their safety. As a result of chronic understaffing, residents at the Facility were left for long periods in their own urine and waste; were not cleaned, repositioned, or moved, resulting in infections, pressure sores, and loss of mobility; were deprived of food and water; and suffered falls. The failure to provide adequate staff not only violated the law and the contractual terms of the Admission Agreement, it also degraded residents and stripped them of their dignity.

26.    As even more specific proof of the chronic understaffing at Ouachita Nursing and Rehabilitation Center and the resulting harm to residents, surveys conducted by the Office of Long Term Care establish that the Defendants were on notice and aware of problems with understaffing at each facility causing harm to the residents. For example, from June 1, 2012 to June 20, 2013, Ouachita Nursing and Rehabilitation Center was cited for eight (8) health related deficiencies. Specifically, in a June 21, 2013 survey, Ouachita Nursing and Rehabilitation Center was cited for failing to "provide care qualified persons according to each resident's written plan of care. (actual harm)" In surveys conducted on April 5, 2013 and June 21, 2013, the facility was cited for numerous deficiencies relevant to the injuries suffered by Ozie Edwards, Myrtle Key and the Plaintiff Class including:

a.    Failure to make sure the nursing home area is free from accident hazards and risks and provides supervision to prevent avoidable accidents; and

b.    Failure to have a program that investigates, controls and keeps infection from spreading.

c.    Failure to provide care for residents in a way that keeps or builds each resident's dignity and respect of individuality; and

d.    Failure to assist those residents who need total help with eating/drinking, grooming and personal and oral hygiene.

27.    Under Arkansas law, the Department of Human Services which licenses nursing Facility to operate, "shall not issue or renew a license of a nursing facility unless that facility employs the direct-care staff needed to provide continuous twenty-four-hour nursing care and service to meet the needs of each resident of the nursing facility and the staffing standards required by all state and federal regulations." Ark. Code Ann. § 20-10-1402(a).

28.    Under Arkansas law, there are specific staffing standards regarding the minimum number of direct-care staff required in nursing Facility and "the staffing standard required…shall be the minimum number of direct-care staff required by nursing Facility and shall be adjusted upward to meet the care needs of residents." Ark. Code Ann. § 20-10-1402(b)(1). Therefore, a facility which provides staffing at the minimum number of direct-care givers required is not in compliance with Arkansas law as those staffing numbers "shall be adjusted upward to meet the care needs of residents." *Id.* By definition, failure to meet the minimum staffing requirements for direct-care under Arkansas law is also a direct violation of the federal law staffing requirements.

29.    Under Arkansas law for direct-care givers,

…all nursing Facility shall maintain the following minimum direct-care staffing-to-resident ratios:

(1) One (1) direct-care staff to every six (6) residents for the day shift. Of this direct-care staff, there shall be at least one (1) licensed nurse to every forty (40) residents;

(2) One (1) direct-care staff to every nine (9) residents for the evening shift. Of this direct-care staff, there shall be at least one (1)

licensed nurse to every forty (40) residents;

(3) One (1) direct-care staff to every fourteen (14) residents for the night shift. Of this direct-care staff, there shall be at least one (1) licensed nurse to every eighty (80) residents.

Ark. Code Ann. § 20-10-1403(a).

## CAUSES OF ACTION AGAINST THE DEFENDANTS

### CLASS CLAIMS

30.    Plaintiffs bring this action individually and in a representative capacity pursuant to Arkansas Rule of Civil Procedure 23 against the Defendants for violations of the Arkansas Deceptive Trade Practices Act, codified at Ark. Code Ann. 4-88-101, et. seq., breach of the provider agreement, breach of the Defendants' standard admission agreement, and negligence, on behalf of Ozie Edwards and all residents and estates of residents who resided at the Facility from November 24, 2009 to September 1, 2013. Excluded from the class are residents and estates of residents that have sued in the past or currently have lawsuits pending against any of the Defendants, employees of the Defendants, and all employees of the Court in which this case is pending.

31.    From November 24, 2009 to September 1, 2013, the Defendants provided custodial care to more than 500 residents at the Facility. The class plaintiffs are so numerous that joinder of all individual claims is impracticable.

32.    At or near the time of admission to the Facility, all residents were required to sign the same or substantially the same "Admission Agreement," an example of which is attached, marked as **Exhibit C**.

33.    In the Admission Agreement, the Defendants promised to provide "nursing services and supplies" in accordance with the Facility's handbook.

34.     The Defendants owed a non-delegable duty to the Plaintiff and Plaintiff Class to provide adequate and appropriate staffing at the Facility at all times, and Defendants knew that state and federal law, which the Defendants expressly incorporated into their Admission Agreements, required the Defendants to meet critical staffing requirements. These requirements include but are not limited to the following:

a.     Meeting requirements for minimum numbers of Facility staff members to be present at all times, Ark. Code Ann. § 20-10-1401 et seq.;

b.     Meeting requirements for the minimum number of staff members to be adjusted upward to meet the care needs of residents, Ark. Code. Ann. § 20-10-1401 et seq.;

c.     Meeting additional staffing requirements to assure that all residents receive the highest quality of life while protecting their health and welfare; Ark. Code Ann. § 20-10-1002 et seq.;

d.     Meeting the federal minimum standards imposed by the United States Department of Health and Human Services, 42 CFR Section 405-301 et seq. including providing sufficient nursing staff and nursing personnel to ensure that each resident attains and maintains the highest practical physical, mental, and psychosocial well-being. 42 CFR Section 483.30; and

e.     Meeting the requirements of other provisions of Arkansas and Federal law.

35.     In an effort to ensure that minimum staffing requirements are met, Arkansas law requires that Defendants honestly, accurately, regularly and truthfully:

a.     Post daily personnel sign-in sheets reflecting levels of staffing per shift, Ark. Code Ann. § 20-10-1406; and

b.     Submit to the Office of Long Term Care a written report of all shifts which failed to meet the minimum staffing requirements, Ark. Code Ann. § 20-10-1407.

36.     Defendants filed such reports knowing that they were inaccurate and misleading.

37.     By understaffing the Facility, Defendants saved significant money and profited at the expense of all residents. Defendants operated and managed the Facility so as to maximize profits by reducing staffing levels below that which was needed to provide adequate care to residents that would comply with federal and state regulations governing skilled nursing Facility. Thus, Defendants intentionally and/or with reckless disregard for the consequences of their actions caused staffing levels at the Facility to be set so that the personnel on duty at any given time could not reasonably meet the needs of the residents, causing injury to the residents at the Facility. The Defendants have created a broad corporate culture in which understaffing is a standard practice and in which Defendants sought reimbursement of funds from government sources for services not provided.

38.     All residents in the Facility were harmed by the Defendants' chronic and institutionalized understaffing. The lack of personnel in the Facility resulted in residents receiving a level of care (1) that was below the level of care that Defendants represented they were able to provide in their Admission Agreement, and (2) that failed to comply with state and federal minimum staffing requirements.

39.     The pervasive common question is whether the Facility were chronically understaffed so as to violate the residents' statutory and contractual rights and breached their legal duty to adequately staff the Facility. There are other questions of law and fact common to the Plaintiff Class which predominate over questions affecting only individual class members. Such common questions include, but are not limited to:

a.      Whether Defendants' standard Admission Agreement imposed minimum staffing requirements.

b.      Whether Ark. Code Ann. 20-10-1201, et. seq. imposes minimum staffing requirements.

c.     Whether Defendants failed to meet the minimum staffing requirements of Ark. Code Ann. 20-10-1201, et. seq., and the Defendants' standard admission agreement.

d.     Whether failure to meet minimum staffing requirements breaches the Defendants' standard admission agreement.

e.     Whether failure to meet minimum staffing requirements violates Ark. Code Ann. 20-10-1201, et. seq.

f.     Whether failure to meet the minimum staffing requirements of Ark. Code Ann. 20-10-1201, et. seq., is a violation of the Arkansas Deceptive Trade Practices Act.

g.     Whether the Defendants owed a duty to the residents to adequately staff the Facility;

h.     Whether the Defendants breach their duty to adequately staff the Facility;

i.     Whether failure to adequately staff the Facility is a breach of the provider agreement;

j.     Whether the admission agreement disclosed the Facility' history of understaffing;

k.     Whether Jennie Jeanette Goss Hassan; Diversicare Management Services Co.; and Advocat Ancillary Services, Inc. are control persons as defined in Ark. Code Ann. 4-88-113(d)(1) and therefore jointly and severally liable for the damages suffered by the Plaintiff Class for the Defendants' deceptive trade practices.

40.     The Plaintiffs will fairly and adequately protect the interest of the Plaintiff Class and have familiarity with the allegations expressed herein and are able to assist in decision making as to the conduct of this litigation.

41.     Plaintiffs' claims are typical of the claims of the class because the class representative's claims arise from the Defendants' standard and routine practice of failing to meet the minimum staffing requirements imposed by state law and their standard admission agreement. The chronic understaffing at the Facility made it impossible for the few staff that

were there to perform their tasks at a level which complied with the protections afforded by the Residents' Rights Act and at the levels promised by the Defendants' Admission Agreements.

42.     By understaffing the Facility, Defendants intentionally placed profits over people and knowingly took advantage of residents who were unable to protect their interests because of their physical and mental infirmities.  Systemic understaffing of the Facility directly resulted in undignified living conditions for the residents, a breach of the Admission Agreement, a breach of the provider agreement, a violation of state law, and a breach of the Facility' duty to adequately staff the Facility. The injuries sustained by the proposed class representatives are typical of the class and further evidence understaffing at the Facility.

43.     By understaffing the Facility, Defendants placed profits over compliance with state law. These decisions were made and implemented by the owners, board members, management, employees and agents of Defendants and are an illegal, deceptive and unconscionable business practice. Since at least November 24, 2009, the Defendants have, as a standard and routine business practice, violated state and federal laws and regulations knowing that the well-being of all residents would be adversely affected as detailed herein.

44.     Defendants failed to discharge their obligations of care to Ozie Edwards and Myrtle Key with a conscious disregard for their rights and safety. At all times mentioned herein, Defendants, through their corporate officers and administrators, had knowledge of, ratified and/or otherwise authorized all of the acts and omissions that caused the injuries suffered by Mr. Edwards and Ms. Key, as more fully set forth below. Defendants knew that their facility could not provide the minimum standard of care to the weak and vulnerable residents of Ouachita Nursing and Rehabilitation Center. The severity of the recurrent negligence inflicted upon Mr. Edwards and Ms. Key while residents of the facility accelerated the deterioration of their health

and physical condition and resulted in physical and emotional injuries. While a resident at Ouachita Nursing and Rehabilitation Center, Ozie Edwards sustained multiple injuries including, but not limited to, the following: (a) Malnutrition; (b) Dehydration; (c) Multiple infections; (d) Poor hygiene; (e) Multiple falls with injury; (f) Skin tears and lacerations from falls; (g) Broken hip resulting from fall; and (h) Death. While a resident at Ouachita Nursing and Rehabilitation Center, Myrtle Key sustained multiple injuries including, but not limited to, the following: (a) Malnutrition; (b) Weight loss; (c) Multiple infections including MRSA; (d) Poor hygiene; (e) Bed sores including large infected wound on her back; (f) Broken arm; (g) Sepsis; and (h) Death.

45. As a direct and proximate result of the Defendants' conduct, the Plaintiff Class has suffered actual damage, both in terms of physical injuries, as detailed above, and economic damage. The Plaintiffs, or someone acting on behalf of the Plaintiffs, provided payment in exchange for services which were not provided, which were not as represented by the Defendants' Admission Agreements, and not up to the standards required by the Arkansas Residents' Rights Act.

46. The Defendants, as the owners, agents, managers and operators of a private organization having the responsibility of protecting and caring for the residents, have direct and vicarious liability for the acts and omissions giving rise to this complaint.

47. Plaintiffs have retained counsel qualified, experienced and able to conduct the litigation, and Plaintiffs have made arrangements to cover the costs associated with this litigation.

48. If each class member were required to pursue individual actions, it would be economically and judicially unfeasible. A class action is appropriate and the superior method for the fair and efficient adjudication of this controversy.

15

COUNT ONE: VIOLATION OF THE DECEPTIVE TRADE PRACTICES ACT

49.     Plaintiffs incorporate the allegations contained in Paragraphs 1–48 as if fully set forth herein.

50.     At all times pertinent to this cause of action, Plaintiffs were "elder person[s]" as defined by the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-201(a). As an "elder person" within the meaning of the Deceptive Trade Practices Act, the Plaintiffs have a private cause of action to recover actual damages, punitive damages, and reasonable attorney's fees pursuant to Ark. Code Ann. § 4-88-204.

51.     At all relevant times, the Arkansas Deceptive Trade Practices Act, codified at Ark. Code Ann. 4-88-107(a) ("ADTPA") provides that it is unlawful to:

a.     Knowingly take advantage of a consumer who is reasonably unable to protect his or her interest because of:

i.     Physical infirmity; or

ii.     A similar factor; and

b.     Engage in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade.

52.     Ark. Code Ann. § 4-88-108 provides that, when utilized in connection with the sale or advertisement of any goods, services, or charitable solicitation, it shall be unlawful for any person to (1) act, use or employ any deception, fraud or false pretense, or (2) conceal, suppress, or omit any material fact with intent that others rely on the concealment, suppression, or omission.

53.     The conduct of Defendants as described herein constitutes a deceptive practice in violation of the ADTPA. Defendants failed to inform Plaintiff and the Plaintiff Class in

Defendants' standard Admission Agreement that the Facility routinely failed to meet minimum staffing requirements imposed by state and federal law which increased profits. Furthermore, Defendants represented themselves as providing services commensurate with the needs of the residents and in compliance with the requirements of Arkansas state law governing long-term care and nursing Facility.

54.     By understaffing the Facility, the Defendants knowingly took advantage of the most vulnerable consumers and those who were unable to protect themselves. Defendants' unfair and deceptive trade practices asserted herein are the type that the ADTPA is specifically designed to protect against and remedy.

55.     The Defendants' trade practices also are, and have been throughout the Class Period unconscionable, because the nursing home residents constitute a vulnerable population: they are elderly, ill, infirm, and often deteriorating. These residents often face the double burden of dependency and isolation. The Defendants accept these vulnerable residents for admission, and then knowingly fail to provide sufficient levels of staffing to provide the care required without disclosing in their admission agreement the Facility' dreadful history of understaffing.

56.     The Defendants also engage in, and have engaged in throughout the Class Period, substantively unconscionable trade practices by understaffing the Facility making it impossible to provide adequate care to residents even though it charged for services it could not provide.

57.     The Defendants knew that they were not meeting, and did not have sufficient CNA staff to meet the Basic Care needs of their residents as mandated by state and federal laws and regulations.

58.     The Defendants were further engaging in deceptive trade practices by infringing upon and depriving the Plaintiff Class of the rights guaranteed by Ark. Code Ann. §§ 20-10-1201

*et seq.* ("Protection of Long Term Care Facility Residents' Act") including, but not limited to, the following:

a) The right to receive adequate and appropriate health care and protective and support services, including social services, mental health services, if available, planned recreational activities, and therapeutic and rehabilitative services consistent with the resident care plan for the Plaintiff Class, with established and recognized practice standards within the community, and with rules as adopted by federal and state agencies, such rights include:

   1) The right to receive adequate and appropriate custodial service, defined as care for the Plaintiff Class which entailed observation of diet and sleeping habits and maintenance of a watchfulness over their general health, safety, and well-being; and

b) The right to appropriate observation, assessment, nursing diagnosis, planning, intervention, and evaluation of care by nursing staff;

c) The right to access to dental and other health-related services, recreational services, rehabilitative services, and social work services appropriate to the needs and conditions of the Plaintiff Class, and not directly furnished by the licensee;

d) The right to a wholesome and nourishing diet sufficient to meet generally accepted standards of proper nutrition, guided by standards recommended by nationally recognized professional groups and associations with knowledge of dietetics, and such therapeutic diets as may be prescribed by attending physicians;

e) The right to a Facility with its premises and equipment, and conduct of its operations maintained in a safe and sanitary manner;

f) The right to be free from mental and physical abuse, and from physical and chemical restraints;

g) The right of the Plaintiff Class to have privacy of their bodies in treatment and in caring for their personal needs;

h) The right to the obligation of the Facility to keep full records of the admissions and discharges of the Plaintiff Class and their medical and general health status, including:

   1) medical records;

   2) personal and social history;

3)     individual resident care plans, including, but not limited to, prescribed services, service frequency and duration, and service goals;

4)     making it a criminal offense to fraudulently alter, deface, or falsify any medical or other long-term care Facility record, or cause or procure any of these offenses to be committed; a

5)     The right to be treated courteously, fairly, and with the fullest measure of dignity.

59.     As described in part and above, the Defendants received repeated citations related to failures of Basic Care in Office of Long Term Care surveys. Upon information and belief, they received these deficiencies despite taking steps to increase staffing and prepare staff for surveys immediately preceding the arrival of state surveyors – steps that would lead surveyors to believe levels of care provided were higher than they actually were during non-survey times.

60.     The conduct of the Defendants, as described herein, constitutes a deceptive practice in violation of the Arkansas Deceptive Trade Practices Act. The Defendants engaged in unconscionable, false, and/or deceptive acts or practices in business, commerce and/or trade by marketing themselves and holding themselves out to the public as being able to meet the needs of elder residents of Ouachita Nursing and Rehabilitation Center. The Defendants profited greatly as a result of their deceptive trade practices, but the Defendants were aware that Ouachita Nursing and Rehabilitation Center could not meet the needs of its residents.

61.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs have suffered actual damages.

## COUNT TWO: BREACH OF THE ADMISSION AGREEMENT

62.     Plaintiffs incorporate the allegations contained in paragraphs 1–61 as if fully set forth herein.

63.     Before being admitted to Ouachita Nursing and Rehabilitation Center, residents, or those acting on their behalf, were required to enter into a resident Admission Agreement, whereby the Facility agreed to provide nursing and custodial care, necessary goods, services, and/or treatment in exchange for valuable consideration. *See* **Exhibit C.**

64.     The residents, or those acting on their behalf, paid for or caused to be paid for, the goods, services, care and treatment, including personal or custodial care, and professional nursing care the Defendants promised to provide.

65.     The Defendants breached their contractual duties by understaffing the Facility and creating a situation whereby it was impossible for caregivers to provide the care and services as described in the agreement, causing damage to the residents.

66.     As a result, the Plaintiffs are entitled to compensatory damages and consequential damages.

67.     As a result of the Defendants' breach of the Admissions Agreement, Plaintiffs assert a claim for judgment for all compensatory damages including the amount a jury determines is sufficient compensation for the loss of the benefit of promised services and care and treatment, in an amount that exceeds that required for federal court jurisdiction in diversity of citizenship cases.

68.     Plaintiffs are entitled to seek punitive damages for breach of contract, because the Defendants knew or should have known, in the light of the surrounding circumstances, that their nonfeasance in breach of the Admission Agreement would naturally and probably result in injury or damage, yet the Defendants breached the agreement in reckless disregard of the consequences from which malice may be inferred.

### COUNT THREE: BREACH OF THE PROVIDER AGREEMENT

69.     Plaintiffs incorporate the allegations contained in paragraphs 1-68 as if fully set forth herein.

70.     Upon becoming a resident of Ouachita Nursing and Rehabilitation Center, the residents, many of whom were Medicare and/or Medicaid recipients, became third-party beneficiaries of the contract or provider agreement between the Defendants and the state and federal governments, an example of which is attached as **Exhibit D**.

71.     For consideration duly paid by the residents, or on their behalf, the Defendants agreed to provide residents with personal and custodial care and professional nursing care in compliance with the requirements set forth in the provider agreements, as well as the minimum standards of care imposed by applicable law including the statutes and regulations set out herein. In addition, by entering into the agreement, the Defendants promised to "comply with all rules, regulations, changes in and additions thereto issued by the United States Department of Health and Human Services pertaining to nursing homes, and to comply with all rules, regulations, duly promulgated changes in and additions thereto issued by the State." The Defendants further agreed that "the rights and privileges of the residents [were] of primary concern to the parties" and covenanted to "protect and preserve" the rights of the residents. The parties to the contract agreed "that failure to act in a manner consistent with those rights and privileges shall constitute an immediate breach of agreement." *See* **Exhibit D.**

72.     As the name implies, the provider agreement exists to pay for and provide for resident, personal, or custodial care and professional nursing care. Additionally, the provider agreement between the Defendants and the state and federal government was clearly intended to benefit and protect the residents of Ouachita Nursing and Rehabilitation Center by requiring the Defendants to provide quality care consistent with federal and state statutes and regulations.

73.     The Defendants breached the provider agreement and committed multiple acts of nonfeasance in failing to adequately staff the Facility and provide the care, goods, and services to industry standards, as required by law and as agreed, including but not limited to:

a)     Failing to provide dietary services, including special diets, supplemental feedings, special delivery preparation, assistance, and equipment required for preparing and dispensing oral feedings and special feeding devices;

b)     Failing to provide personal or custodial services and nursing care;

c)     Failing to implement policies and procedures so as to prevent infringement or deprivation of the Plaintiff Class's rights as residents of a long term care Facility;

d)     Failing to comply with protections, duties and obligations imposed by applicable state and federal statutes and regulations as alleged herein; and

e)     Failing to staff Ouachita Nursing and Rehabilitation Center with sufficient personnel to adequately meet the needs of the Plaintiff Class, failing to comply with the rules and regulations promulgated by the state and federal governments, and in failing to provide staff qualified to meet the needs of the residents.

74.     As a result of the Defendants' breach of the provider agreement, Plaintiffs assert a claim for judgment for all compensatory damages including the amount a jury determines is sufficient compensation for the loss of the benefit of promised services and care and treatment, in an amount that exceeds that required for federal court jurisdiction in diversity of citizenship cases.

75.     The Defendants are also liable for all consequential damages, because the Defendants knew, or should have known, that breaches of the provider agreement would result in consequential damages to the Plaintiff Class, and, under the circumstances, the Defendants should have understood that it had agreed to assume responsibility for any consequential damages caused by their breaches of the provider agreement.

76.     Plaintiffs seek judgment for all foreseeable consequential damages, which flowed naturally from the failure of the Defendants to provide the care, goods, and services promised under the provider agreement, including but not limited to medical expenses, pain and suffering, and mental anguish.

77.     Plaintiffs are entitled to seek punitive damages for breach of contract, because the Defendants knew or ought to have known, in the light of the surrounding circumstances, that their nonfeasance in breach of the provider agreement would naturally and probably result in injury or damage, yet the Defendants breached the agreement in reckless disregard of the consequences from which malice may be inferred.

78.     A copy of the provider agreement is attached to this Complaint as **Exhibit D**.

### COUNT FOUR: NEGLIGENCE

79.     Plaintiff incorporates the allegations contained in Paragraphs 1 – 78 as if fully set forth herein.

80.     The Defendants owed a non-delegable duty to residents, including the Plaintiff Class, to adequately staff the Facility and to provide adequate and appropriate custodial care and supervision, which a reasonably careful person would provide under similar circumstances.

81.     The Defendants owed a non-delegable duty to their residents, including the Plaintiff Class, to exercise reasonable care in adequately staffing the Facility and providing care and services in a safe and beneficial manner.

82.     The Defendants owed a non-delegable duty to their residents, including the Plaintiff Class, to hire, train and supervise employees to deliver care and services to residents in a safe and beneficial manner.

83.    The Defendants owed a non-delegable duty to residents, including the Plaintiff Class, to use reasonable care in adequately staffing the Facility in order to treat their residents with the degree of skill and learning ordinarily possessed and used by nursing home Facility in the same or similar locality.

84.    The Defendants owed a non-delegable duty to assist all residents, including the Plaintiff Class, in attaining and maintaining the highest level of physical, mental and psychosocial well-being.

85.    The Defendants breached these duties by failing to adequately staff the Facility and failing to exercise reasonable care causing injury, abuse and neglect to the Plaintiff Class. Understaffing the Facility caused the following acts and omissions, which is not exhaustive or an all-inclusive list:

    a)    The failure to follow physician orders to ensure that residents were free of significant medication errors;

    b)    The failure to ensure that the Plaintiff Class attained and maintained its highest level of physical, mental, and psychosocial well-being;

    c)    The failure to establish, publish and/or adhere to policies for nursing personnel concerning the care and treatment of residents with nursing, medical and psychosocial needs similar to those of the Plaintiff Class;

    d)    The failure to increase the number of nursing personnel to ensure that the Plaintiff Class received timely and accurate care assessments, and proper treatment, medication and diet;

    e)    The failure to provide sufficient numbers of qualified personnel, including nurses, licensed practical nurses, certified nurse assistants and medication aides to meet the total needs of the Plaintiff Class throughout the Class Period;

    f)    The failure to increase the number of nursing personnel at the Facility to ensure that the Plaintiff Class:

        1)    Received timely and accurate care assessments;
        2)    Received proper treatment, medication, and diet; and

3)     Was protected from accidental injuries by the correct use of ordered and reasonable safety measures.

g)     The failure to adequately screen, evaluate, and check references, test for competence and use ordinary care in selecting nursing personnel to work at the Facility;

h)     The creation of and/or the failure or refusal to identify and correct the injuries, conditions, and circumstances at the Facility;

i)     The failure to terminate employees at the Facility assigned to the Plaintiff Class who were known to be careless, incompetent and unwilling to comply with the policies and procedures of the Facility and the rules and regulations promulgated by the Arkansas Department of Human Services and the Office of Long Term Care;

j)     The failure to assign nursing personnel at the Facility duties consistent with their education and experience based on:

1)     The Plaintiff Class's medical history and condition, nursing and rehabilitative needs;
2)     The characteristics of the resident population residing in the area of the Facility where the Plaintiff Class was; and,
3)     The nursing skills needed to provide care to such resident population.

k)     The failure by the members of the governing body of the Facility to discharge their legal and lawful obligation by (1) ensuring that the rules and regulations designed to protect the health and safety of residents, such as the Plaintiff Class, as promulgated by the Arkansas Department of Human Services and the Arkansas Office of Long Term Care, were consistently complied with on an ongoing basis and (2) ensuring appropriate corrective measures were implemented to correct problems concerning inadequate resident care;

l)     The failure to adopt adequate guidelines, policies, and procedures of the Facility for documenting, maintaining files, investigating and responding to any complaint regarding the quality of resident care or misconduct by employees at the Facility, regardless of whether such complaint derived from a resident of the Facility, an employee of the Facility or any interested person;

m)     The failure to maintain medical records on the Plaintiff Class in accordance with accepted professional standards and practices that are complete, accurately documented, readily accessible and systematically

organized with respect to diagnosis, treatment and assessment and establishment of appropriate care plans of care and treatment; and

n)    The failure to properly in-service and orient employees to pertinent patient care needs to maintain the safety of residents.

86.    A reasonably careful nursing home operating under similar circumstances would foresee that the failure to adequately staff and provide the ordinary care listed above would result in devastating injuries to the Plaintiff Class.

87.    The Defendants' also caused violation of certain laws and regulations in force in the State of Arkansas at the time of the occurrences discussed herein including, but not limited to, the following:

a)    By failing to provide sufficient nursing staff and nursing personnel to ensure that the Plaintiff Class attained and maintained its highest practicable physical, mental and psychosocial well-being;

b)    By failing to provide a safe environment; and

c)    By failing to administer the Facility in a manner that enabled it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident.

88.    The Defendants were further negligent by infringing upon and depriving the Plaintiff Class of the rights guaranteed by Ark. Code Ann. §§ 20-10-1201 *et seq.* including, but not limited to, the following:

a)    The right to receive adequate and appropriate health care and protective and support services, including social services, mental health services, if available, planned recreational activities, and therapeutic and rehabilitative services consistent with the resident care plan for the Plaintiff Class, with established and recognized practice standards within the community, and with rules as adopted by federal and state agencies, such rights include:

1)    The right to receive adequate and appropriate custodial service, defined as care for the Plaintiff Class which entailed observation of diet and sleeping habits and maintenance of a watchfulness over her general health, safety, and well-being; and

b)     The right to appropriate observation, assessment, nursing diagnosis, planning, intervention, and evaluation of care by nursing staff;

c)     The right to access to dental and other health-related services, recreational services, rehabilitative services, and social work services appropriate to the needs and conditions of the Plaintiff Class, and not directly furnished by the licensee;

d)     The right to a wholesome and nourishing diet sufficient to meet generally accepted standards of proper nutrition, guided by standards recommended by nationally recognized professional groups and associations with knowledge of dietetics, and such therapeutic diets as may be prescribed by attending physicians;

e)     The right to a facility with its premises and equipment, and conduct of its operations maintained in a safe and sanitary manner;

f)     The right to be free from mental and physical abuse, and from physical and chemical restraints;

g)     The right of the Plaintiff Class to have privacy of their bodies in treatment and in caring for her personal needs;

h)     The right to the obligation of the Facility to keep full records of the admissions and discharges of the Plaintiff Class and their medical and general health status, including:

    1)     medical records;

    2)     personal and social history;

    3)     individual resident care plans, including, but not limited to, prescribed services, service frequency and duration, and service goals;

    4)     making it a criminal offense to fraudulently alter, deface, or falsify any medical or other long-term care Facility record, or cause or procure any of these offenses to be committed; and

    5)     The right to be treated courteously, fairly, and with the fullest measure of dignity.

89.     A reasonably prudent nursing home, operating under the same or similar conditions, would not have failed to adequately staff the Facility and provide the care listed

above. Each of the foregoing acts of negligence on the part of the Defendants was a proximate cause of the Plaintiff Class' injuries as more specifically described herein. The Plaintiff Class suffered personal injury including extreme pain and suffering, mental anguish, disfigurement, disability, degradation, loss of personal dignity, and emotional distress.

90.    As a direct and proximate result of such grossly negligent, willful, wanton, reckless, malicious and/or intentional conduct, Plaintiffs assert a claim for judgment for all compensatory and punitive damages against the Defendants including, but not limited to, medical expenses, extreme pain and suffering, mental anguish, emotional distress and in some instances loss of life in an amount exceeding that required by federal court jurisdiction in diversity of citizenship cases, to be determined by the jury, plus costs and all other relief to which Plaintiffs are entitled by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and on behalf of the Plaintiff Class pray for judgment against Defendants as follows:

a)    For damages in an amount adequate to compensate the Plaintiffs for the injuries and damages sustained and exceeding that required by federal court jurisdiction in diversity of citizenship cases.

b)    For all actual, general and special damages caused by the alleged conduct of Defendants.

c)    For the costs of litigating this case.

d)    For attorney's fees pursuant to Ark. Code Ann. § 16-22-308 and Ark. Code Ann. § 4-88-204.

e)      For punitive damages sufficient to punish Defendants for their egregious and malicious misconduct in reckless disregard and conscious indifference to the consequences the residents and to deter Defendants and others from repeating such atrocities.

f)      For all other relief to which Plaintiffs are entitled.

Respectfully submitted,

The Plaintiffs and all others similarly situated

By: _____

Brian D. Reddick (94057)
Brent L. Moss (95075)
Robert W. Francis (2007032)
Daniel K. Yim (2014202)
Reddick Moss, PLLC
One Information Way, Suite 105
Little Rock, Arkansas  72202
Telephone: (501) 907-7790
Facsimile:  (501) 907-7793

and

H. Gregory Campbell (92001)
Campbell Law Firm, P.A.
One Information Way, Box 101
Little Rock, AR 72202
Telephone: (501) 375-5659

*Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been placed in the U.S. Mail, postage pre-paid, on this 23 day of June, 2015, to the following attorneys of record:

Kirkman T. Dougherty
Stephanie J. Randall
HARDIN, JESSON & TERRY, PLC
5000 Rogers Avenue, Suite 500
Fort Smith, AR 72917

OUACHITA COUNTY CLERK

12:36:06*FILED

20CT'14

IN THE CIRCUIT COURT OF OUACHITA COUNTY, ARKANSAS
PROBATE DIVISION

IN THE MATTER OF THE ESTATE OF
OZIE LEE EDWARDS, DECEASED                           NO. PR-2014-125

### ORDER APPOINTING PERSONAL REPRESENTATIVE

The Petition of Addie Edwards for appointment of a personal representative in the estate of

Ozie Lee Edwards, deceased, is presented to the Court.  Upon consideration of the Petition and the

facts and evidence in support of it, the Court finds:

1.       No demand for notice of proceedings for the appointment of a personal representative

of the estate has been filed.  The Petition is not opposed by any known person, and it may be heard

without notice.

2.       Ozie Lee Edwards, who resided at Ouachita Nursing & Rehab Center, 1411 Country

Club Rd., Camden, Arkansas, died at Ouachita Nursing & Rehab Center, 1411 Country Club Rd.,

Camden, Arkansas, on November 11, 2013.

3.       This Court has jurisdiction of this proceeding and venue properly lies in this County.

4.       Addie Edwards is a proper person by law to serve as personal representative of the

estate.

5.       It appears there are no unsecured claims against the decedent's estate.

6.       The estate has no assets other than a potential personal injury/wrongful death action,

and bond, therefore, is waived at this time.  The Court will revisit the issue of bond should the estate

acquire assets at any time.

EXHIBIT

A

**IT IS THEREFORE ORDERED** as follows:

a.      the administration of the estate is opened;

b.      Addie Edwards is appointed personal representative of the estate; and

c.      Letters of Administration shall be issued to this personal representative without the requirement of a bond.

DATED this _30_ day of _September_ , 2014.

_____

**CIRCUIT JUDGE**

Submitted by:

_____

J. Michael Lewis, Bar #92269
LEWIS & LEWIS
P. O. Box 20160
White Hall, AR 71612
Telephone No. (870) 247-2111
Attorneys for Estate

OUACHITA COUNTY CLERK
16:07:01*FILED
23JUN15

## IN THE CIRCUIT COURT OF OUACHITA COUNTY, ARKANSAS
## PROBATE DIVISION

IN THE MATTER OF THE ESTATE OF
MYRTLE RUTH LINEBARIER KEY, DECEASED          NO. PR- *2015 - 075*

### ORDER APPOINTING PERSONAL REPRESENTATIVE

The Petition of Gail Wolfe for appointment of a personal representative in the estate of Myrtle Ruth Linebarier Key, deceased, is presented to the Court.   Upon consideration of the Petition and the facts and evidence in support of it, the Court finds:

1.      No demand for notice of proceedings for the appointment of a personal representative of the estate has been filed.   The Petition is not opposed by any known person, and it may be heard without notice.

2.      Myrtle Ruth Linebarier Key, aged 82, who resided at 626 Tate Street, Camden, Arkansas 71701, died intestate at Ouachita County Medical Center, Camden, Arkansas, on or about August 22, 2013.

3.      This Court has jurisdiction of this proceeding and venue properly lies in this County.

4.      Gail Wolfe is a proper person by law to serve as personal representative of the estate.

5.      It appears there are no unsecured claims against the decedent's estate.

6.      The estate may have a potential personal injury/wrongful death action, and bond, therefore, is waived at this time.   The Court will revisit the issue of bond should the estate acquire assets at any time.



EXHIBIT
B

**IT IS THEREFORE ORDERED** that administration is hereby opened in said estate and that Gail Wolfe be and they hereby is, named and appointed personal representative of the estate of the decedent; that the personal representative shall serve without bond; and that letters testamentary shall be issued to said personal representative.

DATED this _22_ day of _June_ , 2015.

_____
**CIRCUIT JUDGE**

Submitted by:

_____
H. Gregory Campbell (#92001)
**CAMPBELL LAW FIRM, P.A.**
One Information Way, Box 101
Little Rock, Arkansas 72202
Telephone No. (501) 372-5659
Attorneys for Estate



Orie
Edwards
#8412

COMMITTED TO COMPASSION, STRIVING FOR EXCELLENCE, SERVING RESPONSIBLY

# ADMISSION AGREEMENT



# DIVERSICARE
## MANAGEMENT SERVICES



EXHIBIT
C

# ADMISSION AGREEMENT

This Admission Agreement is a legally binding contract. Do not sign this Admission Agreement until you have read it and understand its terms and have read the Resident Handbook in its entirety and understand the policies and rules contained within it. By signing this Admission Agreement you are certifying that you understand and agree to the terms of this Admission Agreement, including all of the policies and rules set out in the Resident Handbook.

October 2009

ONRC-OLE-06369

## I.   Your Admission to the Facility

This Admission Agreement ("Agreement") states the terms and conditions agreed to by you, _Orie Edwards_____ your Responsible Party, _Addie Edwards_____ and _Diversicare Leasing Corp. d/b/a Ouachita Nursing and Rehabilitation Center_

In this Agreement "you" and "your" refers to the person who wishes to become a resident at the Facility, and the Facility refers to _Diversicare Leasing Corp. d/b/a Ouachita Nursing and Rehabilitation Center_
(Please list facility name exactly as it appears on the business license)

Your Responsible Party is your legal guardian, if one has been appointed, or your Attorney-in-Fact, if you have executed a power of attorney, or some other individual or family member who agrees to assist the Facility in providing for your healthcare and maintenance. The obligations of your Responsible Party are described more fully in this Agreement and in the Resident Handbook, both of which you and your Responsible Party should read carefully before signing this Agreement.

By signing this Agreement, you and your Responsible Party make certain agreements and promises, and the Facility makes certain agreements and promises. These agreements and promises are set out below.

## COVENANTS

### Resident Handbook

You and your Responsible Party acknowledge that the Facility has made certain disclosures to you and your Responsible Party, has informed you and your Responsible Party of your rights and the Facility's duties, and has adopted certain policies and rules which are set forth in this Agreement and in the Facility's Resident Handbook (including the Appendices, all of which are referred to in this Agreement as the "Handbook"). You and your Responsible Party acknowledge that you have received a copy of the most recent edition of the Handbook, dated _Oct. 2009_____, and that you have read the Handbook and this Agreement in its entirety. You and your Responsible Party further acknowledge that you have had an opportunity to question a representative of the Facility concerning the contents of the Handbook and this Agreement and that any questions you have have been answered to your satisfaction. You and your Responsible Party agree to abide by all of the policies and rules contained in the Handbook, and agree that the policies and rules set forth in the Handbook will become a part of this Agreement just as if those policies and rules were set forth in full in this Agreement.

_Initialed:_          _Resident:_ _____          _Responsible Party:_ _A. E._

### Responsible Party

The person signing this Agreement as your Responsible Party has the following relationship(s) to the Resident (please check all that apply): **(If Legal Guardian, Attorney-In-Fact, Power of Attorney, Health Care Agent, etc., responsible party must provide documentation to that effect.)**

Spouse _✓_          Relative _____          Legal Guardian _____          Attorney-in-Fact _____
_A. E._
Friend or Interested Person _____          Other (state relationship) _____

## II.   _Setting Realistic Expectations_ Video

Upon admission to the facility you are asked to view the video titled, "Setting Realistic Expectations," A script of this video is provided in your Resident Handbook under Section II. We encourage you to view this video to assist with understanding the skilled nursing environment and establish realistic expectations.

_Initialed:_          _Resident:_ _____          _Responsible Party:_ _____

5

ONRC-OLE-06371

III.   **Services and Supplies**

A.   **Nursing Services**

The Facility will provide nursing services and supplies as described in Section III of the Handbook, and other health-related services as may be directed by your attending physician. Physicians operating within the Facility are independent contractors, not employees of the Facility, and the Facility shall not be liable for any acts or omissions of any physician who renders care or fails or declines to render care to you at the Facility. You are responsible for the payment of all charges of any physician who renders care to you at the Facility.

The facility will provide general nursing services as described in Section III of the Handbook, this does not include 24-hour one-on-one personal care. You or your responsible party may purchase additional private sitter services. The facility will provide you with a list of available sitter services if you so desire.

☐ Yes, I would like to purchase 24-hour one-on-one services

☒ No, I do not wish to purchase 24-hour one-on-one services

Initialed:     Resident: _____     Responsible Party: _____

B.   **Physician Services**

I have designated the physician identified below as my personal attending physician. If he/she fails to fulfill a given requirement, the facility will have the right, after consulting with me, to seek another physician to assure that I am appropriately and adequately cared for and treated. The facility has arranged for and recommends physicians who have agreed to follow facility policies and state and federal regulatory requirements. These physicians are shown as the "Facility Choice." The resident or his/her representative may choose another physician so long as that physician is willing to provide services under the conditions required by the facility's policies and applicable regulations. If no choice is made, or the chosen physician is not willing to meet the facility requirements, the facility Medical Director or physician will be used.

Patient physician: _____Mark Crump_____     Phone: _____836. 8101_____

Specialty (If applicable): _____

Address: _____Camden AR_____

Initialed:     Resident: _____     Responsible Party: _____

C.   **Laundry Services  (See Clothing recommendations in Section 1 in Resident handbook.**
**"Your admission to the facility"**

We encourage residents to be up and fully dressed each day.  Laundry done on site is picked up, washed and folded or put on hangers and returned to resident's room.  We provide bed linens and towels.  We would like to suggest that clothing is wash and wear since staff does not iron clothing.   Further, it is important that you and your family understand that the facility's laundry utilizes high heat, strong chemicals, etc., in its laundry that most likely will reduce clothing life.

If you choose to utilize our laundry services, all clothing must be identified with the resident's first initial and last name (i.e. L. Smith).  You must use a sewn in label or permanent laundry marker.  Our staff will assist with the labeling of clothing if it has not been done prior to admission.

If family elects to launder the resident's personal clothing, they need to notify social services or designee.  If this option is elected, family must provide a fire retardant laundry hamper to place the soiled laundry in.  For infection control, laundry must be picked up at minimum twice weekly, or more often if necessary.  The facility may launder wet or soiled clothing if left in the resident's room for an extended period of time, or if soiled item is creating offensive odor.  The facility is not responsible for lost or stolen items.

☐ Facility does patient's laundry          ☒ Family does patient's laundry

Initialed:     Resident: _____     Responsible Party: _____

6

**D.** **"TLC" Tender Lift and Care – No Lift Policy and Procedure**

THIS PROGRAM HAS BEEN IMPLEMENTED IN AN EFFORT TO PROVIDE A SAFE AND HEALTHY ENVIRONMENT FOR RESIDENTS IN OUR CARE AND FOR THE SAFETY OF OUR EMPLOYEES.

Our residents will be evaluated on admission, at care planning and at any change of condition to establish their needs for the total lift or sit-to-stand lift.

I have received and understand the explanation of the TLC "No Lift" policy

*Initialed:*          *Resident:* _____          *Responsible Party:* _____

See Forms/Clinical Records Section of this agreement booklet Page 61

**E.** **Pharmacy**

Each resident of the Facility has the option to select a pharmacy of his or her choice for the purchase of any drugs that are not included in the regular per-day charges of the Facility. The only qualification to this right is that, in order to protect your health, we require that any pharmacy you select must provide drugs and services which meet the standards of the distribution system of the Facility, including uniform labeling, packaging, storing, processing, and administration of drugs.

My pharmacy of choice, listed below is to provide all drugs.

_____All core)_____
(Name of Pharmacy)

_____
(Address)

_____Philadelphia, AR._____
(City, State, Zip)

_____
(Telephone)

Please see Prescription Drug Plan Enrollment in Business Office Section, Page 46.

**NO DRUGS, UNDER ANY CIRCUMSTANCES, MAY BE BROUGHT INTO THE FACILITY BY ANYONE OTHER THAN A PHARMACY UNLESS PRIOR ARRANGEMENTS HAVE BEEN MADE WITH FACILITY IN ACCORDANCE WITH STATE REGULATIONS.**

*Initialed:*          *Resident:* _____          *Responsible Party:* _____

7

## AUTHORIZATION FOR TREATMENT, ASSIGNMENT OF BENEFITS, PAYMENT RESPONSIBILITY AND RELEASE OF INFORMATION

Resident's Name: _____Orie Edwards_____

Facility of Residence: _____Ouachita Nursing + Rehab. Center_____

Provider: _____

**Authorization for Treatment**: The undersigned authorizes **Ouachita Nrg. + Rehab. Center** and/or any of their contractors (collectively referred to as "Provider"), to render services that Provider and/or Patient's physician determine to be necessary or advisable. The undersigned agree to cooperate with all reasonable requests of Provider in connection with Provider's rendition of Services.

**Assignment of Benefits**: The undersigned hereby assigns and transfers to Provider the right to any and all third-party payments (including Medicare, Medicaid and/or private medical insurance benefits) to which the undersigned may be or become entitled to for services rendered by Provider. The undersigned hereby authorizes Provider to apply and file for all such benefit payments in the name of and on behalf of Patient and directs that such payments be made directly to Provider. Any insurance benefit payments received by the undersigned for services rendered by Provider shall be paid to Provider.

**Payment Responsibility**: The Patient shall be financially responsible for any portion of Provider's invoice that is not paid, except for payments denied by Medicare or in the event of covered services provided to Medicaid recipients. The undersigned agree to execute any and all documents and perform any acts that Provider may reasonably request to ensure that all third-party benefits for services are paid to Provider.

**Release of Information**: The undersigned hereby certifies that all information provided to Provider by the undersigned is true and accurate in all respects. The undersigned hereby authorizes Provider to disclose any information, medical and nonmedical, furnished Provider or obtained by Provider in connection with Patient's diagnosis and/or treatment, to any physician, governmental agency (including the U.S. Department of Health and Human Services or any of its intermediaries or carriers), insurance company or health care provider requesting such information. The undersigned agrees to allow Provider access to Patient's clinical records and agrees to allow Provider to make copies of such records. The undersigned consents to Provider's discussing Patient's medical condition with Patient's family members for medical or claims management purposes.

Executed this ___23___ day of _____Nov._____, 20_12_

_____          _____Eddie Edwards_____
Resident                                        Responsible Party

ONRC-OLE-06374

<u>Miscellaneous</u>

   A.    <u>Sole Agreement</u>. This Agreement and the policies set forth in the Handbook are the entirety of the agreement be-
tween the Facility and you and your Responsible Party. No oral statements or prior written material not specifically incorporated in
this Agreement or in the Handbook shall be of any force or effect and no changes in or additions to this Agreement shall be of any
force or effect unless incorporated herein by amendment to the Agreement, which amendment is in writing and signed by all parties to
the Agreement.

   B.    <u>Incorporation of Appendices</u>. The Appendices attached hereto are specifically incorporated into this
Agreement, and are a part of this Agreement.

   C.    <u>Non-Assignability</u>. You and your Responsible Party acknowledge that your right to reside at the Facility is
personal and is not assignable. You may not assign your rights under this Agreement to any other person or entity. The Fa-
cility may assign its rights under this Agreement without the consent of you or your Responsible Party.

   D.    <u>Waiver of Breach</u>. The waiver by any party to this Agreement of a breach of the Agreement or the viola-
tion of any provision of the Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of
the Agreement or provision thereof.

   E.    <u>Severability</u>. In the event any provision of this Agreement is held to be unenforceable for any reason, such
unenforceability shall not affect the remainder of this Agreement, which shall remain in full force and effect and be enfor-
ceable in accordance with its terms.

   F.    <u>Governing Law</u>. This Agreement shall be interpreted, construed and enforced pursuant to and in accor-
dance with the laws of the State of Arkansas. _Ouachita_ County, Arkansas shall be the sole and exclusive venue
for any litigation, special proceeding, or any other proceeding between the parties that may arise out of, in connection with,
or by reason of this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement this **23** day
of _nov._ , 2 **012**

RESIDENT:                                   RESPONSIBLE PARTY:

_____                    _Addie Edwards_

_____                    _Addie Edwards_
(Printed Name)                               (Printed Name)

                                             _Spouse_
                                             (Relationship)

FACILITY SIGNATURE:

_Rhonda Kordmaier_
(Employee Name)

_CC_
(Employee Position)

_11/23/12_
(Date)

Arkansas Department of Human Services
Division of County Operations

## NOTICE OF ADMISSION, DISCHARGE, OR TRANSFER FROM A FACILITY

Recipient's Name: _Ozie Edwards_     Social Security Number:

Medicaid Number: _MA_

_Ouachita Nursing + Rehab. Center_
Name of Facility

_1411 Country Club Rd. Camden, AR. 71701_
Address of Facility

1. ☒ Admitted: Date: _11-24-12_

   From:     ☒ Hospital     ☐ Home     ☐ Other  (Explain) _____

   DCO-703 Completed:     ☐ Yes     ☐ No

   Date Submitted to Utilization Control: _____

   Admitted or Transferred to:     ☒ Medicare Bed     Date: _11-24-12_

   ☐ Medicaid Bed     Date: _____

   ☐ Hospice     Date: _____

   Transferred From:     _____
                         Name of Other Facility

   _____
   Address of Other Facility

2. ☐ Transferred Date: _____

   Name/Address of other Facility: _____

   _____

3. ☐ Discharged Date: _____     Expired Date: _____

   Reason for Discharge: _____

_____                         _____
Signature of Administrator                Date

11

ONBC-OLE-06376

# Social Services or Designee Section

_____
Person Completing This Section

11/23/12 & 11/26/12
Date

ONRC-OLE-06377

I.     **Your Resident Rights**

You and your Responsible Party acknowledge that the Facility has informed you, both orally and in writing in a language you can each understand, of your rights and of all policies and rules governing your conduct and responsibilities during your stay in the Facility.

*Initialed:* _____     *Resident:* _____     *Responsible Party:* _____

A.     Mail. I request that the business office at the facility assist in the opening and/or reading of my personal mail. I further request assistance in opening financial related mail addressed to me such as checks, medical bills or statements, Medicare and Medicaid correspondence.

I understand that I may revoke this request at any time.

☐ Opening of personal mail requested
☐ Opening of personal mail not requested
☐ Opening of financial mail requested
☐ Opening of financial mail not requested
☐ I authorize the facility to handle financial mail on my behalf
☒ I do not authorize the facility to handle financial mail

*Initialed:* _____     *Resident:* _____     *Responsible Party:* _____

B.     Clinical Records. The facility is authorized to release medical information and necessary data pertinent to the billing of other payors by the facility and by other providers or the filing of insurance papers in the interest of the resident and/or the facility and the resident may be examined by physicians and/or registered nurses as may be required by either the state or federal government.

*Initialed:* _____     *Resident:* _____     *Responsible Party:* _____

C.     Your Health Information Rights. Although your health record is the physical property of the nursing facility, the information in your health record belongs to you. (See Appendix I of Resident Handbook)

For More Information or to Report a Problem. If you have questions and/or would like additional information, you may contact our facility's administrator (privacy officer) at __836 - 411__

If you believe that your privacy rights have been violated, you may file a complaint with us. These complaints must be filed in writing on a form provided by our facility. The complaint form may be obtained from the administrator, and returned to the administrator (privacy officer) when completed. You may also file a complaint with the Secretary of the United States Department of Health and Human Services. If you need further information concerning how to file a complaint with the Secretary of the United States Department of Health and Human Services, please contact the facility's administrator at _____836 - 8166_____
There will be no retaliatory action for filing a compliant.

By signing this you are acknowledging that you have had the opportunity to review before signing. Please note that we reserve the right to change at any time, as well as the right to make any revisions or changes effective for medical information we already have about you or any information we receive about you in the future. We will post a copy of the current Resident Privacy Notice at the facility, and each such notice will contain the effective date of such notice.

*Initialed:* _____     *Resident:* _____     *Responsible Party:* _____

D.     Notices. Any notice, demand or communication, which is required, permitted or desired to be given under this Agreement or any provision of the Handbook shall be in writing and shall be deemed sufficiently given when personally delivered or mailed to the Responsible Party at the following address: __Addie Edwards__
__725 Pearl St. Cedar Sp. 71701__

ONRC-OLE-06378

E.     <u>Personal Fund Account Authorization.</u> You and your Responsible Party request and authorize the Facility to hold, safeguard, manage and account for your personal funds in the manner described in the "Personal Funds" Section IV of the Handbook. You and your Responsible Party specifically authorize the Facility to withdraw funds from your personal account to pay for any and all charges owed by you to the Facility, including charges for Non-covered items and services requested by you or your Responsible Party. All charges will be paid directly to the Facility out of your personal account at the time the charges first become due. (page 29)

If a balance remains in your personal account at the time of your death, you and your Responsible Party specifically authorize the Facility to withdraw funds from your account to pay the Facility for charges incurred by your prior to your death, such as unpaid pharmacy charges, and for expenses incurred on your behalf, such as funeral expenses.

If the remaining funds owed to you by the Facility from your personal account or otherwise are $500 or less and you have not completed the Beneficiary Designation form, then your Responsible party or your surviving spouse shall be deemed your Designated Beneficiary and you authorize the Facility to disburse funds in your personal account or any other funds owed to you by the Facility to your Designated Beneficiary.

**If the remaining funds are disbursed to your Designated Beneficiary, you and your Responsibly Party agree to release the Facility from liability if a court of competent jurisdiction determines that the Designated Benificiary was not entitled to such funds and you and your Responsible Party agree that the Designated Beneficiary shall return to the Facility, within 10 days after receipt of written notice, such funds so that the Facility may remit those funds to the probating estate or other party as designated by the court.**

F.     <u>Patient Fund Account Authorization.</u> If the remaining funds owed to you by the facility from your personal account or otherwise are $500 or less and you have not completed the Beneficiary Designation form, then your Responsible Party or your surviving spouse shall be deemed your Designated Beneficiary and you authorize the facility to disburse funds in your personal account or any other funds owed to you by the facility to your Designated Beneficiary.

G.     <u>Personal Property.</u> The Facility strongly discourages residents from keeping valuable jewelry, papers, large sums of money, or other personal items considered to be valuable in the Facility. The Facility will take ordinary precautions to protect your property in the Facility, but you and your Responsible Party agree that the Facility will not have any responsibility or liability for the loss or theft of your personal property for any reason.

H.     <u>Citizenship.</u> In accordance with the Deficit Reduction Act of 2005, attestation can no longer be accepted regarding immigration status without proof. Under this law, documentation must be provided to support that residents are U.S. citizens or nationals. In accordance with this law, the facility requires proof of citizenship from all applicants prior to or upon admission.

You and your Responsible Party acknowledge that the Facility has informed you, both orally and in writing, in a language you each understand, of the laws regarding Citizenship under the Deficit Reduction Act of 2005, signed by President Bush in February, 2005. Medicare and SSI recipients are exempt from the requirement to verify citizenship. This group of individuals met the requirement through the Social Security Administration verification process.

Current guidance outline may be obtained by visiting the CMS website www.cms.hhs\faca.

I attest that the resident for admission is a Citizen of the United States and can and will provide documentation to prove citizenship:

*Initialed:*          *Resident:* _____          *Responsible Party* _____

## II.     <u>Transfer/Discharge</u>

In the event you choose to leave the Facility permanently, or a person with legal authority to act on your behalf removes you from the Facility, you and your Responsible Party agree to give the Facility written notice of your planned departure at least thirty-days prior to the date of your departure, unless you are a Medicare or Medicaid recipient. You and your Responsible Party agree that in the event you fail to give the required thirty-day notice, and you are not a Medicare or Medicaid recipient, you will pay to the Facility an amount equal to the prevailing Daily Rate for each day within the thirty-day period prior to your departure because the Facility had no written notice of your planned departure.

ONRC-OLF-06379

The Facility will use reasonable efforts to safeguard your personal property remaining at the Facility after discharge, but the Facility will not be liable for any damage to or loss of any of your personal property that is left at the Facility after your discharge. The Facility may dispose of personal property left by you if such property is not claimed by you within thirty (30) days after your discharge.

*Initialed:*      *Resident:* _____      *Responsible Party:* _____

### III.    Facility Rules

I have been informed both orally and in writing of the facility rules and understand them. Any changes in these rules will be addressed and discussed at the resident council meetings and will be posted at facility. (See Section V in Handbook)

A.    Activities/Field Trips: You and your Responsible Party do ___✓___ or do not _____ give permission for the resident to be taken from the facility by employees of the facility for the purpose of entertainment, rides, shopping, or etc.

It is my understanding that I will not be allowed to leave the facility unless considered physically able to do so at the time by the nurse in charge and must have permission from the physician through a physician order.

*Initialed:*      *Resident:* _____      *Responsible Party:* _____

B.    Photographs: The Facility may photograph or videotape you and may use such photographs or videotapes as described in the Handbook.

*Initialed:*      *Resident:* _____      *Responsible Party:* _____

C.    Restraints. The facility strives to be a restraint free facility, however some restraints may be necessary for your positioning or your safety. (See Handbook Section IV)

I do _____ or do not _____ hereby consent to the use of restraints.

*Initialed:*      *Resident:* _____      *Responsible Party:* _____

D.    Smoking    ☐ I have been advised this is a NON-SMOKING Facility
☐ I have been advised that smoking is permitted in designated areas and made aware of smoking assessments, policy and guidelines.

*Initialed:*      *Resident:* _____      *Responsible Party:* _____

Assessments are performed to determine your ability to smoke safely and determine what, if any, additional measures are needed to protect you from possible self-inflicted injury due to smoking habits. The facility strives to provide a safe environment for all residents, visitors and staff.

*Initialed:*      *Resident:* _____      *Responsible Party:* _____

E.    Motorized Vehicles and Wheelchairs.  This facility balances promotion of resident independence with promotion of safety for all persons who reside, visit, or work in the facility.  Because this Facility is populated by a large number of residents with visual, hearing, and balance impairments, we restrict or may prohibit the use of motorized wheelchairs, or other power operated vehicles (collectively, "motorized wheelchairs"), to residents who have shown through assessment, that they can safely operate the wheelchairs in the nursing facility environment.

*Initialed:*      *Resident:* _____      *Responsible Party:* _____

F.    Transportation. In the event that it should become necessary while I am a resident in the facility to secure for me transportation to a hospital or elsewhere, I hereby authorize you to select on my behalf, an ambulance service or other carrier for such purpose.

*Initialed:*      *Resident:* _____      *Responsible Party:* _____

ONRC-OLF-06380

n/a

# DECLARATION OF LIVING WILL

## OF

_____
(Name)

## DECLARATION OF LIVING WILL

    If I should have an incurable or irreversible condition with no hope of recovery, or that will cause my death within a relatively short time, and I am no longer able to make decisions regarding my medical treatment, I direct my attending physician, pursuant to the Common Law and the Arkansas Rights of the Terminally Ill or Permanently Unconscious Act, to withhold or withdraw treatment that only prolongs the process of dying and is not necessary to my comfort or to alleviate pain.

    Additionally, if I should become permanently unconscious, I direct my attending physician, pursuant to the Arkansas Rights of the Terminally Ill or Permanently Unconscious Act, to withhold or withdraw life-sustaining treatments that are no longer necessary to my comfort or to alleviate pain.

Specifically, I Do Not wish to have the following treatments:

- ❑    Cardiopulmonary Resuscitation.
- ❑    Mechanical Breathing.
- ❑    Major Surgery.
- ❑    Kidney Dialysis.
- ❑    Chemotherapy.
- ❑    Minor Surgery (unless necessary for my comfort or to alleviate pain).
- ❑    Invasive Diagnostic Tests.
- ❑    Antibiotics.
- ❑    Blood Products.
- ❑    Other Medications not Necessary for Alleviation of Pain.

Other instructions: _____

_____

By checking the applicable line below, I specifically;

_____    DIRECT that artificial nutrition may be withheld or withdrawn after consultation with my attending physician

_____    DIRECT that artificial hydration may be withheld or withdrawn after consultation with my attending physician.

Resident: _____     _____
                                                        Date

ONRC-OLF-06381

## DECLARATION OF LIVING WILL

### Executed by Person Other Than the Patient

n/A

I,_____, being the first of the following individuals or category of individuals who is reasonably available for consultation do make known my desire, by my instructions to others through this living will, that _____'s ("Patient") life shall not be artificially prolonged under the circumstances that I have identified. I am, or we are, the:

- ☐ Legal guardian or designated person under a durable power of attorney
- ☐ Spouse
- ☐ Majority of adult children participating in the decision
- ☐ Parents
- ☐ Majority of adult siblings participating in the decision
- ☐ Persons standing in loco parentis to the Patient
- ☐ Majority of the Patient's adult heirs at law participating in the decision.

I thus do hereby declare:

If Patient's attending physician determines that Patient is no longer able to make decisions regarding Patient's medical treatment, I direct attending physician and other health care providers to withhold or withdraw treatment from Patient under the circumstances I have indicated below by my signature.

If Patient should have an incurable or irreversible condition with no hope of recovery, or that will cause death within a relatively short time, I direct Patient's attending physician, pursuant to the Common Law and the Arkansas Rights of the Terminally Ill or Permanently Unconscious Act, to withhold or withdraw treatment that only prolongs the process of dying and is not necessary to Patient's comfort or to alleviate pain.

Additionally, if Patient should become permanently unconscious, I direct Patient's attending physician, pursuant to the Arkansas Rights of the Terminally Ill or Permanently Unconscious Act, to withhold or withdraw the following life-sustaining treatments that are no longer necessary to Patient's comfort or to alleviate pain.

Specifically, I Do Not wish to have the following treatments:

- ☐ Cardiopulmonary Resuscitation ("CPR"),
- ☐ Mechanical Breathing.
- ☐ Major Surgery.
- ☐ Kidney Dialysis.
- ☐ Chemotherapy.
- ☐ Minor Surgery (unless necessary for my comfort or to alleviate pain)
- ☐ Invasive Diagnostic Tests.
- ☐ Antibiotics.
- ☐ Blood Products.
- ☐ Other Medications not Necessary for Alleviation of Pain.

Add other medical directives, if any: _____
_____
_____
_____

By checking the appropriate line below, I specifically:

_____        DIRECT that artificial nutrition may be withheld or withdrawn after consultation with
                     Patient's attending physician.

_____        DIRECT that artificial hydration may be withheld or withdrawn after consultation with
                     Patient's attending physician.

21

ONBC_OLF_06382

**GENERAL PROVISIONS**

This advance directive shall be in effect until it is revoked.

I understand that I may revoke this advance directive at any time by giving notice of my wish to revoke the directive, either orally or in writing, to Patient's health care provider, or by physical destruction of the original and any copies of this directive.

I understand and agree that if Patient has executed any prior directive, Patient's directive shall supercede this directive.

I understand the full importance of this advance directive and certify that my instructions are consistent with decisions Patient would have made if Patient had capacity to decide.

**SIGNATURE PAGE**

**This page must be copied and completed for each person authorized to participate in decision.**

I,_____, being of sound mind, do hereby sign this document, knowingly, voluntarily, and with careful thought this _____ day of _____, 20____.

_____
Signature

_____
Address

_____
Address

_____
Telephone

## ATTESTATION

I attest that the person who signed this document did so in my presence, that he/she appears to be of sound mind and free of duress or undue influence. I am eighteen years of age or older, and I am not designated by this document as the person's health care proxy.

_____     _____
(Signature of Witness)                               (Date)

_____
(Address)

_____     _____
(Signature of Witness)                               (Date)

_____
(Address)

ONRC OLE 06383

## APPOINTMENT OF MY HEALTH CARE PROXY

N/A

If my attending physician determines that I am temporarily or permanently unable to make health care decisions, I direct my attending physician and other health care providers to follow the instructions of my health care proxy. My health care proxy is authorized to make whatever medical treatment decisions I could make if I were able. Such decisions regarding life-sustaining treatment shall be consistent with my wishes as expressed in my living will, including my decision whether to withhold or withdraw nutrition and hydration. If my desires are unknown, my health care proxy shall act in my best interests, taking into account my overall medical condition and prognosis.

I designate and appoint _____ (name), _____

_____(address) as my agent, or attorney in fact, to make decisions regarding my health care during periods when my health care provider has determined that I lack capacity to decide for myself. Specifically, and not to limit any other rights prescribed, my attorney in fact shall have the power to employ and discharge physicians; to consent to or refuse to consent to medical procedures, including the withholding or withdrawal of life-sustaining treatment, and nutrition and hydration according to my wishes expressed in my living will, or according to his or her own personal judgment based on the circumstances of my medical condition and my best interests; to admit me to hospitals, including psychiatric hospitals, nursing homes, or hospice care; and to sign all appropriate forms, consents and releases in connection with said matters.

Signed this _____ day of _____, 20_____.


_____
Signature


_____          _____
Witness                                                              Witness


_____          _____


_____          _____
Address                                                            Address

ONRC OLE 06384

N/A

## DO NOT RESUSCITATE
### NO CPR

Resident's Name: _____

Identification No.: _____
       (Medical record number; social security number; or date of birth)

    I, the undersigned person, understand that a "Do Not Resuscitate" instruction means that when a person's heartbeat and breathing stop because of cardiac or respiratory arrest, the person does not wish to be revived by cardiopulmonary resuscitation ("CPR"), and death is probable. I also understand that a physician's order is necessary to carry out a Do Not Resuscitate instruction.

    With this knowledge, I hereby direct that in the event of cardiac or respiratory arrest, efforts at CPR shall not be initiated on the resident designated above by any health care provider. I understand that I may revoke this direction at any time by marking through or destroying this form, or by expressing a desire to be resuscitated in writing or orally to my health care provider. I understand that if there is any doubt about the applicability or validity of this instruction, CPR will be initiated.

    If this instruction is signed by a person other than the resident, and is contrary to the resident's previously executed advance directive, the resident's instructions in the advance directive will be honored. However, nothing in this Form shall require medically futile treatment. This Form may only be signed by the person responsible for making the resident's health care decisions when either directed by the resident, or when the resident lacks capacity to understand the facts related to the resident's condition and proposed treatment and, therefore, cannot make an intelligent decision.

_____        _____
Resident's Signature                    Date

_____        _____
Responsible Party (If Resident lacks capacity)   Date

_____
Relationship of Responsible Party (guardian, attorney-in fact, health care proxy, family, or other)

_____        _____
Witness                                 Date

_____        _____
Witness                                 Date

27

ONRC-OLE-06385

## ACKNOWLEDGMENT OF RECEIPT ADVANCE DIRECTIVE

## MEDICAL TREATMENT DECISIONS

*Orie Edwards*

By my signature below, I acknowledge that I have been informed in writing in a language that I understand of my rights and all rules and regulations to make decisions concerning medical care, including the right to accept or refuse medical or surgical treatment and the right to formulate and to issue Advance Directives to be followed should I become incapacitated.

☒ I do not choose to formulate or issue any Advance Directives at this time.

☐ I direct the continued administration of all possible medical treatment, as ordered by my physician, to prolong life to the greatest extent possible without regard to condition, chance of recovery, or expense.

☐ I have chosen to formulate and issue the attached Advance Directive.

## RIGHT TO REVOKE ADVANCE DIRECTIVE

I understand that the attached and foregoing Advance Directive may be revoked by me at any time without regard to my mental state or competency, by any of the following methods:

1. Physical destruction. Being canceled, defaced, obliterated, burned, torn, or otherwise destroyed by me or by some person in my presence and by my direction;

2. Written revocation. My written revocation expressing my intent to revoke, signed and dated by me. My revocation shall become effective only when I , or a person acting on my behalf, delivers the written revocation to my attending physician. The attending physician or his designee shall record in my medical record the time and date the notification of the written revocation was received and shall enter the word "VOID" on each page of the Directive in my medical records; or

3. Oral revocation. A verbal expression by me of my intent to revoke the Directive made in the presence of a witness twenty-one (21) years of age or older who signs and dates a written confirmation that such expression of intent was made. Any verbal revocation shall become effective upon receipt of the above-mentioned writing by the attending physician. The attending physician or his or her designee shall record in my medical record the time, date, and place of revocation and the time, date, and place of receipt of the notification of the revocation, if different, and shall enter the word "VOID" on each page of the Directive in my medical records.

Resident: _____    Date _____

Responsible Party _*Addie Edwards*_    _11-23-12_
                                        Date

29

## SCHEDULING HEALTH CARE NEEDS

Please list as much detail as possible regarding appointments and contact information regarding appointments and practitioners to be seen. If there is a YES answer to questions 1, 2 or 3, this information is to be given to the nursing designee for follow-up.

1. Does the resident have any appointments scheduled for physician visits, tests or procedures?
   ✔Yes ___No

   a. If yes, when and with whom_____

   _____

   b. Is this appointment related to the reason for this admission? ___Yes ___No

2. Are there plans to make any appointments? ___Yes ✔No
   a. If yes, for what service and with whom_____
   _____

3. Does the resident have an eye exam, dental visit or other type of health related appointment planned?
   ✔Yes ___No

   a. If Yes, when and with whom____ Loders – El Dorado 1/10/13_____

4. Who are the various providers of medical care the resident currently sees?  (within the last 12 months, such as internist, cardiologist, orthopedist, neurologist, podiatrist, optometrist, chiropractor, dentist, etc)

   _____ Dr Loders 1/10 – El Dorado = _____

   _____ ? Audiologist = _____

5. Additional comments regarding outside ancillary care_____

   _____

   _____

   _____

   _____

   _____

ONRC OLF 06387

# Business Office or  Designee Section

_____     _____

Person Completing This Section                    Date

ONRC OLE 06388

## Medicare Co-Pay Notification

If you have been approved for admission to the Medicare Certified Section of the Facility under MEDICARE PART A COVERAGE, you and/or your Responsible Party acknowledge that Medicare Part A coverage is in effect for up to 100 days.

Medicare pays 100% for the first 20 days of coverage. From day 21 to day 100 (the Co-Pay Period), you or your Responsible Party will be responsible for $ _144.50_ per day for room and board. This is the amount that will NOT be paid by Medicare.

(NOTE: If, within the last 60 days, you have had any portion of a stay in a health care facility that was covered under Medicare Part A, coverage under Medicare Part A is not reset to day 1 when you are admitted to this Facility. In that instance, Medicare Part A coverage for your stay in this Facility is resumed as if it was a continuation of your stay at the previous facility.)

## Medicare Replacement Plan Notification

- Your Medicare Replacement Plan _Medical Advantage_ pays _____ % for the first _____ of coverage.

- From Day _____ to _____ (the Co-Pay Period), you are responsible for $ _____ per day for your authorized skilled nursing admission. This is the amount that will NOT be paid by your Medicare Replacement Plan.

- You have _____ days available per benefit period/calendar year for Skilled Nursing and Rehab services

- Your plan Case Manager will assist in determining your eligibility requirements for your care while in the Skilled Nursing and Rehab center.

## Private Insurance Plan Notification

- Your Private Insurance Plan _____ pays _____ % after your $_____ deductible has been met.

- You are responsible for the $_____ deductible and $_____ per day or _____% of usual and customary charges, for your authorized skilled nursing admission.

- This is the amount that will NOT be paid by your private insurance plan. You have _____ days per benefit period/calendar year for Skilled Nursing and Rehab services.

- Your plan Case Manager will assist in determining your eligibility requirements for your care while in the Skilled Nursing and Rehab Center.

| My Method of Payment for the Co-Pay Period is: (Please select one) |
| --- |
| 1. Private*_____   2. Medicaid**_✓____   3. Other _____ |

*This includes Private Insurance because you are responsible for the filing of insurance. As a courtesy to you, the facility will file Private Insurance and attempt to collect from the insurance company for 60 days after Medicare pays. In the event the Private Insurance does not pay within 60 days of billing by the Facility, the balance is due from the resident/responsible party. Insurance benefits are contract between the insurance company and the policyholder. **This includes your responsibility to file a Medicaid application.

I certify that I understand Medicare Part A coverage and that I have chosen a method of payment for the co-pay period. I assume the responsibility of reimbursing the facility during the co-pay period either by filing for Medicaid or by paying privately.

Signature of Resident or Responsible Party: _Addie Edwards_

Witness: _Rhonda Hardin_   Date: _11/26/12_

35

ONRC OLE 06389



### Medicare Secondary Payer

*THIS FORM SHOULD BE COMPLETED FOR EVERY PATIENT RECEIVING SERVICES AND SUPPLIES UN-
DER MEDICARE PART A AND PART B.*

Date: _____

FACILITY NAME: _____ PROVIDER MEDICARE NO.#: _____
RESIDENT NAME: _____ HIC # _____
RESIDENT DATE OF BIRTH: _____ AGE _____ ACCT #: _____

I. WORK RELATED ACCIDENT. Is Illness/Injury due to a work related accident? No _____ GO TO PART II
YES _____ COMPLETE THE FOLLOWING: State date, time and place of accident _____
_____
Covered by Worker's Compensation? Yes ____ No ____ Covered by Federal Black Lung Program? Yes ____ No ____ Give the
name and address of the Worker's Compensation or Federal Black Lung Program _____
_____ Patient's policy or ID # _____

II. NONWORK RELATED ACCIDENT, Is illness/injury due to a nonwork related accident? No _____ GO TO PART
III YES _____ What type of accident called the illness/injury? Automobile? Give name and address of automobile Insurer
_____ Insurance Claim # _____
Other _____ Give detail of third party payer _____
_____

Was another party responsible for this accident? Yes ____ No ____ Give name and address of any liability Insurer _____
_____ Insurance Claim # _____
Is there litigation? Yes ____ No ____ Give name and address of attorney _____
_____

III. GROUP HEALTH INSURANCE. IS PATIENT AGE 65 OR OVER? No ____ GO TO PART IV
YES ____ is patient employed an covered by the Employer's Group Health Plan (EGHP)? No ____ Yes ____ Give the name and
address of EGHP _____
_____
_____ Patient's ID # _____
Is your spouse currently employed? NO ____ GO TO PART IV
YES ____ Is the patient covered under the group health plan of the spouse's employer? NO ____ GO TO PART IV
YES ____ Give name and address of EGHP _____
_____ Patient's ID # _____

IV. END STAGE RENAL DISEASE. Is the patient undergoing kidney dialysis for ESRD and entitled to benefits solely on
the basis of ESRD? Yes ____ MEDICARE IS PRIMARY PAYER
NO ____ Is the patient covered by EGHP? YES ____ Give name and address of EGHP _____
_____
_____ Patient's ID # _____
Has the patient been undergoing kidney dialysis for more than 18 months or been entitled to Medicare for more than ____
months? YES ____ MEDICARE IS PRIMARY PAYER NO ____ Is patient within a 18-month period as defined in section
264.4 (para. 4143.85)? YES ____ EGHP IS PRIMARY PAYER NO ____ MEDICARE IS PRIMARY PAYER

V. DISABLED BENEFICIARY UNDER AGE 65. Is the patient a disabled Medicare beneficiary under 65?
NO ____ MEDICARE IS PRIMARY PAYER. YES ____ Is patient covered by a group health insurance plan (GHP) based on
the patient's own employment or employment of a spouse or parent? YES ____ Give the name and address of GHP _____
_____
_____
_____ Patient's ID # _____

NO ____ MEDICARE IS PRIMARY PAYER

ONRC-OLF-06390

VI. OTHER HEALTH INSURANCE. Does the patient have other health insurance that will pay for nursing home benefits (not supplementary insurance) before Medicare? NO ___ MEDICARE IS PRIMARY PAYER

YES___ Give the name and address of the insurance company _____

_____

_____Patient's  ID # _____

NOTE: WHEN ONE OF THESE CASES EXISTS, MEDICARE IS THE SECONDARY PAYER. THE OTHER INSUR-ANCE BECOMES THE PRIMARY PAYER. WHEN A YES IS RECEIVED, THE FACILITY MUST BILL THE OTHER PAYMENT SOURCE BEFORE MEDICARE.


_____          _____
Resident/Patient's Signature                          Witness


_____          _____
Resident's Agent or Representative                   Witness


_____
Agent's Relationship


_____          _____
Date                                                          Date

QNBC-OLF-06391

## PATIENT FUND AUTHORIZATION

*Ozie Edwards*

1. Funds are deposited in an interest-bearing account. Interest earned is credited to the resident's account. This account is separate from the facility's operating accounts.

2. Facility maintains a full and complete separate accounting of each resident's funds according to generally accepted accounting principles. The system precludes commingling of the resident's funds with the facility's funds or with funds of any person other than another resident. Individual financial records are available upon request of the resident or his or her legal representative.

3. Facility will notify a resident who receives Medicaid benefits when the balance of the account is $200.00 less than the amount required to be eligible for Medicaid. Facility will notify resident that if the amount is exceeded (in addition to the resident's other nonexempt resources) he or she may lose eligibility for Medicaid.

4. Upon death of the resident, the facility will convey within 30 days the remaining personal funds with an accounting to the Resident's Designated Beneficiary.

5. Facility has purchased a surety bond to assure the security of all residents' personal funds deposited with facility.

6. Facility will not charge the resident's personal fund for any items or services covered by Medicaid or Medicare.

    Select one box to indicate choice:

    ☒  I will manage my funds.

    ☐  I authorize _____ to manage my funds.

    ☐  I authorize the facility to manage my funds in accordance with the Federal Policy on Protection of Resident Funds as stated above.

7. In the event of discharge, it is my wish that any funds remaining in this account be applied to outstanding debts incurred for my care or personal services while at the facility.

_____          _____
Resident                                           Date

I, _____*Addie Edwards*_____, am authorized to execute this form on behalf of the resident regarding the management of the resident's funds.

*Addie Edwards*                          11/26/12
Signature                                          Date

39

QNRC-OLF-06392



## PRESCRIPTION DRUG PLAN ENROLLMENT AUTHORIZATION

Residents of nursing facilities who are eligible to receive Medicare benefits can enroll or must be enrolled by regulation to receive prescription drug benefits under Part D Medicare. The Part D prescription drug benefit is administered through Prescription Drug Plans (insurance companies) that are responsible for establishing specific formularies of drugs that they will cover for members in their plan. Eligible individuals enroll with these specific Prescription Drug Plans to receive drug coverage under Part D.

There are many plans to choose from in every geographic area available to eligible individuals, but there are significant differences between plans in terms of drugs that they will pay for, necessity of prior authorization, usage of step therapy regimens and general suitability to serve residents in nursing facilities.

According to regulation, nursing home residents have the right to change their PDP enrollment on a monthly basis if they so choose. There is not advantage to making frequent changes from one PDP to another, but there is a huge advantage to finding the most suitable PDP for each resident. Coverage under the new plan is effective the first day of the month after enrollment. The old plan will be effective until the new plan kicks in so there will not be a gap in coverage.

A staff member of this facility can present the facts related to the available choices to assist you in making an informed decision regarding the plan that is the best for you or your relative. We can handle the enrollment process with your permission or there are several other options available to you discussed on the CMS website.

Indicated below is a space to designate your PDP of choice for yourself or your relative and a signature line authorizing us to handle the enrollment process.

**My Prescription Drug plan of choice is:** _____

My signature below is authorizing the nursing facility to handle the enrollment process on an expedited basis into the PDP of choice indicated above.

**Name of Facility Resident:** _____

**Signature of Responsible Party:** _____

**Print Name:** _____

**Date:** _____

**Witness:** _____

40

ONRC-OLF-06393

**BENEFICIARY DESIGNATION FORM**

Be it known to all, that I, _____Orie Edwards_____, a resident of
(Print Resident's Name)

_____Ouachita Nursing + Rehab. Center_____, hereby declares and
(Print Name of Facility)

designates that _____Addie Purifoy Edwards_____, an adult next of kin, who
(Print Beneficiary's Name)

resides at _____725 Pearl St Camden, AR. 71701_____, shall receive all monies held
(Print Beneficiary's Address)

in my personal trust account held at said facility, if any, at the time of my death. If the above name adult

next of kin predeceases me in death, I declare and designate that _____Ethel Williams_____,
(Print 2nd Beneficiary's Name)

adult next of kin, who resides at, _____352 Sanders Camden, AR. 71701_____, receive all monies
(Print 2nd Beneficiary's Address)

held in my personal trust account.

By my signature below, I further declare that I am competent to execute this document and have done

so voluntarily, free of undue influence, coercion, or duress of any kind. I further state that I have the right

at any time to modify this form and designate other individuals to receive the monies held in my personal trust

account.

_____Addie Edwards_____          _____11/26/12_____
Resident's Signature                             Date

_____43110_____
Resident's Social Security Number

_____Brenda Karr_____          _____11/26/12_____
Witness                                             Date

_____Rebecca Kimbell, LSW_____          _____11/26/12_____
Witness                                             Date

41

ONRC-OLE-06394

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

Form Approved
OMB no. 0938-0950

## APPOINTMENT OF REPRESENTATIVE

NAME OF BENEFICIARY *Orie Edwards*       MEDICARE NUMBER *XCXF 12321425*

### SECTION I: APPOINTMENT OF REPRESENTATIVE

To be completed by the beneficiary:

I appoint this individual, _____, to act as my representative in connection with my claim or asserted right under Title XVIII of the Social Security Act (the "Act") and related provisions of Title XI of the Act. I authorize this individual to make any request; to present or to elicit evidence; to obtain appeals information; and to receive any notice in connection with my appeal, wholly in my stead. I understand that personal medical information related to my appeal may be disclosed to the representative indicated below.

SIGNATURE OF BENEFICIARY *Ottie Edwards*       DATE *11/26/72*

STREET ADDRESS *725 Pearl St.*       PHONE NUMBER (AREA CODE) *870 836-3113*

CITY *Camden*       STATE *AR*       ZIP *71701*

### SECTION II: ACCEPTANCE OF APPOINTMENT

To be completed by the representative:

I, _____, hereby accept the above appointment. I certify that I have not been disqualified, suspended, or prohibited from practice before the Department of Health and Human Services; that I am not, as a current or former employee of the United States, disqualified from acting as the beneficiary's representative; and that I recognize that any fee may be subject to review and approval by the Secretary.

I am a/an _____
(PROFESSIONAL STATUS OR RELATIONSHIP TO THE PARTY, E.G. ATTORNEY, RELATIVE, ETC.)

SIGNATURE       DATE

STREET ADDRESS       PHONE NUMBER (AREA CODE)

CITY       STATE       ZIP

### SECTION III: WAIVER OF FEE FOR REPRESENTATION

Instructions: This form should be filled out if the representative waives a fee for such representation. (Note that providers or suppliers may not charge a fee for representation and thus, all providers or suppliers that furnished the items or services at issue must complete this section.)

I waive my right to charge and collect a fee for representing _____ before the Secretary of the Department of Health and Human Services.

SIGNATURE       DATE

### SECTION IV: WAIVER OF PAYMENT FOR ITEMS OR SERVICES AT ISSUE

Instructions: Providers or suppliers that furnished the items or services at issue must complete this section if the appeal involves a question of liability under section 1879(a)(2) of the Act. (Section 1879(a)(2) generally addresses whether a provider/supplier or beneficiary did not know, and could not reasonably be expected to know, that the items or services at issue would not be covered by Medicare.)

I waive my right to collect payment from the beneficiary for furnished items or services at issue involving 1879(a)(2) of the Act.

SIGNATURE       DATE

Form CMS-1696 (07/05)   EF (07/05)

43

ONBC OLF 06395

**CHARGING OF FEES FOR REPRESENTING BENEFICIARIES BEFORE
THE SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES**

An attorney, or other representative for a beneficiary, who wishes to charge a fee for services rendered in connection with an appeal before the Department of Health and Human Services (DHHS) at the Administrative Law Judge (ALJ) or Medicare Appeals Council (MAC) level is required by law to obtain approval of the fee in accordance with 42 CFR §405.910(f). A claim that has been remanded by a court to the Secretary for further administrative proceedings is considered to be before the Secretary after the remand by the court.

The form, "Petition to Obtain Representative Fee" elicits the information required for a fee petition. It should be completed by the representative and filed with DHHS. Where a representative has rendered services in a claim before DHHS, the regulations require that the amount of the fee to be charged, if any, for services performed before the Secretary of DHHS be specified. If any fee is to be charged for such services, a petition for approval of that amount must be submitted.

An approval of a fee is not required where the appellant is a provider or supplier or where the fee is for services (1) rendered in an official capacity such as that of legal guardian, committee, or similar court-appointed office and the court has approved the fee in question; (2) in representing the beneficiary before the federal district court of above, or (3) in representing the beneficiary in appeals below the ALJ level. If the representative wishes to waive a fee, he or she may do so. Section III on the front of this form can be used for that purpose. In some instances, as indicated on the form, the fee must be waived for representation.

**AUTHORIZATION OF FEE**

The requirement for the approval of fees ensures that representative will receive fair value for the services performed before DHHS on behalf of a claimant while at the same time giving a measure of security to the beneficiaries. In approving a requested fee, the ALJ or MAC considers the nature and type of services performed, the complexity of the case, the level of skill and competence required in rendition of the services, the amount of time spent on the case, the results achieved, the level of administrative review to which the representative carried the appeal and the amount of the fee requested by the representative.

**CONFLICT OF INTEREST**
Sections 203, 205 and 207 of Title XVIII of the United States Code make it a criminal offense for certain officers, employees and former officers and employees of the United States to render certain services in matters affecting the Government or to aid or assist in the prosecution of claims against the United States. Individuals with a conflict of interest are excluded from being representatives of beneficiaries before DHHS.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0950. The time required to prepare and distribute this collection is 15 minutes per notice, including the time to select the preprinted form, complete it and deliver it to the beneficiary. If you have comments concerning the accuracy of the time estimates or suggestions for improving this form, please write to CMS, PRA Clearance Officer, 7500 Security Boulevard, Baltimore, Maryland 21244-1850.
Form CMS-1696 (07/05) EF (07/05)

ONRC-OLF-06396

## APPLICATION FOR MEDICAID/RE-EVALUATIONS

I authorize _____Ouachita Nursing + Rehab. Center_____ to handle all matter concerning the
                                    (Facility)

resident listed below, now and in the future, concerning applying for and re-evaluation of Medicaid Services.

If you should have any questions concerning _____Orie Edwards_____
                                                      (Resident)

please contact _____Patty Garrison_____.
          (Facility Bookkeeper)


Resident _____Addie Edward_____          Date _____11/26/12_____

Responsible Party _____Rhonda Hardin_____     Date _____11/26/12_____

Facility Representative                              Date

If signed with mark or unable to make mark, please have two witnesses.


_____          _____
Facility Representative                              Date

45

ONRC-OLF-06397

## LONG TERM AUTHORIZATION AGREEMENT

Beneficiary Name: _Ozie Edwards_         Medicare #: _045207_
Facility Name: _OnRC_                      Provider: _McKesson_
                        Address:

1.  I request that payment of authorized Medicare, Medigap, Medicaid and other third party payor benefits be made on my behalf to the provider named above for any products or services furnished me by that supplier.

    Medigap Insurer: _____   Policy #: _____

2.  I authorize any holder of medical information about me to release to the Centers for Medicare and Medicaid Services and any other payor and their agents any information needed to determine benefits payable to the provider named above for products/services it has furnished me. I also authorize any holder of medical information to release to the provider name above copies of my records from any other source in order to determine benefits payable to the provider named above for products/services it has furnished me.

3.  I understand that if I have a medical need for an enteral pump during my stay, the provider named above will rent or sell a pump to me. If I choose to purchase the pump instead of renting it, I have initialed the line below:

    I choose to purchase the pump _____

4.  I acknowledge that I have received from the provider named above, a copy of its Notice of Privacy Practices.

    _G.E._          _11/26/12_
    Initials          Date

    _Addie Edwards_                          _11/26/12_
    *Beneficiary's (Resident's) Signature or Name          *Date

By _____
    *Signature of Beneficiary's Representative or Witness          *Title/Relationship to Beneficiary
    (If the beneficiary is unable to sign, complete all * items)

_____
    *Complete Address of Beneficiary's Representative or Witness

*The above individual signing on behalf of the beneficiary certified that the beneficiary is unable to sign due to: (circle the appropriate reason)

Physical Incapacity          Mental Incapacity          Death (indicate date of death): _____

As a Medicare Part B provider of covered services, the provider named above is obligated to uphold the standards shown below.

1. A supplier must be in compliance with all applicable Federal and State licensure and regulatory requirements. 2. A supplier must provide complete and accurate information on the DMEPOS supplier application. Any changes to this information must be reported to the National Supplier Clearinghouse within 30 days. 3. An authorized individual (and whose signature is binding) must sign the application for billing privileges. 4. A supplier must fill orders from its own inventory, or must contract with other companies for the purchase of items necessary to fill the order. A supplier may not contract with any entity that is currently excluded from the Medicare program, any State health care programs, or from any other Federal procurement of nonprocurement programs. 5. A supplier must advise beneficiaries that they may rent or purchase inexpensive or routinely purchased durable medical equipment and of the purchase option for capped rental equipment. 6. A supplier must notify beneficiaries of warranty coverage and honor all warranties under applicable State law and repair or replace free of charge Medicare covered items that are under warranty. 7. A supplier must maintain a physical facility on an appropriate site. 8. A supplier must permit CMS, or its agents to conduct on-site inspections to ascertain the supplier's compliance with these standards. The supplier location must be accessible to beneficiaries during reasonable business hours and must maintain a viable sign and posted hours of operation. 9. A supplier must maintain a primary business telephone listed under the name of the business in a local directory or a toll-free number available through directory assistance. The exclusive use of a beeper, answering machine or cell phone is prohibited. 10. A supplier must have comprehensive liability insurance in the amount of at least $300,000 that covers both the supplier's place of business and all customers and employees of the supplier. If the supplier manufactures its own items, this insurance must also cover product liability and completed operations. 11. A supplier must agree not to initiate telephone contact with beneficiaries with a few exceptions allowed. This Standard prohibits suppliers from calling beneficiaries in order to solicit new business. 12. A supplier is responsible for delivery and must instruct beneficiaries on use of Medicare covered items and maintain proof of delivery. 13. A supplier must answer questions and respond to complaints of the beneficiaries, and maintain documentation of such contracts. 14. A supplier must maintain and replace at no charge or repair directly or through a service contract with another company, Medicare covered items it has rented to beneficiaries. 15. A supplier must accept returns of substandard (less than full quality for the particular item) or unsuitable items (inappropriate for the beneficiary at the time it was fitted and rented or sold) from beneficiaries. 16. A supplier must disclose these supplier standards to each beneficiary to whom it supplies a Medicare-covered item. 17. A supplier must disclose to the government any person having ownership, financial, or control interest in the supplier. 18. A supplier must not convey or reassign a supplier number; i.e. the supplier may not sell or allow another entity to use its Medicare billing number. 19. A supplier must have a complaint resolution protocol established to address beneficiary complaints that relate to these standards. A record of these complaints must be maintained at the physical facility. 20. Complaint records must include: the name, address, telephone number and health insurance claim number of the beneficiary, a summary of the complaint, and any actions taken to resolve it. 21. A supplier must agree to furnish HCFA any information required by the Medicare statute and implementing regulations.

ONRC-OLF-06398

## BED HOLD POLICY

If resident _____*Orie Edwards*_____ is discharged to a hospital, I do/I do not (circle one) wish to hold the resident's bed. I understand that if the bed is not held, _____*ONRC*_____ (facility) may proceed to admit to that bed.

Medicare will not pay for any days that the resident is not in the facility (private insurance may or may not cover this cost). I agree to contact _____*ONRC*_____ (facility) if I decide to stop holding the bed; charges will stop immediately and the bed will be filled.

I agree to pay the bed hold bill to date every seven (7) days. I further agree that when the resident is ready for discharge from the hospital, I will contact the facility business office and pay the days remaining to readmission in full.

I further understand that if I hold the bed this does not necessarily mean the resident will be admitted to the same room(s) he previously occupied.

_____*ONRC*_____ (facility) will remind the resident and/or the resident's representative of the bed hold policy at the time of hospitalization. The resident or the resident's representative must notify the facility if bed hold is desired.

If I choose to hold the bed, I promise to pay reasonable charges, not to exceed the daily private room rate, for the bed hold period. The private rate is the price per day a private patient pays to stay in the nursing facility (available in the business office).

I agree to be bound by the terms of this agreement.


Resident _____     Date _____

Responsible Party _____*Addie Edwards*_____     Date ___*11-26-12*___

47

ONRC-OLE-06399

I.    __Payment__

    You are responsible for payment of all charges for items and services provided to you by the Facility unless these charges are paid for by a third-party reimbursement program such as Medicare or Medicaid. You are responsible for payment of all charges for medicines and medical supplies provided to you that are not otherwise paid for by third-party reimbursement programs such as Medicare or Medicaid. You are responsible for payment of all charges of any physician who renders care to you while you are a resident of the Facility, and any other charges by third parties providing items or services to you at your request.

    You and your Responsible Party acknowledge receiving information from the Facility on how to apply for and use Medicare and Medicaid benefits, and you each release the Facility and each of its owners, agents, servants, and employees from any liability or responsibility in connection with your potential claim for coverage or reimbursement and for any failure to obtain such coverage or reimbursement. If you elect to apply for Medicaid benefits, you and your Responsible Party give the Facility permission to seek and receive information on the status of your Medicaid eligibility application from the appropriate state agency.

    You and your Responsible Party hereby authorize the Facility and all other providers of items and services to file in your name and on your behalf claims for any and all third-party payments (including but not limited to Medicare, Medicaid and/or private medical insurance benefits) for items and services provided to you by the Facility or by such third-party providers, including the Facility's provider(s), and the right to receive the same.

    **THE FACILITY DOES NOT MAKE ANY ASSURANCE OF ANY KIND THAT YOUR CARE WILL BE PAID FOR BY MEDICARE, MEDICAID, ANY THIRD-PARTY INSURANCE OR OTHER REIMBURSEMENT SOURCE.**

    You and your Responsible Party agree that you will be responsible for payment of all charges for items and services provided to you by the Facility as set forth in the Handbook and in this Agreement, including both Covered and Non-covered services (as defined in Section VIII of the Handbook and as described in Appendix B to the Handbook). If your Responsible Party has legal access to income or resources of yours which is available to pay for care and services you receive at the Facility, then your Responsible Party agrees to provide payment to the Facility from such income or resources.

    Billing  The Facility will bill you monthly. Your monthly statement will include billing for your Daily Rate one month in advance, unless you are a Medicare recipient, as well as any charges for Non-covered items and services. Bills for services rendered to you by the Facility which are not paid by the tenth (10th) day of each month will be past due or delinquent. When payment for services is not made by the tenth (10th) day of any billing month, your account will be accessed a delinquency charge at the monthly rate not to exceed 5% per annum above the Federal Reserve discount rate which is the maximum permitted by law. The delinquency charge does not alter any obligations of either the Facility, you, or your Responsible Party under the Admission Agreement. The Facility does not grant credit or allow installment payments, and the Facility's acceptance of a partial payment will not limit the Facility's rights under the Admission Agreement. If you fail to make a required payment within fifteen (15) days of the due date, the Facility may require you to vacate the Facility. A reasonable period, not to exceed thirty (30) days from the date of receipt of notice of failure to pay, will be allowed for you to make arrangements for you to vacate the Facility. The notice will be deemed received on either the actual day of receipt or five (5) days after mailing, whichever occurs first. You will be responsible for all relocation expenses, in addition to all charges due to the Facility for all days of care received. If your account is referred to an attorney for collection, you must pay reasonable attorney's fees, collection costs, and other costs of litigation, to the extent permitted by law. You will not be readmitted if any amount is owed from a previous stay.

    You and your Responsible Party understand that a third-party guarantee of payment for Non-covered services (as defined in Section VIII of the Handbook and as described in Appendix B to the Handbook) is not required as a condition of admission. **You and your Responsible Party also understand that you (the resident) are not required to request or receive Non-covered services as a condition of admission. You and your Responsible Party understand that if you do request that the Facility make Non-covered services available to you, both you and your Responsible Party are agreeing by signing this Agreement that each of you (both the resident and the Responsible Party) shall be personally liable for any charges for Non-covered items or services requested by you or your Responsible Party. You and your Responsible Party also understand that if you do not request that the Facility make Non-covered services available to you, Non-covered services will not be made available to you and your Responsible Party will not be agreeing to be personally liable for any charges for Non-covered items or services by signing this Agreement.**

ONRC-OLF-06400

You and your Responsible Party do _____ or do not _____ request that the Facility make Non-covered services available to you. If you and your responsible Party do request that the facility make non-covered services available to you, additional person may be required to execute the third party Guaranty Agreement of non-covered items and services found.

*Initialed:*        *Resident:* _____   *Responsible Party:* _____   *Not Applicable:* _____

## Complete All Appropriate Sections Below

A.        Medicare. If you have a reasonable potential of being eligible for Medicare coverage, you and your Responsible Party acknowledge that you have received a list of those items and services offered by the Facility that are paid for under the Medicare program, as well as those Non-covered items and services which are not covered by Medicare, and the charges for those Non-covered items and services (these lists are contained in section VIII, Item A and further discussed in Appendix B of the Handbook). Currently, the daily co-insurance amount under the Medicare (Part A) program is $ 144.50 per day.

*Initialed:*        *Resident:* _____   *Responsible Party:* _____   *Not Applicable:* _____

*Medicare includes Private Insurance because you are responsible for the filing of insurance. Insurance benefits are contracts between the insurance company and the policyholder. The facility will file Private Insurance as a courtesy to you and attempt to collect from the insurance company 60 days after Medicare pays. In the event the Private Insurance does not pay within 60 days of billing by the Facility, the balance is due from the resident/responsible party.

B.        Medicaid. If you have a reasonable potential of being eligible for Medicaid benefits, you and your Responsible Party acknowledge that you have received a list of those items and services paid for by Medicaid under the Arkansas State Medicaid Plan, as well as a list of Non-covered items and services and the amount of the charges for those Non-covered items and services (these lists are contained in Appendix Section VIII, Item B, and further discussed in Appendix B of Handbook).

*Initialed:*        *Resident:* _____   *Responsible Party:* _____   *Not Applicable:* _____

C.        Private Pay. If the cost of your stay at the Facility will not be covered by Medicaid or Medicare (a "Private Pay" resident) you and your Responsible Party acknowledge that you have received a list of those items and services which are included in the Facility's Daily Rate, as well as a list of those Non-covered items and services which are not included in the Facility's Daily- Rate, and the amount of the charges for those Non-covered items and services (these lists are contained in these lists are contained in Appendix Section VIII, Item C, and further discussed in Appendix C of Handbook). The Daily Rate in effect at the present time is $ 142.00 per day.  The Facility reserves the right to increase this daily rate.  As a Private pay resident, your Responsible Party or other individuals will have a right but no obligation, to execute a Third Party Guaranty Agreement of the daily Rate, which if executed, would entitle Resident to at least sixty (60) days notice of discharge for non- payment, as opposed to the thirty (30) days required if this guaranty is not executed.  Execution of this Guaranty is NOT required in order to obtain admission to the Facility.  This Guaranty is located on Page 13.

*Initialed:*        *Resident:* _____   *Responsible Party:* _____   *Not Applicable:* _____

ONRC-OLE-06401

# Clinical Records or Designee Section

_____          _____
Person Completing This Section                        Date

ONRC-OLE-06402

## INVENTORY LIST



| QTY | ARTICLES | QTY | APPLIANCES | QTY | PROSTHETIC DEVICES | ACQUIRED AFTER ADMISSION | |
|---|---|---|---|---|---|---|---|
| | | | | | | Date | Item |
| | Belts | | T.V. – Ser. # | | Dentures: ☐ Upper | | |
| | Blouses | | Radio – Ser. # | | ☐ Lower ☐ Partial | | |
| | Coats | | Hair Dryer | | Eye Wear | | |
| | Dresses | | Electric Razor | | Cane | | |
| | Gloves | | | | Walker – Ser. # | | |
| | Hats | | | | Wheelchair – Ser # | | |
| | Housecoats – Robes | | | | Brace | | |
| | Jackets | | **JEWELRY** | | | | |
| | Nightgowns – Pajamas | | Ring (Describe) | | | | |
| | Purses | | | | **OTHER** | | |
| | Shaving Kit | | Watch (Describe) | | | | |
| | Shoes | | | | | | |
| | Shorts | | Other | | | | |
| | Slacks | | | | | | |
| | Slippers | | | | | | |
| | Slips | | **FURNITURE** | | **VALUABLES RELEASED FROM SAFE** | | |
| | Socks/Hose | | | | | | |
| | Suitcases | | | | | | |
| | Suits | | | | | | |
| | Sweaters | | | | | | |
| | Ties | | | | | | |
| | Undershirts | | | | | | |
| | Underwear | | | | | | |

*(Left margin: ON ADMISSION)*

I certify that this is a correct list of my clothes and belongings which I wish to retain in my possession and for which I take ENTIRE RESPONSIBILITY. I have received a copy of this list.

_____     _____     _____     _____
Signature of Patient/Responsible Party     Date     Signature of Facility Rep.     Date

If the patient is unable to sign, state reason: _____

Signature of Witness: _____

Patient/Responsible Party is responsible for assuring that all personal belongings are properly marked. All items brought in after admission are added to this inventory at the request of Patient/Responsible Party, as well as advise facility of items taken out for replacement or seasonal changes.

| QTY | ARTICLES | QTY | APPLIANCES | QTY | PROSTHETIC DEVICES | ACQUIRED AFTER ADMISSION | |
|---|---|---|---|---|---|---|---|
| | | | | | | Date | Item |
| | Belts | | T.V. – Ser. # | | Dentures: ☐ Upper | | |
| | Blouses | | Radio – Ser. # | | ☐ Lower ☐ Partial | | |
| | Coats | | Hair Dryer | | Eye Wear | | |
| | Dresses | | Electric Razor | | Cane | | |
| | Gloves | | | | Walker – Ser. # | | |
| | Hats | | | | Wheelchair – Ser # | | |
| | Housecoats – Robes | | | | Brace | | |
| | Jackets | | **JEWELRY** | | | | |
| | Nightgowns – Pajamas | | Ring (Describe) | | | | |
| | Purses | | | | **OTHER** | | |
| | Shaving Kit | | Watch (Describe) | | | | |
| | Shoes | | | | | | |
| | Shorts | | Other | | | | |
| | Slacks | | | | | | |
| | Slippers | | | | | | |
| | Slips | | **FURNITURE** | | **VALUABLES RELEASED FROM SAFE** | | |
| | Socks/Hose | | | | | | |
| | Suitcases | | | | | | |
| | Suits | | | | | | |
| | Sweaters | | | | | | |
| | Ties | | | | | | |
| | Undershirts | | | | | | |
| | Underwear | | | | | | |

*(Left margin: ON DISCHARGE)*

I received on discharge in satisfactory condition the above articles and a copy of this list.
Disposition of belongings: _____

_____     _____     _____     _____
Signature of Patient/Responsible Party     Date     Signature of Facility Rep.     Date

ONRC-OLE-06403

TLC-102A

## Acknowledgement of
## "TLC Tender Lift and Care
## "No Lift" Policy and Procedure

## Resident Acknowledgement Form

THIS PROGRAM HAS BEEM IMPLEMENTED IN AN EFFORT TO PROVIDE A SAFE AND HEALTHY ENVIRONMENT FOR RESIDENTS IN OUR CARE AND FOR THE SAFETY OF OUR EMPLOYEES.

Our residents will be evaluated on admission, at care planning and at any change of condition to establish their needs for the total lift to sit-to-stand lift.

I have received and understand the explanation of the TLC "No Lift" policy.

This form will be signed by a facility representative, resident and/or resident representative and dated.

_____     _____
Facility Representative                                             Date   11/26/12

_____     _____
Resident or Responsible Party                                 Date   11/26/12

55

ONRC-OLE-06404

*Ozie Edwards*

### Vaccination, Blood Testing, Tuberculosis Screening Authorization

I hereby give the facility permission to administer influenza vaccination annually, in the fall. To the best of my knowledge, I have not had an anaphylactic reaction to eggs. I have been instructed that as a result of the vaccination, I may experience some side effects, such as, slight discomfort, soreness at the injection site, redness as the injection site, slight fever (occasionally), or muscle aches (occasionally).

I have received information regarding the risk and benefits of receiving the influenza vaccination. I have had an opportunity to ask and have answered any questions I may have. If I refuse, I understand that I will be at risk for a possible influenza episode.

*Initialed:* _____ *Resident:* _____ *Responsible Party:* _____ *Refused:* _O.E._  Had 2012 @ Silver Oaks

I hereby give the facility permission to administer pneumococcal vaccination. I understand that this immunization is to be given only one (1) time. To the best of my knowledge, I have not received a pneumococcal vaccination. I have been instructed that as a result of this vaccination, I may experience some side effects, such as, slight discomfort, soreness of the arm, redness of the arm, slight fever (occasionally), muscle aches (occasionally), joint aches (rarely), or rash (rarely).

I have received information regarding the risk and benefits of receiving the pneumococcal vaccination. I have had an opportunity to ask and have answered any questions I may have. If I refuse, I understand that I will be at risk for a possible pneumococcal episode.

*Initialed:* _____ *Resident:* _____ *Responsible Party:* _____ *Refused:* _O.E._  Had in 2010 @ OVRC

To protect against possible transmission of blood-borne diseases such as Hepatitis B and Acquired Immune Deficiency Syndrome, I understand that it may be necessary to test my blood while I am a resident of this nursing facility, if for example an employee is stuck by a needle while drawing blood. I further understand that my blood will be routinely tested for these diseases and that the results of any testing will be kept confidential. I hereby grant permission for testing.

*Initialed:* _____ *Resident:* _____ *Responsible Party:* _O.E._

I hereby grant permission for an intradermal skin test for tuberculosis upon admission and yearly thereafter if the initial skin test is negative. If the skin test is positive, permission is given for yearly chest x-rays to rule out active tuberculosis.

*Initialed:* _____ *Resident:* _____ *Responsible Party:* _O.E._

57

ONRC-OLE-06405

## DMS POLICY & PROCEDURE
### Nursing Department

### Influenza Immunization Informed Consent Form

I hereby give the facility permission to administer influenza vaccination annually, in the fall. To the best of my knowledge, I have not had an anaphylactic reaction to eggs.  I have been instructed that as a result of the vaccination, I may experience some side effects such as:

- Slight discomfort
- Soreness at the injection site
- Redness at the injection site
- Slight Fever (occasionally)
- Muscle Aches (occasionally)

I have received information regarding the risks and benefits of receiving the influenza vaccination. I have had an opportunity to ask and have answered any questions I may have.

Resident Signature _Ozie Edwards / Eddie Edwards_____ Date _11/26/12_

Witness Signature _Brenda Koolin_____ Date _11/26/12_____ If I refuse, I understand that I

will be at risk for a possible influenza episode.

Refused Reason for refusal ___Had @ Silver Oaks 2012_____

Influenza Immunization Informed Consent Form 1 of 1 N-I-006A (IC-I-07A)

59

ONRC-OLE-06406

**DMS POLICY & PROCEDURE**
Nursing Department

Pneumococcal Immunization Informed Consent Form

I hereby give the facility permission to administer **pneumococcal vaccination.** understand that this immunization is to be given only one (1) time.  To the best of my knowledge, I have not received a pneumococcal vaccination.  I have been instructed that as a result of this vaccination, I may experience some side effects such as:

- Slight discomfort
- Soreness of the arm
- Redness of the arm
- Slight fever (occasionally)
- Muscle aches (occasionally)
- Joint aches (rarely)
- Rash (rarely)

I have received information regarding the risks and benefits of receiving the pneumococcal vaccination. I have had an opportunity to ask and have answered any questions I may have.

Resident Signature _____  Date __11/26/12__

Witness Signature _____  Date __11/26/12__

If I refuse, I understand that I will be at risk for a possible pneumococcal episode.

☒ Refused

Reason for refusal ___Had @ OVFC - in 2010___

ONRC-OLE-06407

## CAPACITY VERIFICATION

To Whom It May Concern:

_Ozie Edwards_, a Resident in _____ONRC_____
[Name of Resident]                                    [Name of Facility]

☐   Capacity & Able to Sign Forms. Has the capacity to understand the nature of his or her medical condition and the consequence of treatment decisions; and acknowledges that he or she understands the content of the forms and is physically able to sign forms.

☐   Capacity & Unable to Sign Forms. Has the capacity to understand the nature of his or her medical condition and the consequence of treatment decisions; and acknowledges that he or she understands the content of the forms. Resident is physically unable to sign forms due to: _____

_____

_____

☐   Waxing and Waning Capacity. Has waxing and waning capacity and is able to make decisions some of the time.

☒   No Capacity. Lacks the capacity to understand the nature of his or her medical condition and the consequence of treatment decisions; and is unable to acknowledge whether he or she understands the content of the forms due to: _____Dementia_____

_____

_____

_____          _____
Resident                                                    Date

_Annie Edwards_          _11/26/12_          _Spouse_
Resident Representative                Date                Relationship to Resident

_Kara Smithen_          _11/27/12_
Nurse                                      Date

63

# Ouachita Nursing & Rehabilitation Center
1411 Country Club Road
Camden, AR 71701
870-836-4111

## MEDICARE
Admission payor source – Medicare
Medicare's MAXIMUM benefit is 100 days of skilled nursing care per spell of illness.
We are NOT guaranteed 100 days.  That is simply the MAXIMUM benefit available.
Patient must meet skilled nursing or therapy criteria <u>each</u> day that Medicare pays.
Medicare pays for the first 20 days at 100%.
For days 21 – 100, Medicare will pay everything EXCEPT the Federal co-insurance rate of $144.50 per day.

*\* Medicare Advantage*

## PRIVATE PAY
Semi-Private pay room rate is $142.00 per day for room and board.
Private pay room rate is $182.00 per day.
This does NOT include therapy, medication, supplies, or any ancillary services.
Private pay must be paid in advance – like rent.

## MEDICAID
Medicaid pays the room and board for approximately 70% of all nursing home residents in the State of Arkansas.
Patient must meet **medical** and ***financial*** criteria for Medicaid benefits.
Typically, the patient will surrender their monthly social security check plus any other income to the nursing home minus $40 for their personal needs.

IE:  If total monthly income (SS, VA, retirement, etc) = $500.00, then the patient liability = $460.00 per month

> **Patient** pays their designated liability (in this case $460.00, the remainder of all my monthly income)
> Medicaid pays the remaining balance.

If you think your family member may qualify for Medicaid assistance, you need to submit a long-term care Medicaid application to the local Department of Human Services as soon as possible.  **The Caseworker is Tasheka Carroll with Miller County DHS at 870-773-0563, or by mail at 3809 Airport Plaza, Texarkana, AR 71854-9985**

*I acknowledge that I have received a copy of this information and understand my payment responsibilities.*

Patient/Responsible Party: _Addie Edward_ Date: _11/26/12_

ONRC-OLE-06409

CONTRACT
TO PARTICIPATE IN THE ARKANSAS NURSING HOME PROGRAM
ADMINISTERED BY THE DIVISION OF ECONOMIC AND MEDICAL SERVICES
OFFICE OF LONG TERM CARE
UNDER TITLE XIX (MEDICAID)

This __facility__ agreement made and entered into this the _____ day of _____

by and between _____ hereinafter called Provider, and

the Department of Economic and Medical Services, Office of Long Term Care hereinafter called State.

WITNESSETH:

I.   Provider agrees that its responsibilities hereunder shall be as follows:

A.   To keep all records, as set forth in applicable Federal and/or State regulations, and Long Term Care Provider Manuals, and any duly promulgated changes in or additions thereto, and to fully disclose the extent of all services provided to individuals receiving assistance under the State Plan.

B.   To make available for inspection all records herein specified to satisfy audit requirements under the program; to furnish all such records for audit conduction periodically by State or its designated agents and/or representatives of the Department of Human Services, and the Department of Health and Human Services of the United States of America or its designees or representatives. For all Medicaid recipients these records shall include, but not necessarily be limited to those records as defined in Section A above.

C.   Provider shall at all times provide State access to the facility, residents, and resident records. Provider expressly agrees not to hinder, impede, or otherwise restrict State from carrying out its official duties, and expressly agrees to reasonably assist State in carrying out its official duties. In this context, "official duties" include inspections, surveys and investigations and reviews as prescribed by State and Federal laws, rules and regulations, and shall allow "observation and recordings made and conducted relative to long term care facilities, long term care residents, and records of or possessed by facility and/or residents. "Observation" includes the right and ability to move in or around the interior and/or exterior, including resident rooms of a long term care facility, unaccompanied (except upon request if the inspector(s)) at any time. "Recordings" include photostatic copies, notes, writings, drawings, and photographs (whether still or motion, in accordance with Section 2 of Art. Act 33 of 1989), and sound recordings."

D.   To accept only residents who have met the requirements of the duly promulgated Pre-Admission Screening Program and for whom the facility can provide all required and necessary services. Provider specifically herein agrees to insure availability of all medications prescribed by the resident's physician.

E.   To provide all services without discrimination on the grounds of race, color, national origin, or physical or mental disability within the provisions of Title VI of the Federal Civil Rights Act, and Section 504 of the Rehabilitation Act of 1973. Provider agrees herewith that it has been furnished with a copy of the LTC Provider Manual, and shall be bound by all provisions thereof, including any and all changes and/or additions thereto.

F.   To comply with all rules, regulations, changes in and additions thereto issued by the United States Department of Health and Human Services pertaining to nursing homes, and to comply with all rules, regulations, duly promulgated changes in and additions thereto issued by the State.

G.   To meet all requirements of applicable Life Safety Code and all State Fire and Safety Codes.

H.   Provider will not transfer or discharge any recipient without a minimum of 30 days advance notice to the individual or a responsible person. Provider may transfer or discharge a Medicaid recipient under the following circumstances:

1.   The transfer or discharge is necessary to meet the resident's welfare and the resident's welfare cannot be met in the facility;

2.   The transfer or discharge is appropriate because the resident's health has improved sufficiently so the resident no longer needs the services provided by the facility;

3.   The safety of the individuals in the facility is endangered;

4.   The health of individuals in the facility would otherwise be endangered;

5.   The resident has failed, after reasonable and appropriate notice, to pay (or to have paid under Title XIX or Title XVIII on the resident's behalf) an allowable charge imposed by the facility for an item or service requested by the resident and for which a charge may be imposed consistent with federal and state laws and regulations; or

6.   The facility ceases to operate.

The notice of transfer or discharge must be made at least 30 days in advance of the resident's transfer or discharge except:

a.   In a case described in item H(3) or H(4) above;

b.   In a case described in item H(2) above where the resident's health improves sufficiently to allow for a more immediate transfer or discharge;

c.   In a case described in item H(1) above where a more immediate transfer or discharge is necessitated by the resident's urgent medical needs; or

d.   In a case where the resident has not resided in the facility for 30 days.

I.   Provider shall give 30 day notice to the State prior to any change of ownership including a change which contemplates or provides for the assumptions of existing liabilities by the new owner.

EXHIBIT
D
tabbies

J.   To bill State (Medicaid) only after the service has been rendered.

K.   To accept Medicaid reimbursement rates determined by the State as full payment for all Medicaid eligible care and services required by the classification of each resident and rendered by the provider, and make no additional charges to the resident, or to accept additional payment from the sudden, relatives, or responsible parties for that service which is covered under the Medicaid Program.

L.   To promptly refund to the resident or recipient any unused portion of recipient applied income collected in advance and not owed due to death, discharge or transfer. Recipient income is to be prorated on a per diem basis according to the number of days in the month.

M.   To promptly refund to a resident or other responsible person any deposit or advance fee collected while awaiting approval for Medicaid eligibility to the extent those days are covered by Medicaid payments.

N.   To provide all services and specific items as defined in the Medical Assistance Reasonable Cost Related Reimbursement Manual for Long Term Care Facilities (MAICNRHAL-LTCF), or any additions thereto or subsequent manuals. Receipt of Medicaid per diem reimbursement rate is considered payment in full for services and items included in the MAICNRHAL.

O.   To accept assignment and file a claim in a timely and proper manner with all third party sources, and if said claim is collected from a third party, to reimburse Medicaid up to the amount Medicaid paid for said services.

P.   The $30 Personal Needs Allowance which is provided for by the Medical Assistance Program for personal expenditures of a resident cannot and shall not be used for any other purpose except as authorized in writing by the resident or responsible party.

Q.   To comply with all State and/or Federal regulations pertaining to resident personal funds and to provide the State access to patient account records or any other financial records maintained by the provider for benefit of the patient. The new owner must specify in writing which owner will be responsible for recipient Medicaid claims and facility account receivables balances resulting from dates of service prior to the ownership change.

Further Provider agrees that it will not prevent or interfere with the individual or responsible person, or the Office of Long Term Care in the transfer or discharging of a patient when same is appropriate.

II.   The State agrees that it shall have the following responsibilities hereunder:

A.   To make timely payments to Provider for the appropriate Medicaid services provided the eligible Medicaid recipient in accordance with the terms of the LTC Provider Manual or other appropriate regulations and procedures previously mentioned herein.

B.   To notify Provider of any changes of rules or regulations to be followed hereunder as promptly as is practicable at all times.

C.   To safeguard the confidentiality of any Medicaid records maintained for the State, its agents, and/or fiscal intermediary as specified in Federal and State regulations.

III.   Mutual Covenants, Duties, Responsibilities, and Undertakings

A.   State and Provider mutually agree to comply with all Federal and State laws, rules and regulations.

B.   State and Provider agree that the rights and privileges of the residents are of primary concern to the parties and the parties expressly agree and covenant to protect and preserve those rights and privileges and that failure to act in a manner consistent with those rights and privileges shall constitute an immediate breach of agreement without recourse.

C.   State and Provider agree and covenant that this written instrument constitutes the entirety of the agreement between both parties and no statement or representations not defined in writing or incorporated herein by express reliance shall be binding upon the parties and such statements or representations not incorporated herein by express reference or not contained herein constitute no part of the agreement.

IV.   This contract may be terminated in accordance with the following provisions:

A.   This contract may be terminated by either party by filing 30 days written notice to the other party.

B.   This contract may be terminated immediately by State for the following reasons:
   1.   Federal sanction of Provider.
   2.   Change of ownership.
   3.   Violation of any provision herein contained.
   4.   In accordance with termination procedures as set out in applicable Federal and/or State regulations or rules by which Provider is bound hereunder.

| Provider | Division of Economic and Medical Services Office of Long Term Care |
|---|---|

By:

Signature (Signature)

Name: (Type Name)    Name: (Type Name)

Title:    Title:

Date:    Date:

EMS-711 (R. 9/89)    2 of 2

## IN THE CIRCUIT COURT OF OUACHITA COUNTY, ARKANSAS
### SIXTH DIVISION

FILED

2015 AUG 28 AM 9 25

OUACHITA COUNTY, ARK
BETTY WILSON
CIRCUIT CLERK

Addie Edwards, as Personal Representative of the
Estate of Ozie Edwards, and on behalf of the
wrongful death beneficiaries of Ozie Edwards;
Gaile Wolfe, as Personal Representative of the
Estate of Myrtle Key, and on behalf of the wrongful
death beneficiaries of Myrtle Key;
and All Others Similarly Situated

                                                                    PLAINTIFFS

vs.                                  CASE NO. CV-2014-203-6

Diversicare Leasing Corp. d/b/a Ouachita Nursing
and Rehabilitation Center; Diversicare Healthcare
Services, Inc.; Diversicare Management Services Co.;
Advocat Ancillary Services, LLC;
Camden Operations, LLC d/b/a Ouachita Nursing
and Rehabilitation Center; JEJ Investments, LLC;
Sub-Ten Holdings, LLC; MasterTen, LLC;
Advanced Practice Solutions, LLC; Procare Therapy
Services, LLC; Southern Administrative Services, LLC;
Ponthie Holdings, LLC; Professional Nursing
Solutions, LLC; John Ponthie; Ross Ponthie;
Mark Thompson; Omega Healthcare Investors, Inc;
and Jennie Jeanette Goss Hassan, in her capacity
as Administrator of Ouachita Nursing
and Rehabilitation Center;                                          DEFENDANTS

### FIRST AMENDED CLASS ACTION COMPLAINT AGAINST THE DIVERSICARE DEFENDANTS AND AMENDED INDIVIDUAL COMPLAINT OF ADDIE EDWARDS, AS PERSONAL REPRESENTATIVE OF THE ESTATE OF OZIE EDWARDS, AGAINST THE PONTHIE DEFENDANTS AND OMEGA HEALTHCARE INVESTORS, INC.

COMES NOW, the Plaintiffs, on behalf of themselves and all others similarly situated,

by and through their attorneys, Reddick Moss, PLLC, and the Campbell Law Firm, P.A., and for

their causes of action against Defendants Diversicare Leasing Corp. d/b/a Ouachita Nursing and

Rehabilitation Center; Diversicare Healthcare Services, Inc.; Diversicare Management Services Co.; and Advocat Ancillary Services, LLC, state as follows:

## INTRODUCTION

1.      The class claims of this Complaint are that the Diversicare Defendants (Diversicare Leasing Corp., Diversicare Healthcare Services, Inc., Diversicare Management Services Co., Advocat Ancillary Services, LLC, as well as Jennie Jeanette Goss Hassan) were chronically understaffed so as to breach the residents' statutory and contractual rights and constituting negligence. This complaint includes a request that a class be certified consisting of all residents and estates of residents who resided at Ouachita Nursing and Rehabilitation Center("the Facility") from November 24, 2009 through September 1, 2013, as well as a prayer for compensatory, economic and punitive damages, attorney's fees, interest, and costs.

## CLASS ACTION COMPLAINT

### PARTIES

2.      Addie Edwards is Ozie Edwards's wife and the Personal Representative of the Estate of Ozie Edwards pursuant to an Order of the Ouachita County Circuit Court dated October 20, 2014, a copy of which is attached hereto as **Exhibit A.**

3.      Addie Edwards brings this action on behalf of Ozie Edwards, on behalf of the wrongful death beneficiaries of Ozie Edwards, and all other residents of Ouachita Nursing and Rehabilitation Center ("Plaintiff Class") for the period November 24, 2009, to September 1, 2013 ("Class Period").

4.      Other than hospitalizations, Ozie Edwards was a resident of Ouachita Nursing and Rehabilitation Center, a nursing home located at 1411 Country Club Road, Camden, Ouachita

County, Arkansas, from approximately November 24, 2012 until September 1, 2013. Ozie Edwards died on November 12, 2013.

5.      Gaile Wolfe is Myrtle Key's daughter and the Personal Representative of the Estate of Myrtle Key pursuant to an Order of the Ouachita County Circuit Court dated June 23, 2015, a copy of which is attached hereto as **Exhibit B.**

6.      Gaile Wolfe brings this action on behalf of Myrtle Key, on behalf of the wrongful death beneficiaries of Myrtle Key, and all other residents of Ouachita Nursing and Rehabilitation Center ("Plaintiff Class") for the period November 24, 2009, to September 1, 2013 ("Class Period").

7.      Other than hospitalizations, Myrtle Key was a resident of Ouachita Nursing and Rehabilitation Center, a nursing home located at 1411 Country Club Road, Camden, Ouachita County, Arkansas, from approximately May 2013 until August 2013. Myrtle Key died on August 22, 2013.

8.      Defendant Diversicare Leasing Corp. d/b/a Ouachita Nursing and Rehabilitation Center is a foreign corporation that owned, operated, managed, and held the license for the nursing home located at 1411 Country Club Road, Camden, Ouachita County, Arkansas known as Ouachita Nursing and Rehabilitation Center. The causes of action made the basis of this suit arise out of such business conducted by Defendant Diversicare Leasing Corp. d/b/a Ouachita Nursing and Rehabilitation Center in the ownership, operation, management, licensing and/or control of the facility during the Class Period. The agent for service of process for Defendant Diversicare Leasing Corp. is Corporation Service Company, 300 Spring Building, Suite 900, 300 S. Springs Street, Little Rock, Arkansas 72201, or any officer thereof.

9.      Defendant Diversicare Healthcare Services, Inc. is a foreign corporation and did business in the State of Arkansas by operating, managing and/or providing services for Ouachita Nursing and Rehabilitation Center. The causes of action made the basis of this suit arise out of such business conducted by Diversicare Healthcare Services, Inc. in the ownership, operation, control, management, and provision of services for the facility during the Class Period. The agent for service of process for Diversicare Healthcare Services, Inc. is Robert E. Rice, 1621 Galleria Boulevard, Brentwood, Tennessee 37027.

10.      Defendant Diversicare Management Services Co. is a foreign corporation and was authorized to do business and did business in the State of Arkansas by operating, managing, owning and providing services for Ouachita Nursing and Rehabilitation Center. The causes of action made the basis of this suit arise out of such business conducted by Diversicare Management Services Co. in the ownership, operation, control, management, and provision of services for the facility during the Class Period. At all times material to this action, Diversicare Management Services Co. was a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiffs' damages. The agent for service of process for Diversicare Management Services Co. is Corporation Service Company, 300 Spring Building, Suite 900, 300 S. Springs Street, Little Rock, Arkansas 72201, or any officer thereof.

11.      Defendant Advocat Ancillary Services, Inc. is a foreign corporation and was authorized to do business and did business in the State of Arkansas by operating, managing, and providing services for Ouachita Nursing and Rehabilitation Center. The causes of action made the basis of this suit arise out of such business conducted by Advocat Ancillary Services, Inc. in the ownership, operation, control, management, and provision of services for the facility during the Class Period. At all times material to this action, Advocat Ancillary Services, Inc. was a

control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiffs' damages. The agent for service of process for Advocat Ancillary Services, Inc. is Corporation Service Company, 300 Spring Building, Suite 900, 300 S. Springs Street, Little Rock, Arkansas 72201, or any officer thereof.

12.     Upon information and belief, Defendant Jennie Jeanette Goss Hassan was the Administrator of Ouachita Nursing and Rehabilitation Center during the residency of Ozie Edwards and Myrtle Key. The causes of action made the basis of this suit arise out of Ms. Goss Hassan's administration of Ouachita Nursing and Rehabilitation Center during the Class Period. At all times material to this action, Jennie Jeanette Goss Hassan was a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiffs' damages.  Defendant Jennie Jeanette Goss Hassan may be served with process at her last known address: 4381 Highway 7, Bismark, Arkansas 71929.

13.     The Diversicare Defendants collectively controlled the operation, planning, management, and staffing of the Facility. The authority exercised by the Diversicare Defendants over the Facility included, but was not limited to, control of marketing, human resources management, training, staffing, creation and implementation of policies and procedures used by the Facility, federal and state Medicare and Medicaid reimbursement, quality care assessment and compliance, licensure and certification, legal services, and financial, tax, and accounting control through fiscal policies established by the Diversicare Defendants.

14.     The Diversicare Defendants operated as a joint venture/enterprise for the purpose of streamlining and efficiency furthering their similar business interests, as the Facility, Diversicare Healthcare Services, Inc.; Diversicare Management Services Co.; and Advocat

Ancillary Services, LLC were owned by and controlled by the same owners, managers, and decision makers.

15.    At all relevant times mentioned herein, the Diversicare Defendants owned, operated and/or controlled the operation of the Facility, either directly or through the agency of each other and/or other agents, subsidiaries, servants, or employees.

16.    Because the Diversicare Defendants named herein and others were engaged in a joint venture/enterprise during relevant times, the acts and omissions of each participant in the joint venture/enterprise are imputable to all other participants.  The actions of the Diversicare Defendants and each of its servants, agents and employees as set forth herein, are imputed to each of the Diversicare Defendants, jointly and severally.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over the subject matter and the parties to this action, and venue is proper in this Court.

## BACKGROUND AND FACTUAL ALLEGATIONS

18.    This case arises from the Diversicare Defendants' systemic failures to have sufficient staff at Ouachita Nursing and Rehabilitation Center to meet the needs of their residents which caused Plaintiffs and the proposed Plaintiff Class to suffer economic damages and the injuries described in more detail below.

19.    Persons admitted to the Facility have limitations caused by physical deterioration, cognitive decline, the onset or exacerbation of an acute or chronic illness or condition, or other related factors. They need nursing care, medical treatment, and rehabilitation to maintain functional status, increase functional status, or live safely from day to day. Many such residents are elderly, disabled, confined to their beds or unable to rise from a bed or chair independently,

and unable to groom, feed, toilet, or clean themselves. Consequently, many nursing home residents rely upon nursing home staff for not only skilled nursing care and treatment, but also essential primary care (herein "Basic Care") including:

(a)     Toileting assistance;

(b)     Incontinence are and changing of wet and soiled clothing and linen;

(c)     Assistance transferring to and from bed and wheelchair;

(d)     Assistance with dressing and personal hygiene;

(e)     Assistance with bathing;

(f)     Assistance with turning and repositioning residents in bed or chair;

(g)     Feeding assistance; and

(h)     Exercises/passive range of motion ("ROM") exercises.

20.     Basic Care is primarily delivered by Certified Nursing Aides or "CNAs."

21.     The Diversicare Defendants limited the number of CNA staff on duty at Ouachita Nursing and Rehabilitation Center which rendered the Facility incapable of meeting the needs of the residents. With the limited budgets for CNA staffing, the supply of CNA hours fell far short of the hours needed to adequately care for the residents.

22.     The difference between the services that The Diversicare Defendants promised in their admission agreement and required by Arkansas statutory law and the services that Ouachita Nursing and Rehabilitation Centerwere capable of providing is profound.

23.     Analysis of survey results reported by the Office of Long Term Care confirm the chronic understaffing at Ouachita Nursing and Rehabilitation Center and the Diversicare Defendants inability to provide the Basic Care services for which they were paid.

24.     More specifically, CNA understaffing led to a pattern and practice of failing to provide Basic Care Services at Ouachita Nursing and Rehabilitation Center to the residents during the Class Period. For example, Ouachita Nursing and Rehabilitation Center failed to provide adequate staff:

(a)     To regularly provide toileting, incontinence care, and basic hygiene care, leaving dependent residents in dirty diapers, dirty clothes, and dirty beds for hours at a time.

(b)     To timely respond to call lights rung by residents. Residents were left to soil themselves while waiting for assistance; others fell while attempting to walk to the bathroom unaided.

(c)     To re-position bed-bound and immobile residents; many residents remained in the same position for hours at a time, which can and sometimes did result in painful, infection-prone pressure sores.

(d)     To undertake ROM exercises – moving their joints and limbs, and assisting vulnerable residents who could walk or exercise. Without this assistance, residents lost mobility, rendering them even less independent.

(e)     To wash and bathe dependent residents;

(f)     To get dependent residents up, dressed, and out of bed.

(g)     To assist dependent residents with meals. Without help, some residents were unable to eat or drink in the time allotted, and some of them suffered weight loss and dehydration.

25.     These practices confirm that Ouachita Nursing and Rehabilitation Center did not provide the Basic Care that was required and paid for, and highlight the very human toll of understaffing the Facility. The Diversicare Defendants' understaffing practices saved them millions of dollars at the expense of the residents' dignity and comfort, and jeopardized their safety. As a result of chronic understaffing, residents at the Facility were left for long periods in their own urine and waste; were not cleaned, repositioned, or moved, resulting in infections, pressure sores, and loss of mobility; were deprived of food and water; and suffered falls. The

8

failure to provide adequate staff not only violated the law and the contractual terms of the Admission Agreement, it also degraded residents and stripped them of their dignity.

26.     As even more specific proof of the chronic understaffing at Ouachita Nursing and Rehabilitation Center and the resulting harm to residents, surveys conducted by the Office of Long Term Care establish that the Diversicare Defendants were on notice and aware of problems with understaffing at each facility causing harm to the residents. For example, from June 1, 2012 to June 20, 2013, Ouachita Nursing and Rehabilitation Center was cited for eight (8) health related deficiencies. Specifically, in a June 21, 2013 survey, Ouachita Nursing and Rehabilitation Center was cited for failing to "provide care qualified persons according to each resident's written plan of care. (actual harm)" In surveys conducted on April 5, 2013 and June 21, 2013, the facility was cited for numerous deficiencies relevant to the injuries suffered by Ozie Edwards, Myrtle Key and the Plaintiff Class including:

   a.   Failure to make sure the nursing home area is free from accident hazards and risks and provides supervision to prevent avoidable accidents; and
   b.   Failure to have a program that investigates, controls and keeps infection from spreading.

   c.   Failure to provide care for residents in a way that keeps or builds each resident's dignity and respect of individuality; and

   d.   Failure to assist those residents who need total help with eating/drinking, grooming and personal and oral hygiene.

27.     Under Arkansas law, the Department of Human Services which licenses nursing Facility to operate, "shall not issue or renew a license of a nursing facility unless that facility employs the direct-care staff needed to provide continuous twenty-four-hour nursing care and service to meet the needs of each resident of the nursing facility and the staffing standards required by all state and federal regulations." Ark. Code Ann. § 20-10-1402(a).

28.     Under Arkansas law, there are specific staffing standards regarding the minimum number of direct-care staff required in nursing Facility and "the staffing standard required…shall be the minimum number of direct-care staff required by nursing Facility and shall be adjusted upward to meet the care needs of residents." Ark. Code Ann. § 20-10-1402(b)(1). Therefore, a facility which provides staffing at the minimum number of direct-care givers required is not in compliance with Arkansas law as those staffing numbers "shall be adjusted upward to meet the care needs of residents." *Id.* By definition, failure to meet the minimum staffing requirements for direct-care under Arkansas law is also a direct violation of the federal law staffing requirements.

29.     Under Arkansas law for direct-care givers,

> …all nursing Facility shall maintain the following minimum direct-care staffing-to-resident ratios:
>
> (1) One (1) direct-care staff to every six (6) residents for the day shift. Of this direct-care staff, there shall be at least one (1) licensed nurse to every forty (40) residents;
>
> (2) One (1) direct-care staff to every nine (9) residents for the evening shift. Of this direct-care staff, there shall be at least one (1) licensed nurse to every forty (40) residents;
>
> (3) One (1) direct-care staff to every fourteen (14) residents for the night shift. Of this direct-care staff, there shall be at least one (1) licensed nurse to every eighty (80) residents.

Ark. Code Ann. § 20-10-1403(a).

## CAUSES OF ACTION AGAINST THE DIVERSICARE DEFENDANTS

### CLASS CLAIMS

30.     Plaintiffs bring this action individually and in a representative capacity pursuant to Arkansas Rule of Civil Procedure 23 against the Diversicare Defendants for violations of the Arkansas Deceptive Trade Practices Act, codified at Ark. Code Ann. 4-88-101, et. seq., breach of the provider agreement, breach of the Diversicare Defendants' standard admission agreement,

and negligence, on behalf of Ozie Edwards and all residents and estates of residents who resided at the Facility from November 24, 2009 to September 1, 2013. Excluded from the class are residents and estates of residents that have sued in the past or residents and estates of residents other than the named Plaintiffs who currently have lawsuits pending against any of the Diversicare Defendants, employees of the Diversicare Defendants, and all employees of the Court in which this case is pending.

31.     From November 24, 2009 to September 1, 2013, the Diversicare Defendants provided custodial care to more than 500 residents at the Facility. The class plaintiffs are so numerous that joinder of all individual claims is impracticable.

32.     At or near the time of admission to the Facility, all residents were required to sign the same or substantially the same "Admission Agreement," an example of which is attached, marked as **Exhibit C**.

33.     In the Admission Agreement, the Diversicare Defendants promised to provide "nursing services and supplies" in accordance with the Facility's handbook.

34.     The Diversicare Defendants owed a non-delegable duty to the Plaintiff and Plaintiff Class to provide adequate and appropriate staffing at the Facility at all times, and the Diversicare Defendants knew that state and federal law, which the Diversicare Defendants expressly incorporated into their Admission Agreements, required the Diversicare Defendants to meet critical staffing requirements. These requirements include but are not limited to the following:

a.     Meeting requirements for minimum numbers of Facility staff members to be present at all times, Ark. Code Ann. § 20-10-1401 et seq.;

b.     Meeting requirements for the minimum number of staff members to be adjusted upward to meet the care needs of residents, Ark. Code. Ann. § 20-10-1401 et seq.;

    c.     Meeting additional staffing requirements to assure that all residents receive the highest quality of life while protecting their health and welfare; Ark. Code Ann. § 20-10-1002 et seq.;

    d.     Meeting the federal minimum standards imposed by the United States Department of Health and Human Services, 42 CFR Section 405-301 et seq. including providing sufficient nursing staff and nursing personnel to ensure that each resident attains and maintains the highest practical physical, mental, and psychosocial well-being. 42 CFR Section 483.30; and

    e.     Meeting the requirements of other provisions of Arkansas and Federal law.

35.     In an effort to ensure that minimum staffing requirements are met, Arkansas law requires that the Diversicare Defendants honestly, accurately, regularly and truthfully:

    a.     Post daily personnel sign-in sheets reflecting levels of staffing per shift, Ark. Code Ann. § 20-10-1406; and

    b.     Submit to the Office of Long Term Care a written report of all shifts which failed to meet the minimum staffing requirements, Ark. Code Ann. § 20-10-1407.

36.     The Diversicare Defendants filed such reports knowing that they were inaccurate and misleading.

37.     By understaffing the Facility, the Diversicare Defendants saved significant money and profited at the expense of all residents. The Diversicare Defendants operated and managed the Facility so as to maximize profits by reducing staffing levels below that which was needed to provide adequate care to residents that would comply with federal and state regulations governing skilled nursing Facility. Thus, the Diversicare Defendants intentionally and/or with reckless disregard for the consequences of their actions caused staffing levels at the Facility to be set so that the personnel on duty at any given time could not reasonably meet the needs of the residents, causing injury to the residents at the Facility. The Diversicare Defendants have created

a broad corporate culture in which understaffing is a standard practice and in which the Diversicare Defendants sought reimbursement of funds from government sources for services not provided.

38.     All residents in the Facility were harmed by the Diversicare Defendants' chronic and institutionalized understaffing. The lack of personnel in the Facility resulted in residents receiving a level of care (1) that was below the level of care that the Diversicare Defendants represented they were able to provide in their Admission Agreement, and (2) that failed to comply with state and federal minimum staffing requirements.

39.     The pervasive common question is whether the Facility were chronically understaffed so as to violate the residents' statutory and contractual rights and breached their legal duty to adequately staff the Facility. There are other questions of law and fact common to the Plaintiff Class which predominate over questions affecting only individual class members. Such common questions include, but are not limited to:

   a.     Whether the Diversicare Defendants' standard Admission Agreement imposed minimum staffing requirements.

   b.     Whether Ark. Code Ann. 20-10-1201, et. seq. imposes minimum staffing requirements.

   c.     Whether the Diversicare Defendants failed to meet the minimum staffing requirements of Ark. Code Ann. 20-10-1201, et. seq., and the Diversicare Defendants' standard admission agreement.

   d.     Whether failure to meet minimum staffing requirements breaches the the Diversicare Defendants' standard admission agreement.

   e.     Whether failure to meet minimum staffing requirements violates Ark. Code Ann. 20-10-1201, et. seq.

   f.     Whether failure to meet the minimum staffing requirements of Ark. Code Ann. 20-10-1201, et. seq., is a violation of the Arkansas Deceptive Trade Practices Act.

g.   Whether the Diversicare Defendants owed a duty to the residents to adequately staff the Facility;

h.   Whether the Diversicare Defendants breach their duty to adequately staff the Facility;

i.   Whether failure to adequately staff the Facility is a breach of the provider agreement;

j.   Whether the admission agreement disclosed the Facility' history of understaffing;

k.   Whether Jennie Jeanette Goss Hassan; Diversicare Management Services Co.; and Advocat Ancillary Services, Inc. are control persons as defined in Ark. Code Ann. 4-88-113(d)(1) and therefore jointly and severally liable for the damages suffered by the Plaintiff Class for the Diversicare Defendants' deceptive trade practices.

40.   The Plaintiffs will fairly and adequately protect the interest of the Plaintiff Class and have familiarity with the allegations expressed herein and are able to assist in decision making as to the conduct of this litigation.

41.   Plaintiffs' claims are typical of the claims of the class because the class representative's claims arise from the Diversicare Defendants' standard and routine practice of failing to meet the minimum staffing requirements imposed by state law and their standard admission agreement. The chronic understaffing at the Facility made it impossible for the few staff that were there to perform their tasks at a level which complied with the protections afforded by the Residents' Rights Act and at the levels promised by the Diversicare Defendants' Admission Agreements.

42.   By understaffing the Facility, the Diversicare Defendants intentionally placed profits over people and knowingly took advantage of residents who were unable to protect their interests because of their physical and mental infirmities. Systemic understaffing of the Facility directly resulted in undignified living conditions for the residents, a breach of the Admission

Agreement, a breach of the provider agreement, a violation of state law, and a breach of the Facility' duty to adequately staff the Facility. The injuries sustained by the proposed class representatives are typical of the class and further evidence understaffing at the Facility.

43.     By understaffing the Facility, Diversicare Defendants placed profits over compliance with state law. These decisions were made and implemented by the owners, board members, management, employees and agents of the Diversicare Defendants and are an illegal, deceptive and unconscionable business practice. Since at least November 24, 2009, the Diversicare Defendants have, as a standard and routine business practice, violated state and federal laws and regulations knowing that the well-being of all residents would be adversely affected as detailed herein.

44.     The Diversicare Defendants failed to discharge their obligations of care to Ozie Edwards and Myrtle Key with a conscious disregard for their rights and safety. At all times mentioned herein, the Diversicare Defendants, through their corporate officers and administrators, had knowledge of, ratified and/or otherwise authorized all of the acts and omissions that caused the injuries suffered by Mr. Edwards and Ms. Key, as more fully set forth below. The Diversicare Defendants knew that their facility could not provide the minimum standard of care to the weak and vulnerable residents of Ouachita Nursing and Rehabilitation Center. The severity of the recurrent negligence inflicted upon Mr. Edwards and Ms. Key while residents of the facility accelerated the deterioration of their health and physical condition and resulted in physical and emotional injuries. While a resident at Ouachita Nursing and Rehabilitation Center, Ozie Edwards sustained multiple injuries including, but not limited to, the following: (a) Malnutrition; (b) Dehydration; (c) Multiple infections; (d) Poor hygiene; (e) Multiple falls with injury; (f) Skin tears and lacerations from falls; (g) Broken hip resulting from

fall; and (h) Death. While a resident at Ouachita Nursing and Rehabilitation Center, Myrtle Key sustained multiple injuries including, but not limited to, the following: (a) Malnutrition; (b) Weight loss; (c) Multiple infections including MRSA; (d) Poor hygiene; (e) Bed sores including large infected wound on her back; (f) Broken arm; (g) Sepsis; and (h) Death.

45.     As a direct and proximate result of the Diversicare Defendants' conduct, the Plaintiff Class has suffered actual damage, both in terms of physical injuries, as detailed above, and economic damage. The Plaintiffs, or someone acting on behalf of the Plaintiffs, provided payment in exchange for services which were not provided, which were not as represented by the Diversicare Defendants' Admission Agreements, and not up to the standards required by the Arkansas Residents' Rights Act.

46.     The Diversicare Defendants, as the owners, agents, managers and operators of a private organization having the responsibility of protecting and caring for the residents, have direct and vicarious liability for the acts and omissions giving rise to this complaint.

47.     Plaintiffs have retained counsel qualified, experienced and able to conduct the litigation, and Plaintiffs have made arrangements to cover the costs associated with this litigation.

48.     If each class member were required to pursue individual actions, it would be economically and judicially unfeasible. A class action is appropriate and the superior method for the fair and efficient adjudication of this controversy.

### COUNT ONE: VIOLATION OF THE DECEPTIVE TRADE PRACTICES ACT

49.     Plaintiffs incorporate the allegations contained in Paragraphs 1–48 as if fully set forth herein.

50.    At all times pertinent to this cause of action, Plaintiffs were "elder person[s]" as defined by the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-201(a). As an "elder person" within the meaning of the Deceptive Trade Practices Act, the Plaintiffs have a private cause of action to recover actual damages, punitive damages, and reasonable attorney's fees pursuant to Ark. Code Ann. § 4-88-204.

51.    At all relevant times, the Arkansas Deceptive Trade Practices Act, codified at Ark. Code Ann. 4-88-107(a) ("ADTPA") provides that it is unlawful to:

a.    Knowingly take advantage of a consumer who is reasonably unable to protect his or her interest because of:

i.    Physical infirmity; or

ii.    A similar factor; and

b.    Engage in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade.

52.    Ark. Code Ann. § 4-88-108 provides that, when utilized in connection with the sale or advertisement of any goods, services, or charitable solicitation, it shall be unlawful for any person to (1) act, use or employ any deception, fraud or false pretense, or (2) conceal, suppress, or omit any material fact with intent that others rely on the concealment, suppression, or omission.

53.    The conduct of the Diversicare Defendants as described herein constitutes a deceptive practice in violation of the ADTPA. The Diversicare Defendants failed to inform Plaintiff and the Plaintiff Class in the Diversicare Defendants' standard Admission Agreement that the Facility routinely failed to meet minimum staffing requirements imposed by state and federal law which increased profits. Furthermore, the Diversicare Defendants represented

17

themselves as providing services commensurate with the needs of the residents and in compliance with the requirements of Arkansas state law governing long-term care and nursing Facility.

54.     By understaffing the Facility, the Diversicare Defendants knowingly took advantage of the most vulnerable consumers and those who were unable to protect themselves. The Diversicare Defendants' unfair and deceptive trade practices asserted herein are the type that the ADTPA is specifically designed to protect against and remedy.

55.     The Diversicare Defendants' trade practices also are, and have been throughout the Class Period unconscionable, because the nursing home residents constitute a vulnerable population:  they are elderly, ill, infirm, and often deteriorating. These residents often face the double burden of dependency and isolation. The Diversicare Defendants accept these vulnerable residents for admission, and then knowingly fail to provide sufficient levels of staffing to provide the care required without disclosing in their admission agreement the Facility' dreadful history of understaffing.

56.     The Diversicare Defendants also engage in, and have engaged in throughout the Class Period, substantively unconscionable trade practices by understaffing the Facility making it impossible to provide adequate care to residents even though it charged for services it could not provide.

57.     The Diversicare Defendants knew that they were not meeting, and did not have sufficient CNA staff to meet the Basic Care needs of their residents as mandated by state and federal laws and regulations.

58.     The Diversicare Defendants were further engaging in deceptive trade practices by infringing upon and depriving the Plaintiff Class of the rights guaranteed by Ark. Code Ann. §§

20-10-1201 *et seq.* ("Protection of Long Term Care Facility Residents' Act") including, but not limited to, the following:

    a)    The right to receive adequate and appropriate health care and protective and support services, including social services, mental health services, if available, planned recreational activities, and therapeutic and rehabilitative services consistent with the resident care plan for the Plaintiff Class, with established and recognized practice standards within the community, and with rules as adopted by federal and state agencies, such rights include:

        1)    The right to receive adequate and appropriate custodial service, defined as care for the Plaintiff Class which entailed observation of diet and sleeping habits and maintenance of a watchfulness over their general health, safety, and well-being; and

    b)    The right to appropriate observation, assessment, nursing diagnosis, planning, intervention, and evaluation of care by nursing staff;

    c)    The right to access to dental and other health-related services, recreational services, rehabilitative services, and social work services appropriate to the needs and conditions of the Plaintiff Class, and not directly furnished by the licensee;

    d)    The right to a wholesome and nourishing diet sufficient to meet generally accepted standards of proper nutrition, guided by standards recommended by nationally recognized professional groups and associations with knowledge of dietetics, and such therapeutic diets as may be prescribed by attending physicians;

    e)    The right to a Facility with its premises and equipment, and conduct of its operations maintained in a safe and sanitary manner;

    f)    The right to be free from mental and physical abuse, and from physical and chemical restraints;

    g)    The right of the Plaintiff Class to have privacy of their bodies in treatment and in caring for their personal needs;

    h)    The right to the obligation of the Facility to keep full records of the admissions and discharges of the Plaintiff Class and their medical and general health status, including:

        1)    medical records;

        2)    personal and social history;

3)      individual resident care plans, including, but not limited to, prescribed services, service frequency and duration, and service goals;

4)      making it a criminal offense to fraudulently alter, deface, or falsify any medical or other long-term care Facility record, or cause or procure any of these offenses to be committed; a

5)      The right to be treated courteously, fairly, and with the fullest measure of dignity.

59.     As described in part and above, the Diversicare Defendants received repeated citations related to failures of Basic Care in Office of Long Term Care surveys. Upon information and belief, they received these deficiencies despite taking steps to increase staffing and prepare staff for surveys immediately preceding the arrival of state surveyors – steps that would lead surveyors to believe levels of care provided were higher than they actually were during non-survey times.

60.     The conduct of the Diversicare Defendants, as described herein, constitutes a deceptive practice in violation of the Arkansas Deceptive Trade Practices Act. The Diversicare Defendants engaged in unconscionable, false, and/or deceptive acts or practices in business, commerce and/or trade by marketing themselves and holding themselves out to the public as being able to meet the needs of elder residents of Ouachita Nursing and Rehabilitation Center. The Diversicare Defendants profited greatly as a result of their deceptive trade practices, but the Diversicare Defendants were aware that Ouachita Nursing and Rehabilitation Center could not meet the needs of its residents.

61.     As a direct and proximate result of the Diversicare Defendants' wrongful conduct, Plaintiffs have suffered actual damages.

## COUNT TWO: BREACH OF THE ADMISSION AGREEMENT

62.     Plaintiffs incorporate the allegations contained in paragraphs 1–61 as if fully set forth herein.

63.     Before being admitted to Ouachita Nursing and Rehabilitation Center, residents, or those acting on their behalf, were required to enter into a resident Admission Agreement, whereby the Facility agreed to provide nursing and custodial care, necessary goods, services, and/or treatment in exchange for valuable consideration. *See* **Exhibit C.**

64.     The residents, or those acting on their behalf, paid for or caused to be paid for, the goods, services, care and treatment, including personal or custodial care, and professional nursing care the Diversicare Defendants promised to provide.

65.     The Diversicare Defendants breached their contractual duties by understaffing the Facility and creating a situation whereby it was impossible for caregivers to provide the care and services as described in the agreement, causing damage to the residents.

66.     As a result, the Plaintiffs are entitled to compensatory damages and consequential damages.

67.     As a result of the Diversicare Defendants' breach of the Admissions Agreement, Plaintiffs assert a claim for judgment for all compensatory damages including the amount a jury determines is sufficient compensation for the loss of the benefit of promised services and care and treatment, in an amount that exceeds that required for federal court jurisdiction in diversity of citizenship cases.

68.     Plaintiffs are entitled to seek punitive damages for breach of contract, because the Diversicare Defendants knew or should have known, in the light of the surrounding circumstances, that their nonfeasance in breach of the Admission Agreement would naturally and

probably result in injury or damage, yet the Diversicare Defendants breached the agreement in reckless disregard of the consequences from which malice may be inferred.

<div align="center">

**COUNT THREE: BREACH OF THE PROVIDER AGREEMENT**

</div>

69.     Plaintiffs incorporate the allegations contained in paragraphs 1-68 as if fully set forth herein.

70.     Upon becoming a resident of Ouachita Nursing and Rehabilitation Center, the residents, many of whom were Medicare and/or Medicaid recipients, became third-party beneficiaries of the contract or provider agreement between the Diversicare Defendants and the state and federal governments, an example of which is attached as **Exhibit D**.

71.     For consideration duly paid by the residents, or on their behalf, the Diversicare Defendants agreed to provide residents with personal and custodial care and professional nursing care in compliance with the requirements set forth in the provider agreements, as well as the minimum standards of care imposed by applicable law including the statutes and regulations set out herein. In addition, by entering into the agreement, the Diversicare Defendants promised to "comply with all rules, regulations, changes in and additions thereto issued by the United States Department of Health and Human Services pertaining to nursing homes, and to comply with all rules, regulations, duly promulgated changes in and additions thereto issued by the State." The Diversicare Defendants further agreed that "the rights and privileges of the residents [were] of primary concern to the parties" and covenanted to "protect and preserve" the rights of the residents. The parties to the contract agreed "that failure to act in a manner consistent with those rights and privileges shall constitute an immediate breach of agreement." *See* **Exhibit D.**

72.     As the name implies, the provider agreement exists to pay for and provide for resident, personal, or custodial care and professional nursing care. Additionally, the provider

agreement between the Diversicare Defendants and the state and federal government was clearly intended to benefit and protect the residents of Ouachita Nursing and Rehabilitation Center by requiring the Diversicare Defendants to provide quality care consistent with federal and state statutes and regulations.

73.    The Diversicare Defendants breached the provider agreement and committed multiple acts of nonfeasance in failing to adequately staff the Facility and provide the care, goods, and services to industry standards, as required by law and as agreed, including but not limited to:

a)    Failing to provide dietary services, including special diets, supplemental feedings, special delivery preparation, assistance, and equipment required for preparing and dispensing oral feedings and special feeding devices;

b)    Failing to provide personal or custodial services and nursing care;

c)    Failing to implement policies and procedures so as to prevent infringement or deprivation of the Plaintiff Class's rights as residents of a long term care Facility;

d)    Failing to comply with protections, duties and obligations imposed by applicable state and federal statutes and regulations as alleged herein; and

e)    Failing to staff Ouachita Nursing and Rehabilitation Center with sufficient personnel to adequately meet the needs of the Plaintiff Class, failing to comply with the rules and regulations promulgated by the state and federal governments, and in failing to provide staff qualified to meet the needs of the residents.

74.    As a result of the Diversicare Defendants' breach of the provider agreement, Plaintiffs assert a claim for judgment for all compensatory damages including the amount a jury determines is sufficient compensation for the loss of the benefit of promised services and care and treatment, in an amount that exceeds that required for federal court jurisdiction in diversity of citizenship cases.

75.     The Diversicare Defendants are also liable for all consequential damages, because the Diversicare Defendants knew, or should have known, that breaches of the provider agreement would result in consequential damages to the Plaintiff Class, and, under the circumstances, the Diversicare Defendants should have understood that it had agreed to assume responsibility for any consequential damages caused by their breaches of the provider agreement.

76.     Plaintiffs seek judgment for all foreseeable consequential damages, which flowed naturally from the failure of the Diversicare Defendants to provide the care, goods, and services promised under the provider agreement, including but not limited to medical expenses, pain and suffering, and mental anguish.

77.     Plaintiffs are entitled to seek punitive damages for breach of contract, because the Diversicare Defendants knew or ought to have known, in the light of the surrounding circumstances, that their nonfeasance in breach of the provider agreement would naturally and probably result in injury or damage, yet the Diversicare Defendants breached the agreement in reckless disregard of the consequences from which malice may be inferred.

78.     A copy of the provider agreement is attached to this Complaint as **Exhibit D**.

### COUNT FOUR: NEGLIGENCE

79.     Plaintiff incorporates the allegations contained in Paragraphs 1 – 78 as if fully set forth herein.

80.     The Diversicare Defendants owed a non-delegable duty to residents, including the Plaintiff Class, to adequately staff the Facility and to provide adequate and appropriate custodial care and supervision, which a reasonably careful person would provide under similar circumstances.

81.     The Diversicare Defendants owed a non-delegable duty to their residents, including the Plaintiff Class, to exercise reasonable care in adequately staffing the Facility and providing care and services in a safe and beneficial manner.

82.     The Diversicare Defendants owed a non-delegable duty to their residents, including the Plaintiff Class, to hire, train and supervise employees to deliver care and services to residents in a safe and beneficial manner.

83.     The Diversicare Defendants owed a non-delegable duty to residents, including the Plaintiff Class, to use reasonable care in adequately staffing the Facility in order to treat their residents with the degree of skill and learning ordinarily possessed and used by nursing home Facility in the same or similar locality.

84.     The Diversicare Defendants owed a non-delegable duty to assist all residents, including the Plaintiff Class, in attaining and maintaining the highest level of physical, mental and psychosocial well-being.

85.     The Diversicare Defendants breached these duties by failing to adequately staff the Facility and failing to exercise reasonable care causing injury, abuse and neglect to the Plaintiff Class. Understaffing the Facility caused the following acts and omissions, which is not exhaustive or an all-inclusive list:

        a)    The failure to follow physician orders to ensure that residents were free of significant medication errors;

        b)    The failure to ensure that the Plaintiff Class attained and maintained its highest level of physical, mental, and psychosocial well-being;

        c)    The failure to establish, publish and/or adhere to policies for nursing personnel concerning the care and treatment of residents with nursing, medical and psychosocial needs similar to those of the Plaintiff Class;

d)     The failure to increase the number of nursing personnel to ensure that the Plaintiff Class received timely and accurate care assessments, and proper treatment, medication and diet;

e)     The failure to provide sufficient numbers of qualified personnel, including nurses, licensed practical nurses, certified nurse assistants and medication aides to meet the total needs of the Plaintiff Class throughout the Class Period;

f)     The failure to increase the number of nursing personnel at the Facility to ensure that the Plaintiff Class:

    1)     Received timely and accurate care assessments;
    2)     Received proper treatment, medication, and diet; and
    3)     Was protected from accidental injuries by the correct use of ordered and reasonable safety measures.

g)     The failure to adequately screen, evaluate, and check references, test for competence and use ordinary care in selecting nursing personnel to work at the Facility;

h)     The creation of and/or the failure or refusal to identify and correct the injuries, conditions, and circumstances at the Facility;

i)     The failure to terminate employees at the Facility assigned to the Plaintiff Class who were known to be careless, incompetent and unwilling to comply with the policies and procedures of the Facility and the rules and regulations promulgated by the Arkansas Department of Human Services and the Office of Long Term Care;

j)     The failure to assign nursing personnel at the Facility duties consistent with their education and experience based on:

    1)     The Plaintiff Class's medical history and condition, nursing and rehabilitative needs;
    2)     The characteristics of the resident population residing in the area of the Facility where the Plaintiff Class was; and,
    3)     The nursing skills needed to provide care to such resident population.

k)     The failure by the members of the governing body of the Facility to discharge their legal and lawful obligation by (1) ensuring that the rules and regulations designed to protect the health and safety of residents, such as the Plaintiff Class, as promulgated by the Arkansas Department of Human Services and the Arkansas Office of Long Term Care, were consistently complied with on an ongoing basis and (2) ensuring

appropriate corrective measures were implemented to correct problems concerning inadequate resident care;

l)  The failure to adopt adequate guidelines, policies, and procedures of the Facility for documenting, maintaining files, investigating and responding to any complaint regarding the quality of resident care or misconduct by employees at the Facility, regardless of whether such complaint derived from a resident of the Facility, an employee of the Facility or any interested person;

m)  The failure to maintain medical records on the Plaintiff Class in accordance with accepted professional standards and practices that are complete, accurately documented, readily accessible and systematically organized with respect to diagnosis, treatment and assessment and establishment of appropriate care plans of care and treatment; and

n)  The failure to properly in-service and orient employees to pertinent patient care needs to maintain the safety of residents.

86.  A reasonably careful nursing home operating under similar circumstances would foresee that the failure to adequately staff and provide the ordinary care listed above would result in devastating injuries to the Plaintiff Class.

87.  The Diversicare Defendants' also caused violation of certain laws and regulations in force in the State of Arkansas at the time of the occurrences discussed herein including, but not limited to, the following:

a)  By failing to provide sufficient nursing staff and nursing personnel to ensure that the Plaintiff Class attained and maintained its highest practicable physical, mental and psychosocial well-being;

b)  By failing to provide a safe environment; and

c)  By failing to administer the Facility in a manner that enabled it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident.

88.  The Diversicare Defendants were further negligent by infringing upon and depriving the Plaintiff Class of the rights guaranteed by Ark. Code Ann. §§ 20-10-1201 *et seq.* including, but not limited to, the following:

a)  The right to receive adequate and appropriate health care and protective and support services, including social services, mental health services, if available, planned recreational activities, and therapeutic and rehabilitative services consistent with the resident care plan for the Plaintiff Class, with established and recognized practice standards within the community, and with rules as adopted by federal and state agencies, such rights include:

   1)  The right to receive adequate and appropriate custodial service, defined as care for the Plaintiff Class which entailed observation of diet and sleeping habits and maintenance of a watchfulness over her general health, safety, and well-being; and

b)  The right to appropriate observation, assessment, nursing diagnosis, planning, intervention, and evaluation of care by nursing staff;

c)  The right to access to dental and other health-related services, recreational services, rehabilitative services, and social work services appropriate to the needs and conditions of the Plaintiff Class, and not directly furnished by the licensee;

d)  The right to a wholesome and nourishing diet sufficient to meet generally accepted standards of proper nutrition, guided by standards recommended by nationally recognized professional groups and associations with knowledge of dietetics, and such therapeutic diets as may be prescribed by attending physicians;

e)  The right to a facility with its premises and equipment, and conduct of its operations maintained in a safe and sanitary manner;

f)  The right to be free from mental and physical abuse, and from physical and chemical restraints;

g)  The right of the Plaintiff Class to have privacy of their bodies in treatment and in caring for her personal needs;

h)  The right to the obligation of the Facility to keep full records of the admissions and discharges of the Plaintiff Class and their medical and general health status, including:

   1)  medical records;

   2)  personal and social history;

   3)  individual resident care plans, including, but not limited to, prescribed services, service frequency and duration, and service goals;

28

4) making it a criminal offense to fraudulently alter, deface, or falsify any medical or other long-term care Facility record, or cause or procure any of these offenses to be committed; and

5) The right to be treated courteously, fairly, and with the fullest measure of dignity.

89. A reasonably prudent nursing home, operating under the same or similar conditions, would not have failed to adequately staff the Facility and provide the care listed above. Each of the foregoing acts of negligence on the part of the Diversicare Defendants was a proximate cause of the Plaintiff Class' injuries as more specifically described herein. The Plaintiff Class suffered personal injury including extreme pain and suffering, mental anguish, disfigurement, disability, degradation, loss of personal dignity, and emotional distress.

90. As a direct and proximate result of such grossly negligent, willful, wanton, reckless, malicious and/or intentional conduct, Plaintiffs assert a claim for judgment for all compensatory and punitive damages against the Diversicare Defendants including, but not limited to, medical expenses, extreme pain and suffering, mental anguish, emotional distress and in some instances loss of life in an amount exceeding that required by federal court jurisdiction in diversity of citizenship cases, to be determined by the jury, plus costs and all other relief to which Plaintiffs are entitled by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and on behalf of the Plaintiff Class pray for judgment against the Diversicare Defendants as follows:

a) For damages in an amount adequate to compensate the Plaintiffs for the injuries and damages sustained and exceeding that required by federal court jurisdiction in diversity of citizenship cases.

b)      For all actual, general and special damages caused by the alleged conduct of the Diversicare Defendants.

c)      For the costs of litigating this case.

d)      For attorney's fees pursuant to Ark. Code Ann. § 16-22-308 and Ark. Code Ann. § 4-88-204.

e)      For punitive damages sufficient to punish Diversicare Defendants for their egregious and malicious misconduct in reckless disregard and conscious indifference to the consequences the residents and to deter the Diversicare Defendants and others from repeating such atrocities.

f)      For all other relief to which Plaintiffs are entitled.

## INDIVIDUAL CLAIMS OF PLAINTIFF ADDIE EDWARDS

91.      Plaintiff Addie Edwards, as Representative of the Estate of Ozie Edwards, and on behalf of the wrongful death beneficiaries of Ozie Edwards, brings the following separate and individual causes of action against Camden Operations, LLC d/b/a Ouachita Nursing and Rehabilitation Center; JEJ Investments, LLC; Sub-Ten Holdings, LLC; MasterTen, LLC; Advanced Practice Solutions, LLC; Procare Therapy Services, LLC; Southern Administrative Services, LLC; Ponthie Holdings, LLC; Professional Nursing Solutions, LLC; John Ponthie; Ross Ponthie; Mark Thompson; Omega Healthcare Investments, Inc.; and Jennie Jeanette Goss Hassan, in her capacity as Administrator of Ouachita Nursing and Rehabilitation Center.

## JURISDICTIONAL STATEMENT

92.      As noted in paragraph 2, Addie Edwards is the Personal Representative of the Estate of Ozie Edwards as shown by the October 20, 2014 Order Appointing Personal

Representative which is attached hereto as **Exhibit A**, and brings this action on behalf of Ozie Edwards.

93.    Addie Edwards is Ozie Edwards's wife.

94.    Other than hospitalizations, Ozie Edwards was a resident of Ouachita Nursing Rehab Center, (sometimes referred to as "facility"), a nursing home located at 1411 Country Club Road, Camden, Ouachita County, Arkansas, from approximately November 24, 2012 until November 12, 2013. Mr. Edwards died on November 12, 2013.

95.    Upon information and belief, on or about September 1, 2013, Defendant Omega Healthcare Investors, Inc. completed the transition in the operation of Ouachita Nursing and Rehabilitation Center from the above referenced Diversicare Defendants to new ownership and operating entities. Defendant Camden Operations, LLC d/b/a Ouachita Nursing and Rehabilitation Center is a domestic limited liability company that, since September 1, 2013, owned, operated, managed, and held the license for the nursing home located 1411 Country Club Road, Camden, Ouachita County, Arkansas known as Ouachita Nursing and Rehabilitation Center. The causes of action made the basis of this suit arise out of such business conducted by Defendant Camden Operations, LLC d/b/a Ouachita Nursing and Rehabilitation Center in the ownership, operation, management, licensing and/or control of the facility during the residency of Ozie Edwards. The agent for service of process for Defendant Camden Operations, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

96.    Defendant JEJ Investments, LLC is a domestic limited liability company that owned, operated, controlled, managed, and/or provided services to Ouachita Nursing and Rehabilitation Center at times pertinent to this lawsuit. The causes of action made the basis of this suit arise out of such business conducted by JEJ Investments, LLC in the ownership,

operation, control, management, and provision of services for the facility during the residency of Ozie Edwards. The agent for service of process on JEJ Investments, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

97.     Defendant Sub-Ten Holdings, LLC is a domestic limited liability company that owned, operated, controlled, managed, and/or provided services to Ouachita Nursing and Rehabilitation Center at times pertinent to this lawsuit. The causes of action made the basis of this suit arise out of such business conducted by Sub-Ten Holdings, LLC in the ownership, operation, control, management, and provision of services for the facility during the residency of Ozie Edwards. The agent for service of process on Sub-Ten Holdings, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

98.     Defendant MasterTen, LLC is a domestic limited liability company that owned, operated, controlled, managed, and/or provided services to Ouachita Nursing and Rehabilitation Center at times pertinent to this lawsuit. The causes of action made the basis of this suit arise out of such business conducted by MasterTen, LLC in the ownership, operation, control, management, and provision of services for the facility during the residency of Ozie Edwards. The agent for service of process on MasterTen, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

99.     Defendant Advanced Practice Solutions, LLC is a domestic limited liability company that owned, operated, controlled, managed, and/or provided services to Ouachita Nursing and Rehabilitation Center at times pertinent to this lawsuit. The causes of action made the basis of this suit arise out of such business conducted by Advanced Practice Solutions, LLC in the ownership, operation, control, management, and provision of services for the facility during the residency of Ozie Edwards. The agent for service of process on Advanced Practice

32

Solutions, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

100.    Defendant Procare Therapy Services, LLC is a domestic limited liability company that owned, operated, controlled, managed, and/or provided services to Ouachita Nursing and Rehabilitation Center at times pertinent to this lawsuit. The causes of action made the basis of this suit arise out of such business conducted by Procare Therapy Services, LLC in the ownership, operation, control, management, and provision of services for the facility during the residency of Ozie Edwards. The agent for service of process on Procare Therapy Services, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

101.    Defendant Southern Administrative Services, LLC is a domestic limited liability company that was engaging in business in the State of Arkansas and owned, operated, controlled, managed, and/or provided services to Ouachita Nursing and Rehabilitation Center at times pertinent to this lawsuit. The causes of action made the basis of this suit arise out of such business conducted by Southern Administrative Services, LLC in the ownership, operation, control, management, and provision of services for the facility during the residency of Ozie Edwards. The agent for service of process on Southern Administrative Services, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

102.    Defendant Ponthie Holdings, LLC is a domestic limited liability company that was engaging in business in the State of Arkansas and owned, operated, controlled, managed, and/or provided services to Ouachita Nursing and Rehabilitation Center at times pertinent to this lawsuit. The causes of action made the basis of this suit arise out of such business conducted by Ponthie Holdings, LLC in the ownership, operation, control, management, and provision of services for the facility during the residency of Ozie Edwards. The agent for service of process

33

on Ponthie Holdings, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

103.    Defendant Professional Nursing Solutions, LLC is a domestic limited liability company that was engaging in business in the State of Arkansas and owned, operated, controlled, managed, and/or provided services to Ouachita Nursing and Rehabilitation Center at times pertinent to this lawsuit. The causes of action made the basis of this suit arise out of such business conducted by Professional Nursing Solutions, LLC in the ownership, operation, control, management, and provision of services for the facility during the residency of Ozie Edwards. The agent for service of process on Professional Nursing Solutions, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

104.    Defendant John Ponthie is a citizen and resident of Shreveport, Louisiana. At certain times material to this action, John Ponthie was an owner and the Incorporator/Organizer of the licensee Defendant Camden Operations, LLC. Upon information and belief, John Ponthie is an owner and/or member of separate Defendants JEJ Investments, LLC, Sub-Ten Holdings, LLC, MasterTen, LLC, Advanced Practice Solutions, LLC, Omega Healthcare Investors, Inc., Procare Therapy Services, LLC, Southern Administrative Services, LLC, Ponthie Holdings, LLC, and Professional Nursing Solutions, LLC. John Ponthie was a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiff's damages. John Ponthie's systematic and continuous contacts with the operations of Ouachita Nursing and Rehabilitation Center, specifically, and the State of Arkansas, generally, render him subject to the personal jurisdiction of this Court pursuant to Ark. Code Ann. § 16-4-101(B).

105.    Defendant Ross Ponthie is a citizen and resident of Alexandria, Louisiana. At certain times material to this action, Ross Ponthie was an owner of the licensee Defendant

Camden Operations, LLC. Upon information and belief, Ross Ponthie is an owner and/or member of separate Defendants Sub-Ten Holdings, LLC, MasterTen, LLC, Advanced Practice Solutions, LLC, Omega Healthcare Investors, Inc., Procare Therapy Services, LLC, Southern Administrative Services, LLC, Ponthie Holdings, LLC, and Professional Nursing Solutions, LLC. Ross Ponthie was a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiff's damages. Ross Ponthie's systematic and continuous contacts with the operations of Ouachita Nursing and Rehabilitation Center, specifically, and the State of Arkansas, generally, render him subject to the personal jurisdiction of this Court pursuant to Ark. Code Ann. § 16-4-101(B).

106.    Defendant Mark Thompson is a citizen and resident of Alexandria, Louisiana. At certain times material to this action, Mark Thompson was an owner of the licensee Defendant Camden Operations, LLC. Upon information and belief, Mark Thompson is an owner and/or member of separate Defendants Sub-Ten Holdings, LLC, MasterTen, LLC, Advanced Practice Solutions, LLC, Omega Healthcare Investors, Inc., Procare Therapy Services, LLC, Southern Administrative Services, LLC, Ponthie Holdings, LLC, and Professional Nursing Solutions, LLC. Mark Thompson was a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiff's damages. Mark Thompson's systematic and continuous contacts with the operations of Ouachita Nursing and Rehabilitation Center, specifically, and the State of Arkansas, generally, render him subject to the personal jurisdiction of this Court pursuant to Ark. Code Ann. § 16-4-101(B).

107.    Upon information and belief, Defendant Jennie Jeanette Goss Hassan was the Administrator of Ouachita Nursing and Rehabilitation Center during the residency of Ozie Edwards. The causes of action made the basis of this suit arise out of Ms. Goss Hassan's

administration of Ouachita Nursing and Rehabilitation Center during the residency of Mr. Edwards. Defendant Jennie Jeanette Goss Hassan may be served with process at her last known address: 4381 Highway 7, Bismark, Arkansas 71929.

108.    Whenever the term "Ponthie Nursing Home Defendants" is used throughout this portion of the Complaint, that term collectively refers to and includes the following Defendants: Camden Operations, LLC d/b/a Ouachita Nursing and Rehabilitation Center; JEJ Investments, LLC; Sub-Ten Holdings, LLC; MasterTen, LLC; Advanced Practice Solutions, LLC; Procare Therapy Services, LLC; Southern Administrative Services, LLC; Ponthie Holdings, LLC; Professional Nursing Solutions, LLC; John Ponthie; Ross Ponthie; and Mark Thompson.

109.    Whenever the term "Administrator Defendant" is used throughout this portion of the Complaint, that term refers to Defendant Jennie Jeanette Goss Hassan.

110.    Whenever the term "Ponthie Defendants" is used throughout this portion of the Complaint, that term collectively refers to and includes the following Defendants: Camden Operations, LLC d/b/a Ouachita Nursing and Rehabilitation Center; JEJ Investments, LLC; Sub-Ten Holdings, LLC; MasterTen, LLC; Advanced Practice Solutions, LLC; Procare Therapy Services, LLC; Southern Administrative Services, LLC; Ponthie Holdings, LLC; Professional Nursing Solutions, LLC; John Ponthie; Ross Ponthie; and Mark Thompson; and Jennie Jeanette Goss Hassan, in her capacity as Administrator of Ouachita Nursing and Rehabilitation Center.

111.    Jurisdiction and venue are proper in this Court.

### FACTUAL ALLEGATIONS

112.    Other than hospitalizations, Ozie Edwards was a resident of Ouachita Nursing and Rehabilitation Center from approximately November 24, 2012 until November 12, 2013. Mr. Edwards died on November 12, 2013.

113.   The Ponthie Defendants were aware of Mr. Edwards's medical condition and the care he required when they represented that they could adequately care for his needs.

114.   In an effort to ensure that Ozie Edwards and other residents whose care was partially funded by the government were placed at Ouachita Nursing and Rehabilitation Center, the Ponthie Defendants held themselves out to the Arkansas Department of Human Services (DHS) and the public at large as being:

a)   Skilled in the performance of nursing, rehabilitative and other medical support services;

b)   Properly staffed, supervised and equipped to meet the total needs of their nursing home residents;

c)   Able to specifically meet the total nursing home, medical and physical therapy needs of Ozie Edwards and other residents like him; and

d)   Licensed by DHS and complying on a continual basis with all rules, regulations and standards established for nursing homes.

115.   The Ponthie Defendants were on notice and aware of problems with resident care at Ouachita Nursing and Rehabilitation Center based upon surveys conducted at the facility by the Office of Long Term Care prior to and during the residency of Ozie Edwards. For example, in a June 21, 2013 survey, Ouachita Nursing and Rehabilitation Center was cited for failing to "provide care qualified persons according to each resident's written plan of care. (actual harm)" In surveys conducted on April 5, 2013 and June 21, 2013, the facility was cited for numerous deficiencies relevant to the injuries suffered by Ozie Edwards including:

a.   Failure to make sure the nursing home area is free from accident hazards and risks and provides supervision to prevent avoidable accidents; and

b.   Failure to have a program that investigates, controls and keeps infection from spreading.

c.   Failure to provide care for residents in a way that keeps or builds each resident's dignity and respect of individuality; and

d.   Failure to assist those residents who need total help with eating/drinking, grooming and personal and oral hygiene.

116.   Under state and federal law, the governing body of a nursing home is composed of individuals or a group in whom the ultimate authority and legal responsibility is vested for conduct of the nursing home. *See* Ark. Office of Long Term Care R. & Regs. § 100. All long-term care facilities must have a governing body, or designated persons functioning as a governing body, that is legally responsible for establishing and implementing policies regarding the management and operation of the facility. *See* 42 C.F.R. § 483.75(d)(1). The governing body has a legal duty to adopt effective patient care policies, administrative policies and by-laws governing the operation of the facility in accordance with legal requirements of state and federal law. *See* Ark. Office of Long Term Care R. & Regs. § 301.1. Upon information and belief, Jennie Jeanette Goss Hassan was a member of the governing body of Ouachita Nursing and Rehabilitation Center and was legally responsible for establishing and implementing policies regarding management and operation of the facility and for retaining the services of a qualified administrator, in whom the ultimate authority and legal responsibility was vested for patient care in the nursing home.

117.   The Ponthie Defendants failed to discharge their obligations of care to Ozie Edwards with a conscious disregard for his rights and safety. At all times mentioned herein, Defendants, through their corporate officers and administrators, had knowledge of, ratified and/or otherwise authorized all of the acts and omissions that caused the injuries suffered by Mr. Edwards, as more fully set forth below. The Ponthie Defendants knew that their facility could not provide the minimum standard of care to the weak and vulnerable residents of Ouachita Nursing and Rehabilitation Center. The severity of the recurrent negligence inflicted upon Mr.

Edwards while a resident of the facility accelerated the deterioration of his health and physical condition and resulted in physical and emotional injuries. While a resident at Ouachita Nursing and Rehabilitation Center, Ozie Edwards sustained multiple injuries including, but not limited to, the following:

    a)    Malnutrition;

    b)    Dehydration;

    c)    Multiple infections;

    d)    Poor hygiene;

    e)    Death.

118.    The injuries sustained by Ozie Edwards, as well as the conduct specified below, caused him to lose his personal dignity and to suffer extreme and unnecessary pain, anguish, and emotional trauma.

119.    The Ponthie Defendants controlled the operation, planning, management and quality control of Ouachita Nursing and Rehabilitation Center. The authority exercised over the nursing facility included, but was not limited to, budgeting, marketing, human resources management, training, staffing, creation and implementation of all policy and procedure manuals used by Ouachita Nursing and Rehabilitation Center, federal and state reimbursement, quality care assessment and compliance, licensure and certification, legal services, and financial, tax and accounting control through fiscal policies established by the Ponthie Defendants.

120.    The Ponthie Defendants operated and managed Ouachita Nursing and Rehabilitation Center so as to maximize profits by reducing staffing levels below that needed to provide adequate care to residents that would comply with federal and state regulations governing skilled nursing facilities. Thus, the Ponthie Defendants knowingly and/or with

39

reckless disregard for the consequences of their actions caused staffing levels at their facility to be set so that the personnel on duty at any given time could not reasonably tend to the needs of their assigned residents. Upon information and belief, the Ponthie Defendants knowingly established staffing levels that created recklessly high nurse/resident ratios and disregarded patient acuity levels as well as the minimal time required to perform essential functions. These acts of malfeasance directly caused injury to Ozie Edwards and other residents of Ouachita Nursing and Rehabilitation Center and were known to the Ponthie Defendants.

130.    The acts and omissions of the Ponthie Defendants were motivated by a desire to increase the profitability by reducing expenditures for needed staff, training, supervision and care to levels that would predictably lead to severe injury.

131.    Plaintiff alleges that, during Ozie Edwards residency at Ouachita Nursing and Rehabilitation Center, Mr. Edwards was under the care, supervision and treatment of the Ponthie Defendants and that the injuries complained of were proximately caused by the acts and omissions of the Ponthie Defendants.

132.    The Ponthie Defendants were vicariously liable for the acts and omissions of all persons or entities under their control, either directly or indirectly, including employees, agents, consultants and independent contractors, whether in-house or outside entities, individuals, agencies or pools causing or contributing to the injuries of Ozie Edwards.

## PLAINTIFF ADDIE EDWARDS' INDIVIDUAL CAUSES OF ACTION AGAINST THE PONTHIE NURSING HOME DEFENDANTS

### COUNT ONE: NEGLIGENCE

133.    Plaintiff incorporates the allegations contained in Paragraphs 91 – 132 as if fully set forth herein.

134.    The Ponthie Nursing Home Defendants owed a non-delegable duty to residents, including Ozie Edwards, to provide adequate and appropriate custodial care and supervision, which a reasonably careful person would provide under similar circumstances.

135.    The Ponthie Nursing Home Defendants owed a non-delegable duty to their residents, including Ozie Edwards, to exercise reasonable care in providing care and services in a safe and beneficial manner.

136.    The Ponthie Nursing Home Defendants owed a non-delegable duty to their residents, including Ozie Edwards, to hire, train and supervise employees to deliver care and services to residents in a safe and beneficial manner.

137.    The Ponthie Nursing Home Defendants owed a non-delegable duty to residents, including Ozie Edwards, to use reasonable care in treating their residents with the degree of skill and learning ordinarily possessed and used by nursing home facilities in the same or similar locality.

138.    The Ponthie Nursing Home Defendants owed a non-delegable duty to assist all residents, including Ozie Edwards, in attaining and maintaining the highest level of physical, mental and psychosocial well-being.

139.    The Ponthie Nursing Home Defendants breached these duties by failing to exercise reasonable care and by failing to prevent the mistreatment, abuse and neglect of Ozie Edwards. The negligence of the Ponthie Defendants includes, but is not limited to, the following acts and omissions:

a)    The failure to follow physician orders to ensure that residents were free of significant medication errors;

b)    The failure to ensure that Mr. Edwards attained and maintained his highest level of physical, mental, and psychosocial well-being;

c)      The failure to establish, publish and/or adhere to policies for nursing personnel concerning the care and treatment of residents with nursing, medical and psychosocial needs similar to those of Mr. Edwards;

d)      The failure to increase the number of nursing personnel to ensure that Ozie Edwards received timely and accurate care assessments, and proper treatment, medication and diet;

e)      The failure to provide sufficient numbers of qualified personnel, including nurses, licensed practical nurses, certified nurse assistants and medication aides to meet the total needs of Mr. Edwards throughout his residency;

f)      The failure to increase the number of nursing personnel at the facility to ensure that Ozie Edwards:

   1)      Received timely and accurate care assessments;
   2)      Received proper treatment, medication, and diet; and
   3)      Was protected from accidental injuries by the correct use of ordered and reasonable safety measures.

g)      The failure to adequately screen, evaluate, and check references, test for competence and use ordinary care in selecting nursing personnel to work at the facility;

h)      The creation of and/or the failure or refusal to identify and correct the injuries, conditions, and circumstances described in paragraph 31 and exhibited by Mr. Edwards;

i)      The failure to terminate employees at the facility assigned to Mr. Edwards who were known to be careless, incompetent and unwilling to comply with the policies and procedures of the facility and the rules and regulations promulgated by the Arkansas Department of Human Services and the Office of Long Term Care;

j)      The failure to assign nursing personnel at the facility duties consistent  with  their education and experience based on:

   1)      Ozie Edwards's medical history and condition, nursing and rehabilitative needs;
   2)      The characteristics of the resident population residing in the area of the facility where Ozie Edwards was a resident; and
   3)      The nursing skills needed to provide care to such resident population.

k)      The failure by the members of the governing body of the facility to discharge their legal and lawful obligation by (1) ensuring that the rules and regulations designed to protect the health and safety of residents, such as Ozie Edwards, as promulgated by the Arkansas Department of Human Services and the Arkansas Office of Long Term Care, were consistently complied with on an ongoing basis and (2) ensuring appropriate corrective measures were implemented to correct problems concerning inadequate resident care;

l)      The failure to adopt adequate guidelines, policies, and procedures of the facility for documenting, maintaining files, investigating and responding to any complaint regarding the quality of resident care or misconduct by employees at the facility, regardless of whether such complaint derived from a resident of the facility, an employee of the facility or any interested person;

m)      The failure to maintain medical records on Ozie Edwards in accordance with accepted professional standards and practices that are complete, accurately documented, readily accessible and systematically organized with respect to diagnosis, treatment and assessment and establishment of appropriate care plans of care and treatment; and

n)      The failure to properly in-service and orient employees to pertinent patient care needs to maintain the safety of residents.

140.    A reasonably careful nursing home operating under similar circumstances would foresee that the failure to provide the ordinary care listed above would result in devastating injuries to Ozie Edwards.

141.    The Ponthie Nursing Home Defendants further breached their duty of care to Ozie Edwards by violating certain laws and regulations in force in the State of Arkansas at the time of the occurrences discussed herein including, but not limited to, the following:

a)      By failing to comply with rules and regulations promulgated by the Arkansas Department of Human Services, Division of Social Services, Office of Long Term Care, pursuant to authority expressly conferred by Act 28 of 1979 (Ark. Code Ann. § 20-10-202, *et seq*.) and published in the Long Term Care (LTC) Provider Manual on April 8, 1984, and the supplements thereto, and federal minimum standards imposed by the United States Department of Health and Human Services;

b)      By failing to provide the necessary care and services to attain or maintain the highest practicable, physical, mental and psychosocial well-being of Ozie Edwards in accordance with the comprehensive assessment and plan of care;

c)    By failing to ensure a nursing care plan based on Ozie Edwards's problems and needs was established that contained measurable objectives and timetables to meet his medical, nursing, and mental and psychosocial needs as identified in his comprehensive assessment;

d)    By failing to review and revise Ozie Edwards's nursing care plan when his needs changed;

e)    By failing to treat Ozie Edwards courteously, fairly and with the fullest measure of dignity;

f)    By failing to provide sufficient nursing staff and nursing personnel to ensure that Ozie Edwards attained and maintained his highest practicable physical, mental and psychosocial well-being;

g)    By failing to provide a safe environment;

h)    By failing to administer the facility in a manner that enabled it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental and psychosocial well-being of each resident; and

i)    By criminally abusing and neglecting Ozie Edwards and by failing to report that abuse in violation of the Adult and Long-Term Care Facility Resident Maltreatment Act, Ark. Code Ann. §§ 12-12-1701 *et seq.*

142.    The Ponthie Nursing Home Defendants were further negligent by infringing upon and depriving Ozie Edwards of the rights guaranteed by Ark. Code Ann. §§ 20-10-1201 *et seq.* including, but not limited to, the following:

a)    The right to receive adequate and appropriate health care and protective and support services, including social services, mental health services, if available, planned recreational activities, and therapeutic and rehabilitative services consistent with the resident care plan for Ozie Edwards, with established and recognized practice standards within the community, and with rules as adopted by federal and state agencies, such rights include:

1)    The right to receive adequate and appropriate custodial service, defined as care for Ozie Edwards which entailed observation of diet and sleeping habits and maintenance of a watchfulness over his general health, safety, and well-being; and

2)    The right to receive adequate and appropriate residential care plans, defined as a written plan developed, maintained, and reviewed not less than quarterly by a registered nurse, with participation from other facility

staff and Mr. Edwards or his designee or legal representative, which included a comprehensive assessment of the needs of Mr. Edwards, a listing of services provided within or outside the facility to meet those needs, and an explanation of service goals;

b)      The right to regular, consultative, and emergency services of physicians;

c)      The right to appropriate observation, assessment, nursing diagnosis, planning, intervention, and evaluation of care by nursing staff;

d)      The right to access to dental and other health-related services, recreational services, rehabilitative services, and social work services appropriate to the needs and conditions of Mr. Edwards, and not directly furnished by the licensee;

e)      The right to a wholesome and nourishing diet sufficient to meet generally accepted standards of proper nutrition, guided by standards recommended by nationally recognized professional groups and associations with knowledge of dietetics, and such therapeutic diets as may be prescribed by attending physicians;

f)      The right to a facility with its premises and equipment, and conduct of its operations maintained in a safe and sanitary manner;

g)      The right to be free from mental and physical abuse, and from physical and chemical restraints;

h)      The right of Mr. Edwards to have privacy of his body in treatment and in caring for his personal needs;

i)      The right to prompt efforts by the facility to resolve resident grievances, including grievances with respect to resident care and the behavior of other residents;

j)      The right to participate in social, religious, and community activities;

k)      The right to the obligation of the facility to keep full records of the admissions and discharges of Mr. Edwards and his medical and general health status, including:

        1)      medical records;

        2)      personal and social history;

        3)      individual resident care plans, including, but not limited to, prescribed services, service frequency and duration, and service goals;

4)     making it a criminal offense to fraudulently alter, deface, or falsify any medical or other long-term care facility record, or cause or procure any of these offenses to be committed; and

l)     The right to be treated courteously, fairly, and with the fullest measure of dignity.

143.    A reasonably prudent nursing home, operating under the same or similar conditions, would not have failed to provide the care listed above. Each of the foregoing acts of negligence on the part of the Ponthie Nursing Home Defendants was a proximate cause of Ozie Edwards's injuries as more specifically described herein. Mr. Edwards suffered personal injury including extreme pain and suffering, mental anguish, disfigurement, disability, degradation, loss of personal dignity, and emotional distress.

144.    As a direct and proximate result of such grossly negligent, willful, wanton, reckless, malicious and/or intentional conduct, Plaintiff asserts a claim for judgment for all compensatory and punitive damages against the Ponthie Defendants including, but not limited to, medical expenses, extreme pain and suffering, mental anguish, emotional distress and loss of life in an amount exceeding that required by federal court jurisdiction in diversity of citizenship cases, to be determined by the jury, plus costs and all other relief to which Plaintiff is entitled by law.

### COUNT TWO: MEDICAL MALPRACTICE

145.    Plaintiff incorporates the allegations contained in Paragraphs 91 – 144 as if fully set forth herein.

146.    The Ponthie Nursing Home Defendants are either medical care providers as defined by Ark. Code Ann. § 16-114-201(2) and/or liable for medical care providers as defined by Ark. Code Ann. § 16-114-201(2).

147.    The Ponthie Nursing Home Defendants owed a non-delegable duty to residents, including Ozie Edwards, to use reasonable care in treating their residents with the degree of skill

and learning ordinarily possessed and used by nursing home facilities in the same or similar locality.

148.    The Ponthie Nursing Home Defendants owed a non-delegable duty to assist all residents, including Ozie Edwards, in attaining and maintaining the highest level of physical, mental and psychosocial well-being.

149.    The Ponthie Nursing Home Defendants failed to meet the applicable standards of care and violated their duty of care to Ozie Edwards through mistreatment, abuse and neglect. The Ponthie Nursing Home Defendants failed to adequately supervise nurses and aides and failed to hire sufficient nurses and aides. As such, the nurses and aides were unable to provide Ozie Edwards the requisite care, and as a result, negligent acts occurred as set forth herein. The medical negligence of Ponthie Defendants includes, but is not limited to, the following acts and omissions:

a)    The failure to ensure that Ozie Edwards received the following:

1)    Timely and accurate care assessments;
2)    Proper treatment, medication and diet;
3)    Necessary supervision; and
4)    Timely nursing and medical intervention due to a significant change in condition.

b)    The failure to provide, implement, and ensure adequate nursing care plan revisions and modifications as the needs of Ozie Edwards changed;

c)    The failure to provide, implement and ensure that an adequate nursing care plan for Ozie Edwards was followed by nursing personnel;

d)    The failure to provide Ozie Edwards with adequate and appropriate nursing care, treatments, and medications;

e)    The failure to ensure that Ozie Edwards was assessed in order to receive adequate and proper nutrition, fluids, and therapeutic diet;

f)    The failure to provide adequate care and treatment to Ozie Edwards; and

g)    The failure to adequately and appropriately monitor Ozie Edwards and recognize

significant changes in her health status.

150.    A reasonably prudent nursing home, operating under the same or similar conditions, would not have failed to provide the care listed above. Each of the foregoing acts of negligence on the part of the Ponthie Nursing Home Defendants was a proximate cause of Ozie Edwards's injuries, which were foreseeable. Mr. Edwards suffered personal injury, including excruciating pain and suffering, mental anguish and emotional distress, which caused his family to suffer more than normal grief upon his death. Plaintiff prays for compensatory damages against the Ponthie Defendants for the wrongful death of Ozie Edwards including the grief suffered as well as the expenses of the funeral and other related costs.

151.    The Ponthie Nursing Home Defendants were negligent and reckless in breaching the duties owed to Ozie Edwards under the Medical Malpractice Act for the reasons specifically enumerated in this Complaint.

152.    As a direct and proximate result of such grossly negligent, willful, wanton, reckless, malicious, and/or intentional conduct, Ozie Edwards suffered injuries as described herein. Plaintiffs assert a claim for judgment for all compensatory and punitive damages against the Ponthie Nursing Home Defendants, including, but not limited to, medical expenses, extreme pain and suffering, mental anguish, emotional distress and loss of life in an amount exceeding that required for federal court jurisdiction in diversity of citizenship cases, to be determined by the jury, plus costs and all other relief to which Plaintiff is entitled by law.

### COUNT THREE: BREACH OF THE ADMISSION AGREEMENT

153.    Plaintiff incorporates the allegations contained in paragraphs 91-152 as if fully set forth herein.

154.    Before being admitted to Ouachita Nursing and Rehabilitation Center, Ozie Edwards was required to enter into a Resident Admission Agreement, whereby the facility agreed to provide nursing and custodial care, necessary goods, services, and/or treatment to Mr. Edwards in exchange for valuable consideration.

155.    Ozie Edwards, or those acting on his behalf, did what the Agreement for Care required of him in that valuable consideration was paid for the goods, services, care and treatment, including personal or custodial care, and professional nursing care the Ponthie Nursing Home Defendants promised to provide.

156.    The Ponthie Nursing Home Defendants breached their contractual duties by failing to provide the care and services as described in the agreement, causing damage to Ozie Edwards.

157.    As a result, the Plaintiff is entitled to compensatory damages and consequential damages.

158.    Plaintiff is entitled to seek punitive damages for breach of contract, because the Ponthie Nursing Home Defendants knew or ought to have known, in the light of the surrounding circumstances, that their nonfeasance in breach of the admissions agreement would naturally and probably result in injury or damage, yet the Ponthie Nursing Home Defendants breached the agreement in reckless disregard of the consequences from which malice may be inferred.

159.    Plaintiff, for good cause, is unable to attach a copy of the actual admissions agreement upon which this claim is based, because it is in the possession of the Ponthie Nursing Home Defendants.

## COUNT FOUR: BREACH OF THE PROVIDER AGREEMENT

160.     Plaintiff incorporates the allegations contained in paragraphs 91-159 as if fully set forth herein.

161.     Upon becoming a resident of Ouachita Nursing and Rehabilitation Center, Mr. Edwards, as a Medicare and/or Medicaid recipient, became a third-party beneficiary of the contract or provider agreement between the Ponthie Nursing Home Defendants and the state and federal governments, an example of which is attached as **Exhibit D**.

162.     For consideration duly paid by Mr. Edwards, or on his behalf, the Ponthie Nursing Home Defendants agreed to provide residents with personal and custodial care and professional nursing care in compliance with the requirements set forth in the provider agreements, as well as the minimum standards of care imposed by applicable law including the statutes and regulations set out herein. In addition, by entering into the agreement, the Ponthie Nursing Home Defendants promised to "comply with all rules, regulations, changes in and additions thereto issued by the United States Department of Health and Human Services pertaining to nursing homes, and to comply with all rules, regulations, duly promulgated changes in and additions thereto issued by the State." The Ponthie Nursing Home Defendants further agreed that "the rights and privileges of the residents [were] of primary concern to the parties" and covenanted to "protect and preserve" the rights of the residents. The parties to the contract agreed "that failure to act in a manner consistent with those rights and privileges shall constitute an immediate breach of agreement."

163.     As the name implies, the provider agreement exists to pay for and provide for resident, personal, or custodial care and professional nursing care. The provider agreements between the Ponthie Nursing Home Defendants and the state and federal government were

clearly intended to benefit the residents of Ouachita Nursing and Rehabilitation Center, including

Ozie Edwards.

164.    The Ponthie Nursing Home Defendants breached the provider agreement and

committed multiple acts of nonfeasance in failing to provide the care, goods, and services to

industry standards, as required by law and as agreed, including but not limited to:

a)    Nonfeasance in failing to provide, as promised, the care and services for Mr.
Edwards to attain or maintain his highest practicable physical, mental, and
psychosocial well-being, in accordance with a comprehensive assessment and
plan of care;

b)    Nonfeasance in failing to provide, as promised, dietary services, including special
diets, supplemental feedings, special delivery preparation, assistance, and
equipment required for preparing and dispensing oral feedings and special feeding
devices;

c)    Nonfeasance in failing to provide, as promised, personal or custodial services and
nursing care;

d)    Nonfeasance in failing, as promised, to implement policies and procedures so as
to prevent infringement or deprivation of Mr. Edwards's rights as a resident of a
long term care facility;

e)    Nonfeasance in failing to provide, as promised, assistance to Mr. Edwards in
developing and carrying out a plan of care;

f)    Nonfeasance in failing to comply, as promised, with protections, duties and
obligations imposed by applicable state and federal statutes and regulations as
alleged herein; and

g)    Nonfeasance in failing to staff Ouachita Nursing and Rehabilitation Center with
sufficient personnel to adequately meet the needs of Mr. Edwards, failing to
comply with the rules and regulations promulgated by the state and federal
governments, and in failing to provide staff qualified to meet the needs of the
residents.

165.    As a result of the Ponthie Nursing Home Defendants' breach of the provider

agreement, Plaintiff asserts a claim for judgment for all compensatory damages including the

amount a jury determines is sufficient compensation for the loss of the benefit of promised

services and care and treatment, in an amount that exceeds that required for federal court jurisdiction in diversity of citizenship cases.

166.   The Ponthie Nursing Home Defendants are also liable for all consequential damages, because the Ponthie Nursing Home Defendants knew, or should have known, that breaches of the provider agreement would result in consequential damages to Ozie Edwards, and, under the circumstances, the Ponthie Nursing Home Defendants should have understood that it had agreed to assume responsibility for any consequential damages caused by their breaches of the provider agreement.

167.   Plaintiff seeks judgment for all foreseeable consequential damages, which flowed naturally from the failure of the Ponthie Nursing Home Defendants to provide the care, goods, and services promised under the provider agreement, including but not limited to medical expenses, pain and suffering, and mental anguish.

168.   Plaintiff is entitled to seek punitive damages for breach of contract, because the Ponthie Nursing Home Defendants knew or ought to have known, in the light of the surrounding circumstances, that their nonfeasance in breach of the provider agreement would naturally and probably result in injury or damage, yet the Ponthie Nursing Home Defendants breached the agreement in reckless disregard of the consequences from which malice may be inferred.

169.   Plaintiff, for good cause, is unable to attach a copy of the actual provider agreement upon which this claim is based, because it is in the possession of the Ponthie Nursing Home Defendants.

## COUNT FIVE: DECEPTIVE TRADE PRACTICES

170.   Plaintiff incorporates the allegations contained in Paragraphs 91–169 as if fully set forth herein.

171.    At all times pertinent to this cause of action, Ozie Edwards was an "elder person" as defined by the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-201(a). As an "elder person" within the meaning of the Deceptive Trade Practices Act, the Plaintiffs have a private cause of action to recover actual damages, punitive damages, and reasonable attorney's fees pursuant to Ark. Code Ann. § 4-88-204.

172.    At all relevant times, the Arkansas Deceptive Trade Practices Act, codified at Ark. Code Ann. § 4-88-107(a) provides that it is unlawful to:

a.    Knowingly take advantage of a consumer who is reasonably unable to protect his or her interest because of:

i.    Physical infirmity; or
ii.    A similar factor; and

b.    Engage in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade.

173.    Ark. Code Ann. § 4-88-108 provides that, when utilized in connection with the sale or advertisement of any goods, services, or charitable solicitation, it shall be unlawful for any person to (1) act, use or employ any deception, fraud or false pretense, or (2) conceal, suppress, or omit any material fact with intent that others rely on the concealment, suppression, or omission.

174.    The conduct of the Ponthie Nursing Home Defendants, as described herein, constitutes a deceptive practice in violation of the Deceptive Trade Practices Act. The Nursing Home Defendants violated the Protection of Long Term Care Facilities Residents' Act and federal law, which is a per se violation of the Deceptive Trade Practices Act. The Ponthie Nursing Home Defendants also failed to inform Plaintiffs in the Ponthie Nursing Home Defendants' standard admission agreement that the facility routinely does not meet minimum staffing requirements imposed by state and federal law.

53

175.    The Ponthie Nursing Home Defendants engaged in an unconscionable, false, and/or deceptive act or practice in business, commerce and/or trade by marketing themselves and holding themselves out to the public and Ozie Edwards as being able to meet the needs of elder residents of Ouachita Nursing and Rehabilitation Center. The Ponthie Nursing Home Defendants profited greatly as a result of their deceptive trade practices, but the Ponthie Nursing Home Defendants were aware that Ouachita Nursing and Rehabilitation Center could not meet the needs of its residents, including Ozie Edwards.

176.    As a direct and proximate result of the Ponthie Nursing Home Defendants' wrongful conduct, Plaintiff has suffered actual damages.

## PLAINTIFF ADDIE EDWARDS' INDIVIDUAL CAUSES OF ACTION AGAINST THE ADMINISTRATOR DEFENDANT

### FACTUAL ALLEGATIONS

177.    Plaintiff incorporates the allegations contained in Paragraphs 91–176 as if fully set forth herein.

178.    Upon information and belief, Jennie Jeanette Goss Hassan was the Administrator at Ouachita Nursing and Rehabilitation Center during the residency of Ozie Edwards.

179.    As administrator of Ouachita Nursing and Rehabilitation Center, Jennie Jeanette Goss Hassan was responsible for ensuring that the facility complied with all state and federal regulations related to nursing facilities. Ms. Goss Hassan had a duty to administer the facility in a manner that enabled it to use resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychological well-being of each resident. The nursing facility, under the leadership of its administrator, is also required to operate and provide services in compliance with all applicable federal, state, and local laws, regulations, and codes, and with accepted professional standards and principles that apply to professionals providing services in

such facilities. In addition, as a member of the facility's governing body, Ms. Goss Hassan had a duty to promulgate and implement policies and procedures for the operation and management of Ouachita Nursing and Rehabilitation Center. Defendant Jennie Jeanette Goss Hassan breached the duty of care she owed to Ozie Edwards.

## NEGLIGENCE

180.    Plaintiff incorporates the allegations contained in Paragraphs 91–179 as if fully set forth herein.

181.    Jennie Jeanette Goss Hassan owed a duty to the residents, including Ozie Edwards, to provide services as a reasonable administrator within accepted standards for a nursing home administrator.

182.    The Administrator Defendant breached the duties owed to the residents of Ouachita Nursing and Rehabilitation Center, including Ozie Edwards, by failing to supervise nurses and nurses' aides and failing to hire sufficient nurses and nurses' aides, and as such, the nurses and nurses' aides were unable to provide Ozie Edwards the care he required. The negligence of the Administrator Defendant includes, but is not limited to, the following acts and omissions:

a)    Failure to adequately assess, evaluate, and supervise nursing personnel so as to ensure that Ozie Edwards received appropriate nursing care;

b)    Failure to ensure that Ozie Edwards was provided with basic and necessary care and supervision;

c)    Failure to adequately hire, train, supervise, and retain a sufficient amount of competent and qualified registered nurses, licensed vocational nurses, nurse assistants and other personnel in said facility to assure that Ozie Edwards received care, treatment, and services in accordance with state and federal law;

d)    Failure to assign nursing personnel at Ouachita Nursing and Rehabilitation Center duties consistent with their education and experience based on:

1)  Ozie Edwards's medical history and condition, nursing, and rehabilitative needs;
2)  The characteristics of the resident population residing in the area of the facility where Ozie Edwards was a resident; and
3)  Nursing skills needed to provide care to such resident population;

e)  The failure to provide sufficient numbers of qualified personnel to ensure that Ozie Edwards was provided with a safe environment and was protected from abuse and mistreatment by the correct use of reasonable safety measures;

f)  The failure to properly in-service and orient employees to pertinent resident care needs to maintain the safety of residents;

g)  The failure to protect Ozie Edwards from abuse and neglect; and

h)  The failure to provide adequate supervision to the nursing staff so as to ensure that Ozie Edwards received adequate and proper care.

183.    A reasonably careful nursing home administrator would have foreseen that the failure to provide the ordinary care listed above would result in devastating injuries to Ozie Edwards.

184.    As a direct and proximate result of the Administrator Defendant's negligent conduct, Plaintiff asserts a claim for judgment for all compensatory damages against the Administrator Defendant, including, but not limited to, medical expenses, extreme pain and suffering, mental anguish, emotional distress and loss of life in an amount exceeding that required by federal court jurisdiction in diversity of citizenship cases, to be determined by the jury, plus costs and all other relief to which Plaintiff is entitled by law.

## PLAINTIFF ADDIE EDWARDS' INDIVIDUAL CAUSES OF ACTION AGAINST OMEGA HEALTHCARE INVESTORS, INC.

### FACTUAL ALLEGATIONS

185.    Plaintiff incorporates the allegations contained in Paragraphs 91–184 as if fully set forth herein.

56

186.    Each of the Ponthie Nursing Home Defendants operated Ouachita Nursing and Rehabilitation Center as a single joint venture or joint for-profit enterprise.

187.    Upon information and belief, separate Defendant Omega Healthcare Investors, Inc. owns the real property upon which Ouachita Nursing and Rehabilitation Center sits and leased it to both Diversicare Leasing Corp. and Camden Operations, LLC pursuant to a Master Lease Agreement or some other similar agreement. However, Omega Healthcare Investors is more than a mere landlord. Under these Master Leases, signed by the Diversicare Defendants and the Ponthie Nursing Home Defendants, the facility pays additional or supplemental rent to Omega Healthcare Investors based on a percentage of gross revenues for the facility, meaning any revenue derived from any use of the facility. Upon information and belief, the facility is responsible for payment of all taxes, utilities, and other costs and expenses of the Business. The facility promised to continue operating as a nursing home business and that it shall comply in all material respects with all licensing and other laws. Under the Master Leases, the facility is responsible and represents to Omega Healthcare Investors that the facility is fully certified to participate in Medicare and Medicaid.  Omega Healthcare Investors obtained a promise from the facility that it would preserve the business. It is believed that Omega Healthcare Investors hires third party consultants to inspect the facility to prepare physical inspection reports with respect to the general condition of the Premises. The parties to the master leases agreed to pay funds into an escrow account paid monthly by the facility and held by Omega Healthcare Investors to finance future maintenance and upgrades for the facility, meaning that Omega Healthcare Investors controlled funds for the payment of their common business expenses. Alterations and renovations of the facility above a certain dollar amount must be approved in advance in writing by Omega Healthcare Investors.  Upon information and belief, Omega Healthcare Investors took

a lien on all personal property of the facility, tangible or intangible, including the licenses necessary to operate the facility, Medicare and Medicaid accounts and/or bed licenses, contract rights, and the right to use the name Ouachita Nursing and Rehabilitation Center.

188.     Upon information and belief, the facility further promised to provide Omega Healthcare Investors with monthly, quarterly, and annual financial reports, including a balance sheet, an income statement showing gross revenue, total patient days, occupancy rates, and the payor mix. Under the Master Leases, the facility was required to provide Omega Healthcare Investors with copies of all inspection surveys conducted and produced by the Arkansas Office of Long-Term-Care and any other state or federal licensing agency along with reports of any regulatory violations. Omega Healthcare Investors has a right under the Master Leases to enter the premises for inspection of its property and the books and other financial records of either the Diversicare Defendants and/or Ponthie Nursing Home Defendants. Omega Healthcare Investors in addition has the right to elect to assume the responsibilities and obligations for the management and operation of the Business upon termination of the Master Leases.

189.     Although they label their agreements a "Master Lease," the parties' relationship with Omega Healthcare Investors is truly one of joint venturers or a partnership, a relationship evidenced by (1) the division of the business' profits, (2) control by Omega Healthcare Investors of funds used to further the business, (3) the cooperation in the ongoing business of the nursing home and carrying on the business of the nursing home, (4) Omega Healthcare Investors' rights to review the facility's budget and internal financial information and access to inspect the facility, (5) Omega Healthcare Investors ongoing monitoring of the business, including regulatory violations and state surveys of the facility, and (6) the retention of the right to step in and take over day to day management and operation of the facility. The Defendants agreed to

work in concert with each other, pooling resources and advancing their common interests in increasing the profitability of Ouachita Nursing and Rehabilitation Center. The Defendants are therefore joint venturers.

## NEGLIGENCE

190.    Plaintiff incorporates the allegations contained in Paragraphs 91–189 as if fully set forth herein.

191.    By agreeing to monitor the care and treatment of residents, the facility's regulatory violations, the facility's budget and financial condition, Omega Healthcare Investors assumed a duty to ensure the residents of Ouachita Nursing and Rehabilitation Center received the care, treatment and services provided. Omega Healthcare Investors in addition assumed a duty to ensure Diversicare Leasing Corp. and Camden Operations, LLC and the remainder of the entities that make up Ouachita Nursing and Rehabilitation Center operated, managed, and controlled the facility in a safe manner designed to provide each resident with the care and treatment needed. By agreeing to monitor the facility's budgets, the facility's regulatory violations, surveys, and financial statements, Omega Healthcare Investors in addition assumed a duty to ensure that the facility had staff sufficient to meet the needs of its residents leading to injury. All of which have a direct effect on patient care.

192.    In addition to the duty to the residents of Ouachita Nursing and Rehabilitation Center such as Ozie Edwards described above, Omega Healthcare Investors took on the additional duty of identifying new operating entities to assume the master lease for Ouachita Nursing and Rehabilitation Center. The transfer of the operations of Ouachita Nursing and Rehabilitation from the Diversicare Defendants (Diversicare Leasing Corp.; Diversicare Healthcare Services, Inc.; Diversicare Management Services Co.; and Advocat Ancillary

Services, LLC) to the Ponthie Defendants (Camden Operations, LLC; JEJ Investments, LLC, Sub-Ten Holdings, LLC, MasterTen, LLC, Advanced Practice Solutions, LLC; Procare Therapy Services, LLC; Southern Administrative Services, LLC; Ponthie Holdings, LLC; Professional Nursing Solutions, LLC; John Ponthie; Ross Ponthie; and Mark Thompson) that was orchestrated and approved by Omega Healthcare Investors, Inc., was completed on September 1, 2013. In selecting and orchestrating the transition of Ouachita Nursing and Rehabilitation Center to the new operating entities, the Ponthie Defendants, Omega Healthcare Investors, Inc. failed to ensure that resident care provided at the facility was not negligent in breach of its duty to residents such as Ozie Edwards.

193.    As a result of Omega Healthcare Investors, Inc.'s breach of its duty to the residents of Ouachita Nursing and Rehabilitation Center, Ozie Edwards suffered the devastating injuries described above.

194.    As a direct and proximate result of Omega Healthcare Investors, Inc.'s grossly negligent, willful, wanton, reckless, malicious and/or intentional conduct, Plaintiff suffered damages and asserts a claim for judgment for punitive and compensatory damages against Defendant Omega Healthcare Investors, Inc., including, but not limited to, medical expenses, extreme pain and suffering, mental anguish, emotional distress and loss of life in an amount exceeding that required by federal court jurisdiction in diversity of citizenship cases, to be determined by the jury, plus costs and all other relief to which Plaintiff is entitled by law.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Addie Edwards, as Personal Representatives of the Estate of Ozie Edwards, and on behalf of the wrongful death beneficiaries of Ozie Edwards, prays for judgment against the Ponthie Defendants as follows:

1.      For damages in an amount adequate to compensate Plaintiffs for the injuries and damages sustained and exceeding that required by federal court jurisdiction in diversity of citizenship cases.

2.      For all general and special damages caused by the alleged conduct of the Ponthie Defendants.

3.      For the costs of litigating this case.

4.      For attorney's fees pursuant to Ark. Code Ann. § 16-22-308 and Ark. Code Ann. § 4-88-204.

5.      For punitive damages sufficient to punish the Ponthie Defendants for their egregious and malicious misconduct in reckless disregard and conscious indifference to the consequences to Ozie Edwards and to deter Defendants and others from repeating such atrocities.

6.      For all other relief to which Plaintiff is entitled.

Respectfully submitted,

As to the Diversicare Defendants:

Plaintiffs Addie Edwards, as Personal Representative of the Estate of Ozie Edwards, Gaile Wolfe, as Personal Representative fo the Estate of Myrtle Key, and on behalf of all other similarly situated

As to the Ponthie Defendants and Omega Healthcare Investors, Inc.:

Plaintiff Addie Edwards, as Personal Representative of the Estate of Ozie Edwards

By: _____

Brian D. Reddick (94057)
Brent L. Moss (95075)

Matthew D. Swindle (2012168)
Robert W. Francis (2007032)
Daniel K. Yim (2014202)
Reddick Moss, PLLC
One Information Way, Suite 105
Little Rock, Arkansas  72202
Telephone: (501) 907-7790
Facsimile:  (501) 907-7793

and

H. Gregory Campbell (92001)
Campbell Law Firm, P.A.
One Information Way, Box 101
Little Rock, AR 72202
Telephone: (501) 375-5659

*Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been placed in the U.S. Mail, postage pre-paid, on this 26th day of August, 2015, to the following attorneys of record:

Kirkman T. Dougherty
Stephanie J. Randall
HARDIN, JESSON & TERRY, PLC
5000 Rogers Avenue, Suite 500
Fort Smith, AR 72917

Amy M. Wilbourn
Vicki Bronson
CONNER & WINTERS, LLP
4375 N. Vantage Dr., Suite 405
Fayetteville, AR 72703

Reddick Moss, PLLC

OUACHITA COUNTY CLERK

12:36:06*FILED

2OCT'14

IN THE CIRCUIT COURT OF OUACHITA COUNTY, ARKANSAS
PROBATE DIVISION

IN THE MATTER OF THE ESTATE OF
OZIE LEE EDWARDS, DECEASED

NO. PR-2014-125

## ORDER APPOINTING PERSONAL REPRESENTATIVE

The Petition of Addie Edwards for appointment of a personal representative in the estate of Ozie Lee Edwards, deceased, is presented to the Court. Upon consideration of the Petition and the facts and evidence in support of it, the Court finds:

1.  No demand for notice of proceedings for the appointment of a personal representative of the estate has been filed. The Petition is not opposed by any known person, and it may be heard without notice.

2.  Ozie Lee Edwards, who resided at Ouachita Nursing & Rehab Center, 1411 Country Club Rd., Camden, Arkansas, died at Ouachita Nursing & Rehab Center, 1411 Country Club Rd., Camden, Arkansas, on November 11, 2013.

3.  This Court has jurisdiction of this proceeding and venue properly lies in this County.

4.  Addie Edwards is a proper person by law to serve as personal representative of the estate.

5.  It appears there are no unsecured claims against the decedent's estate.

6.  The estate has no assets other than a potential personal injury/wrongful death action, and bond, therefore, is waived at this time. The Court will revisit the issue of bond should the estate acquire assets at any time.

EXHIBIT

*A*

IT IS THEREFORE ORDERED as follows:

a.    the administration of the estate is opened;

b.    Addie Edwards is appointed personal representative of the estate; and

c.    Letters of Administration shall be issued to this personal representative without the

requirement of a bond.

DATED this _30_ day of _September_____, 2014.

_____
CIRCUIT JUDGE

Submitted by:

_____
J. Michael Lewis, Bar #92269
LEWIS & LEWIS
P. O. Box 20160
White Hall, AR 71612
Telephone No. (870) 247-2111
Attorneys for Estate

-2-

OUACHITA COUNTY CLERK
16:06:54*FILED
23JUN'15

IN THE CIRCUIT COURT OF OUACHITA COUNTY, ARKANSAS
PROBATE DIVISION

IN THE MATTER OF THE ESTATE OF
MYRTLE RUTH LINEBARIER KEY, DECEASED          NO. PR- 2015 - 075

## ORDER APPOINTING PERSONAL REPRESENTATIVE

The Petition of Gail Wolfe for appointment of a personal representative in the estate of Myrtle Ruth Linebarier Key, deceased, is presented to the Court. Upon consideration of the Petition and the facts and evidence in support of it, the Court finds:

1.      No demand for notice of proceedings for the appointment of a personal representative of the estate has been filed. The Petition is not opposed by any known person, and it may be heard without notice.

2.      Myrtle Ruth Linebarier Key, aged 82, who resided at 626 Tate Street, Camden, Arkansas 71701, died intestate at Ouachita County Medical Center, Camden, Arkansas, on or about August 22, 2013.

3.      This Court has jurisdiction of this proceeding and venue properly lies in this County.

4.      Gail Wolfe is a proper person by law to serve as personal representative of the estate.

5.      It appears there are no unsecured claims against the decedent's estate.

6.      The estate may have a potential personal injury/wrongful death action, and bond, therefore, is waived at this time. The Court will revisit the issue of bond should the estate acquire assets at any time.



EXHIBIT
B

**IT IS THEREFORE ORDERED** that administration is hereby opened in said estate and that Gail Wolfe be and they hereby is, named and appointed personal representative of the estate of the decedent; that the personal representative shall serve without bond; and that letters testamentary shall be issued to said personal representative.

DATED this ___22___ day of ___June_____, 2015.

_____
**CIRCUIT JUDGE**

Submitted by:

_____
H. Gregory Campbell (#92001)
**CAMPBELL LAW FIRM, P.A.**
One Information Way, Box 101
Little Rock, Arkansas 72202
Telephone No. (501) 372-5659
Attorneys for Estate



*Orie*
*Edwards*
*#8412*

COMMITTED TO COMPASSION, STRIVING FOR EXCELLENCE, SERVING RESPONSIBLY

# ADMISSION AGREEMENT



# DIVERSICARE
## MANAGEMENT SERVICES



EXHIBIT

*C*

ONRC-OLE-06368

# ADMISSION AGREEMENT

This Admission Agreement is a legally binding contract. Do not sign this Admission Agreement until you have read it and understand its terms and have read the Resident Handbook in its entirety and understand the policies and rules contained within it. By signing this Admission Agreement you are certifying that you understand and agree to the terms of this Admission Agreement, including all of the policies and rules set out in the Resident Handbook.

October 2009

ONRC-OLE-06369

# Admissions Coordinator or Designee Section

_____     _____

Person Completing This Section                    Date

ONRC-OLE-06370

**I.     Your Admission to the Facility**

This Admission Agreement ("Agreement") states the terms and conditions agreed to by you, _Ossie Edwards_ , your Responsible Party, _Addie Edwards_ and _Diversicare Leasing Corp. d/b/a Ouachita Nursing and Rehabilitation Centre_

In this Agreement "you" and "your" refers to the person who wishes to become a resident at the Facility, and the Facility refers to _Diversicare Leasing Corp. d/b/a Ouachita Nursing and Rehabilitation Center_
(Please list facility name exactly as it appears on the business license)

Your Responsible Party is your legal guardian, if one has been appointed, or your Attorney-in-Fact, if you have executed a power of attorney, or some other individual or family member who agrees to assist the Facility in providing for your healthcare and maintenance. The obligations of your Responsible Party are described more fully in this Agreement and in the Resident Handbook, both of which you and your Responsible Party should read carefully before signing this Agreement.

By signing this Agreement, you and your Responsible Party make certain agreements and promises, and the Facility makes certain agreements and promises. These agreements and promises are set out below.

<div align="center">

**COVENANTS**

</div>

**Resident Handbook**

You and your Responsible Party acknowledge that the Facility has made certain disclosures to you and your Responsible Party, has informed you and your Responsible Party of your rights and the Facility's duties, and has adopted certain policies and rules which are set forth in this Agreement and in the Facility's Resident Handbook (including the Appendices, all of which are referred to in this Agreement as the "Handbook"). You and your Responsible Party acknowledge that you have received a copy of the most recent edition of the Handbook, dated ___Oct. 2009___ _____, and that you have read the Handbook and this Agreement in its entirety. You and your Responsible Party further acknowledge that you have had an opportunity to question a representative of the Facility concerning the contents of the Handbook and this Agreement and that any questions you have have been answered to your satisfaction. You and your Responsible Party agree to abide by all of the policies and rules contained in the Handbook, and agree that the policies and rules set forth in the Handbook will become a part of this Agreement just as if those policies and rules were set forth in full in this Agreement.

_Initialed:_     _Resident:_ _____     Responsible Party: _A. E._

**Responsible Party**

The person signing this Agreement as your Responsible Party has the following relationship(s) to the Resident (please check all that apply): (If Legal Guardian, Attorney-In-Fact, Power of Attorney, Health Care Agent, etc., responsible party must provide documentation to that effect.)

Spouse _____     Relative _____     Legal Guardian _____     Attorney-in-Fact _____

Friend or Interested Person _____     Other (state relationship) _____

**II.     _Setting Realistic Expectations_ Video**

Upon admission to the facility you are asked to view the video titled, "Setting Realistic Expectations.," A script of this video is provided in your Resident Handbook under Section II. We encourage you to view this video to assist with understanding the skilled nursing environment and establish realistic expectations.

_Initialed:_     _Resident:_ _____     _Responsible Party:_ _____

<div align="center">5</div>

III.   **Services and Supplies**

A.   **Nursing Services**

The Facility will provide nursing services and supplies as described in Section III of the Handbook, and other health-related services as may be directed by your attending physician. Physicians operating within the Facility are independent contractors, not employees of the Facility, and the Facility shall not be liable for any acts or omissions of any physician who renders care or fails or declines to render care to you at the Facility. You are responsible for the payment of all charges of any physician who renders care to you at the Facility.

The facility will provide general nursing services as described in Section III of the Handbook, this does not include 24-hour one-on-one personal care. You or your responsible party may purchase additional private sitter services. The facility will provide you with a list of available sitter services if you so desire.

☐ Yes, I would like to purchase 24-hour one-on-one services

☒ No, I do not wish to purchase 24-hour one-on-one services

*Initialed:* ___   *Resident:* _____   *Responsible Party:* _____

B.   **Physician Services**

I have designated the physician identified below as my personal attending physician. If he/she fails to fulfill a given requirement, the facility will have the right, after consulting with me, to seek another physician to assure that I am appropriately and adequately cared for and treated. The facility has arranged for and recommends physicians who have agreed to follow facility policies and state and federal regulatory requirements. These physicians are shown as the "Facility Choice." The resident or his/her representative may choose another physician so long as that physician is willing to provide services under the conditions required by the facility's policies and applicable regulations. If no choice is made, or the chosen physician is not willing to meet the facility requirements, the facility Medical Director or physician will be used.

Patient physician: ___Merle Crump___   Phone: ___836. 8101___

Specialty (If applicable): _____

Address: ___Camden AR___

*Initialed:* ___   *Resident:* _____   *Responsible Party:* _____

C.   **Laundry Services  (See Clothing recommendations in Section 1 in Resident handbook, "Your admission to the facility"**

We encourage residents to be up and fully dressed each day.  Laundry done on site is picked up, washed and folded or put on hangers and returned to resident's room.  We provide bed linens and towels.  We would like to suggest that clothing is wash and wear since staff does not iron clothing.  Further, it is important that you and your family understand that the facility's laundry utilizes high heat, strong chemicals, etc., in its laundry that most likely will reduce clothing life.

If you choose to utilize our laundry services, all clothing must be identified with the resident's first initial and last name (i.e. L. Smith).  You must use a sewn in label or permanent laundry marker.  Our staff will assist with the labeling of clothing if it has not been done prior to admission.

If family elects to launder the resident's personal clothing, they need to notify social services or designee.  If this option is elected, family must provide a fire retardant laundry hamper to place the soiled laundry in.  For infection control, laundry must be picked up at minimum twice weekly, or more often if necessary.  The facility may launder wet or soiled clothing if left in the resident's room for an extended period of time, or if soiled item is creating offensive odor.  The facility is not responsible for lost or stolen items.

☐ Facility does patient's laundry        ☒ Family does patient's laundry

*Initialed:* ___   *Resident:* _____   *Responsible Party:* _____

6

D.     "TLC" Tender Lift and Care – No Lift Policy and Procedure

THIS PROGRAM HAS BEEN IMPLEMENTED IN AN EFFORT TO PROVIDE A SAFE AND HEALTHY ENVIRONMENT FOR RESIDENTS IN OUR CARE AND FOR THE SAFETY OF OUR EMPLOYEES.

Our residents will be evaluated on admission, at care planning and at any change of condition to establish their needs for the total lift or sit-to-stand lift.

I have received and understand the explanation of the TLC "No Lift" policy

Initialed: _____     Resident: _____          Responsible Party: _____

See Forms/Clinical Records Section of this agreement booklet Page 61

E.     Pharmacy

Each resident of the Facility has the option to select a pharmacy of his or her choice for the purchase of any drugs that are not included in the regular per-day charges of the Facility. The only qualification to this right is that, in order to protect your health, we require that any pharmacy you select must provide drugs and services which meet the standards of the distribution system of the Facility, including uniform labeling, packaging, storing, processing, and administration of drugs.

My pharmacy of choice, listed below is to provide all drugs.

_____Allcore_____
(Name of Pharmacy)

_____
(Address)

_____Philadelphia, AR._____
(City, State, Zip)

_____
(Telephone)

Please see Prescription Drug Plan Enrollment in Business Office Section, Page 46.

NO DRUGS, UNDER ANY CIRCUMSTANCES, MAY BE BROUGHT INTO THE FACILITY BY ANYONE OTHER THAN A PHARMACY UNLESS PRIOR ARRANGEMENTS HAVE BEEN MADE WITH FACILITY IN ACCORDANCE WITH STATE REGULATIONS.

Initialed: _____     Resident: _____          Responsible Party: _____

7

ONRC-OLE-06373

## AUTHORIZATION FOR TREATMENT, ASSIGNMENT OF BENEFITS, PAYMENT RESPONSIBILITY AND RELEASE OF INFORMATION

Resident's Name: _Orie Edwards_

Facility of Residence: _Ouachita Nursing + Rehab. Center_

Provider: _____

**Authorization for Treatment**: The undersigned authorizes _Ouachita Nrg. + Rehab. Center_ and/or any of their contractors (collectively referred to as "Provider"), to render services that Provider and/or Patient's physician determine to be necessary or advisable. The undersigned agree to cooperate with all reasonable requests of Provider in connection with Provider's rendition of Services.

**Assignment of Benefits**: The undersigned hereby assigns and transfers to Provider the right to any and all third-party payments (including Medicare, Medicaid and/or private medical insurance benefits) to which the undersigned may be or become entitled to for services rendered by Provider. The undersigned hereby authorizes Provider to apply and file for all such benefit payments in the name of and on behalf of Patient and directs that such payments be made directly to Provider. Any insurance benefit payments received by the undersigned for services rendered by Provider shall be paid to Provider.

**Payment Responsibility**: The Patient shall be financially responsible for any portion of Provider's invoice that is not paid, except for payments denied by Medicare or in the event of covered services provided to Medicaid recipients. The undersigned agree to execute any and all documents and perform any acts that Provider may reasonably request to ensure that all third-party benefits for services are paid to Provider.

**Release of Information**: The undersigned hereby certifies that all information provided to Provider by the undersigned is true and accurate in all respects. The undersigned hereby authorizes Provider to disclose any information, medical and nonmedical, furnished Provider or obtained by Provider in connection with Patient's diagnosis and/or treatment, to any physician, governmental agency (including the U.S. Department of Health and Human Services or any of its intermediaries or carriers), insurance company or health care provider requesting such information. The undersigned agrees to allow Provider access to Patient's clinical records and agrees to allow Provider to make copies of such records. The undersigned consents to Provider's discussing Patient's medical condition with Patient's family members for medical or claims management purposes.

Executed this ___23___ day of ____Nov.____, 20 _12_

_____           _Eddie Edwards_
Resident                                                        Responsible Party

8

ONRC-OLE 06374

<u>Miscellaneous</u>

A.    <u>Sole Agreement</u>. This Agreement and the policies set forth in the Handbook are the entirety of the agreement be-tween the Facility and you and your Responsible Party. No oral statements or prior written material not specifically incorporated in this Agreement or in the Handbook shall be of any force or effect and no changes in or additions to this Agreement shall be of any force or effect unless incorporated herein by amendment to the Agreement, which amendment is in writing and signed by all parties to the Agreement.

B.    <u>Incorporation of Appendices</u>. The Appendices attached hereto are specifically incorporated into this Agreement, and are a part of this Agreement.

C.    <u>Non-Assignability</u>. You and your Responsible Party acknowledge that your right to reside at the Facility is personal and is not assignable. You may not assign your rights under this Agreement to any other person or entity. The Fa-cility may assign its rights under this Agreement without the consent of you or your Responsible Party.

D.    <u>Waiver of Breach</u>. The waiver by any party to this Agreement of a breach of the Agreement or the viola-tion of any provision of the Agreement shall not operate as, or be construed to be, a waiver of any subsequent breach of the Agreement or provision thereof.

E.    <u>Severability</u>. In the event any provision of this Agreement is held to be unenforceable for any reason, such unenforceability shall not affect the remainder of this Agreement, which shall remain in full force and effect and be enfor-ceable in accordance with its terms.

F.    <u>Governing Law</u>. This Agreement shall be interpreted, construed and enforced pursuant to and in accor-dance with the laws of the State of Arkansas. _Ouachita_ County, Arkansas shall be the sole and exclusive venue for any litigation, special proceeding, or any other proceeding between the parties that may arise out of, in connection with, or by reason of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement this **23** day of _Nov._, 2 **012**

RESIDENT:

_____

_____
(Printed Name)

RESPONSIBLE PARTY:

_Addie Edwards_

_Addie Edwards_
(Printed Name)

_Spouse_
(Relationship)

FACILITY SIGNATURE:

_Rhonda Hardman_
(Employee Name)

_CU_
(Employee Position)

_11/23/12_
(Date)

9

Arkansas Department of Human Services
Division of County Operations

## NOTICE OF ADMISSION, DISCHARGE, OR TRANSFER FROM A FACILITY

Recipient's Name: _Ozie Edwards_          Social Security Number: _____

Medicaid Number: _MA_ _____

_Ouachita Nursing + Rehab. Center_
Name of Facility

_1411 Country Club Rd. Camden, AR. 71701_
Address of Facility

1. ☑ Admitted: Date: _11-24-12_

   From:   ☑ Hospital   ☐ Home   ☐ Other (Explain)_____

   DCO-703 Completed:   ☐ Yes   ☐ No

   Date Submitted to Utilization Control: _____

   Admitted or Transferred to:   ☑ Medicare Bed   Date: _11-24-12_

                                 ☐ Medicaid Bed   Date: _____

                                 ☐ Hospice   Date: _____

   Transferred From:   _____
                       Name of Other Facility

                       _____
                       Address of Other Facility

2. ☐ Transferred Date: _____

   Name/Address of other Facility: _____

   _____

3. ☐ Discharged Date: _____          Expired Date: _____

   Reason for Discharge: _____

_____          _____
Signature of Administrator                              Date

11

ONRC-OLE-06376

## Social Services or Designee Section

_____
Person Completing This Section

11/28/12 & 11/26/12
Date

ONRC-OLE-06377

**I.**   <u>Your Resident Rights</u>

You and your Responsible Party acknowledge that the Facility has informed you, both orally and in writing in a language you can each understand, of your rights and of all policies and rules governing your conduct and responsibilities during your stay in the Facility.

*Initialed:*        *Resident:* _____        *Responsible Party:* _~~l . Ee .~~_

**A.**   <u>Mail.</u> I request that the business office at the facility assist in the opening and/or reading of my personal mail. I further request assistance in opening financial related mail addressed to me such as checks, medical bills or statements, Medicare and Medicaid correspondence.

I understand that I may revoke this request at any time.

☐ Opening of personal mail requested
☐ Opening of personal mail not requested
☐ Opening of financial mail requested
☐ Opening of financial mail not requested
☐ I authorize the facility to handle financial mail on my behalf
☒ I do not authorize the facility to handle financial mail

*Initialed:*        *Resident:* _____        *Responsible Party:* _~~l . Ee .~~_

**B.**   <u>Clinical Records.</u> The facility is authorized to release medical information and necessary data pertinent to the billing of other payors by the facility and by other providers or the filing of insurance papers in the interest of the resident and/or the facility and the resident may be examined by physicians and/or registered nurses as may be required by either the state or federal government.
*Initialed:*        *Resident:* _____        *Responsible Party:* _~~l . Ee .~~_

**C.**   <u>Your Health Information Rights.</u> Although your health record is the physical property of the nursing facility, the information in your health record belongs to you. (See Appendix I of Resident Handbook)

<u>For More Information or to Report a Problem.</u> If you have questions and/or would like additional information, you may contact our facility's administrator (privacy officer) at __836 - 411__

If you believe that your privacy rights have been violated, you may file a complaint with us. These complaints must be filed in writing on a form provided by our facility. The complaint form may be obtained from the administrator, and returned to the administrator (privacy officer) when completed. You may also file a complaint with the Secretary of the United States Department of Health and Human Services. If you need further information concerning how to file a complaint with the Secretary of the United States Department of Health and Human Services, please contact the facility's administrator at __836 - 8166__
There will be no retaliatory action for filing a compliant.

By signing this you are acknowledging that you have had the opportunity to review before signing. Please note that we reserve the right to change at any time, as well as the right to make any revisions or changes effective for medical information we already have about you or any information we receive about you in the future. We will post a copy of the current Resident Privacy Notice at the facility, and each such notice will contain the effective date of such notice.

*Initialed:*        *Resident:* _____        *Responsible Party:* _~~l . Ee .~~_

**D.**   <u>Notices.</u> Any notice, demand or communication, which is required, permitted or desired to be given under this Agreement or any provision of the Handbook shall be in writing and shall be deemed sufficiently given when personally delivered or mailed to the Responsible Party at the following address: __Addie Edwards__
__725 Pearl St. Coden, Al. 71701__

15

E.     Personal Fund Account Authorization. You and your Responsible Party request and authorize the Facility to hold, safeguard, manage and account for your personal funds in the manner described in the "Personal Funds" Section IV of the Handbook. You and your Responsible Party specifically authorize the Facility to withdraw funds from your personal account to pay for any and all charges owed by you to the Facility, including charges for Non-covered items and services requested by you or your Responsible Party. All charges will be paid directly to the Facility out of your personal account at the time the charges first become due. (page 29)

If a balance remains in your personal account at the time of your death, you and your Responsible Party specifically authorize the Facility to withdraw funds from your account to pay the Facility for charges incurred by your prior to your death, such as unpaid pharmacy charges, and for expenses incurred on your behalf, such as funeral expenses.

If the remaining funds owed to you by the Facility from your personal account or otherwise are $500 or less and you have not completed the Beneficiary Designation form, then your Responsible party or your surviving spouse shall be deemed your Designated Beneficiary and you authorize the Facility to disburse funds in your personal account or any other funds owed to you by the Facility to your Designated Beneficiary.

If the remaining funds are disbursed to your Designated Beneficiary, you and your Responsibly Party agree to release the Facility from liability if a court of competent jurisdiction determines that the Designated Binificiary was not entitled to such funds and you and your Responsible Party agree that the Designated Beneficiary shall return to the Facility, within 10 days after receipt of written notice, such funds so that the Facility may remit those funds to the probating estate or other party as designated by the court.

F.     Patient Fund Account Authorization. If the remaining funds owed to you by the facility from your personal account or otherwise are $500 or less and you have not completed the Beneficiary Designation form, then your Responsible Party or your surviving spouse shall be deemed your Designated Beneficiary and you authorize the facility to disburse funds in your personal account or any other funds owed to you by the facility to your Designated Beneficiary.

G.     Personal Property. The Facility strongly discourages residents from keeping valuable jewelry, papers, large sums of money, or other personal items considered to be valuable in the Facility. The Facility will take ordinary precautions to protect your property in the Facility, but you and your Responsible Party agree that the Facility will not have any responsibility or liability for the loss or theft of your personal property for any reason.

H.     Citizenship. In accordance with the Deficit Reduction Act of 2005, attestation can no longer be accepted regarding immigration status without proof. Under this law, documentation must be provided to support that residents are U.S. citizens or nationals. In accordance with this law, the facility requires proof of citizenship from all applicants prior to or upon admission.

You and your Responsible Party acknowledge that the Facility has informed you, both orally and in writing, in a language you each understand, of the laws regarding Citizenship under the Deficit Reduction Act of 2005, signed by President Bush in February, 2005. Medicare and SSI recipients are exempt from the requirement to verify citizenship. This group of individuals met the requirement through the Social Security Administration verification process.

Current guidance outline may be obtained by visiting the CMS website www.cms.hhs\faca.

I attest that the resident for admission is a Citizen of the United States and can and will provide documentation to prove citizenship:

Initialed:      Resident: _____        Responsible Party _____

II.    Transfer/Discharge

In the event you choose to leave the Facility permanently, or a person with legal authority to act on your behalf removes you from the Facility, you and your Responsible Party agree to give the Facility written notice of your planned departure at least thirty-days prior to the date of your departure, unless you are a Medicare or Medicaid recipient. You and your Responsible Party agree that in the event you fail to give the required thirty-day notice, and you are not a Medicare or Medicaid recipient, you will pay to the Facility an amount equal to the prevailing Daily Rate for each day within the thirty-day period prior to your departure because the Facility had no written notice of your planned departure.

16

ONRC-OLE-06379

The Facility will use reasonable efforts to safeguard your personal property remaining at the Facility after discharge, but the Facility will not be liable for any damage to or loss of any of your personal property that is left at the Facility after your discharge. The Facility may dispose of personal property left by you if such property is not claimed by you within thirty (30) days after your discharge.

Initialed: _____   Resident: _____      Responsible Party: _____

III.   **Facility Rules**

I have been informed both orally and in writing of the facility rules and understand them. Any changes in these rules will be addressed and discussed at the resident council meetings and will be posted at facility. (See Section V in Handbook)

A.   **Activities/Field Trips:** You and your Responsible Party do ____ or do not _____ give permission for the resident to be taken from the facility by employees of the facility for the purpose of entertainment, rides, shopping, or etc.

It is my understanding that I will not be allowed to leave the facility unless considered physically able to do so at the time by the nurse in charge and must have permission from the physician through a physician order.

Initialed: _____   Resident: _____      Responsible Party: _____

B.   **Photographs:** The Facility may photograph or videotape you and may use such photographs or videotapes as described in the Handbook.

Initialed: _____   Resident: _____      Responsible Party: _____

C.   **Restraints.** The facility strives to be a restraint free facility, however some restraints may be necessary for your positioning or your safety. (See Handbook Section IV)

I do _____ or do not _____ hereby consent to the use of restraints.

Initialed: _____   Resident: _____      Responsible Party: _____

D.   **Smoking**   ☐ I have been advised this is a NON-SMOKING Facility
☐ I have been advised that smoking is permitted in designated areas and made aware of smoking assessments, policy and guidelines.

Initialed: _____   Resident: _____      Responsible Party: _____

Assessments are performed to determine your ability to smoke safely and determine what, if any, additional measures are needed to protect you from possible self-inflicted injury due to smoking habits. The facility strives to provide a safe environment for all residents, visitors and staff.

Initialed: _____   Resident: _____      Responsible Party: _____

E.   **Motorized Vehicles and Wheelchairs.** This facility balances promotion of resident independence with promotion of safety for all persons who reside, visit, or work in the facility. Because this Facility is populated by a large number of residents with visual, hearing, and balance impairments, we restrict or may prohibit the use of motorized wheelchairs, or other power operated vehicles (collectively, "motorized wheelchairs), to residents who have shown through assessment, that they can safely operate the wheelchairs in the nursing facility environment.

Initialed: _____   Resident: _____      Responsible Party: _____

F.   **Transportation.** In the event that it should become necessary while I am a resident in the facility to secure for me transportation to a hospital or elsewhere, I hereby authorize you to select on my behalf, an ambulance service or other carrier for such purpose.

Initialed: _____   Resident: _____      Responsible Party: _____

17

n/a

### DECLARATION OF LIVING WILL

### OF

_____

**(Name)**

### <u>DECLARATION OF LIVING WILL</u>

If I should have an incurable or irreversible condition with no hope of recovery, or that will cause my death within a relatively short time, and I am no longer able to make decisions regarding my medical treatment, I direct my attending physician, pursuant to the Common Law and the Arkansas Rights of the Terminally Ill or Permanently Unconscious Act, to withhold or withdraw treatment that only prolongs the process of dying and is not necessary to my comfort or to alleviate pain.

Additionally, if I should become permanently unconscious, I direct my attending physician, pursuant to the Arkansas Rights of the Terminally Ill or Permanently Unconscious Act, to withhold or withdraw life-sustaining treatments that are no longer necessary to my comfort or to alleviate pain.

Specifically, I Do Not wish to have the following treatments:

- ☐ Cardiopulmonary Resuscitation.
- ☐ Mechanical Breathing.
- ☐ Major Surgery.
- ☐ Kidney Dialysis.
- ☐ Chemotherapy.
- ☐ Minor Surgery (unless necessary for my comfort or to alleviate pain).
- ☐ Invasive Diagnostic Tests.
- ☐ Antibiotics.
- ☐ Blood Products.
- ☐ Other Medications not Necessary for Alleviation of Pain.

Other instructions: _____

_____

By checking the applicable line below, I specifically;

_____   DIRECT that artificial nutrition may be withheld or withdrawn after consultation with my attending physician

_____   DIRECT that artificial hydration may be withheld or withdrawn after consultation with my attending physician.

Resident: _____        _____

                                                                          Date

19

ONRC-OLE-06381

## DECLARATION OF LIVING WILL

### Executed by Person Other Than the Patient

*n /A*

I,_____, being the first of the following individuals or category of individuals who is reasonably available for consultation do make known my desire, by my instructions to others through this living will, that _____'s ("Patient") life shall not be artificially prolonged under the circumstances that I have identified. I am, or we are, the:

- ☐ Legal guardian or designated person under a durable power of attorney
- ☐ Spouse
- ☐ Majority of adult children participating in the decision
- ☐ Parents
- ☐ Majority of adult siblings participating in the decision
- ☐ Persons standing in loco parentis to the Patient
- ☐ Majority of the Patient's adult heirs at law participating in the decision.

I thus do hereby declare:

If Patient's attending physician determines that Patient is no longer able to make decisions regarding Patient's medical treatment, I direct attending physician and other health care providers to withhold or withdraw treatment from Patient under the circumstances I have indicated below by my signature.

If Patient should have an incurable or irreversible condition with no hope of recovery, or that will cause death within a relatively short time, I direct Patient's attending physician, pursuant to the Common Law and the Arkansas Rights of the Terminally Ill or Permanently Unconscious Act, to withhold or withdraw treatment that only prolongs the process of dying and is not necessary to Patient's comfort or to alleviate pain.

Additionally, if Patient should become permanently unconscious, I direct Patient's attending physician, pursuant to the Arkansas Rights of the Terminally Ill or Permanently Unconscious Act, to withhold or withdraw the following life-sustaining treatments that are no longer necessary to Patient's comfort or to alleviate pain.

Specifically, I Do Not wish to have the following treatments:

- ☐ Cardiopulmonary Resuscitation ("CPR").
- ☐ Mechanical Breathing.
- ☐ Major Surgery.
- ☐ Kidney Dialysis.
- ☐ Chemotherapy.
- ☐ Minor Surgery (unless necessary for my comfort or to alleviate pain)
- ☐ Invasive Diagnostic Tests.
- ☐ Antibiotics.
- ☐ Blood Products.
- ☐ Other Medications not Necessary for Alleviation of Pain.

Add other medical directives, if any: _____
_____
_____
_____

By checking the appropriate line below, I specifically:

_____     DIRECT that artificial nutrition may be withheld or withdrawn after consultation with Patient's attending physician.

_____     DIRECT that artificial hydration may be withheld or withdrawn after consultation with Patient's attending physician.

21

ONRC-OLE-06382

## GENERAL PROVISIONS

This advance directive shall be in effect until it is revoked.

I understand that I may revoke this advance directive at any time by giving notice of my wish to revoke the directive, either orally or in writing, to Patient's health care provider, or by physical destruction of the original and any copies of this directive.

I understand and agree that if Patient has executed any prior directive, Patient's directive shall supercede this directive.

I understand the full importance of this advance directive and certify that my instructions are consistent with decisions Patient would have made if Patient had capacity to decide.

## SIGNATURE PAGE

**This page must be copied and completed for each person authorized to participate in decision.**

I,_____, being of sound mind, do hereby sign this document, knowingly, voluntarily, and with careful thought this _____ day of _____, 20____.

_____
Signature

_____
Address

_____
Address

_____
Telephone

### ATTESTATION

I attest that the person who signed this document did so in my presence, that he/she appears to be of sound mind and free of duress or undue influence. I am eighteen years of age or older, and I am not designated by this document as the person's health care proxy.

_____        _____
(Signature of Witness)                        (Date)

_____
(Address)

_____        _____
(Signature of Witness)                        (Date)

_____
(Address)

ONRC-OLE-06383

## APPOINTMENT OF MY HEALTH CARE PROXY

N/A

If my attending physician determines that I am temporarily or permanently unable to make health care decisions, I direct my attending physician and other health care providers to follow the instructions of my health care proxy. My health care proxy is authorized to make whatever medical treatment decisions I could make if I were able. Such decisions regarding life-sustaining treatment shall be consistent with my wishes as expressed in my living will, including my decision whether to withhold or withdraw nutrition and hydration. If my desires are unknown, my health care proxy shall act in my best interests, taking into account my overall medical condition and prognosis.

I designate and appoint _____ (name), _____

_____(address) as my agent, or attorney in fact, to make decisions regarding my health care during periods when my health care provider has determined that I lack capacity to decide for myself. Specifically, and not to limit any other rights prescribed, my attorney in fact shall have the power to employ and discharge physicians; to consent to or refuse to consent to medical procedures, including the withholding or withdrawal of life-sustaining treatment, and nutrition and hydration according to my wishes expressed in my living will, or according to his or her own personal judgment based on the circumstances of my medical condition and my best interests; to admit me to hospitals, including psychiatric hospitals, nursing homes, or hospice care; and to sign all appropriate forms, consents and releases in connection with said matters.

Signed this _____ day of _____, 20_____.

_____

Signature

_____                _____

Witness                                                                                Witness

_____                _____

Address                                                                               Address

25

ONRC-OLE-06384

n/A

## DO NOT RESUSCITATE
### NO CPR

Resident's Name: _____

Identification No.: _____

(Medical record number; social security number; or date of birth)

I, the undersigned person, understand that a "Do Not Resuscitate" instruction means that when a person's heartbeat and breathing stop because of cardiac or respiratory arrest, the person does not wish to be revived by cardiopulmonary resuscitation ("CPR"), and death is probable. I also understand that a physician's order is necessary to carry out a Do Not Resuscitate instruction.

With this knowledge, I hereby direct that in the event of cardiac or respiratory arrest, efforts at CPR shall not be initiated on the resident designated above by any health care provider. I understand that I may revoke this direction at any time by marking through or destroying this form, or by expressing a desire to be resuscitated in writing or orally to my health care provider. I understand that if there is any doubt about the applicability or validity of this instruction, CPR will be initiated.

If this instruction is signed by a person other than the resident, and is contrary to the resident's previously executed advance directive, the resident's instructions in the advance directive will be honored. However, nothing in this Form shall require medically futile treatment. This Form may only be signed by the person responsible for making the resident's health care decisions when either directed by the resident, or when the resident lacks capacity to understand the facts related to the resident's condition and proposed treatment and, therefore, cannot make an intelligent decision.

_____     _____
Resident's Signature                 Date

_____     _____
Responsible Party (If Resident lacks capacity)      Date

_____
Relationship of Responsible Party (guardian, attorney-in fact, health care proxy, family, or other)

_____     _____
Witness                              Date

_____     _____
Witness                              Date

27

ONRC-OLE-06385

## ACKNOWLEDGMENT OF RECEIPT ADVANCE DIRECTIVE
## MEDICAL TREATMENT DECISIONS

*Orie Edwards*

By my signature below, I acknowledge that I have been informed in writing in a language that I understand of my rights and all rules and regulations to make decisions concerning medical care, including the right to accept or refuse medical or surgical treatment and the right to formulate and to issue Advance Directives to be followed should I become incapacitated.

☒  I do not choose to formulate or issue any Advance Directives at this time.

☐  I direct the continued administration of all possible medical treatment, as ordered by my physician, to prolong life to the greatest extent possible without regard to condition, chance of recovery, or expense.

☐  I have chosen to formulate and issue the attached Advance Directive.

## RIGHT TO REVOKE ADVANCE DIRECTIVE

I understand that the attached and foregoing Advance Directive may be revoked by me at any time without regard to my mental state or competency, by any of the following methods:

1.  Physical destruction. Being canceled, defaced, obliterated, burned, torn, or otherwise destroyed by me or by some person in my presence and by my direction;

2.  Written revocation. My written revocation expressing my intent to revoke, signed and dated by me. My revocation shall become effective only when I , or a person acting on my behalf, delivers the written revocation to my attending physician. The attending physician or his designee shall record in my medical record the time and date the notification of the written revocation was received and shall enter the word "VOID" on each page of the Directive in my medical records; or

3.  Oral revocation. A verbal expression by me of my intent to revoke the Directive made in the presence of a witness twenty-one (21) years of age or older who signs and dates a written confirmation that such expression of intent was made. Any verbal revocation shall become effective upon receipt of the above-mentioned writing by the attending physician. The attending physician or his or her designee shall record in my medical record the time, date, and place of revocation and the time, date, and place of receipt of the notification of the revocation, if different, and shall enter the word "VOID" on each page of the Directive in my medical records.

Resident: _____     _____
                                                                                          Date

Responsible Party *Addie Edwards*                          *11-23-12*
                                                                                  Date

29

## SCHEDULING HEALTH CARE NEEDS

Please list as much detail as possible regarding appointments and contact information regarding appointments and practitioners to be seen. If there is a YES answer to questions 1, 2 or 3, this information is to be given to the nursing designee for follow-up.

1.  Does the resident have any appointments scheduled for physician visits, tests or procedures?
    ✔Yes  ___No

    a. If yes, when and with whom_____

    _____

    b. Is this appointment related to the reason for this admission? ___Yes  ___No

2.  Are there plans to make any appointments?  ___Yes  ✔No
    a.  If yes, for what service and with whom_____

    _____

3.  Does the resident have an eye exam, dental visit or other type of health related appointment planned?
    ✔Yes  ___No

    a.  If Yes, when and with whom_____ Landers– El Dorado 1/10/13_____

4.  Who are the various providers of medical care the resident currently sees?  (within the last 12 months, such as internist, cardiologist, orthopedist, neurologist, podiatrist, optometrist, chiropractor, dentist, etc)

    _____ Landers 1/10 – El Dorado = _____

    _____ ? Audiologist = _____

5.  Additional comments regarding outside ancillary care_____

    _____

    _____

    _____

    _____

    _____

ONRC-OLE-06387

# Business Office or  Designee Section

_____
Person Completing This Section

_____
Date

33

ONRC-OLE-06388

**Medicare Co-Pay Notification**

If you have been approved for admission to the Medicare Certified Section of the Facility under MEDICARE PART A COVERAGE, you and/or your Responsible Party acknowledge that Medicare Part A coverage is in effect for up to 100 days.

Medicare pays 100% for the first 20 days of coverage. From day 21 to day 100 (the Co-Pay Period), you or your Responsible Party will be responsible for $ 144.50 per day for room and board. This is the amount that will NOT be paid by Medicare.

(NOTE: If, within the last 60 days, you have had any portion of a stay in a health care facility that was covered under Medicare Part A, coverage under Medicare Part A is not reset to day 1 when you are admitted to this Facility. In that instance, Medicare Part A coverage for your stay in this Facility is resumed as if it was a continuation of your stay at the previous facility.)

**Medicare Replacement Plan Notification**

- Your Medicare Replacement Plan _Medical Advantage_ pays _____ % for the first _____ of coverage.

- From Day _____ to _____ (the Co-Pay Period), you are responsible for $_____ per day for your authorized skilled nursing admission. This is the amount that will NOT be paid by your Medicare Replacement Plan.

- You have ____ days available per benefit period/calendar year for Skilled Nursing and Rehab services

- Your plan Case Manager will assist in determining your eligibility requirements for your care while in the Skilled Nursing and Rehab center.

**Private Insurance Plan Notification**

- Your Private Insurance Plan _____ pays _____ % after your $_____ deductible has been met.

- You are responsible for the $_____ deductible and $_____ per day or _____% of usual and customary charges, for your authorized skilled nursing admission.

- This is the amount that will NOT be paid by your private insurance plan. You have _____ days per benefit period/calendar year for Skilled Nursing and Rehab services.

- Your plan Case Manager will assist in determining your eligibility requirements for your care while in the Skilled Nursing and Rehab Center.

---

My Method of Payment for the Co-Pay Period is: (Please select one)

1. Private*_____  2. Medicaid**  ✓  3. Other _____

---

*This includes Private Insurance because you are responsible for the filing of insurance. As a courtesy to you, the facility will file Private Insurance and attempt to collect from the insurance company for 60 days after Medicare pays. In the event the Private Insurance does not pay within 60 days of billing by the Facility, the balance is due from the resident/responsible party. Insurance benefits are contract between the insurance company and the policyholder. **This includes your responsibility to file a Medicaid application.

I certify that I understand Medicare Part A coverage and that I have chosen a method of payment for the co-pay period. I assume the responsibility of reimbursing the facility during the co-pay period either by filing for Medicaid or by paying privately.

Signature of Resident or Responsible Party: _Addie Edwards_

Witness: _Rhonda Kordenin_       Date: _11/26/12_

35

n/A

## Medicare Secondary Payer

*THIS FORM SHOULD BE COMPLETED FOR EVERY PATIENT RECEIVING SERVICES AND SUPPLIES UNDER MEDICARE PART A AND PART B.*

Date: _____

FACILITY NAME: _____ PROVIDER MEDICARE NO.#: _____
RESIDENT NAME: _____ HIC # _____
RESIDENT DATE OF BIRTH: _____ AGE _____ ACCT #: _____

I. WORK RELATED ACCIDENT. Is Illness/Injury due to a work related accident? No _____ GO TO PART II
YES _____ COMPLETE THE FOLLOWING: State date, time and place of accident _____

Covered by Worker's Compensation? Yes ___ No ___ Covered by Federal Black Lung Program? Yes ___ No ___ Give the
name and address of the Worker's Compensation or Federal Black Lung Program _____
_____ Patient's policy or ID # _____

II. NONWORK RELATED ACCIDENT, Is illness/injury due to a nonwork related accident? No _____ GO TO PART
III YES _____ What type of accident called the illness/injury? Automobile? Give name and address of automobile Insurer
_____ Insurance Claim # _____
Other _____ Give detail of third party payer _____
_____
_____

Was another party responsible for this accident? Yes ___ No ___ Give name and address of any liability Insurer _____
_____ Insurance Claim # _____
Is there litigation? Yes ___ No ___ Give name and address of attorney _____
_____

III. GROUP HEALTH INSURANCE. IS PATIENT AGE 65 OR OVER? No ___ GO TO PART IV
YES ___ is patient employed an covered by the Employer's Group Health Plan (EGHP)? No ___ Yes ___ Give the name and
address of EGHP _____
_____ Patient's ID # _____
Is your spouse currently employed? NO ___ GO TO PART IV
YES ___ Is the patient covered under the group health plan of the spouse's employer? NO ___ GO TO PART IV
YES ___ Give name and address of EGHP _____
_____ Patient's ID # _____

IV. END STAGE RENAL DISEASE. Is the patient undergoing kidney dialysis for ESRD and entitled to benefits solely on
the basis of ESRD? Yes ___ MEDICARE IS PRIMARY PAYER
NO ___ Is the patient covered by EGHP? YES ___ Give name and address of EGHP _____
_____ Patient's ID # _____
Has the patient been undergoing kidney dialysis for more than 18 months or been entitled to Medicare for more than ___
months? YES ___ MEDICARE IS PRIMARY PAYER  NO ___ Is patient within a 18-month period as defined in section
264.4 (para. 4143.85)? YES ___ EGHP IS PRIMARY PAYER  NO ___ MEDICARE IS PRIMARY PAYER

V. DISABLED BENEFICIARY UNDER AGE 65. Is the patient a disabled Medicare beneficiary under 65?
NO ___ MEDICARE IS PRIMARY PAYER. YES ___ Is patient covered by a group health insurance plan (GHP) based on
the patient's own employment or employment of a spouse or parent? YES ___ Give the name and address of GHP _____
_____
_____ Patient's ID # _____

NO ___ MEDICARE IS PRIMARY PAYER

36

ONRC-OLF-06390

VI. OTHER HEALTH INSURANCE. Does the patient have other health insurance that will pay for nursing home benefits (not supplementary insurance) before Medicare? NO ___ MEDICARE IS PRIMARY PAYER

YES___ Give the name and address of the insurance company _____

_____ Patient's ID # _____

NOTE: WHEN ONE OF THESE CASES EXISTS, MEDICARE IS THE SECONDARY PAYER. THE OTHER INSURANCE BECOMES THE PRIMARY PAYER. WHEN A YES IS RECEIVED, THE FACILITY MUST BILL THE OTHER PAYMENT SOURCE BEFORE MEDICARE.


_____          _____
Resident/Patient's Signature             Witness


_____          _____
Resident's Agent or Representative       Witness


_____
Agent's Relationship


_____          _____
Date                                     Date

37

ONRC-OLE-06391

## PATIENT FUND AUTHORIZATION

*Ozie Edwards*

1. Funds are deposited in an interest-bearing account. Interest earned is credited to the resident's account. This account is separate from the facility's operating accounts.

2. Facility maintains a full and complete separate accounting of each resident's funds according to generally accepted accounting principles. The system precludes commingling of the resident's funds with the facility's funds or with funds of any person other than another resident. Individual financial records are available upon request of the resident or his or her legal representative.

3. Facility will notify a resident who receives Medicaid benefits when the balance of the account is $200.00 less than the amount required to be eligible for Medicaid. Facility will notify resident that if the amount is exceeded (in addition to the resident's other nonexempt resources) he or she may lose eligibility for Medicaid.

4. Upon death of the resident, the facility will convey within 30 days the remaining personal funds with an accounting to the Resident's Designated Beneficiary.

5. Facility has purchased a surety bond to assure the security of all residents' personal funds deposited with facility.

6. Facility will not charge the resident's personal fund for any items or services covered by Medicaid or Medicare.

Select one box to indicate choice:

☒ I will manage my funds.

☐ I authorize _____ to manage my funds.

☐ I authorize the facility to manage my funds in accordance with the Federal Policy on Protection of Resident Funds as stated above.

7. In the event of discharge, it is my wish that any funds remaining in this account be applied to outstanding debts incurred for my care or personal services while at the facility.

_____          _____
Resident                           Date

I, *Addie Edwards*, am authorized to execute this form on behalf of the resident regarding the management of the resident's funds.

*Addie Edwards*                    11/26/12
Signature                          Date

39



## PRESCRIPTION DRUG PLAN ENROLLMENT AUTHORIZATION

Residents of nursing facilities who are eligible to receive Medicare benefits can enroll or must be enrolled by regulation to receive prescription drug benefits under Part D Medicare. The Part D prescription drug benefit is administered through Prescription Drug Plans (insurance companies) that are responsible for establishing specific formularies of drugs that they will cover for members in their plan. Eligible individuals enroll with these specific Prescription Drug Plans to receive drug coverage under Part D.

There are many plans to choose from in every geographic area available to eligible individuals, but there are significant differences between plans in terms of drugs that they will pay for, necessity of prior authorization, usage of step therapy regimens and general suitability to serve residents in nursing facilities.

According to regulation, nursing home residents have the right to change their PDP enrollment on a monthly basis if they so choose. There is not advantage to making frequent changes from one PDP to another, but there is a huge advantage to finding the most suitable PDP for each resident. Coverage under the new plan is effective the first day of the month after enrollment. The old plan will be effective until the new plan kicks in so there will not be a gap in coverage.

A staff member of this facility can present the facts related to the available choices to assist you in making an informed decision regarding the plan that is the best for you or your relative. We can handle the enrollment process with your permission or there are several other options available to you discussed on the CMS website.

Indicated below is a space to designate your PDP of choice for yourself or your relative and a signature line authorizing us to handle the enrollment process.


My Prescription Drug plan of choice is: _____

My signature below is authorizing the nursing facility to handle the enrollment process on an expedited basis into the PDP of choice indicated above.

Name of Facility Resident: _____

Signature of Responsible Party: _____

Print Name: _____

Date: _____

Witness: _____

ONRC-OLE-06393

## BENEFICIARY DESIGNATION FORM

Be it known to all, that I, _Orie Edwards_, a resident of
(Print Resident's Name)

_Ouachita Nursing + Rehab. Center_, hereby declares and
(Print Name of Facility)

designates that _Addie Purifey Edwards_, an adult next of kin, who
(Print Beneficiary's Name)

resides at _725 Pearl St Camden AR. 71701_, shall receive all monies held
(Print Beneficiary's Address)

in my personal trust account held at said facility, if any, at the time of my death. If the above name adult

next of kin predeceases me in death, I declare and designate that _Ethel Williams_,
(Print 2nd Beneficiary's Name)

adult next of kin, who resides at, _352 Sanders Camden, AR 71701_, receive all monies
(Print 2nd Beneficiary's Address)

held in my personal trust account.

By my signature below, I further declare that I am competent to execute this document and have done

so voluntarily, free of undue influence, coercion, or duress of any kind.  I further state that I have the right

at any time to modify this form and designate other individuals to receive the monies held in my personal trust

account.

_Addie Edward_                         _11/26/12_
Resident's Signature                    Date

_43110_
Resident's Social Security Number

_Rhonda Hardin_                         _11/26/12_
Witness                                 Date

_Rebecca Kimbell, LSW_                  _11/26/12_
Witness                                 Date

41

ONRC-OLE-06394

DEPARTMENT OF HEALTH AND HUMAN SERVICES
CENTERS FOR MEDICARE & MEDICAID SERVICES

Form Approved
OMB no. 0938-0950

## APPOINTMENT OF REPRESENTATIVE

NAME OF BENEFICIARY *Orie Edwards*          MEDICARE NUMBER *XCXF 1232 1425*

### SECTION I: APPOINTMENT OF REPRESENTATIVE

To be completed by the beneficiary:

I appoint this individual, _____, to act as my representative in connection with my claim or asserted right under Title XVIII of the Social Security Act (the "Act") and related provisions of Title XI of the Act. I authorize this individual to make any request; to present or to elicit evidence; to obtain appeals information; and to receive any notice in connection with my appeal, wholly in my stead. I understand that personal medical information related to my appeal may be disclosed to the representative indicated below.

| SIGNATURE OF BENEFICIARY *Dottie Edwards* | DATE *11/26/72* |
|---|---|
| STREET ADDRESS *725 Pere St.* | PHONE NUMBER (AREA CODE) *870 936-3113* |
| CITY *Camden* | STATE *AL* | ZIP *71701* |

### SECTION II: ACCEPTANCE OF APPOINTMENT

To be completed by the representative:

I, _____, hereby accept the above appointment. I certify that I have not been disqualified, suspended, or prohibited from practice before the Department of Health and Human Services; that I am not, as a current or former employee of the United States, disqualified from acting as the beneficiary's representative; and that I recognize that any fee may be subject to review and approval by the Secretary.

I am a/an _____
                        (PROFESSIONAL STATUS OR RELATIONSHIP TO THE PARTY, E.G. ATTORNEY, RELATIVE, ETC.)

| SIGNATURE | DATE |
|---|---|
| STREET ADDRESS | PHONE NUMBER (AREA CODE) |
| CITY | STATE | ZIP |

### SECTION III: WAIVER OF FEE FOR REPRESENTATION

Instructions: This form should be filled out if the representative waives a fee for such representation. (Note that providers or suppliers may not charge a fee for representation and thus, all providers or suppliers that furnished the items or services at issue must complete this section.)

I waive my right to charge and collect a fee for representing _____
before the Secretary of the Department of Health and Human Services.

| SIGNATURE | DATE |
|---|---|

### SECTION IV: WAIVER OF PAYMENT FOR ITEMS OR SERVICES AT ISSUE

Instructions: Providers or suppliers that furnished the items or services at issue must complete this section if the appeal involves a question of liability under section 1879(a)(2) of the Act. (Section 1879(a)(2) generally addresses whether a provider/supplier or beneficiary did not know, and could not reasonably be expected to know, that the items or services at issue would not be covered by Medicare.)

I waive my right to collect payment from the beneficiary for furnished items or services at issue involving 1879(a)(2) of the Act.

| SIGNATURE | DATE |
|---|---|

Form CMS-1696 (07/05)  EF (07/05)

43

ONRC-OLE-06395

**CHARGING OF FEES FOR REPRESENTING BENEFICIARIES BEFORE
THE SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES**

An attorney, or other representative for a beneficiary, who wishes to charge a fee for services rendered in connection with an appeal before the Department of Health and Human Services (DHHS) at the Administrative Law Judge (ALJ) or Medicare Appeals Council (MAC) level is required by law to obtain approval of the fee in accordance with 42 CFR §405.910(f). A claim that has been remanded by a court to the Secretary for further administrative proceedings is considered to be before the Secretary after the remand by the court.

The form, "Petition to Obtain Representative Fee" elicits the information required for a fee petition. It should be completed by the representative and filed with DHHS. Where a representative has rendered services in a claim before DHHS, the regulations require that the amount of the fee to be charged, if any, for services performed before the Secretary of DHHS be specified. If any fee is to be charged for such services, a petition for approval of that amount must be submitted.

An approval of a fee is not required where the appellant is a provider or supplier or where the fee is for services (1) rendered in an official capacity such as that of legal guardian, committee, or similar court-appointed office and the court has approved the fee in question; (2) in representing the beneficiary before the federal district court of above, or (3) in representing the beneficiary in appeals below the ALJ level. If the representative wishes to waive a fee, he or she may do so. Section III on the front of this form can be used for that purpose. In some instances, as indicated on the form, the fee must be waived for representation.

**AUTHORIZATION OF FEE**

The requirement for the approval of fees ensures that representative will receive fair value for the services performed before DHHS on behalf of a claimant while at the same time giving a measure of security to the beneficiaries. In approving a requested fee, the ALJ or MAC considers the nature and type of services performed, the complexity of the case, the level of skill and competence required in rendition of the services, the amount of time spent on the case, the results achieved, the level of administrative review to which the representative carried the appeal and the amount of the fee requested by the representative.

**CONFLICT OF INTEREST**

Sections 203, 205 and 207 of Title XVIII of the United States Code make it a criminal offense for certain officers, employees and former officers and employees of the United States to render certain services in matters affecting the Government or to aid or assist in the prosecution of claims against the United States. Individuals with a conflict of interest are excluded from being representatives of beneficiaries before DHHS.

According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0938-0950. The time required to prepare and distribute this collection is 15 minutes per notice, including the time to select the preprinted form, complete it and deliver it to the beneficiary. If you have comments concerning the accuracy of the time estimates or suggestions for improving this form, please write to CMS, PRA Clearance Officer, 7500 Security Boulevard, Baltimore, Maryland 21244-1850.
Form CMS-1696 (07/05) EF (07/05)

ONRC-OLE-06396

## APPLICATION FOR MEDICAID/RE-EVALUATIONS

I authorize _Ouachita Nursing + Rehab. Center_ to handle all matter concerning the
_____(Facility)_____

resident listed below, now and in the future, concerning applying for and re-evaluation of Medicaid Services.

If you should have any questions concerning _____ _Ozie Edwards_ _____

please contact _Patty Garrison_                    (Resident)
_____(Facility Bookkeeper)_____

Resident _Addie Edward_                    Date _11/20/12_

Responsible Party                            Date _11/26/12_

Facility Representative _Rhonda Hardin_      Date

If signed with mark or unable to make mark, please have two witnesses.

Facility Representative _____   Date _____

45

ONRC-OLF-06397

# LONG TERM AUTHORIZATION AGREEMENT

Beneficiary Name: _Ozie Edwards_      Medicare #: _045207_
Facility Name: _ONRC_      Provider: _McKesson_
      Address: _____

1. I request that payment of authorized Medicare, Medigap, Medicaid and other third party payor benefits be made on my behalf to the provider named above for any products or services furnished me by that supplier.

    Medigap Insurer: _____      Policy #: _____

2. I authorize any holder of medical information about me to release to the Centers for Medicare and Medicaid Services and any other payor and their agents any information needed to determine benefits payable to the provider named above for products/services it has furnished me. I also authorize any holder of medical information to release to the provider name above copies of my records from any other source in order to determine benefits payable to the provider named above for products/services it has furnished me.

3. I understand that if I have a medical need for an enteral pump during my stay, the provider named above will rent or sell a pump to me. If I choose to purchase the pump instead of renting it, I have initialed the line below:

      I choose to purchase the pump _____

4. I acknowledge that I have received from the provider named above, a copy of its Notice of Privacy Practices.

    _O. E._     _11/26/12_
    Initials     Date

    _Addie Edwards_     _11/26/12_
    *Beneficiary's (Resident's) Signature or Name     *Date

By _____
    *Signature of Beneficiary's Representative or Witness     *Title/Relationship to Beneficiary
    (If the beneficiary is unable to sign, complete all * items)

    *Complete Address of Beneficiary's Representative or Witness

*The above individual signing on behalf of the beneficiary certified that the beneficiary is unable to sign due to: (circle the appropriate reason)

    Physical Incapacity     Mental Incapacity     Death (indicate date of death): _____

As a Medicare Part B provider of covered services, the provider named above is obligated to uphold the standards shown below.

1. A supplier must be in compliance with all applicable Federal and State licensure and regulatory requirements. 2. A supplier must provide complete and accurate information on the DMEPOS supplier application. Any changes to this information must be reported to the National Supplier Clearinghouse within 30 days. 3. An authorized individual (and whose signature is binding) must sign the application for billing privileges. 4. A supplier must fill orders from its own inventory, or must contract with other companies for the purchase of items necessary to fill the order. A supplier may not contract with any entity that is currently excluded from the Medicare program, any State health care programs, or from any other Federal procurement and nonprocurement programs. 5. A supplier must advise beneficiaries that they may rent or purchase inexpensive or routinely purchased durable medical equipment and of the purchase option for capped rental equipment. 6. A supplier must notify beneficiaries of warranty coverage and honor all warranties under applicable State law and repair or replace free of charge Medicare covered items that are under warranty. 7. A supplier must maintain a physical facility on an appropriate site. 8. A supplier must permit CMS, or its agents to conduct on-site inspections to ascertain the supplier's compliance with these standards. The supplier location must be accessible to beneficiaries during reasonable business hours and must maintain a visible sign and posted hours of operation. 9. A supplier must maintain a primary business telephone listed under the name of the business in a local directory or a toll-free number available through directory assistance. The exclusive use of a beeper, answering machine or cell phone is prohibited. 10. A supplier must have comprehensive liability insurance in the amount of at least $300,000 that covers both the supplier's place of business and all customers and employees of the supplier. If the supplier manufactures its own items, this insurance must also cover product liability and completed operations. 11. A supplier must agree not to initiate telephone contact with beneficiaries with a few exceptions allowed. This Standard prohibits suppliers from calling beneficiaries in order to solicit new business. 12. A supplier is responsible for delivery and must instruct beneficiaries on us of Medicare covered items and maintain proof of delivery. 13. A supplier must answer questions and respond to complaints of the beneficiaries, and maintain documentation of such contracts. 14. A supplier must maintain and replace at no charge directly or through a service contract with another company. Medicare covered items it has rented to beneficiaries. 15. A supplier must accept returns of substandard (less than full quality for the particular item) or unsuitable items (inappropriate for the beneficiary at the time it was fitted and rented or sold) from beneficiaries. 16. A supplier must disclose these supplier standards to each beneficiary to whom it supplies a Medicare-covered item. 17. A supplier must disclose to the government any person having ownership, financial, or control interest in the supplier. 18. A supplier must not convey or reassign a supplier number; i.e. the supplier may not sell or allow another entity to use its Medicare billing number. 19. A supplier must have a complaint resolution protocol established to address beneficiary complaints that relate to these standards. A record of these complaints must be maintained at the physical facility. 20. Complaint records must include: the name, address, telephone number and health insurance claim number of the beneficiary, a summary of the complaint, and any actions taken to resolve it. 21. A supplier must agree to furnish HCFA any information required by the Medicare statute and implementing regulations.

46

## BED HOLD POLICY

If resident _____*Orie Edwards*_____ is discharged to a hospital, I do/I do not (circle one) wish to hold the resident's bed. I understand that if the bed is not held, _____ _____*ONRC*_____ (facility) may proceed to admit to that bed.

Medicare will not pay for any days that the resident is not in the facility (private insurance may or may not cover this cost). I agree to contact _____*ONRC*_____ (facility) if I decide to stop holding the bed; charges will stop immediately and the bed will be filled.

I agree to pay the bed hold bill to date every seven (7) days. I further agree that when the resident is ready for discharge from the hospital, I will contact the facility business office and pay the days remaining to readmission in full.

I further understand that if I hold the bed this does not necessarily mean the resident will be admitted to the same room(s) he previously occupied.

_____*ONRC*_____ (facility) will remind the resident and/or the resident's representative of the bed hold policy at the time of hospitalization. The resident or the resident's representative must notify the facility if bed hold is desired.

If I choose to hold the bed, I promise to pay reasonable charges, not to exceed the daily private room rate, for the bed hold period. The private rate is the price per day a private patient pays to stay in the nursing facility (available in the business office).

I agree to be bound by the terms of this agreement.

Resident _____

_____*Addie Edwards*_____

Responsible Party

Date _____

Date _____*11-26-12*_____

47

ONRC-OLE-06399

I.    **Payment**

You are responsible for payment of all charges for items and services provided to you by the Facility unless these charges are paid for by a third-party reimbursement program such as Medicare or Medicaid. You are responsible for payment of all charges for medicines and medical supplies provided to you that are not otherwise paid for by third-party reimbursement programs such as Medicare or Medicaid. You are responsible for payment of all charges of any physician who renders care to you while you are a resident of the Facility, and any other charges by third parties providing items or services to you at your request.

You and your Responsible Party acknowledge receiving information from the Facility on how to apply for and use Medicare and Medicaid benefits, and you each release the Facility and each of its owners, agents, servants, and employees from any liability or responsibility in connection with your potential claim for coverage or reimbursement and for any failure to obtain such coverage or reimbursement. If you elect to apply for Medicaid benefits, you and your Responsible Party give the Facility permission to seek and receive information on the status of your Medicaid eligibility application from the appropriate state agency.

You and your Responsible Party hereby authorize the Facility and all other providers of items and services to file in your name and on your behalf claims for any and all third-party payments (including but not limited to Medicare, Medicaid and/or private medical insurance benefits) for items and services provided to you by the Facility or by such third-party providers, including the Facility's provider(s), and the right to receive the same.

**THE FACILITY DOES NOT MAKE ANY ASSURANCE OF ANY KIND THAT YOUR CARE WILL BE PAID FOR BY MEDICARE, MEDICAID, ANY THIRD-PARTY INSURANCE OR OTHER REIMBURSEMENT SOURCE.**

You and your Responsible Party agree that you will be responsible for payment of all charges for items and services provided to you by the Facility as set forth in the Handbook and in this Agreement, including both Covered and Non-covered services (as defined in Section VIII of the Handbook and as described in Appendix B to the Handbook). If your Responsible Party has legal access to income or resources of yours which is available to pay for care and services you receive at the Facility, then your Responsible Party agrees to provide payment to the Facility from such income or resources.

Billing  The Facility will bill you monthly. Your monthly statement will include billing for your Daily Rate one month in advance, unless you are a Medicare recipient, as well as any charges for Non-covered items and services. Bills for services rendered to you by the Facility which are not paid by the tenth (10th) day of each month will be past due or delinquent. When payment for services is not made by the tenth (10th) day of any billing month, your account will be accessed a delinquency charge at the monthly rate not to exceed 5% per annum above the Federal Reserve discount rate which is the maximum permitted by law. The delinquency charge does not alter any obligations of either the Facility, you, or your Responsible Party under the Admission Agreement. The Facility does not grant credit or allow installment payments, and the Facility's acceptance of a partial payment will not limit the Facility's rights under the Admission Agreement. If you fail to make a required payment within fifteen (15) days of the due date, the Facility may require you to vacate the Facility. A reasonable period, not to exceed thirty (30) days from the date of receipt of notice of failure to pay, will be allowed for you to make arrangements for you to vacate the Facility. The notice will be deemed received on either the actual day of receipt or five (5) days after mailing, whichever occurs first. You will be responsible for all relocation expenses, in addition to all charges due to the Facility for all days of care received. If your account is referred to an attorney for collection, you must pay reasonable attorney's fees, collection costs, and other costs of litigation, to the extent permitted by law. You will not be readmitted if any amount is owed from a previous stay.

You and your Responsible Party understand that a third-party guarantee of payment for Non-covered services (as defined in Section VIII of the Handbook and as described in Appendix B to the Handbook) is not required as a condition of admission. **You and your Responsible Party also understand that you (the resident) are not required to request or receive Non-covered services as a condition of admission. You and your Responsible Party understand that if you do request that the Facility make Non-covered services available to you, both you and your Responsible Party are agreeing by signing this Agreement that each of you (both the resident and the Responsible Party) shall be personally liable for any charges for Non-covered items or services requested by you or your Responsible Party. You and your Responsible Party also understand that if you do not request that the Facility make Non-covered services available to you, Non-covered services will not be made available to you and your Responsible Party will not be agreeing to be personally liable for any charges for Non-covered items or services by signing this Agreement.**

49

You and your Responsible Party do _____ or do not __✓__ request that the Facility make Non-covered services available to you. If you and your responsible Party do request that the facility make non-covered services available to you, additional person may be required to execute the third party Guaranty Agreement of non-covered items and services found.

Initialed:        Resident: _____    Responsible Party: _____    Not Applicable: _____

**Complete All Appropriate Sections Below**

A.        Medicare. If you have a reasonable potential of being eligible for Medicare coverage, you and your Responsible Party acknowledge that you have received a list of those items and services offered by the Facility that are paid for under the Medicare program, as well as those Non-covered items and services which are not covered by Medicare, and the charges for those Non-covered items and services (these lists are contained in section VIII, Item A and further discussed in Appendix B of the Handbook). Currently, the daily co-insurance amount under the Medicare (Part A) program is $ _144.50_ per day.

Initialed:        Resident: _____    Responsible Party: _____    Not Applicable: _____

*Medicare includes Private Insurance because you are responsible for the filing of insurance. Insurance benefits are contracts between the insurance company and the policyholder. The facility will file Private Insurance as a courtesy to you and attempt to collect from the insurance company 60 days after Medicare pays. In the event the Private Insurance does not pay within 60 days of billing by the Facility, the balance is due from the resident/responsible party.

B.        Medicaid. If you have a reasonable potential of being eligible for Medicaid benefits, you and your Responsible Party acknowledge that you have received a list of those items and services paid for by Medicaid under the Arkansas State Medicaid Plan, as well as a list of Non-covered items and services and the amount of the charges for those Non-covered items and services (these lists are contained in Appendix Section VIII, Item B, and further discussed in Appendix B of Handbook).

Initialed:        Resident: _____    Responsible Party: _____    Not Applicable: _____

C.        Private Pay. If the cost of your stay at the Facility will not be covered by Medicaid or Medicare (a "Private Pay" resident) you and your Responsible Party acknowledge that you have received a list of those items and services which are included in the Facility's Daily Rate, as well as a list of those Non-covered items and services which are not included in the Facility's Daily- Rate, and the amount of the charges for those Non-covered items and services (these lists are contained in these lists are contained in Appendix Section VIII, Item C, and further discussed in Appendix C of Handbook). The Daily Rate in effect at the present time is $ _142.00_ per day. The Facility reserves the right to increase this daily rate. As a Private pay resident, your Responsible Party or other individuals will have a right but no obligation, to execute a Third Party Guaranty Agreement of the daily Rate, which if executed, would entitle Resident to at least sixty (60) days notice of discharge for non- payment, as opposed to the thirty (30) days required if this guaranty is not executed. Execution of this Guaranty is NOT required in order to obtain admission to the Facility. This Guaranty is located on Page 13.

Initialed:        Resident: _____    Responsible Party: _____    Not Applicable: _____

50

ONRC-OLF-06401

# Clinical Records or Designee Section

_____
Person Completing This Section

_____
Date
11/26/12

ONRC-OLE-06402



## INVENTORY LIST

| QTY | ARTICLES | QTY | APPLIANCES | QTY | PROSTHETIC DEVICES | | ACQUIRED AFTER ADMISSION |
|---|---|---|---|---|---|---|---|
| | | | | | | Date | Item |
| | Belts | | T.V. – Ser. # | | Dentures: ☐ Upper | | |
| | Blouses | | Radio – Ser. # | | ☐ Lower ☐ Partial | | |
| | Coats | | Hair Dryer | | Eye Wear | | |
| | Dresses | | Electric Razor | | Cane | | |
| | Gloves | | | | Walker – Ser. # | | |
| | Hats | | | | Wheelchair – Ser # | | |
| | Housecoats – Robes | | | | Brace | | |
| | Jackets | | JEWELRY | | | | |
| | Nightgowns – Pajamas | | Ring (Describe) | | | | |
| | Purses | | | | OTHER | | |
| | Shaving Kit | | Watch (Describe) | | | | |
| | Shoes | | | | | | |
| | Shorts | | Other | | | | |
| | Slacks | | | | | | |
| | Slippers | | | | | | |
| | Slips | | FURNITURE | | VALUABLES RELEASED FROM SAFE | | |
| | Socks/Hose | | | | | | |
| | Suitcases | | | | | | |
| | Suits | | | | | | |
| | Sweaters | | | | | | |
| | Ties | | | | | | |
| | Undershirts | | | | | | |
| | Underwear | | | | | | |

(ON ADMISSION)

I certify that this is a correct list of my clothes and belongings which I wish to retain in my possession and for which I take ENTIRE RESPONSIBILITY. I have received a copy of this list.

Signature of Patient/Responsible Party _____     Date _____     Signature of Facility Rep. _____     Date _____

If the patient is unable to sign, state reason: _____

Signature of Witness: _____

Patient/Responsible Party is responsible for assuring that all personal belongings are properly marked. All items brought in after admission are added to this inventory at the request of Patient/Responsible Party, as well as advise facility of items taken out for replacement or seasonal changes.

| QTY | ARTICLES | QTY | APPLIANCES | QTY | PROSTHETIC DEVICES | | ACQUIRED AFTER ADMISSION |
|---|---|---|---|---|---|---|---|
| | | | | | | Date | Item |
| | Belts | | T.V. – Ser. # | | Dentures: ☐ Upper | | |
| | Blouses | | Radio – Ser. # | | ☐ Lower ☐ Partial | | |
| | Coats | | Hair Dryer | | Eye Wear | | |
| | Dresses | | Electric Razor | | Cane | | |
| | Gloves | | | | Walker – Ser. # | | |
| | Hats | | | | Wheelchair – Ser # | | |
| | Housecoats – Robes | | | | Brace | | |
| | Jackets | | JEWELRY | | | | |
| | Nightgowns – Pajamas | | Ring (Describe) | | | | |
| | Purses | | | | OTHER | | |
| | Shaving Kit | | Watch (Describe) | | | | |
| | Shoes | | | | | | |
| | Shorts | | Other | | | | |
| | Slacks | | | | | | |
| | Slippers | | | | | | |
| | Slips | | FURNITURE | | VALUABLES RELEASED FROM SAFE | | |
| | Socks/Hose | | | | | | |
| | Suitcases | | | | | | |
| | Suits | | | | | | |
| | Sweaters | | | | | | |
| | Ties | | | | | | |
| | Undershirts | | | | | | |
| | Underwear | | | | | | |

(ON DISCHARGE)

I received on discharge in satisfactory condition the above articles and a copy of this list.
Disposition of belongings: _____

Signature of Patient/Responsible Party _____     Date _____     Signature of Facility Rep. _____     Date _____

53

ONRC-OLE-06403

TLC-102A

## Acknowledgement of
## "TLC Tender Lift and Care
## "No Lift" Policy and Procedure

### Resident Acknowledgement Form

THIS PROGRAM HAS BEEM IMPLEMENTED IN AN EFFORT TO PROVIDE A SAFE AND HEALTHY ENVIRONMENT FOR RESIDENTS IN OUR CARE AND FOR THE SAFETY OF OUR EMPLOYEES.

Our residents will be evaluated on admission, at care planning and at any change of condition to establish their needs for the total lift to sit-to-stand lift.

I have received and understand the explanation of the TLC "No Lift" policy.

This form will be signed by a facility representative, resident and/or resident representative and dated.

_____     _____
Facility Representative                Date   11/26/12

_____     _____
Resident or Responsible Party          Date   11/26/12

55

ONRC-OLF-06404

*Ozie*
*Edwards*

## Vaccination, Blood Testing, Tuberculosis Screening Authorization

I hereby give the facility permission to administer influenza vaccination annually, in the fall. To the best of my knowledge, I have not had an anaphylactic reaction to eggs. I have been instructed that as a result of the vaccination, I may experience some side effects, such as, slight discomfort, soreness at the injection site, redness as the injection site, slight fever (occasionally), or muscle aches (occasionally).

I have received information regarding the risk and benefits of receiving the influenza vaccination. I have had an opportunity to ask and have answered any questions I may have. If I refuse, I understand that I will be at risk for a possible influenza episode.

*Initialed:* _____  *Resident:* _____  *Responsible Party:* _____  *Refused:* O.E. Had 2012 @ Silver Oaks

I hereby give the facility permission to administer pneumococcal vaccination. I understand that this immunization is to be given only one (1) time. To the best of my knowledge, I have not received a pneumococcal vaccination. I have been instructed that as a result of this vaccination, I may experience some side effects, such as, slight discomfort, soreness of the arm, redness of the arm, slight fever (occasionally), muscle aches (occasionally), joint aches (rarely), or rash (rarely).

I have received information regarding the risk and benefits of receiving the pneumococcal vaccination. I have had an opportunity to ask and have answered any questions I may have. If I refuse, I understand that I will be at risk for a possible pneumococcal episode.

*Initialed:* _____  *Resident:* _____  *Responsible Party:* _____  *Refused:* O.E. Had in 2010 @ OVRC

To protect against possible transmission of blood-borne diseases such as Hepatitis B and Acquired Immune Deficiency Syndrome, I understand that it may be necessary to test my blood while I am a resident of this nursing facility, if for example an employee is stuck by a needle while drawing blood. I further understand that my blood will be routinely tested for these diseases and that the results of any testing will be kept confidential. I hereby grant permission for testing.

*Initialed:* _____  *Resident:* _____  *Responsible Party:* O.E.

I hereby grant permission for an intradermal skin test for tuberculosis upon admission and yearly thereafter if the initial skin test is negative. If the skin test is positive, permission is given for yearly chest x-rays to rule out active tuberculosis.

*Initialed:* _____  *Resident:* _____  *Responsible Party:* O.E.

57

ONRC-OLE-06405

**DMS POLICY & PROCEDURE**
Nursing Department

Influenza Immunization Informed Consent Form

I hereby give the facility permission to administer influenza vaccination annually, in the fall. To the best of my knowledge, I have not had an anaphylactic reaction to eggs. I have been instructed that as a result of the vaccination, I may experience some side effects such as:

- Slight discomfort
- Soreness at the injection site
- Redness at the injection site
- Slight Fever (occasionally)
- Muscle Aches (occasionally)

I have received information regarding the risks and benefits of receiving the influenza vaccination. I have had an opportunity to ask and have answered any questions I may have.

Resident Signature _Ogie Edman_ /_Ollie Edwan_ Date _11/26/12_

Witness Signature _Rhonda Koelin_ Date _11/26/12_   If I refuse, I understand that I

will be at risk for a possible influenza episode.

☒Refused Reason for refusal _Had @ Silver Oaks 2012_

Influenza Immunization Informed Consent Form 1 of 1 N-I-006A (IC-I-07A)

59

ONRC-OLE-06406

**DMS POLICY & PROCEDURE**
Nursing Department

Pneumococcal Immunization Informed Consent Form

I hereby give the facility permission to administer pneumococcal vaccination. understand that this immunization is to be given only one (1) time.  To the best of my knowledge, I have not received a pneumococcal vaccination.  I have been instructed that as a result of this vaccination, I may experience some side effects such as:

- Slight discomfort
- Soreness of the arm
- Redness of the arm
- Slight fever (occasionally)
- Muscle aches (occasionally)
- Joint aches (rarely)
- Rash (rarely)

I have received information regarding the risks and benefits of receiving the pneumococcal vaccination. I have had an opportunity to ask and have answered any questions I may have.

Resident Signature _~~Odie Edward~~_____   Date __11/26/12__

Witness Signature _~~Yolanda Karlin~~_____   Date __11/26/12__

If I refuse, I understand that I will be at risk for a possible pneumococcal episode.

☒ Refused

Reason for refusal __Had @ OVFC - in 2010__

ONRC-OLE-06407

## CAPACITY VERIFICATION

To Whom It May Concern:

_Ozie Edwards_ , a Resident in _ONRC_
[Name of Resident]                                    [Name of Facility]

☐  Capacity & Able to Sign Forms. Has the capacity to understand the nature of his or her medical condition and the consequence of treatment decisions; and acknowledges that he or she understands the content of the forms and is physically able to sign forms.

☐  Capacity & Unable to Sign Forms. Has the capacity to understand the nature of his or her medical condition and the consequence of treatment decisions; and acknowledges that he or she understands the content of the forms. Resident is physically unable to sign forms due to: _____
_____
_____

☐  Waxing and Waning Capacity. Has waxing and waning capacity and is able to make decisions some of the time.

☒  No Capacity. Lacks the capacity to understand the nature of his or her medical condition and the consequence of treatment decisions; and is unable to acknowledge whether he or she understands the content of the forms due to: _Dementia_
_____
_____

_____                    _____
Resident                                                Date

_Annie Edmond_                    _11/26/12_        _Spouse_
Resident Representative                Date                Relationship to Resident

_Kajai Smithon_                    _11/27/12_
Nurse                                          Date

63

ONRC-OLE-06408

**Ouachita Nursing & Rehabilitation Center**
1411 Country Club Road
Camden, AR 71701
870-836-4111

## MEDICARE
Admission payor source – Medicare
Medicare's MAXIMUM benefit is 100 days of skilled nursing care per spell of illness.
We are NOT guaranteed 100 days.  That is simply the MAXIMUM benefit available.
Patient must meet skilled nursing or therapy criteria <u>each</u> day that Medicare pays.
Medicare pays for the first 20 days at 100%.
For days 21 – 100, Medicare will pay everything EXCEPT the Federal co-insurance rate of $144.50 per day.

*Medicare Advantage*

## PRIVATE PAY
Semi-Private pay room rate is $142.00 per day for room and board.
Private pay room rate is $182.00 per day.
This does NOT include therapy, medication, supplies, or any ancillary services.
Private pay must be paid in advance – like rent.

## MEDICAID
Medicaid pays the room and board for approximately 70% of all nursing home residents in the State of Arkansas.
Patient must meet ***medical*** and ***financial*** criteria for Medicaid benefits.
Typically, the patient will surrender their monthly social security check plus any other income to the nursing home minus $40 for their personal needs.

IE:  If total monthly income (SS, VA, retirement, etc) = $500.00, then the patient liability = $460.00 per month

> <u>Patient</u> pays their designated liability (in this case $460.00, the remainder of all my monthly income)
> Medicaid pays the remaining balance.

If you think your family member may qualify for Medicaid assistance, you need to submit a long-term care Medicaid application to the local Department of Human Services as soon as possible.  The Caseworker is Tasheka Carroll with Miller County DHS at 870-773-0563, or by mail at 3809 Airport Plaza, Texarkana, AR 71854-9985

*I acknowledge that I have received a copy of this information and understand my payment responsibilities.*

Patient/Responsible Party _Addie Edwards_ Date: _11/26/12_

## CONTRACT
### TO PARTICIPATE IN THE ARKANSAS NURSING HOME PROGRAM
### ADMINISTERED BY THE DIVISION OF ECONOMIC AND MEDICAL SERVICES
### OFFICE OF LONG TERM CARE
### UNDER TITLE XIX (MEDICAID)

This ___Facility___ agreement made and entered into this the _____ day of _____ hereinafter called Provider; and

by and between

the Department of Economic and Medical Services, Office of Long Term Care hereinafter called State.

WITNESSETH:

I.   Provider agrees that its responsibilities hereunder shall be as follows:

   A.   To keep all records, as set forth in applicable Federal and/or State regulations, and Long Term Care Provider Manuals, and any duly promulgated changes in or additions thereto, and to fully disclose the extent of all services provided to individuals receiving assistance under the State Plan.

   B.   To make available for inspection all records herein specified to satisfy audit requirements under the program; to furnish all such records for audit conducted periodically by State or its designated agents and/or representatives of the Department of Human Services, and the Department of Health and Human Services of the United States of America or its designees or representatives. For all Medicaid recipients these records shall include, but not necessarily be limited to those records as defined in Section A above.

   C.   Provider shall at all times provide State access to the facility, residents, and resident records. Provider expressly agrees not to hinder, impede, or otherwise restrict State from carrying out its official duties, and expressly agrees to reasonably assist State in carrying out its official duties. In this context, "official duties" include inspections, surveys and investigations and reviews as prescribed by State and Federal laws, rules and regulations, and shall allow "observation and recordings made and conducted relative to long term care facilities, long term care residents, and records of or possessed by facility and/or residents. "Observation" includes the right and ability to move in or around the interior and/or exterior, including resident rooms of a long term care facility, unaccompanied (except upon request if the inspector(s)) at any time. "Recordings" include photostatic copies, notes, writings, drawings, and photographs (whether still or motion, in accordance with Section 2 of Art. Act 33 of 1989), and sound recordings."

   D.   To accept only residents who have met the requirements of the duly promulgated Pre-Admission Screening Program and for whom the facility can provide all required and necessary service. Provider specifically herein agrees to insure availability of all medications prescribed by the resident's physician.

   E.   To provide all services without discrimination on the grounds of race, color, national origin, or physical or mental disability within the provisions of Title VI of the Federal Civil Rights Act, and Section 504 of the Rehabilitation Act of 1973. Provider agrees herewith that it has been furnished with a copy of the LTC Provider Manual, and shall be bound by all provisions thereof, including any and all changes and/or additions thereto.

   F.   To comply with all rules, regulations, changes in and additions thereto issued by the United States Department of Health and Human Services pertaining to nursing homes, and to comply with all rules, regulations, duly promulgated changes in and additions thereto issued by the State.

   G.   To meet all requirements of applicable Life Safety Code and all State Fire and Safety Codes.

   H.   Provider will not transfer or discharge any recipient without a minimum of 30 days advance notice to the individual or a responsible person. Provider may transfer or discharge a Medicaid recipient under the following circumstances:

      1.   The transfer or discharge is necessary to meet the resident's welfare and the resident's welfare cannot be met in the facility;

      2.   The transfer or discharge is appropriate because the resident's health has improved sufficiently so the resident no longer needs the services provided by the facility;

      3.   The safety of the individuals in the facility is endangered;

      4.   The health of individuals in the facility would otherwise be endangered;

      5.   The resident has failed, after reasonable and appropriate notice, to pay (or to have paid under Title XIX or Title XVIII on the resident's behalf an allowable charge imposed by the facility for an item or service requested by the resident and for which a charge may be imposed consistent with federal and state laws and regulations; or

      6.   The facility ceases to operate.

      The notice of transfer or discharge must be made at least 30 days in advance of the resident's transfer or discharge except:

         a.   In a case described in Item H(3) or H(4) above;

         b.   In a case described in Item H(2) above where the resident's health improves sufficiently to allow for a more immediate transfer or discharge;

         c.   In a case described in Item H(1) above where a more immediate transfer or discharge is necessitated by the resident's urgent medical needs; or

         d.   In a case where the resident has not resided in the facility for 30 days.

   I.   Provider shall give 30 day notice to the State prior to any change of ownership including a change which contemplates or provides for the assumptions of existing liabilities by the new owner.

EMS-T11 (R. 9/39)

**EXHIBIT**

**D**

J. To bill State (Medicaid) only after the service has been provided.

K. To accept Medicaid reimbursement rates determined by the State as full payment for all Medicaid eligible care and services required by the classification of each resident and rendered by the provider, and make no additional charges to the resident, or to accept any additional payment from the resident, relatives, or responsible parties for that service which is covered under the Medicaid Program.

L. To promptly refund to the resident or responsible party any unused portion of recipient applied income collected in advance and not owed due to death, discharge or transfer. Recipient income is to be prorated on a per diem basis according to the number of days in the month.

M. To promptly refund to a resident or other responsible person any deposit or entrance fee collected while awaiting approval for Medicaid eligibility to the extent those days are covered by Medicaid payments.

N. To provide all services and specific items as defined in the Medical Assistance Reasonable Cost Related Reimbursement Manual for Long Term Care Facilities (MARCRRM-LTCF) or any additions thereto or subsequent manuals. Receipt of Medicaid per diem reimbursement rates is considered payment in full for services and items included in the MARCRRM.

O. To accept assignment and file a claim in a timely and proper manner with all third party sources, and if said claim is collected from a third party, to reimburse Medicaid up to the amount Medicaid paid for said services.

P. The $30 Personal Needs Allowance which is provided for by the Medicaid Program for personal expenditures of a resident cannot and shall not be used for any other purpose except as authorized in writing by the resident or responsible party.

Q. To comply with all State and/or Federal regulations pertaining to resident personal funds and to provide the State access to patient account records or any other financial records maintained by the provider for benefit of the patient. The new owner must specify in writing which owner will be responsible for recipient Medicaid claims and facility account receivable balances resulting from dates of service prior to the ownership change.

Further Provider agrees that it will not prevent or interfere with the individual or responsible person, or the Office of Long Term Care in the transfer or discharging of a patient when same is appropriate.

II. The State agrees that it shall have the following responsibilities hereunder:

A. To make timely payments to Provider for the appropriate Medicaid services provided the eligible Medicaid recipients in accordance with the terms of the LTC Provider Manual or other appropriate regulations and procedures previously mentioned herein.

B. To notify Provider of any changes of rules or regulations to be followed hereunder as promptly as is practicable at all times.

C. To safeguard the confidentiality of any Medicaid records maintained for the State, its agents, and/or fiscal intermediary as specified in Federal and State regulations.

III. Mutual Covenants, Duties, Responsibilities, and Undertakings

A. State and Provider mutually agree to comply with all Federal and State laws, rules and regulations.

B. State and Provider agree that the rights and privileges of the residents are of primary concern to the parties and the parties expressly agree and covenant to protect and preserve those rights and privileges and that failure to act in a manner consistent with those rights and privileges shall constitute an immediate breach of agreement and may result in immediate termination of this agreement without recourse.

C. State and Provider agree and covenant that this written instrument constitutes the entirety of the agreement between both parties and no statement or representations not reduced to writing or incorporated herein by express reference shall be binding upon the parties and such statements or representations not incorporated herein by express reference or not contained herein shall constitute no part of this agreement.

IV. This contract may be terminated in accordance with the following provisions:

A. This contract may be terminated by either party by giving 30 days written notice to the other party.

B. This contract may be terminated immediately by State for the following reasons:

   1. Federal sanction of Provider.

   2. Change of ownership.

   3. Violation of any provision herein contained.

   4. In accordance with termination procedures as set out in appropriate Federal and/or State regulations or rules by which Provider is bound hereunder.

| Provider | Division of Economic and Medical Services Office of Long Term Care |
|---|---|
| By: _____ (Signature) | _____ (Signature) |
| Name: _____ (Type Name) | Name: _____ (Type name) |
| Title: _____ | Title: _____ |
| Date: _____ | Date: _____ |

## IN THE CIRCUIT COURT OF OUACHITA COUNTY, ARKANSAS
### SIXTH DIVISION

FILED

2015 AUG 28  AM 9 26

OUACHITA COUNTY, ARK
BETTY WILSON
CIRCUIT CLERK

Addie Edwards, as Personal Representative of the
Estate  of Ozie Edwards, and on behalf of the
wrongful death beneficiaries of Ozie Edwards;
Gaile Wolfe, as Personal Representative of the
Estate of Myrtle Key, and on behalf of the wrongful
death beneficiaries of Myrtle Key;
and All Others Similarly Situated

PLAINTIFFS

vs.                    **CASE NO. CV-2014-203-6**

Diversicare Leasing Corp. d/b/a Ouachita Nursing
and Rehabilitation Center; Diversicare Healthcare
Services, Inc.; Diversicare Management Services Co.;
Advocat Ancillary Services, LLC;
Camden Operations, LLC d/b/a Ouachita Nursing
and Rehabilitation Center; JEJ Investments, LLC;
Sub-Ten Holdings, LLC; MasterTen, LLC;
Advanced Practice Solutions, LLC; Procare Therapy
Services, LLC; Southern Administrative Services, LLC;
Ponthie Holdings, LLC; Professional Nursing
Solutions, LLC; John Ponthie; Ross Ponthie;
Mark Thompson; Omega Healthcare Investors, Inc;
and Jennie Jeanette Goss Hassan, in her capacity
as Administrator of Ouachita Nursing
and Rehabilitation Center;

DEFENDANTS

---

**Motion To Sever The Claims Of Addie Edwards, as Personal Representative of the Estate
of Ozie Edwards, Against The Ponthie Defendants and Omega Healthcare Investors, Inc.**

---

Comes now, Addie Edwards, as Personal Representative of the Estate of Ozie Edwards,
and for her motion to sever her claims against the Ponthie Defendants and Omega Healthcare
Investors, Inc., states as follows:

1.      Plaintiff Addie Edwards originally filed her complaint in this matter on November 24, 2014, asserting individual claims as the personal representative of the Estate of Ozie Edwards against Diversicare Leasing Corp. d/b/a Ouachita Nursing and Rehabilitation Center; Diversicare Healthcare Services, Inc.; Diversicare Management Services Co.; and Advocat Ancillary Services, LLC (collectively "the Diversicare Defendants").

2.      Ms. Edwards's claims against the Diversicare Defendants related to injuries sustained by Ozie Edwards at Ouachita Nursing and Rehabilitation Center from November 24, 2009 until September 1, 2013.

3.      In her original complaint, Plaintiff Addie Edwards also asserted individual claims as the personal representative of the Estate of Ozie Edwards against Camden Operations, LLC d/b/a Ouachita Nursing and Rehabilitation Center; JEJ Investments, LLC; Sub-Ten Holdings, LLC; MasterTen, LLC; Advanced Practice Solutions, LLC; Procare Therapy Services, LLC; Southern Administrative Services, LLC; Ponthie Holdings, LLC; Professional Nursing Solutions, LLC; John Ponthie; Ross Ponthie; Mark Thompson; and Jennie Jeanette Goss Hassan, in her capacity as administrator of Ouachita Nursing and Rehabilitation Center (collectively "the Ponthie Defendants").

4.      During Ozie Edwards's residency at Ouachita Nursing and Rehabilitation Center, the ownership of the facility changed. On information and belief, that change occurred on September 1, 2013. Ms. Edwards's claims against the Ponthie Defendants are related to injuries sustained by Ozie Edwards at Ouachita Nursing and Rehabilitation Center from September 1, 2013 until Mr. Edwards's death on November 12, 2013.

5.      In her original complaint, Plaintiff Addie Edwards also asserted individual claims as the personal representative of the Estate of Ozie Edwards against Omega Healthcare Investors, Inc.

6.      On June 23, 2015, Gaile Wolfe, as personal representative of the estate of Myrtle Key, joined with Plaintiff Addie Edwards, as personal representative of the estate of Ozie Edwards, to amend Ms. Edwards's claims against the Diversicare Defendants and assert class action claims against the Diversicare Defendants on behalf of themselves and all others similarly situated for the period November 24, 2009, to September 1, 2013. Such amendment did not concern Ms. Edwards's individual claims against the Ponthie Defendants related to Mr. Edwards's residency at Ouachita Nursing and Rehabilitation Center from September 1, 2013, onward.

7.      Contemporaneously with this motion to sever, Plaintiffs are filing a First Amended Class Action Complaint Against the Diversicare Defendants and Amended Individual Complaint of Addie Edwards, as Personal Representative of the Estate of Ozie Edwards, Against the Ponthie Defendants and Omega Healthcare Investors, Inc.

8.      In order to simplify and expedite the resolution of these matters, Plaintiff Addie Edwards, as Personal Representative of the Estate of Ozie Edwards, moves to sever her individual claims against the Ponthie Defendants and Omega Healthcare Investors, Inc. from the class claims asserted against the Diversicare Defendants.

9.      Ms. Edwards's claims against the Ponthie Defendants and Omega Healthcare Investors, Inc. are separate and distinct from her class claims asserted against the Diversicare Defendants.

3

10.     Rule 21 of the Arkansas Rules of Civil Procedure provides that "any claim against a party may be severed and proceeded with separately." Severed claims become independent actions which would yield a final order upon completion. *Ellis v. Agriliance, LLC*, 2012 Ark. App. 549, at 5.

11.     Severing Ms. Edwards's individual claims against the Ponthie Defendants and Omega Healthcare Investors, Inc. will promote judicial economy and avoid any unnecessary confusion of the claims of the proposed class against the Diversicare Defendants versus Ms. Edwards's individual claims against the Ponthie Defendants and Omega Healthcare Investors, Inc.

12.     Ms. Edwards specifically moves for the severance of her individual claims against the Ponthie Defendants and Omega Healthcare Investors, Inc. pursuant to Rule 21, and not simply for a separate trial. "A circuit court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim or issue. *Ellis*, 2012 Ark. App 549, at 4 (citing Ark. R. Civ. P. 42(b)). However, separate trials under Rule 42 must be distinguished from severance of claims. *Id.* (citing David Newborn, John Watkins, & D.P. Marshall, *Ark. Civ. Prac. & Proc.* § 25:3 (5th ed. 2010). "When separate trials are ordered, the case as a whole remains intack and a single judgment is ultimately entered. Consequently, an appeal from one of the trials does not result in a final judgment." *Id.* at 4-5 (citing *Barnhart v. City of Fayetteville*, 316 Ark. 742 (1994)). However, severed claims under Rule 21 become independent actions, each of which would presumably yield a final order upon completion. *Id.* at 5 (citing *e.g. Green v. George's Farms, Inc.*, 2011 Ark. 70, at 3, n.1).

13.   Accordingly, Plaintiff Addie Edwards, as Personal Representative of the Estate of Ozie Edwards, respectfully asks that her individual claims against the Ponthie Defendants and Omega Healthcare Investors, Inc. be severed from the class claims asserted against the Diversicare Defendants. Ms. Edwards further requests that her individual claims against the Ponthie Defendants and Omega Healthcare Investors, Inc. be separately docketed and assigned a new case number in order to prevent any future confusion.

## CONCLUSION AND REQUEST FOR RELIEF

Plaintiff Addie Edwards, as Personal Representative of the Estate of Ozie Edwards, has claims against the Ponthie Defendants and Omega Healthcare Investors, Inc. that are separate and distinct from her claims asserted against the Diversicare Defendants as part of a proposed class. In order to prevent confusion, promote judicial economy, and simplify the litigation of Ms. Edwards's claims, Ms. Edwards prays for an order

(1)   severing the claims of Addie Edwards, as Personal Representative of the Estate of Ozie Edwards, against Camden Operations, LLC d/b/a Ouachita Nursing and Rehabilitation Center; JEJ Investments, LLC; Sub-Ten Holdings, LLC; MasterTen, LLC; Advanced Practice Solutions, LLC; Procare Therapy Services, LLC; Southern Administrative Services, LLC; Ponthie Holdings, LLC; Professional Nursing Solutions, LLC; John Ponthie; Ross Ponthie; Mark Thompson; and Jennie Jeanette Goss Hassan, in her capacity as administrator of Ouachita Nursing and Rehabilitation Center (collectively "the Ponthie Defendants") and Omega Healthcare Investors, Inc.; and

(2)   directing the clerk to separately docket and assign a new case number for Ms. Edwards's claims against the Ponthie Defendants and Omega Healthcare Investors, Inc.

Respectfully submitted,

Plaintiff Addie Edwards, as Personal Representative
of the Estate of Ozie Edwards

By: _Matth D Sndll_____

    Brian D. Reddick (94057)
    Brent L. Moss (95075)
    Matthew D. Swindle (2012168)
    Robert W. Francis (2007032)
    Daniel K. Yim (2014202)
    **Reddick Moss, PLLC**
    One Information Way, Suite 105
    Little Rock, Arkansas  72202
    Telephone: (501) 907-7790
    Facsimile:  (501) 907-7793

    *Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

    I hereby certify that a true and correct copy of the foregoing has been placed in the U.S.
Mail, postage pre-paid, on this 26th day of August, 2015, to the following attorneys of record:

Kirkman T. Dougherty
Stephanie J. Randall
**HARDIN, JESSON & TERRY, PLC**
5000 Rogers Avenue, Suite 500
Fort Smith, AR 72917

Amy M. Wilbourn
Vicki Bronson
**CONNER & WINTERS, LLP**
4375 N. Vantage Dr., Suite 405
Fayetteville, AR 72703

_Matth D Sndll_____
Reddick Moss, PLLC

## IN THE CIRCUIT COURT OF OUACHITA COUNTY, ARKANSAS
## 6th DIVISION

**Addie Edwards as Personal Representative of the
Estate of Ozie Edwards, and on behalf of the
wrongful death beneficiaries of Ozie Edwards**                                    **PLAINTIFFS**


**vs.**                                         **CASE NO. CV-2014-203-6**


**Diversicare Leasing Corp. d/b/a Ouachita Nursing
and Rehabilitation Center; Diversicare Healthcare
Services, Inc.; Diversicare Management Services Co.;
Advocat Ancillary Services, LLC; Omega
Healthcare Investors, Inc.; Camden Operations, LLC
d/b/a Ouachita Nursing and Rehabilitation Center;
JEJ Investments, LLC; Sub-Ten Holdings, LLC; MasterTen,
LLC; Advanced Practice Solutions, LLC; Procare
Therapy Services, LLC; Southern Administrative Services,
LLC; Ponthie Holdings, LLC; Professional Nursing
Solutions, LLC; John Ponthie; Ross Ponthie;
Mark Thompson; and Jennie Jeanette Goss Hassan
in her capacity as Administrator of
Ouachita Nursing and Rehabilitation Center**                                      **DEFENDANTS**



## SEPARATE DEFENDANTS' ANSWER TO PLAINTIFFS'
## FIRST AMENDED CLASS ACTION COMPLAINT

COME NOW the Separate Defendants, Omega Healthcare Investors, Inc. (for the time period on and after September 1, 2013); Camden Operations, LLC d/b/a Ouachita Nursing and Rehabilitation Center; JEJ Investments, LLC, Sub-Ten Holdings, LLC, MasterTen, LLC, Advanced Practice Solutions, LLC; ProCare Therapy Services, LLC; Southern Administrative Services, LLC; Ponthie Holdings, LLC; Professional Nursing Solutions, LLC; John Ponthie; Ross Ponthie; and Mark Thompson (collectively referred to as "Camden" unless specifically identified herein), by and through their attorneys, Conner & Winters, LLP, and for their Answer to the Plaintiffs' First Amended Class Action Complaint ("Complaint"), state the following to-wit:

1.    The allegations contained in paragraph 1 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

2.    Camden admits the allegations of paragraph 2 of the Complaint.

3.    The allegations contained in paragraph 3 of the Complaint are not directed toward Camden because Camden did not own or operate the facility until September 1, 2013, and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

4.    Camden is without sufficient information to admit or deny the allegations contained in paragraph 4 of the Complaint, and accordingly deny the same and demand strict proof thereof.

5.    Camden is without sufficient information to admit or deny the allegations contained in paragraph 5 of the Complaint, and accordingly deny the same and demand strict proof thereof.

6.    The allegations contained in paragraph 6 of the Complaint are not directed toward Camden because Camden did not own or operate the facility until September 1, 2013, and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

2

7.     Camden is without sufficient information to admit or deny the allegations contained in paragraph 7 of the Complaint, and accordingly deny the same and demand strict proof thereof.

8.     The allegations contained in paragraph 8 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

9.     The allegations contained in paragraph 9 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

10.     The allegations contained in paragraph 10 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

11.     The allegations contained in paragraph 11 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

12.     The allegations contained in paragraph 12 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

13.     Camden denies the allegations of paragraph 13 of the Complaint.

14.     Camden denies the allegations of paragraph 14 of the Complaint.

15.     Camden denies the allegations of paragraph 15 of the Complaint.

16.     Camden denies the allegations of paragraph 16 of the Complaint.

17.     Camden denies the allegations of paragraph 17 of the Complaint.

18.     Camden denies the allegations of paragraph 18 of the Complaint.

19.     Camden denies the allegations of paragraph 19 of the Complaint.

20.     Camden denies the allegations of paragraph 20 of the Complaint.

21.     Camden denies the allegations of paragraph 21 of the Complaint.

22.     Camden denies the allegations of paragraph 22 of the Complaint.

23.     Camden denies the allegations of paragraph 23 of the Complaint.

24.     Camden denies the allegations of paragraph 24 of the Complaint.

25.     Camden denies the allegations of paragraph 25 of the Complaint.

26.     Camden denies the allegations of paragraph 26 of the Complaint.

27.     In response to paragraph 27 of the Complaint, Camden states that Arkansas law speaks for itself. To the extent the allegations of paragraph 27 are intended to imply liability on the part of any defendant, they are denied.

28.     In response to paragraph 28 of the Complaint, Camden states that Arkansas law speaks for itself. To the extent the allegations of paragraph 28 are intended to imply liability on the part of any defendant, they are denied.

29.     In response to paragraph 29 of the Complaint, Camden states that Arkansas law speaks for itself. To the extent the allegations of paragraph 29 are intended to imply liability on the part of any defendant, they are denied.

4

30.     The allegations contained in paragraph 30 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

31.     The allegations contained in paragraph 31 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

32.     The allegations contained in paragraph 32 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

33.     In response to paragraph 33 of the Complaint, Camden states that document speaks for itself. To the extent the allegations of paragraph 33 are intended to imply liability on the part of any defendant, they are denied.

34.     The allegations contained in paragraph 34 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

35.     The allegations contained in paragraph 35 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

5

36.     The allegations contained in paragraph 36 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

37.     The allegations contained in paragraph 37 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

38.     The allegations contained in paragraph 38 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

39.     The allegations contained in paragraph 39 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

40.     The allegations contained in paragraph 40 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

41.     The allegations contained in paragraph 41 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a

response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

42.     The allegations contained in paragraph 42 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

43.     The allegations contained in paragraph 43 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

44.     The allegations contained in paragraph 44 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

45.     The allegations contained in paragraph 45 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

46.     The allegations contained in paragraph 46 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

47.     The allegations contained in paragraph 47 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

48.     The allegations contained in paragraph 48 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

49.     In response to paragraph 49 of the Complaint, Camden reasserts and incorporates herein its answers and responses contained in the preceding paragraphs.

50.     Camden denies the allegations of paragraph 50 of the Complaint.

51.     Camden denies the allegations of paragraph 51 of the Complaint.

52.     In response to paragraph 52, Camden states that Arkansas law speaks for itself. To the extent the allegations of said paragraph are intended to imply liability on the part of any defendant they are denied.

53.     The allegations contained in paragraph 53 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

54.     The allegations contained in paragraph 54 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

55.     The allegations contained in paragraph 55 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

56.     The allegations contained in paragraph 56 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

57.     The allegations contained in paragraph 57 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

58.     The allegations contained in paragraph 58 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

59.     The allegations contained in paragraph 59 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

60.     The allegations contained in paragraph 60 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a

response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

61.     The allegations contained in paragraph 61 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

62.     In response to paragraph 62 of the Complaint, Camden reasserts and incorporates herein its answers and responses contained in the preceding paragraphs.

63.     Camden denies the allegations of paragraph 63 of the Complaint.

64.     Camden denies the allegations of paragraph 64 of the Complaint.

65.     The allegations contained in paragraph 65 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

66.     Camden denies the allegations of paragraph 66 of the Complaint.

67.     Camden denies the allegations of paragraph 67 of the Complaint.

68.     Camden denies the allegations of paragraph 68 of the Complaint.

69.     In response to paragraph 69 of the Complaint, Camden reasserts and incorporates herein its answers and responses contained in the preceding paragraphs.

70.     Camden denies the allegations of paragraph 70 of the Complaint.

71.     The allegations contained in paragraph 71 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a

response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

72.     Camden denies the allegations of paragraph 72 of the Complaint.

73.     The allegations contained in paragraph 73 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

74.     The allegations contained in paragraph 74 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

75.     The allegations contained in paragraph 75 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

76.     The allegations contained in paragraph 76 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

77.     The allegations contained in paragraph 77 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

78.     The allegations contained in paragraph 78 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

79.     In response to paragraph 79 of the Complaint, Camden reasserts and incorporates herein its answers and responses contained in the preceding paragraphs.

80.     The allegations contained in paragraph 80 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

81.     The allegations contained in paragraph 81 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

82.     The allegations contained in paragraph 82 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

83.     The allegations contained in paragraph 83 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

84.     The allegations contained in paragraph 84 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

85.     The allegations contained in paragraph 85 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

86.     The allegations contained in paragraph 86 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

87.     The allegations contained in paragraph 87 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

88.     The allegations contained in paragraph 88 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

89.     The allegations contained in paragraph 89 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a

response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

90.    The allegations contained in paragraph 90 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any defendant, they are specifically denied.

91.    Camden denies the allegations of paragraph 91 of the Complaint.

92.    Camden admits the allegations of paragraph 92 of the Complaint.

93.    Camden admits the allegations of paragraph 93 of the Complaint.

94.    In response to paragraph 94 of the Complaint, Camden admits that Mr. Edwards was a resident of the Facility from September 1, 2013 until his death, except for times of hospitalization. Camden does not have sufficient information with which to admit or deny the remaining allegations of said paragraph and therefore they are denied.

95.    In response to paragraph 95 of the Complaint Camden admits a transition in the lease operation of Ouachita Nursing and Rehabilitation Center occurred on September 1, 2013. Defendant Camden Operations, LLC d/b/a Ouachita Nursing and Rehabilitation Center admits it is an Arkansas limited liability company that, since September 1, 2013, leased, operated, managed and held the license for the nursing home located at 1411 Country Club Road, Camden, Arkansas known as Ouachita Nursing and Rehabilitation Center.   Defendant Camden Operations, LLC further admits that Amy Wilbourn is its agent for service of process.  Camden denies all allegations contained in paragraph 95 of the Complaint not specifically admitted herein.

14

96.     In response to paragraph 96 of the Complaint, Separate Defendant JEJ Investments, LLC admits that it is an Arkansas limited liability company and that its agent for service of process is Amy Wilbourn.  Separate Defendant JEJ Investments, LLC denies it ever owned, managed, operated, controlled or provided services of any kind to Ouachita Nursing and Rehabilitation Center. Separate Defendant JEJ Investments, LLC denies all allegations contained in paragraph 96 of the Complaint not specifically admitted herein.  The allegations contained in paragraph 96 of the Complaint are not directed towards the remainder of the Defendants and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

97.     In response to paragraph 97 of the Complaint, Separate Defendant Sub-Ten Holdings, LLC admits that it is an Arkansas limited liability company and that its agent for service of process is Amy Wilbourn.  Separate Defendant Sub-Ten Holdings, LLC denies it ever owned, managed, operated, controlled or provided services of any kind to Ouachita Nursing and Rehabilitation Center. Separate Defendant Sub-Ten Holdings, LLC denies all allegations contained in paragraph 97 of the Complaint not specifically admitted herein.  The allegations contained in paragraph 97 of the Complaint are not directed towards the remainder of the Defendants and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

98.     In response to paragraph 98 of the Complaint, Separate Defendant MasterTen, LLC admits that it is an Arkansas limited liability company and that its agent for service of process is Amy Wilbourn.  Separate Defendant MasterTen, LLC denies it ever owned, managed,

operated, controlled or provided services of any kind to Ouachita Nursing and Rehabilitation Center. Separate Defendant MasterTen, LLC denies all allegations contained in paragraph 98 of the Complaint not specifically admitted herein. The allegations contained in paragraph 98 of the Complaint are not directed towards the remainder of the Defendants and therefore, do not call for a response on their behalf. To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

99.    In response to paragraph 99 of the Complaint, Separate Defendant Advanced Practice Solutions, LLC admits that it is an Arkansas limited liability company and that its agent for service of process is Amy Wilbourn. Separate Defendant Advanced Practice Solutions, LLC denies it ever owned, managed, operated, controlled or provided services of any kind to Ouachita Nursing and Rehabilitation Center. Separate Defendant Advanced Practice Solutions, LLC denies all allegations contained in paragraph 99 of the Complaint not specifically admitted herein. The allegations contained in paragraph 99 of the Complaint are not directed towards the remainder of the Defendants and therefore, do not call for a response on their behalf. To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

100.    In response to paragraph 100 of the Complaint, Separate Defendant Procare Therapy Services, LLC admits that it is an Arkansas limited liability company and that its agent for service of process is Amy Wilbourn. Separate Defendant Procare Therapy Services, LLC denies it ever owned, managed, operated, controlled or provided services of any kind to Ouachita Nursing and Rehabilitation Center. Separate Defendant Procare Therapy Services, LLC denies all allegations contained in paragraph 100 of the Complaint not specifically admitted herein. The allegations contained in paragraph 100 of the Complaint are not directed towards the remainder

16

of the Defendants and therefore, do not call for a response on their behalf. To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

101. In response to paragraph 101 of the Complaint, Separate Defendant Southern Administrative Services, LLC admits that it is an Arkansas limited liability company and that its agent for service of process is Amy Wilbourn. Separate Defendant Southern Administrative Services, LLC denies it ever owned, managed, operated, controlled or provided services of any kind to Ouachita Nursing and Rehabilitation Center. Separate Defendant Southern Administrative Services, LLC denies all allegations contained in paragraph 101 of the Complaint not specifically admitted herein. The allegations contained in paragraph 101 of the Complaint are not directed towards the remainder of the Defendants and therefore, do not call for a response on their behalf. To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

102. In response to paragraph 102 of the Complaint, Separate Defendant Ponthie Holdings, LLC admits that it is an Arkansas limited liability company and that its agent for service of process is Amy Wilbourn. Separate Defendant Ponthie Holdings, LLC denies it ever owned, managed, operated, controlled or provided services of any kind to Ouachita Nursing and Rehabilitation Center. Separate Defendant Ponthie Holdings, LLC denies all allegations contained in paragraph 102 of the Complaint not specifically admitted herein. The allegations contained in paragraph 102 of the Complaint are not directed towards the remainder of the Defendants and therefore, do not call for a response on their behalf. To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

17

103.    In response to paragraph 103 of the Complaint, Separate Defendant Professional Nursing Solutions, LLC admits that it is an Arkansas limited liability company and that its agent for service of process is Amy Wilbourn.  Separate Defendant Professional Nursing Solutions, LLC denies it ever owned, managed, operated, controlled or provided services of any kind to Ouachita Nursing and Rehabilitation Center. Separate Defendant Professional Nursing Solutions, LLC denies all allegations contained in paragraph 103 of the Complaint not specifically admitted herein.  The allegations contained in paragraph 103 of the Complaint are not directed towards the remainder of the Defendants and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

104.    Defendant John Ponthie admits that he is a citizen and resident of Shreveport, Louisiana, as alleged in paragraph 104 of the Complaint.  To the extent the allegations contained in paragraph 104 of the Complaint are non-factual in nature and allege issues of law, a response is not required. Defendant John Ponthie denies all allegations contained in paragraph 104 of the Complaint not specifically admitted herein.  The allegations contained in paragraph 104 of the Complaint are not directed towards the remainder of the Defendants and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

105.    Defendant Ross Ponthie admits that he is a citizen and resident of Alexandria, Louisiana, and admits that he is a member of Camden Operations, LLC, Advanced Practice Solutions, LLC, ProCare Therapy Services, LLC, Ponthie Holdings, LLC, and Professional Nursing Solutions, LLC as alleged in paragraph 105 of the Complaint.  To the extent the allegations contained in paragraph 105 of the Complaint are non-factual in nature and allege

issues of law, a response is not required. Defendant Ross Ponthie denies all allegations contained in paragraph 105 of the Complaint not specifically admitted herein.  The allegations contained in paragraph 105 of the Complaint are not directed towards the remainder of the Defendants and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

106.    Defendant Mark Thompson admits that he is a citizen and resident of Alexandria, Louisiana, and admits that he is a member of Camden Operations, LLC, Advanced Practice Solutions, LLC, ProCare Therapy Services, LLC, and Professional Nursing Solutions, LLC as alleged in paragraph 106 of the Complaint.  To the extent the allegations contained in paragraph 106 of the Complaint are non-factual in nature and allege issues of law, a response is not required. Defendant Mark Thompson denies all allegations contained in paragraph 106 of the Complaint not specifically admitted herein.  The allegations contained in paragraph 106 of the Complaint are not directed towards the remainder of the Defendants and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

107.    The allegations contained in paragraph 107 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

108.    In response to the allegations of paragraph 108 of Complaint, Camden objects to the Plaintiffs "lumping" defendants together as "Ponthie Nursing Home Defendants".  Each Defendant is entitled to proper notice of the claims against him as a matter of due process and

under the Arkansas pleading requirements. Paragraph 108 does not assert any facts or claims against Camden and thus no response is required. To the extent the statements contained in paragraph 108 of the Complaint purport to show liability on the part of any Defendant, they are specifically denied.

109.    The allegations contained in paragraph 109 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf. To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

110.    In response to the allegations of paragraph 110 of Complaint, Camden objects to the Plaintiffs "lumping" defendants together as "Ponthie Defendants". Each Defendant is entitled to proper notice of the claims against him as a matter of due process and under the Arkansas pleading requirements. Paragraph 110 does not assert any facts or claims against Camden and thus no response is required. To the extent the statements contained in paragraph 110 of the Complaint purport to show liability on the part of any Defendant, they are specifically denied.

111.    Camden denies the allegations of paragraph 111 of the Complaint.

112.    In response to paragraph 112 of the Complaint, Camden admits that Mr. Edwards was a resident of the Facility from September 1, 2013 until his death, except for times of hospitalization. Camden does not have sufficient information with which to admit or deny the remaining allegations of said paragraph and therefore they are denied.

113.    Camden denies the allegations of paragraph 113 of the Complaint.

114.    Camden denies the allegations of paragraph 114 of the Complaint.

115.    Camden denies the allegations of paragraph 115 of the Complaint.

116.    Camden denies the allegations of paragraph 116 of the Complaint.

20

117.    Camden denies the allegations of paragraph 117 of the Complaint.

118.    Camden denies the allegations of paragraph 118 of the Complaint.

119.    Camden denies the allegations of paragraph 119 of the Complaint.

120.    Camden denies the allegations of paragraph 120 of the Complaint.

121.    Camden notes that there are paragraphs numbered 121 through 129 of the Complaint.

122.    Camden denies the allegations of paragraph 130 of the Complaint.

123.    Camden denies the allegations of paragraph 131 of the Complaint.

124.    Camden denies the allegations of paragraph 132 of the Complaint.

125.    In response to paragraph 133 of the Complaint, Camden asserts and incorporates herein its responses contained in the preceding paragraphs.

126.    Camden denies the allegations of paragraph 134 of the Complaint.

127.    Camden denies the allegations of paragraph 135 of the Complaint.

128.    Camden denies the allegations of paragraph 136 of the Complaint.

129.    Camden denies the allegations of paragraph 137 of the Complaint.

130.    Camden denies the allegations of paragraph 138 of the Complaint.

131.    Camden denies the allegations of paragraph 139 of the Complaint.

132.    Camden denies the allegations of paragraph 140 of the Complaint.

133.    Camden denies the allegations of paragraph 141 of the Complaint.

134.    Camden denies the allegations of paragraph 142 of the Complaint.

135.    Camden denies the allegations of paragraph 143 of the Complaint.

136.    Camden denies the allegations of paragraph 144 of the Complaint.

137.    In response to paragraph 145 of the Complaint, Camden asserts and incorporates herein its responses contained in the preceding paragraphs.

138.    Camden denies the allegations of paragraph 146 of the Complaint.

139.    Camden denies the allegations of paragraph 147 of the Complaint.

140.    Camden denies the allegations of paragraph 148 of the Complaint.

141.    Camden denies the allegations of paragraph 149 of the Complaint.

142.    Camden denies the allegations of paragraph 150 of the Complaint.

143.    Camden denies the allegations of paragraph 151 of the Complaint.

144.    Camden denies the allegations of paragraph 152 of the Complaint.

145.    In response to paragraph 153 of the Complaint, Camden asserts and incorporates herein its responses contained in the preceding paragraphs.

146.    Camden denies the allegations of paragraph 154 of the Complaint.

147.    Camden denies the allegations of paragraph 155 of the Complaint.

148.    Camden denies the allegations of paragraph 156 of the Complaint.

149.    Camden denies the allegations of paragraph 157 of the Complaint.

150.    Camden denies the allegations of paragraph 158 of the Complaint.

151.    Camden denies the allegations of paragraph 159 of the Complaint.

152.    In response to paragraph 160 of the Complaint, Camden asserts and incorporates herein its responses contained in the preceding paragraphs.

153.    Camden denies the allegations of paragraph 161 of the Complaint.

154.    Camden denies the allegations of paragraph 162 of the Complaint.

155.    Camden denies the allegations of paragraph 163 of the Complaint.

156.    Camden denies the allegations of paragraph 164 of the Complaint.

157.    Camden denies the allegations of paragraph 165 of the Complaint.

158.    Camden denies the allegations of paragraph 166 of the Complaint.

159.    Camden denies the allegations of paragraph 167 of the Complaint.

160.    Camden denies the allegations of paragraph 168 of the Complaint.

161.    Camden denies the allegations of paragraph 169 of the Complaint.

162.    In response to paragraph 170 of the Complaint, Camden asserts and incorporates herein its responses contained in the preceding paragraphs.

163.    Camden denies the allegations of paragraph 171 of the Complaint.

164.    In response to the allegations of paragraph 172 of the Complaint, Camden asserts that the statute speaks for itself. To the extent the allegations of paragraph 172 are meant to imply liability on the part of any Defendant, they are denied.

165.    In response to the allegations of paragraph 173 of the Complaint, Camden asserts that the statute speaks for itself. To the extent the allegations of paragraph 173 are meant to imply liability on the part of any Defendant, they are denied.

166.    Camden denies the allegations of paragraph 174 of the Complaint.

167.    Camden denies the allegations of paragraph 175 of the Complaint.

168.    Camden denies the allegations of paragraph 176 of the Complaint.

169.    In response to paragraph 177 of the Complaint, Camden asserts and incorporates herein its responses contained in the preceding paragraphs.

170.    The allegations contained in paragraph 178 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

171.    The allegations contained in paragraph 179 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

172.    In response to paragraph 180 of the Complaint, Camden asserts and incorporates herein its responses contained in the preceding paragraphs.

173.    The allegations contained in paragraph 181 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

174.    The allegations contained in paragraph 182 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

175.    The allegations contained in paragraph 183 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

176.    The allegations contained in paragraph 184 of the Complaint are not directed toward Camden and therefore, do not call for a response on their behalf.  To the extent that a response is required, or to the extent that these allegations purport to show liability on the part of any Defendant, they are specifically denied.

177.    In response to paragraph 185 of the Complaint, Camden asserts and incorporates herein its responses contained in the preceding paragraphs.

178.    Camden denies the allegations of paragraph 186 of the Complaint.

179.    In response to paragraph 187 of the complaint, Omega Healthcare Services, Inc. admits that it owns the real estate on which the facility is located. Omega Healthcare Services, Inc. denies the remaining allegations of said paragraph. Camden denies the allegations of said paragraph.

180.    Camden denies the allegations of paragraph 188 of the Complaint.

181.    Camden denies the allegations of paragraph 189 of the Complaint.

182.    In response to paragraph 190 of the Complaint, Camden asserts and incorporates herein its responses contained in the preceding paragraphs.

183.    Camden denies the allegations of paragraph 191 of the Complaint.

184.    Camden denies the allegations of paragraph 192 of the Complaint.

185.    Camden denies the allegations of paragraph 193 of the Complaint.

186.    Camden denies the allegations of paragraph 194 of the Complaint.

187.    Camden denies all allegations contained in the Complaint not specifically admitted herein.

188.    Camden asserts that Plaintiffs' Complaint fails to state a cause of action against them and should be dismissed pursuant to Arkansas Rule of Civil Procedure 12(b)(6).

189.    In the event applicable and pending further investigation of this matter, Camden asserts all affirmative defenses and all defensive motions allowed under Arkansas law and the Arkansas Rules of Civil Procedure, including but not limited to:

  a.      Insufficiency of process;
  b.      Insufficiency of service of process;

c.   Failure to perfect service of process within the time allowed by Rule 4 of the Arkansas Rules of Civil Procedure;

d.   Lack of personal jurisdiction;

e.   Improper venue;

f.   Failure to join an indispensable party pursuant to Rule 19 of the Arkansas Rules of Civil Procedure;

g.   Failure to prosecute in the name of the real party in interest;

h.   Failure to state facts upon which relief may be granted;

i.   Pendency of another action between the same parties arising out of the same transaction or occurrence;

j.   Waiver;

k.   Waiver of breach by acceptance of benefits,

l.   Laches;

m.   Estoppel;

n.   Failure of consideration;

o.   Unclean hands

p.   Set-off;

q.   Accord and satisfaction;

r.   Impossibility;

s.   Plaintiffs' prevention of performance.

t.   Cancellation;

u.   Release;

v.   Fraud in inducement;

w.   Statute of limitations;

x.   Election of remedies; and

y.   All other available contract defenses

191.   Camden asserts that any damages suffered by the Plaintiffs, the same being denied, were proximately caused by third parties for whom Camden is not legally responsible.

192.   Camden pleads the affirmative defenses of independent intervening cause as the sole and/or concurring proximate cause for this accident; comparative fault on the part of Plaintiff which was a proximate result of Plaintiff's loss or damage; contributory negligence on the part of Plaintiff or others to whom Camden held no control, including the failure to avoid a known condition, which was a proximate result of Plaintiff's loss or damage; assumption of risk on the part of Plaintiff; failure to mitigate damages on the part of Plaintiff; the acts or omissions of other parties for whom Camden is not responsible which was a proximate result of Plaintiffs' loss or damages, all of which serve as a bar to any recovery against Camden or in the alternative,

in diminution of any alleged damages; and for the proration of fault, including the right to recover contribution from co-Defendants or Plaintiff and for which Camden hereby make a claim for contribution recovery if they are required to pay more than their prorata share, to the extent supported by current facts or those facts developed in the course of this lawsuit.

193.   Camden pleads all provisions of the Civil Justice Reform Act of 2003, A.C.A. § 16-55-201, *et seq*, including all of its provisions, as a prohibition of, reduction of, or bar to the claims in this case against Camden.

194.   Camden states that an arbitration agreement may exist between the parties. Camden reserves the right to enforce any applicable arbitration agreement after conducting an investigation.   Camden files this Answer in accordance with the Arkansas Rules of Civil Procedure.   The filing of this Answer should neither be construed as Camden invoking the litigation process nor as a waiver of Camden's right to compel arbitration in this matter.

195. Camden states that the Complaint fails to assert facts to support an award of punitive damages.

196. Camden denies that its conduct was grossly negligent, willful, wanton, reckless, malicious, intentional, or conducted with conscious indifference to the rights of the Plaintiff.

197. Camden affirmatively pleads that any claim for punitive damages is preempted by the federal statutory and regulatory scheme related to nursing homes.

198.   Camden asserts that it is immune from suit or damages under the doctrine of charitable immunity.

199. Camden affirmatively asserts that Plaintiffs' claim for punitive damages against cannot be sustained because any award of punitive damages made under a process which fails to protect against the risk of a jury awarding punitive damages, or determining the amount of an

award of punitive damages, in whole or in part, to punish Camden for having caused injury to non-parties would violate Camden's due process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article II, §§ 2, 3, and 8 of the Arkansas Constitution, and would be improper under the common law and public policy of Arkansas. *See Philip Morris USA v. Williams*, 127 S. Ct. 1057 (2007).

200. Camden affirmatively pleads that Plaintiffs' claim for punitive damages against Defendants is barred, in whole or in part, because an award of punitive damages under Arkansas law would violate Defendants' due process rights and equal protection rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article II, §§ 2, 3, and 8 of the Arkansas Constitution.

201. Camden affirmatively pleads that Plaintiffs' claim for punitive damages cannot be sustained because Arkansas law regarding the standards for determining liability for and the amount of punitive damages fail to give Defendants  prior notice of the conduct for which punitive damages may be imposed, and the severity of the penalty that may be imposed, and are void for vagueness in violation of Defendants' due process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article II, §§ 2, 3, and 8 of the Arkansas Constitution.

202. Camden asserts that any claim for punitive damages asserted by the Plaintiff cannot be sustained because any award of punitive damages without bifurcating the trial as to all punitive damages issues, would violate Camden's due process rights guaranteed by the Fourteenth Amendment to the United States Constitution, the Civil Justice Reform Act of 2003, and similar applicable provisions of the Arkansas Constitution.

203. Camden affirmatively pleads that Plaintiffs' claims for punitive damages against Defendants cannot be sustained, because an award of punitive damages under Arkansas law that allows Plaintiff to prejudicially emphasize the corporate status of the Defendants violates Defendants' due process and equal protection rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article II, §§ 2, 3, and 8 of the Arkansas Constitution, and would be improper under the common law and public policy of Arkansas.

204. Camden reserves the right to amend this Answer, and to raise such other defenses, join such additional parties, and raise such additional claims as investigation of the facts alleged herein may warrant.

205. Camden asserts any affirmative defense raised by any other Defendants.

206. Camden asserts that it is improper for Plaintiff Addie Edwards to combine her cause of action against Camden with a class action case against Diversicare Defendants.  It is also improper for Plaintiff Addie Edwards to combine her cause of action against Camden with Gaile Wolfe's cause of action against the Diversicare Defendants. Gaile Wolfe does not assert a cause of action against Camden. Furthermore, neither party asserts a class action against Camden. Therefore, Addie Edwards' Complaint against Camden should be dismissed from this case.

WHEREFORE, the separate Defendants, Omega Healthcare Investors, Inc. (for the time period on and after September 1, 2013); Camden Operations, LLC d/b/a Ouachita Nursing and Rehabilitation Center; JEJ Investments, LLC; Sub-Ten Holdings, LLC; MasterTen, LLC; Advanced Practice Solutions, LLC; ProCare Therapy Services, LLC; Southern Administrative Services, LLC; Ponthie Holdings, LLC; Professional Nursing Solutions, LLC; John Ponthie; Ross Ponthie; and Mark Thompson, respectfully prays that the Complaint be dismissed in its

entirety and that Plaintiffs take nothing thereby, for their costs and attorney's fees in defending

this matter, and for all other relief to which they may be entitled.

> Omega Healthcare Investors, Inc. (for the time period on and after September 1, 2013); Camden Operations, LLC d/b/a Ouachita Nursing and Rehabilitation Center; JEJ Investments, LLC; Sub-Ten Holdings, LLC; MasterTen, LLC; Advanced Practice Solutions, LLC; ProCare Therapy Services, LLC; Southern Administrative Services, LLC; Ponthie Holdings, LLC; Professional Nursing Solutions, LLC; John Ponthie; Ross Ponthie; and Mark Thompson

> By: _____
> Amy M. Wilbourn (Ark. Bar No. 2003166)
> Vicki Bronson (Ark. Bar No. 97058
> 4375 N. Vantage Dr., Suite 405
> Fayetteville, AR 72703
> (479) 582-5711 Telephone
> (479) 587-1426 Facsimile
> Email: awilbourn@cwlaw.com
> Email: vbronson@cwlaw.com

30

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was mailed to the following on this the 16th day of September, 2015:

Brian Reddick
Brent Moss
Robert Francis
Matthew Swindle
REDDICK MOSS, PLLC
One Information Way, Suite 105
Little Rock, AR  72202

Robert M. Sexton
RAINWATER, HOLT & SEXTON
6315 Ranch Drive
Little Rock, AR  72223

Kirkman Dougherty
Stephanie J. Randall
Hardin, Jesson & Terry, PLC
5000 Rogers Ave., Suite 500
Fort Smith, Arkansas 72917

_____
Vicki Bronson

31

IN THE CIRCUIT COURT OF OUACHITA COUNTY ARKANSAS
6th DIVISION

FILED

2015 SEP 18 AM 10 49

OUACHITA COUNTY, ARK
BETTY WILSON
CIRCUIT CLERK

Addie Edwards as Personal Representative of the
Estate of Ozie Edwards, and on behalf of the
wrongful death beneficiaries of Ozie Edwards;
Gaile Wolfe, as Personal Representative of the
Estate of Myrtle Key, and on behalf of the wrongful
Death beneficiaries of Myrtle Key; and all others
Similarly situated                                                        **PLAINTIFFS**

vs.                                      CASE NO. CV-2014-203-6

Diversicare Leasing Corp. d/b/a Ouachita Nursing
and Rehabilitation Center; Diversicare Healthcare
Services, Inc.; Diversicare Management Services Co.;
Advocat Ancillary Services, LLC; Omega
Healthcare Investors, Inc.; Goss Operations, LLC
d/b/a Ouachita Nursing and Rehabilitation Center;
JEJ Investments, LLC; Sub-Ten Holdings, LLC; MasterTen,
LLC; Advanced Practice Solutions, LLC; Procare
Therapy Services, LLC; Southern Administrative Services,
LLC; Ponthie Holdings, LLC; Professional Nursing
Solutions, LLC; John Ponthie; Ross Ponthie;
Mark Thompson; and Jennie Jeanette Goss Hassan
in her capacity as Administrator of
Ouachita Nursing and Rehabilitation Center                               **DEFENDANTS**

**SEPARATE DEFENDANT JENNIE JEANETTE GOSS HASSON'S**
**ANSWER TO PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

Comes now Separate Defendant, Jennie Jeanette Goss Hassan ("Goss") in her capacity as

Administrator of Ouachita Nursing and Rehabilitation Center, and submits the following in

response to Plaintiffs' First Amended Class Action Complaint ("Complaint") for the time period

beginning September 1, 2013, and ending November 12, 2013:

      1.     Goss denies the allegations of paragraph 1 of the Complaint. Goss specifically

denies that a class should be certified.

      2.     Goss admits the allegations of paragraph 2 of the Complaint.

3.      Goss denies the allegations of paragraph 3 of the Complaint.

4.      In response to the allegations of paragraph 4 of the Complaint, Goss states that the admission records for Mr. Edwards speak for themselves. All other allegations of said paragraph are denied.

5.      Goss does not have sufficient information with which to admit or deny the allegations of paragraph 5 of the Complaint and therefore denies them.

6.      Goss denies the allegations of paragraph 6 of the Complaint.

7.      In response to the allegations of paragraph 7 of the Complaint, Goss states that the admission records for Ms. Key speak for themselves. All other allegations of said paragraph are denied.

8.      The allegations contained in paragraph 8 of the Complaint are not directed toward Goss and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

9.      The allegations contained in paragraph 9 of the Complaint are not directed toward Goss and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

10.     The allegations contained in paragraph 10 of the Complaint are not directed toward Goss and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

2

11.     The allegations contained in paragraph 11 of the Complaint are not directed toward Goss and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

12.     In response to the allegations of paragraph 12 of the Complaint, Goss admits that she was the administrator of the facility during the residency of Mr. Edwards and Ms. Key. All other allegations of said paragraph are denied.

13.     Goss denies the allegations of paragraph 13 of the Complaint.

14.     Goss denies the allegations of paragraph 14 of the Complaint.

15.     Goss denies the allegations of paragraph 15 of the Complaint.

16.     Goss denies the allegations of paragraph 16 of the Complaint.

17.     Goss admits the allegations of paragraph 17 of the Complaint.

18.     Goss denies the allegations of paragraph 18 of the Complaint.

19.     Goss denies the allegations of paragraph 19 of the Complaint.

20.     Goss denies the allegations of paragraph 20 of the Complaint.

21.     Goss denies the allegations of paragraph 21 of the Complaint.

22.     Goss denies the allegations of paragraph 22 of the Complaint.

23.     Goss denies the allegations of paragraph 23 of the Complaint.

24.     Goss denies the allegations of paragraph 24 of the Complaint.

25.     Goss denies the allegations of paragraph 25 of the Complaint.

26.     Goss denies the allegations of paragraph 26 of the Complaint.

27.    In response to paragraph 27 of the Complaint, Goss states that Arkansas law speaks for itself. To the extent the allegations of paragraph 27 are intended to imply liability on the part of any Defendant, they are denied.

28.    In response to paragraph 28 of the Complaint, Goss states that Arkansas law speaks for itself. To the extent the allegations of paragraph 28 are intended to imply liability on the part of any defendant, they are denied.

29.    In response to paragraph 29 of the Complaint, Goss states that Arkansas law speaks for itself. To the extent the allegations of paragraph 29 are intended to imply liability on the part of any defendant, they are denied.

30.    Goss denies the allegations of paragraph 30 of the Complaint. Goss specifically denies that Plaintiffs' claims are appropriate for a class action and denies that a class action should be certified.

31.    Goss denies the allegations of paragraph 31 of the Complaint.

32.    Goss denies the allegations of paragraph 32 of the Complaint.

33.    Goss denies the allegations of paragraph 33 of the Complaint.

34.    Goss denies the allegations of paragraph 34 of the Complaint.

35.    In response to paragraph 35 of the Complaint, Goss states that Arkansas law speaks for itself. To the extent the allegations of paragraph 35 are intended to imply liability on the part of any defendant, they are denied.

36.    Goss denies the allegations of paragraph 36 of the Complaint.

37.    Goss denies the allegations of paragraph 37 of the Complaint.

38.    Goss denies the allegations of paragraph 38 of the Complaint.

39.    Goss denies the allegations of paragraph 39 of the Complaint.

40.     Goss denies the allegations of paragraph 40 of the Complaint.

41.     Goss denies the allegations of paragraph 41 of the Complaint. Goss specifically denies that a class should be certified. Plaintiffs allege that over 500 people resided at the facility during the relevant time period. Whether any of these 500 individuals were harmed and the nature and extent of the harm is an individual issue, not a common issue. There is no typicality or commonalty of the claims.

42.     Goss denies the allegations of paragraph 42 of the Complaint. Goss specifically denies that a class should be certified. Plaintiffs allege that over 500 people resided at the facility during the relevant time period. Whether any of these 500 individuals were harmed and the nature and extent of the harm is an individual issue, not a common issue. There is no typicality or commonality of the claims.

43.     Goss denies the allegations of paragraph 43 of the Complaint.

44.     Goss denies the allegations of paragraph 44 of the Complaint.

45.     Goss denies the allegations of paragraph 45 of the Complaint.

46.     Goss denies the allegations of paragraph 46 of the Complaint.

47.     Goss denies the allegations of paragraph 47 of the Complaint.

48.     Goss denies the allegations of paragraph 48 of the Complaint. Goss specifically denies that a class should be certified. Plaintiffs allege that over 500 people resided at the facility during the relevant time period. Whether any of these 500 individuals were harmed and the nature and extent of the harm is an individual issue, not a common issue. There is no typicality of the claims. There is no commonality of claims. Individual issues predominate. Plaintiffs' claims are not appropriate for a class action. Furthermore, there is no economic deterrent to prevent potential plaintiffs from bringing individual causes of action. The amount of damages sought is

5

always at least a 6 figure number. In addition, individual causes of actions against nursing homes are filed at least monthly across the state of Arkansas.

49.    In response to paragraph 49 of the Complaint, Goss reasserts and incorporates herein her answers and responses contained in the preceding paragraphs.

50.    Goss denies the allegations of paragraph 50 of the Complaint.

51.    In response to paragraph 51, Goss states that Arkansas law speaks for itself. To the extent the allegations of said paragraph are intended to imply liability on the part of any Defendant they are denied.

52.    In response to paragraph 52, Goss states that Arkansas law speaks for itself. To the extent the allegations of said paragraph are intended to imply liability on the part of any Defendant they are denied.

53.    Goss denies the allegations of paragraph 53 of the Complaint.

54.    Goss denies the allegations of paragraph 54 of the Complaint.

55.    Goss denies the allegations of paragraph 55 of the Complaint.

56.    Goss denies the allegations of paragraph 56 of the Complaint.

57.    Goss denies the allegations of paragraph 57 of the Complaint.

58.    Goss denies the allegations of paragraph 58 of the Complaint.

59.    Goss denies the allegations of paragraph 59 of the Complaint.

60.    Goss denies the allegations of paragraph 60 of the Complaint.

61.    Goss denies the allegations of paragraph 61 of the Complaint.

62.    In response to paragraph 62 of the Complaint, Goss reasserts and incorporates herein her answers and responses contained in the preceding paragraphs.

63.    Goss denies the allegations of paragraph 63 of the Complaint.

64.     Goss denies the allegations of paragraph 64 of the Complaint.

65.     Goss denies the allegations of paragraph 65 of the Complaint.

66.     Goss denies the allegations of paragraph 66 of the Complaint.

67.     Goss denies the allegations of paragraph 67 of the Complaint.

68.     Goss denies the allegations of paragraph 68 of the Complaint.

69.     In response to paragraph 69 of the Complaint, Goss reasserts and incorporates herein her answers and responses contained in the preceding paragraphs.

70.     Goss denies the allegations of paragraph 70 of the Complaint.

71.     Goss denies the allegations of paragraph 71 of the Complaint.

72.     Goss denies the allegations of paragraph 72 of the Complaint.

73.     Goss denies the allegations of paragraph 73 of the Complaint.

74.     Goss denies the allegations of paragraph 74 of the Complaint.

75.     Goss denies the allegations of paragraph 75 of the Complaint.

76.     Goss denies the allegations of paragraph 76 of the Complaint.

77.     Goss denies the allegations of paragraph 77 of the Complaint.

78.     Goss denies the allegations of paragraph 78 of the Complaint.

79.     In response to paragraph 79 of the Complaint, Goss reasserts and incorporates herein her answers and responses contained in the preceding paragraphs.

80.     Goss denies the allegations of paragraph 80 of the Complaint.

81.     Goss denies the allegations of paragraph 81 of the Complaint.

82.     Goss denies the allegations of paragraph 82 of the Complaint.

83.     Goss denies the allegations of paragraph 83 of the Complaint.

84.     Goss denies the allegations of paragraph 84 of the Complaint.

85.     Goss denies the allegations of paragraph 85 of the Complaint.

86.     Goss denies the allegations of paragraph 86 of the Complaint.

87.     Goss denies the allegations of paragraph 87 of the Complaint.

88.     Goss denies the allegations of paragraph 88 of the Complaint.

89.     Goss denies the allegations of paragraph 89 of the Complaint.

90.     Goss denies the allegations of paragraph 90 of the Complaint.

91.     Goss denies the allegations of paragraph 91 of the Complaint.

92.     Goss admits the allegations of paragraph 92 of the Complaint.

93.     Goss admits the allegations of paragraph 93 of the Complaint.

94.     In response to the allegations of paragraph 94 of the Complaint, Goss asserts that the admission records speak for themselves. All other allegations of said paragraph are denied.

95.     Goss is without sufficient information with which to admit or deny the allegations of paragraph 95 and therefore denies them.

96.     The allegations contained in paragraph 96 of the Complaint are not directed toward Goss and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

97.     The allegations contained in paragraph 97 of the Complaint are not directed toward Goss and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

98.     The allegations contained in paragraph 98 of the Complaint are not directed toward Goss and therefore, do not call for a response on her behalf.  To the extent that a response

8

is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

99.     The allegations contained in paragraph 99 of the Complaint are not directed toward Goss and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

100.     The allegations contained in paragraph 100 of the Complaint are not directed toward Goss and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

101.     The allegations contained in paragraph 101 of the Complaint are not directed toward Goss and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

102.     The allegations contained in paragraph 102 of the Complaint are not directed toward Goss and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

103.     The allegations contained in paragraph 103 of the Complaint are not directed toward Goss and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

104.     The allegations contained in paragraph 104 of the Complaint are not directed toward Goss and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

105.     The allegations contained in paragraph 105 of the Complaint are not directed toward Goss and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

106.     The allegations contained in paragraph 106 of the Complaint are not directed toward Goss and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

107.     In response to the allegations of paragraph 107 of the Complaint, Goss admits that she was the administrator of the facility during the residency of Mr. Edwards and Ms. Key. All other allegations of said paragraph are denied.

108.     The allegations contained in paragraph 108 of the Complaint are not directed toward Goss and therefore, do not call for a response on her behalf.  To the extent that a response is required, or to the extent that the allegations purport to show liability on the part of any Defendant, they are specifically denied.

109.     Paragraph 109 does not assert any facts or claims against Goss and thus no response is required. To the extent the statements contained in paragraph 109 of the Complaint purport to show liability on the part of any Defendant, they are specifically denied.

110.     In response to the allegations of paragraph 110 of Complaint, Goss objects to the Plaintiffs "lumping" certain defendants together as "Ponthie Nursing Home Defendants". Each Defendant is entitled to proper notice of the claims against him or her as a matter of due process and under the Arkansas pleading requirements. Paragraph 110 does not assert any facts or claims against Goss and thus no response is required. To the extent the statements contained in paragraph 110 of the Complaint purport to show liability on the part of any Defendant, they are specifically denied.

111.     Goss admits the allegations of paragraph 111 of the Complaint.

112.     In response to the allegations of paragraph 112 of the Complaint, Goss asserts that the admission records of Mr. Edwards speak for themselves.

113.     Goss denies the allegations of paragraph 113 of the Complaint.

114.     Goss denies the allegations of paragraph 114 of the Complaint.

115.     Goss denies the allegations of paragraph 115 of the Complaint.

116.     Goss denies the allegations of paragraph 116 of the Complaint.

117.     Goss denies the allegations of paragraph 117 of the Complaint.

118.     Goss denies the allegations of paragraph 118 of the Complaint.

119.     Goss denies the allegations of paragraph 119 of the Complaint.

120.     Goss denies the allegations of paragraph 120 of the Complaint.

121.     Goss notes that there are no paragraphs numbered 121 through 129.

122.     Goss denies the allegations of paragraph 130 of the Complaint.

123.     Goss denies the allegations of paragraph 131 of the Complaint.

124.     Goss denies the allegations of paragraph 132 of the Complaint.

125.    In response to paragraph 133 of the Complaint, Goss reasserts and incorporates herein her answers and responses contained in the preceding paragraphs.

126.    Goss denies the allegations of paragraph 134 of the Complaint.

127.    Goss denies the allegations of paragraph 135 of the Complaint.

128.    Goss denies the allegations of paragraph 136 of the Complaint.

129.    Goss denies the allegations of paragraph 137 of the Complaint.

130.    Goss denies the allegations of paragraph 138 of the Complaint.

131.    Goss denies the allegations of paragraph 139 of the Complaint.

132.    Goss denies the allegations of paragraph 140 of the Complaint.

133.    Goss denies the allegations of paragraph 141 of the Complaint.

134.    Goss denies the allegations of paragraph 142 of the Complaint.

135.    Goss denies the allegations of paragraph 143 of the Complaint.

136.    Goss denies the allegations of paragraph 144 of the Complaint.

137.    In response to paragraph 145 of the Complaint, Goss reasserts and incorporates herein her answers and responses contained in the preceding paragraphs.

138.    Goss denies the allegations of paragraph 146 of the Complaint.

139.    Goss denies the allegations of paragraph 147 of the Complaint.

140.    Goss denies the allegations of paragraph 148 of the Complaint.

141.    Goss denies the allegations of paragraph 149 of the Complaint.

142.    Goss denies the allegations of paragraph 150 of the Complaint.

143.    Goss denies the allegations of paragraph 151 of the Complaint.

144.    Goss denies the allegations of paragraph 152 of the Complaint.

145.    In response to paragraph 153 of the Complaint, Goss reasserts and incorporates herein her answers and responses contained in the preceding paragraphs.

146.    Goss denies the allegations of paragraph 154 of the Complaint.

147.    Goss denies the allegations of paragraph 155 of the Complaint.

148.    Goss denies the allegations of paragraph 156 of the Complaint.

149.    Goss denies the allegations of paragraph 157 of the Complaint.

150.    Goss denies the allegations of paragraph 158 of the Complaint.

151.    Goss denies the allegations of paragraph 159 of the Complaint.

152.    In response to paragraph 160 of the Complaint, Goss reasserts and incorporates herein her answers and responses contained in the preceding paragraphs.

153.    Goss denies the allegations of paragraph 161 of the Complaint.

154.    Goss denies the allegations of paragraph 162 of the Complaint.

155.    Goss denies the allegations of paragraph 163 of the Complaint.

156.    Goss denies the allegations of paragraph 164 of the Complaint.

157.    Goss denies the allegations of paragraph 165 of the Complaint.

158.    Goss denies the allegations of paragraph 166 of the Complaint.

159.    Goss denies the allegations of paragraph 167 of the Complaint.

160.    Goss denies the allegations of paragraph 168 of the Complaint.

161.    Goss denies the allegations of paragraph 169 of the Complaint.

162.    In response to paragraph 170 of the Complaint, Goss reasserts and incorporates herein her answers and responses contained in the preceding paragraphs.

163.    Goss denies the allegations of paragraph 171 of the Complaint.

164.    Goss denies the allegations of paragraph 172 of the Complaint.

165.    Goss denies the allegations of paragraph 173 of the Complaint.

166.    Goss denies the allegations of paragraph 174 of the Complaint.

167.    Goss denies the allegations of paragraph 175 of the Complaint.

168.    Goss denies the allegations of paragraph 176 of the Complaint.

169.    In response to paragraph 177 of the Complaint, Goss reasserts and incorporates herein her answers and responses contained in the preceding paragraphs.

170.    Goss admits the allegations of paragraph 178 of the Complaint.

171.    Goss denies the allegations of paragraph 179 of the Complaint.

172.    In response to paragraph 180 of the Complaint, Goss reasserts and incorporates herein her answers and responses contained in the preceding paragraphs.

173.    Goss denies the allegations of paragraph 181 of the Complaint.

174.    Goss denies the allegations of paragraph 182 of the Complaint.

175.    Goss denies the allegations of paragraph 183 of the Complaint.

176.    Goss denies the allegations of paragraph 184 of the Complaint.

177.    In response to paragraph 185 of the Complaint, Goss reasserts and incorporates herein her answers and responses contained in the preceding paragraphs.

178.    Goss denies the allegations of paragraph 186 of the Complaint.

179.    Goss denies the allegations of paragraph 187 of the Complaint.

180.    Goss denies the allegations of paragraph 188 of the Complaint.

181.    Goss denies the allegations of paragraph 189 of the Complaint.

182.    In response to paragraph 190 of the Complaint, Goss reasserts and incorporates herein her answers and responses contained in the preceding paragraphs.

183.    Goss denies the allegations of paragraph 191 of the Complaint.

184.   Goss denies the allegations of paragraph 192 of the Complaint.

185.   Goss denies the allegations of paragraph 193 of the Complaint.

186.   Goss denies the allegations of paragraph 194 of the Complaint.

187.   Goss denies all allegations contained in the Complaint not specifically admitted herein.

188.   Goss asserts that Plaintiffs' Complaint fails to state a cause of action against her and should be dismissed pursuant to Arkansas Rule of Civil Procedure 12(b)(6).

189.   In the event applicable and pending further investigation of this matter, Goss asserts all affirmative defenses and all defensive motions allowed under Arkansas law and the Arkansas Rules of Civil Procedure, including but not limited to:

a.   Insufficiency of process;
b.   Insufficiency of service of process;
c.   Failure to perfect service of process within the time allowed by Rule 4 of the Arkansas Rules of Civil Procedure;
d.   Lack of personal jurisdiction;
e.   Improper venue;
f.   Failure to join an indispensable party pursuant to Rule 19 of the Arkansas Rules of Civil Procedure;
g.   Failure to prosecute in the name of the real party in interest;
h.   Failure to state facts upon which relief may be granted;
i.   Pendency of another action between the same parties arising out of the same transaction or occurrence;
j.   Waiver;
k.   Waiver of breach by acceptance of benefits,
l.   Laches;
m.   Estoppel;
n.   Failure of consideration;
o.   Unclean hands
p.   Set-off;
q.   Accord and satisfaction;
r.   Impossibility;
s.   Plaintiffs' prevention of performance.
t.   Cancellation;
u.   Release;
v.   Fraud in inducement;
w.   Statute of limitations;

x.   Election of remedies; and

y.   All other available contract defenses

190.   Goss pleads the affirmative defenses of independent intervening cause as the sole and/or concurring proximate cause for this accident; comparative fault on the part of Plaintiffs which was a proximate result of Plaintiffs' loss or damage; contributory negligence on the part of Plaintiffs or others to whom Goss held no control, including the failure to avoid a known condition, which was a proximate result of Plaintiffs' loss or damage; assumption of risk on the part of Plaintiffs; failure to mitigate damages on the part of Plaintiffs; the acts or omissions of other parties for whom Goss is not responsible which was a proximate result of Plaintiffs' loss or damages, all of which serve as a bar to any recovery against Goss or in the alternative, in diminution of any alleged damages; and for the proration of fault, including the right to recover contribution from co-Defendants or Plaintiffs and for which Goss hereby make a claim for contribution recovery if they are required to pay more than their prorata share, to the extent supported by current facts or those facts developed in the course of this lawsuit.

191.   Goss pleads all provisions of the Civil Justice Reform Act of 2003, A.C.A. § 16-55-201, *et seq*, including all of its provisions, as a prohibition of, reduction of, or bar to the claims in this case against her.

192.   Goss states that an arbitration agreement may exist between the parties.  Goss reserves the right to enforce any applicable arbitration agreement after conducting an investigation.  Goss files this Answer in accordance with the Arkansas Rules of Civil Procedure. The filing of this Answer should neither be construed as Goss invoking the litigation process nor as a waiver of Goss's right to compel arbitration in this matter.

193.   Goss states that the Complaint fails to assert facts to support an award of punitive damages.

194.    Goss denies that her conduct was grossly negligent, willful, wanton, reckless, malicious, intentional, or conducted with conscious indifference to the rights of the Plaintiffs.

195.    Goss affirmatively pleads that any claim for punitive damages is preempted by the federal statutory and regulatory scheme related to nursing homes.

196.    Goss affirmatively asserts that Plaintiffs' claim for punitive damages against her cannot be sustained because any award of punitive damages made under a process which fails to protect against the risk of a jury awarding punitive damages, or determining the amount of an award of punitive damages, in whole or in part, to punish Goss for having caused injury to non-parties would violate Goss' due process rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article II,  §§ 2, 3, and 8 of the Arkansas Constitution, and would be improper under the common law and public policy of Arkansas. *See Philip Morris USA v. Williams*, 127 S. Ct. 1057 (2007).

197.    Goss affirmatively pleads that Plaintiffs' claim for punitive damages against Defendants is barred, in whole or in part, because an award of punitive damages under Arkansas law would violate Defendants' due process rights and equal protection rights guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and Article II, §§ 2, 3, and 8 of the Arkansas Constitution.

198.    Goss affirmatively pleads that Plaintiffs' claim for punitive damages cannot be sustained because Arkansas law regarding the standards for determining liability for and the amount of punitive damages fail to give Defendants prior notice of the conduct for which punitive damages may be imposed, and the severity of the penalty that may be imposed, and are void for vagueness in violation of Defendants' due process rights guaranteed by the Fifth and

Fourteenth Amendments to the United States Constitution and Article II, §§ 2, 3, and 8 of the Arkansas Constitution.

199.    Goss asserts that any claim for punitive damages asserted by the Plaintiffs cannot be sustained because any award of punitive damages without bifurcating the trial as to all punitive damages issues, would violate Goss' due process rights guaranteed by the Fourteenth Amendment to the United States Constitution, the Civil Justice Reform Act of 2003, and similar applicable provisions of the Arkansas Constitution.

200.    Goss reserves the right to amend this Answer, and to raise such other defenses, join such additional parties, and raise such additional claims as investigation of the facts alleged herein may warrant.

201.    Goss asserts any affirmative defense raised by any other Defendants.

202.    Goss asserts that it is improper for Plaintiff Addie Edwards and Plaintiff Gaile Wolfe to combine their causes of action against her in one lawsuit. The facts and circumstances regarding Mr. Edwards and Ms. Key are different. Whether they were injured, the extent of any injury, the party responsible and the amount of damages are just some of the issues that will have to be decided on an individual basis. Therefore the Court should dismiss the Complaint in its entirety.

203.    Plaintiffs' claims do not meet the minimum requirements for certification as a class action as required by Rule 23 of the Arkansas Rules of Civil Procedure. The claims are not typical or common but instead are solely individual.  Whether they were injured, the extent of any injury, the party responsible and the amount of damages are just some of the issues that will have to be decided on an individual basis. A class action is not the appropriate method for bringing the claims. In addition, the amount of damages Plaintiffs seek is not a small amount but

instead is at least a six-figure number, therefore, there is no economic deterrent for Plaintiffs and others allegedly situated to bring their own individual actions. Proof of that is found in the fact that individual cases against nursing homes are filed at least monthly across the state of Arkansas.

WHEREFORE, the separate Defendant Goss prays that the Complaint be dismissed in its entirety and that Plaintiffs take nothing thereby, for her costs and attorney's fees in defending this matter, and for all other relief to which she may be entitled.

<div style="margin-left: 3em;">

JENNIE JEANETTE GASS HASSAN

By: _Vicki Bronson_ _____
Amy M. Wilbourn (Ark. Bar No. 2003166)
Vicki Bronson (Ark. Bar No. 97058
4375 N. Vantage Dr., Suite 405
Fayetteville, AR 72703
(479) 582-5711 Telephone
(479) 587-1426 Facsimile
Email:  awilbourn@cwlaw.com
Email:  vbronson@cwlaw.com

</div>

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was mailed to the following on this the 17th day of September, 2015:

Brian Reddick
Brent Moss
Robert Francis
Matthew Swindle
REDDICK MOSS, PLLC
One Information Way, Suite 105
Little Rock, AR 72202

Robert M. Sexton
RAINWATER, HOLT & SEXTON
6315 Ranch Drive
Little Rock, AR 72223

Kirkman Dougherty
Stephanie J. Randall
Hardin, Jesson & Terry, PLC
5000 Rogers Ave., Suite 500
Fort Smith, Arkansas 72917

_____
Vicki Bronson

**IN THE CIRCUIT COURT OF OUACHITA COUNTY, ARKANSAS**
**SIXTH DIVISION**

Addie Edwards as Personal Representative of the
Estate  of Ozie Edwards, and on behalf of the
wrongful death beneficiaries of Ozie Edwards                    PLAINTIFFS

vs.            CASE NO. CV-2014-203-6

Omega Healthcare Investors, Inc.; Camden Operations, LLC
d/b/a Ouachita Nursing and Rehabilitation Center;
JEJ Investments, LLC; Sub-Ten Holdings, LLC; MasterTen,
LLC; Advanced Practice Solutions, LLC; Procare
Therapy Services, LLC; Southern Administrative Services,
LLC; Ponthie Holdings, LLC; Professional Nursing
Solutions, LLC; John Ponthie; Ross Ponthie;
Mark Thompson; and Jennie Jeanette Goss Hassan
in her capacity as Administrator of
Ouachita Nursing and Rehabilitation Center                    DEFENDANTS

## ENTRY OF APPEARANCE

To:    The clerk of court and all parties of record,

        I, John V. O'Grady, am admitted or otherwise authorized to practice in this court, and I

enter my appearance on behalf of Plaintiff in the above-referenced matter and request the Clerk

to enter his name as attorney of record in this case.

John V. O'Grady
*Reddick Moss, PLLC*
One Information Way, Suite 105
Little Rock, AR 72202
Telephone: (501) 907-7790
Facsimile: (501) 907-7793
Email: john@reddickmoss.com

Respectfully submitted,

By: _____

Brian D. Reddick (94057)
Brent L. Moss (95075)
Robert W. Francis (2007032)
Daniel K. Yim (2014202)
John V. O'Grady (2014044)
Reddick Moss, PLLC
One Information Way, Suite 105
Little Rock, Arkansas  72202
Telephone:  (501) 907-7790
Facsimile:  (501) 907-7793

and

Robert M. Sexton (1996106)
Rainwater Holt & Sexton
801 Technology Dr.
Little Rock, AR 72223
Telephone:  (501) 868-2500
Facsimile:  (501) 868-2505

*Attorneys for the Plaintiff*

2

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing has been served on this 22nd day of March 2016, to the following attorneys of record:

Kirkman T. Dougherty
Stephanie J. Randall
HARDIN, JESSON & TERRY, PLC
5000 Rogers Avenue, Suite 500
Fort Smith, AR 72917

Amy M. Wilbourn
Vicki Bronson
CONNER & WINTERS, LLP
4375 N. Vantage Dr., Suite 405
Fayetteville, AR 72703

Reddick Moss, PLLC

FILED

2016 OCT 17  AM 11 03

OUACHITA COUNTY, ARK

VERNA D. CLARK

TRIAL COURT ASSISTANT

CIRCUIT CLERK

**PAULETTE WRIGHT**
COURT REPORTER

**DAVID F. GUTHRIE**
CIRCUIT JUDGE
THIRTEENTH JUDICIAL DISTRICT
101 N. WASHINGTON, SUITE 205
UNION COUNTY COURTHOUSE
EL DORADO, ARKANSAS 71730

**TELEPHONE**
(870) 864-1968

**FAX**
(870) 864-1969

**COUNTIES**
CALHOUN      DALLAS
CLEVELAND    OUACHITA
COLUMBIA     UNION

October 13, 2016

Mr. Brian Reddick
Reddick Moss, P.L.L.C.
One Information Way, Suite 105
Little Rock, AR 72202

Mr. H. Gregory Campbell
Campbell Law Firm, P.A.
101 Information Way, Box 101
Little Rock, AR 72202

Mr. Kirkman Dougherty
Hardin, Jesson & Terry, PLC
P.O. Box 10127
Fort Smith, AR 72917-0127

Ms. Amy Wilbourn
Conner & Winters, LLP
4375 North Vantage Drive, Ste. 405
Fayetteville, AR 72703

Re:   **Addie Edwards, as Personal Representative of the Estate of Ozie Edwards,
      and on behalf of the wrongful death beneficiaries of Ozie Edwards, et al.
      v. Diversicare Leasing Corp. d/b/a Ouachita Nursing and Rehabilitation
      Center, et al.
      Ouachita County Circuit Court No. 52CV-14-203-6**

Counsel:

This case is set for jury trial **May 1 - 5, 2017**, beginning at 9:00 a.m.

This case is set <u>SECOND OUT</u>.  You should be prepared for trial on the above date., In the event of a change in status or if the case is to be continued, you will be notified.  If you have any questions at any time concerning the status of this case, please contact our office.

Trial will be held in Courtroom "B", Ouachita County Courthouse, 145 Jefferson Street SW, Camden.  Five days are reserved.

Any objection to the date, time or type of setting must be received by the Court within five (5) days from the date of this Notice; otherwise, the objection will be deemed to have been waived.

Very truly yours,

Verna D. Clark
Trial Court Assistant

c:    Circuit Clerk
      Court Reporter

**IN THE CIRCUIT COURT OF OUACHITA COUNTY, ARKANSAS** ~~FILED~~
**SIXTH DIVISION**

Addie Edwards as Personal Representative of the Estate of
Ozie Edwards, and on behalf of the wrongful death beneficiaries
of Ozie Edwards

**PLAINTIFFS**

vs.                     Case No. CV-2014-203-6

Diversicare Leasing Corp. d/b/a Ouachita Nursing and Rehabilitation
Center; Diversicare Healthcare Services, Inc.; Diversicare Management
Services, Co.; Advocat Ancillary Services, LLC; Omega Healthcare
Investors, Inc.; Camden Operations, LLC d/b/a Ouachita Nursing and
Rehabilitation Center; JEJ Investments, LLC; Sub-Ten Holdings, LLC;
MasterTen, LLC; Advanced Practice Solutions, LLC; Procare Therapy
Services, LLC; Southern Administrative Services, LLC; Ponthie Holdings,
LLC; Professional Nursing Solutions, LLC; John Ponthie; Ross Ponthie;
Mark Thompson; and Jennie Jeanette Goss Hassan in her capacity as
Administrator of Ouachita Nursing and Rehabilitation Center          **DEFENDANTS**

## ENTRY OF APPEARANCE

Come now Mark Dossett, Jeff Fletcher, and Dale Brown, and the law firm of Kutak Rock

LLP, and hereby enter their appearance as counsel of record in the above-referenced action on

behalf of the following Defendants:  Camden Operations, LLC d/b/a Ouachita Nursing and

Rehabilitation Center; Sub-Ten Holdings, LLC; and Jennie Jeanette Goss Hassan, in her capacity

as Administrator of Ouachita Nursing and Rehabilitation Center.

Copies of any and all pleadings, notices and other matters filed herein should be forwarded

to Mark Dossett, Jeff Fletcher, and Dale Brown, Kutak Rock LLP, Suite 200, 234 East Millsap

Road,     Fayetteville,     Arkansas     72703-4099;     mark.dossett@kutakrock.com,

jeffrey.fletcher@kutakrock.com, and dale.brown@kutakrock.com.

Dated this 21st day of November, 2016.

4818-3306-5277.1

Respectfully submitted,

**KUTAK ROCK LLP**

By: _____
Mark W. Dossett, AR 95174
Jeff Fletcher, AR 2005129
Dale W. Brown, AR 2004121
234 East Millsap Road, Suite 200
Fayetteville, AR  72703-4099
(479) 973-4200 Telephone
(479) 973-0007 Facsimile
Mark.Dossett@KutakRock.com
Jeffrey.Fletcher@KutakRock.com
Dale.Brown@KutakRock.com


**ATTORNEYS FOR DEFENDANTS,
Camden Operations, LLC d/b/a Ouachita
Nursing and Rehabilitation Center; Sub-Ten
Holdings, LLC; and Jennie Jeanette Goss
Hassan, in her capacity as Administrator of
Ouachita Nursing and Rehabilitation Center**

2

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was mailed to the following on this the 21st day of November, 2016, to:

Mr. Brian Reddick
Mr. Brent Moss
Mr. Matthew Swindle
Mr. Robert Francis
Mr. Daniel Yim
REDDICK MOSS, PLLC
One Information Way, Suite 105
Little Rock, AR 72202

Mr. H. Gregory Campbell
Campbell Law Firm, P.A.
One Information Way, Box 101
Little Rock, AR 72202

Mr. Kirkman Dougherty
Ms. Stephanie Randall
HARDIN, JESSON, & TERRY, PLC
5000 Rogers Avenue
Suite 500
Fort Smith, AR 72917

Ms. Amy Wilbourn
Ms. Vicki Bronson
CONNER & WINTERS, LLP
4375 N. Vantage Drive
Suite 405
Fayetteville, AR 72703


Dale W. Brown

3

4818-3306-5277.1