## IN THE CIRCUIT COURT OF OUACHITA COUNTY, ARKANSAS
### SIXTH DIVISION

Addie Edwards, as Personal Representative of the
Estate of Ozie Edwards, and on behalf of the
wrongful death beneficiaries of Ozie Edwards
and All Others Similarly Situated                                      PLAINTIFFS


vs.                              CASE NO. CV-2014-203-6


Camden Operations, LLC d/b/a Ouachita Nursing
and Rehabilitation Center; Camden-Progressive Eldercare
Services, Inc. d/b/a Ouachita Nursing
and Rehabilitation Center; Camden II Operations, LLC
d/b/a Pine Hills Health and Rehabilitation Center; Progressive
Eldercare Services, Inc.; Sub-Ten Holdings, LLC;
JEJ Investments, LLC; Advanced Practice Solutions, LLC;
Procare Therapy Services, LLC; Southern Administrative Services, LLC;
Ponthie Holdings, LLC; Professional Nursing Solutions, LLC;
Care Plus Staffing, LLC; Ross Ponthie; and John Ponthie          DEFENDANTS



### FIRST AMENDED CLASS ACTION COMPLAINT
### AGAINST CAMDEN OPERATIONS, LLC AND CAMDEN-PROGRESSIVE
### ELDERCARE SERVICES, INC BOTH d/b/a OUACHITA NURSING
### AND REHABILITATION CENTER, CAMDEN II OPERATIONS, LLC d/b/a
### PINE HILLS HEALTH AND REHABILITATION CENTER AND
### THE PONTHIE DEFENDANTS

COMES NOW, the Plaintiffs, on behalf of themselves and all others similarly situated,

by and through their attorneys, Reddick Moss, PLLC, and the Campbell Law Firm, P.A., and for

their causes of action against the Defendants, state as follows:

### INTRODUCTION

1.      The class claims of this Complaint are that the Defendants' engaged in a civil

conspiracy, pursued a common plan and design and acted in concert to create a deceptive

business practice of chronically understaffing the Facilities which violated the residents'

statutory and contractual rights and unjustly enriched the Defendants. Plaintiffs allege that the

Defendants engaged in a deceptive business practice of chronically understaffing the Facilities, breached the Admission Agreement and the Provider Agreement, violated the Arkansas Deceptive Trade Practices Act ("ADTPA") and violated the Arkansas Residents' Rights Act. Plaintiffs seek damages for breach of the Admission Agreement and breach of the Provider Agreement. Plaintiffs also seek damages under the ADTPA as well as damages for unjust enrichment for receiving payments they were not legally entitled to receive by engaging in the deceptive business practice of understaffing the Facilities and violating state and federal staffing laws, including the Arkansas Residents' Rights Act.

2.      This complaint includes a request that a class be certified consisting of all residents and estates of residents who resided at Camden Operations, LLC and Camden-Progressive Eldercare Services, Inc. both d/b/a Camden Nursing and Rehabilitation Center and Camden II Operations, LLC d/b/a Pine Hills Health and Rehabilitation Center ("the Facilities") from September 1, 2013 through the present ("Class Period"), as well as a prayer for compensatory, economic and punitive damages, attorney's fees, interest, and costs. Excluded from the Class are residents and estates of residents that have sued in the past or currently have lawsuits pending against any of the Defendants, and all employees of the Court in which the case in pending.

## CLASS ACTION COMPLAINT

### PARTIES

2.      Addie Edwards is Ozie Edwards's wife and the Personal Representative of the Estate of Ozie Edwards pursuant to an Order of the Ouachita County Circuit Court dated October 20, 2014, a copy of which is attached hereto as **Exhibit A.**

3.    Addie Edwards brings this action on behalf of Ozie Edwards, on behalf of the wrongful death beneficiaries of Ozie Edwards, and all other residents of the Facilities ("Plaintiff Class") for the period September 1, 2013, to present ("Class Period").

4.    Other than hospitalizations, Ozie Edwards was a resident of Ouachita Nursing and Rehabilitation Center, a nursing home located at 1411 Country Club Road, Camden, Ouachita County, Arkansas, from September 1, 2013, until his death on November 12, 2013.

5.    Defendant Camden Operations, LLC d/b/a Ouachita Nursing and Rehabilitation Center was a domestic limited liability company that, beginning September 1, 2013, owned, operated, managed, and held the license for the nursing home located 1411 Country Club Road, Camden, Ouachita County, Arkansas known as Ouachita Nursing and Rehabilitation Center. See **Exhibit B**. The causes of action that form the basis of this suit arise out of the business conducted by and through the Facilities during the residency of Ozie Edwards. The agent for service of process for Defendant Camden Operations, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

6.    Camden-Progressive Eldercare Services, Inc. d/b/a Ouachita Nursing and Rehabilitation Center is a domestic limited liability company that, beginning on or about September 1, 2015, owned, operated, managed, and held the license for the nursing home located 1411 Country Club Road, Camden, Ouachita County, Arkansas known as Ouachita Nursing and Rehabilitation Center. **Exhibit C**.  The causes of action that form the basis of this suit arise out of the business conducted by and through the Facilities during the residency of Ozie Edwards. The agent for service of process for Defendant Camden Operations, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

3

7.      Defendant Camden II Operations, LLC d/b/a Pine Hills Health and Rehabilitation Center is a domestic limited liability company that owned, operated, managed, and held the license for the nursing home located at 900 Magnolia Road, Camden, Ouachita County, Arkansas known as Pine Hills Health and Rehabilitation Center. The causes of action that form the basis of this suit arise out of the business conducted by and through the Facilities during the residency of Ozie Edwards. The agent for service of process for Defendant Camden II Operations, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

8.      Defendant Sub-Ten Holdings, LLC is a domestic limited liability company that owned, operated, managed and controlled the Facilities at times pertinent to this lawsuit.  Sub-Ten Holdings, LLC was the sole member of Camden Operations, LLC d/b/a Ouachita Nursing and Rehabilitation Center.  **Exhibit B and C**.  The causes of action that form the basis of this suit arise out of such business conducted by Sub-Ten Holdings, LLC in the ownership, operation, control, management of, and provision of services to, the Facilities during the residency of Ozie Edwards.  As a result of Sub-Ten Holdings, LLC's ownership, management and control of the Facilities, it knew or should have known of the understaffing at the Facilities and is a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiff's damages.  The agent for service of process on JEJ Investments, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

9.      Defendant JEJ Investments, LLC is a domestic limited liability company that owned, operated, controlled, managed, and/or provided services to the Facilities at times pertinent to this lawsuit. JEJ Investments, LLC also owned, controlled and managed Sub-Ten Holdings, LLC.  **Exhibit B**.  Defendant John Ponthie owns 100% of Defendant JEJ Investments,

4

LLC. **Exhibit B**. The causes of action that form the basis of this suit arise out of such business conducted by JEJ Investments, LLC in the ownership, operation, control, management of, and provision of services to, the Facilities during the residency of Ozie Edwards. As a result of JEJ Investments, LLC's ownership, management and control of the Facilities, it knew or should have known of the understaffing at the Facilities and is a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiff's damages. The agent for service of process on JEJ Investments, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

10.    Progressive Eldercare Services, Inc. is an Arkansas corporation with its principal place of business located at 26 Warnock Springs Rd., Camden, Arkansas, and it owns 100% of Camden-Progressive Eldercare Services, Inc. Upon information and belief, John Ponthie owns 100% of Progressive Eldercare Services, Inc. Progressive Eldercare Services, Inc. exercises its powers to supervise and control the Facilities and maintains its supervision and control over the Facilities through its powers to hire and fire the president and administrator of the Facilities; to elect the board of directors of the Facilities; dissolve the Facilities; and establish and amend the admission policy of the Facilities. The administrator at the Facilities is employed by Progressive Eldercare Services, Inc. The causes of action that form the basis of this suit arise out of such business conducted by Progressive Eldercare Services, Inc. in the ownership, operation, control, management of, and provision of services to, the Facilities during the residency of Ozie Edwards. As a result of Progressive Eldercare Services' ownership, management and control of the Facilities, it knew or should have known of the understaffing at the Facilities and is a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiff's damages. The agent for service of process for Progressive Eldercare

5

Services, Inc. is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

11.     Defendant Advanced Practice Solutions, LLC is a domestic limited liability company that operated, controlled, managed, and provided services to the Facilities at times pertinent to this lawsuit. Advanced Practice Solutions, LLC is integrally involved in staffing the Facilities and the causes of action that form the basis of this suit arise out of such business conducted by and decisions made and implemented by Advanced Practice Solutions, LLC in the operation, control, management by, and provision of services to the Facilities during the residency of Ozie Edwards. As a result of Advanced Practice Solutions, LLC's ownership, management and control of the Facilities, it knew or should have known of the understaffing at the Facilities and is a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiff's damages. The agent for service of process on Advanced Practice Solutions, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

12.     Defendant Procare Therapy Services, LLC is a domestic limited liability company that operated, controlled, managed, and provided services to the Facilities at times pertinent to this lawsuit. Procare Therapy Services, LLC is integrally involved in staffing the Facilities and the causes of action that form the basis of this suit arise out of such business conducted by and decisions made and implemented by Procare Therapy Services, LLC in the operation, control, management by, and provision of services to the Facilities during the residency of Ozie Edwards. As a result of Procare Therapy Services, LLC's ownership, management and control of the Facilities, it knew or should have known of the understaffing at the Facilities and is a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally

liable for the Plaintiff's damages. The agent for service of process on Procare Therapy Services, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

13.     Defendant Southern Administrative Services, LLC is a domestic limited liability company that operated, controlled, managed, and provided services to the Facilities at times pertinent to this lawsuit. Southern Administrative Services, LLC is integrally involved in determining the staff at the Facilities and the causes of action that form the basis of this suit arise out of such business conducted by and decisions made and implemented by Southern Administrative Services, LLC in the operation, control, management by, and provision of services to the Facilities during the residency of Ozie Edwards.  As a result of Southern Administrative Services, LLC's ownership, management and control of the Facilities, it knew or should have known of the understaffing at the Facilities and is a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiff's damages. The agent for service of process on Southern Administrative Services, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

14.     Defendant Professional Nursing Solutions, LLC is a domestic limited liability company that operated, controlled, managed, and provided services to the Facilities at times pertinent to this lawsuit. Professional Nursing Services, LLC is integrally involved in determining the staff at the Facilities and the causes of action that form the basis of this suit arise out of such business conducted by and decisions made and implemented by Professional Nursing Solutions, LLC in the operation, control, management by, and provision of services to the Facilities during the residency of Ozie Edwards.  As a result of Professional Nursing Solutions, LLC's ownership, management and control of the Facilities, it knew or should have known of the understaffing at the Facilities and is a control person as defined in Ark. Code Ann. § 4-88-

113(d)(1) and is therefore jointly and severally liable for the Plaintiff's damages. The agent for service of process on Professional Nursing Solutions, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

15.     Defendant Care Plus Staffing, LLC is a domestic limited liability company that operated, controlled, managed, and provided services to the Facilities at times pertinent to this lawsuit. Care Plus Staffing, LLC is integrally involved in determining the staff at the Facilities and the causes of action that form the basis of this suit arise out of such business conducted by and decisions made and implemented by Care Plus Staffing, LLC in the operation, control, management by, and provision of services to the Facilities during the residency of Ozie Edwards. As a result of Care Plus Staffing, LLC's ownership, management and control of the Facilities, it knew or should have known of the understaffing at the Facilities and is a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiff's damages. The agent for service of process on Care Plus Staffing, LLC is Amy M. Wilbourn, 4375 N. Vantage Drive, Suite 405, Fayetteville, Arkansas 72703.

16.     Defendant John Ponthie is a citizen and resident of Shreveport, Louisiana. At certain times material to this action, John Ponthie was an owner and the Incorporator/Organizer of the licensee Defendant Camden Operations, LLC. John Ponthie is an owner and sole member of separate Defendant JEJ Investments, LLC and an owner/member of Sub-Ten Holdings, LLC. **Exhibit B**. Upon information and belief, John Ponthie is also the owner and/or member of Progressive Eldercare Services, Inc., Advanced Practice Solutions, LLC, Procare Therapy Services, LLC, Southern Administrative Services, LLC, Care Plus Staffing, LLC, and Professional Nursing Solutions, LLC. The causes of action that form the basis of this suit arise out of such business conducted by and decisions made and implemented by John Ponthie in the

8

ownership, operation, control, and management of the Facilities and the Ponthie Defendants during the residency of Ozie Edwards. The common plan and design to understaff the Facilities to increase profits is the brainchild of John Ponthie and his brother, Ross Ponthie. John Ponthie is a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiff's damages. John Ponthie's systematic and continuous contacts with the operations of the Facilities, specifically, and the State of Arkansas, generally, render him subject to the personal jurisdiction of this Court pursuant to Ark. Code Ann. § 16-4-101(B).

17.    Defendant Ross Ponthie is a citizen and resident of Alexandria, Louisiana. At certain times material to this action, Ross Ponthie was an owner and the Incorporator/Organizer of the licensee Defendant Camden Operations, LLC, Defendant Camden Operations II, LLC, the managing member of Sub-Ten Holdings, LLC, the sole member of the Facilities and an owner/member of JEJ Investments, LLC. **Exhibit B**. Upon information and belief, Ross Ponthie is an owner and/or member of separate Defendants Advanced Practice Solutions, LLC, Procare Therapy Services, LLC, Southern Administrative Services, LLC, Care Plus Staffing, LLC, and Professional Nursing Solutions, LLC. The causes of action that form the basis of this suit arise out of such business conducted by and decisions made and implemented by Ross Ponthie in the ownership, operation, control, and management of the Facilities and the Ponthie Defendants during the residency of Ozie Edwards. The common plan and design to understaff the Facilities to increase profits is the brainchild of Ross Ponthie and his brother, John Ponthie. Ross Ponthie is a control person as defined in Ark. Code Ann. § 4-88-113(d)(1) and is therefore jointly and severally liable for the Plaintiff's damages. Ross Ponthie's systematic and continuous contacts with the operations of the Facilities, specifically, and the State of Arkansas, generally, render him subject to the personal jurisdiction of this Court pursuant to Ark. Code Ann. § 16-4-101(B).

18.    Whenever the term "Ponthie Defendants" or "Ponthie Nursing Home Defendants" is used throughout this portion of the Complaint, that term collectively refers to and includes the following Defendants: Camden Operations, LLC and Camden-Progressive Eldercare Services, Inc. both d/b/a Ouachita Nursing and Rehabilitation Center; Camden II Operations, LLC d/b/a Pine Hills Health and Rehabilitation Center; JEJ Investments, LLC; Sub-Ten Holdings, LLC; Progressive Eldercare Services, Inc.; Advanced Practice Solutions, LLC; Procare Therapy Services, LLC; Southern Administrative Services, LLC; Care Plus Staffing, LLC; Professional Nursing Solutions, LLC; Ross Ponthie and John Ponthie.

19.    The Defendants collectively and by agreement controlled the operation, planning, and management of the Facilities allowing them to pursue a common plan and design to understaff the Facilities in violation of the residents' statutory and contractual rights. The authority exercised by the Defendants over the Facilities included, but was not limited to, control of marketing, human resources management, training, staffing, creation and implementation of policies and procedures used by the Facilities, federal and state Medicare and Medicaid reimbursement, quality care assessment and compliance, licensure and certification, legal services, and financial, tax, and accounting control through fiscal policies established by the Defendants.

20.    The Defendants operated as a joint venture/enterprise and pursued a common plan and design to advance their business interests of increasing profits at the expense of the residents, as the Ponthie Defendants were owned by and controlled by the same owners, managers, and decision makers, including Ross Ponthie and John Ponthie.

21.     At all relevant times mentioned herein, the Defendants owned, operated and/or controlled the operation of the Facilities, either directly or through the agency of each other and/or other agents, subsidiaries, servants, or employees.

22.     Because the Defendants named herein and others were engaged in a joint venture/enterprise and aided and abetted each other in pursing their common plan and design in carrying out their deceptive business practice of understaffing the Facilities, the acts and omissions of each participant are imputable to all other participants making them jointly and severally liable for all harm caused to the residents. The actions of the Defendants and each of its servants, agents and employees as set forth herein, are imputed to each of the Defendants, jointly and severally.

**JURISDICTION AND VENUE**

23.     This Court has jurisdiction over the subject matter and the parties to this action, and venue is proper in this Court.

**BACKGROUND AND FACTUAL ALLEGATIONS**

24.     This case arises from Defendants' systemic failure to have sufficient staff at the Facilities to meet the needs of its residents which caused Plaintiffs and the proposed Plaintiff Class to suffer economic and compensatory damages and injuries described in more detail below. The operation and activity of the Facilities is to provide skilled and complex nursing, rehabilitative and personal care services to ill, infirm, medically disabled and elderly individuals.

25.     Persons admitted to the Facilities have limitations caused by physical deterioration, cognitive decline, the onset or exacerbation of an acute or chronic illness or condition, or other related factors. They need nursing care, medical treatment, and rehabilitation to maintain functional status, increase functional status, or live safely from day to day. The

11

residents are elderly, disabled, confined to their beds or unable to rise from a bed or chair independently, and unable to groom, feed, toilet, or clean themselves. Consequently, many nursing home residents rely upon nursing home staff for not only skilled nursing care and treatment, but also essential primary care (herein "Basic Care") including:

     a)     Toileting assistance;

     b)     Incontinence are and changing of wet and soiled clothing and linen;

     c)     Assistance transferring to and from bed and wheelchair;

     d)     Assistance with dressing and personal hygiene;

     e)     Assistance with bathing;

     f)     Assistance with turning and repositioning residents in bed or chair;

     g)     Feeding assistance; and

     h)     Exercises/passive range of motion ("ROM") exercises.

26.     Defendants limited the number of CNA staff and licensed staff on duty at the Facilities which rendered the Facilities incapable of meeting the needs of the residents. With the limited budgets for staffing, the supply of staffing hours fell far short of the hours needed to adequately care for the residents.

27.     The difference between the services that Defendants were required to provide according to state and federal law and regulations—which Defendants promised to provide in their admissions agreement—and the services that the Facilities were actually capable of providing is profound.

28.     Analysis of survey results reported by the Office of Long Term Care confirm the chronic understaffing at the Facilities and the Defendants inability to provide the Basic Care services for which they were paid.

29.    More specifically, understaffing led to a pattern and practice of failing to provide Basic Care Services at the Facilities to the residents during the Class Period. For example, the Facilities failed to provide adequate staff:

a)    To regularly provide toileting, incontinence care, and basic hygiene care, leaving dependent residents in dirty diapers, dirty clothes, and dirty beds for hours at a time;

b)    To timely respond to call lights rung by residents. Residents were left to soil themselves while waiting for assistance; others fell while attempting to walk to the bathroom unaided;

c)    To re-position bed-bound and immobile residents; many residents remained in the same position for hours at a time, which can and sometimes did result in painful, infection-prone pressure sores;

d)    To undertake ROM exercises – moving their joints and limbs, and assisting vulnerable residents who could walk or exercise. Without this assistance, residents lost mobility, rendering them even less independent.

e)    To wash and bathe dependent residents;

f)    To get dependent residents up, dressed, and out of bed; and

g)    To assist dependent residents with meals. Without help, some residents were unable to eat or drink in the time allotted, and some of them suffered weight loss and dehydration.

30.    These practices confirm that the Facilities did not provide the Basic Care that was required and paid for, and highlight the very human toll of understaffing the Facilities. Defendants' understaffing practices saved them millions of dollars at the expense of the residents' dignity and comfort, and jeopardized their safety. As a result of chronic understaffing, residents at the Facilities were left for long periods in their own urine and waste; were not cleaned, repositioned, or moved, resulting in infections, pressure sores, and loss of mobility; were deprived of food and water; and suffered falls. The failure to provide adequate staff not

13

only violated the law and the contractual terms of the Admission Agreement, it also degraded residents and stripped them of their dignity.

31.    As even more specific proof of the chronic understaffing at the Facilities and the resulting harm to residents, surveys conducted by the Office of Long Term Care establish that the Defendants were on notice and aware of problems with understaffing causing harm to the residents. For example, from September 1, 2013 to present, the Facilities was cited for dozens of health-related deficiencies.

32.    As even more specific proof of the chronic understaffing at the Facilities and the resulting harm to residents, surveys conducted by the Office of Long Term Care establish that the Ponthie Defendants were on notice and aware of problems with understaffing at each Facilities causing harm to the residents. For example, from October 8, 2013 to April 19, 2016, the Facilities was cited for at least twenty-seven (27) health related deficiencies. Specifically, in a October 8, 2013 survey, the Facilities was cited for failing to "meet minimum direct-care staffing on the day shift." In surveys conducted on October 8, 2013 and April 19, 2016, the Facilities was cited for numerous deficiencies relevant to the injuries suffered by Ozie Edwards and the Plaintiff Class including:

a.    Failure to ensure that sufficient direct care staff was available to provide personal care and to assist a resident with getting out of bed as requested; and

b.    Failure to ensure that a resident who enters the Facilities without pressure sores does not develop pressure sores and a resident having pressure sores receives necessary treatment and service to promote healing and prevent infection and prevent new pressure sores from developing; and

c.    Failure to ensure physician-ordered laboratory tests were performed as ordered, to enable the physician to identy any potential abnormalities that might necessitate changes in treatment; and

d.    Failure to have a program that investigates, controls and keeps infection from spreading; and

e.    Failure to have enough nurses to care for every resident in a way that

maximizes the resident's well being.

33.    Under Arkansas law, the Department of Human Services which licenses nursing

Facilities to operate, "shall not issue or renew a license of a nursing Facilities unless that

Facilities employs the direct-care staff needed to provide continuous twenty-four-hour nursing

care and service to meet the needs of each resident of the nursing Facilities and the staffing

standards required by all state and federal regulations." Ark. C. Ann. § 20-10-1402(a).

34.    Under Arkansas law, there are specific staffing standards regarding the minimum

number of direct-care staff required in nursing Facilities and "the staffing standard

required…shall be the minimum number of direct-care staff required by nursing Facilities and

shall be adjusted upward to meet the care needs of residents." Ark. C. Ann. § 20-10-1402(b)(1).

Therefore, a Facilities which provides staffing at the minimum number of direct-care givers

required is not in compliance with Arkansas law as those staffing numbers "shall be adjusted

upward to meet the care needs of residents." *Id.* By definition, failure to meet the minimum

staffing requirements for direct-care under Arkansas law is also a direct violation of the federal

law staffing requirements.

35.    Under Arkansas law for direct-care givers,

…all nursing Facilities shall maintain the following minimum
direct-care staffing-to-resident ratios:

(1) One (1) direct-care staff to every six (6) residents for the day
shift. Of this direct-care staff, there shall be at least one (1)
licensed nurse to every forty (40) residents;

(2) One (1) direct-care staff to every nine (9) residents for the
evening shift. Of this direct-care staff, there shall be at least one (1)
licensed nurse to every forty (40) residents;

15

(3) One (1) direct-care staff to every fourteen (14) residents for the night shift. Of this direct-care staff, there shall be at least one (1) licensed nurse to every eighty (80) residents.

Ark. C. Ann. § 20-10-1403(a).

## CAUSES OF ACTION AGAINST THE DEFENDANTS

### CLASS CLAIMS

36.    Plaintiffs bring this action individually and in a representative capacity pursuant to Arkansas Rule of Civil Procedure 23 against the Defendants for engaging in a civil conspiracy, pursuing a common plan and design and acting in concert to create a deceptive business practice of chronically understaffing the Facilities which violated the residents' statutory and contractual rights that unjustly enriched the Defendants. Plaintiffs allege that the Defendants engaged in a deceptive business practice of chronically understaffing the Facilities, breached the Admission Agreement and the Provider Agreement, violated the Arkansas Deceptive Trade Practices Act ("ADTPA"), and violated the Residents' Rights Act. Plaintiffs seek damages for breach of the Admission Agreement and breach of the Provider Agreement; damages under the ADTPA as well as damages for unjust enrichment for receiving payments they were not legally entitled to receive by engaging in the deceptive business practice of understaffing the Facilities and violating state and federal laws, including the Residents' Rights Act on behalf of the named Plaintiffs and all residents and estates of residents who resided at the Facilities from April 1, 2016 to present.  Excluded from the class are residents and estates of residents that have sued in the past or currently have lawsuits pending against any of the Defendants, employees of the Defendants, and all employees of the Court in which this case is pending.

16

37.    From September 1, 2013 to present, the Defendants provided custodial care to more than 400 residents at the Facilities. The class plaintiffs are so numerous that joinder of all individual claims is impracticable.

38.    Upon information and belief, at or near the time of admission to the Facilities, all residents were required to sign the same or substantially the same "Admission Agreement," an example of which is attached, marked as **Exhibit D**.

39.    In the Admission Agreement, the Defendants promised "to furnish . . . nursing and personal care, social services, linens, bedding, and other items required for the Resident's known physical condition or by law for the Resident's health, safety, grooming and well-being." Also, Defendants promised "to exercise due diligence to obtain the services of the Resident's personal physician when the Resident's condition requires such medical attention."

40.    The Defendants owed a non-delegable legal duty to the Plaintiffs and Plaintiff Class to provide adequate and appropriate staffing at the Facilities at all times, and Defendants knew that state and federal law, which the Defendants expressly incorporated into their Admission Agreement, required the Defendants to meet critical staffing requirements. These requirements include but are not limited to the following:

    a)    Meeting requirements for minimum numbers of Facilities staff members to be present at all times, Ark. Code Ann. § 20-10-1401 et seq.;

    b)    Meeting requirements for the minimum number of staff members to be adjusted upward to meet the care needs of residents, Ark. Code. Ann. § 20-10-1401 et seq.;

    c)    Meeting additional staffing requirements to assure that all residents receive the highest quality of life while protecting their health and welfare; Ark. Code Ann. § 20-10-1002 et seq.;

    d)    Meeting the federal minimum standards imposed by the United States Department of Health and Human Services, 42 CFR Section

405-301 et seq., including providing sufficient nursing staff and nursing personnel to ensure that each resident attains and maintains the highest practical physical, mental, and psychosocial well-being. 42 CFR Section 483.30; and

e)    Meeting the requirements of other provisions of Arkansas and Federal law.

41.    In an effort to ensure that minimum staffing requirements are met, Arkansas law requires that Defendants honestly, accurately, regularly and truthfully:

a)    Post daily personnel sign-in sheets reflecting levels of staffing per shift, Ark. Code Ann. § 20-10-1406; and

b)    Submit to the Office of Long Term Care a written report of all shifts which failed to meet the minimum staffing requirements, Ark. Code Ann. § 20-10-1407.

42.    Defendants filed such reports knowing that they were inaccurate and misleading.

43.    By understaffing the Facilities, Defendants saved significant money and profited at the expense of all residents. Defendants operated and managed the Facilities so as to maximize profits by reducing staffing levels below that which was needed to provide adequate care to residents that would comply with federal and state regulations governing skilled nursing Facilities. By understaffing the Facilities, the Defendants did not use money received from Medicare and/or Medicaid they were legally required to use to adequately staff the Facilities to meet the needs of its residents. Thus, Defendants intentionally and/or with reckless disregard for the consequences of their actions caused staffing levels at the Facilities to be set so that the personnel on duty at any given time could not reasonably meet the needs of the residents, causing injury to the residents at the Facilities. The Defendants have created a broad corporate culture in which understaffing is a standard practice and in which Defendants sought reimbursement of funds from government sources for services not provided.

18

44.    All residents in the Facilities were injured by the Defendants' chronic and institutionalized understaffing. The lack of personnel in the Facilities resulted in residents receiving a level of care (1) that was below the level of care that Defendants represented they were able to provide in their Admission Agreement, and (2) that failed to comply with state and federal minimum staffing requirements.

45.    The pervasive common question is whether the Facilities was chronically understaffed so as to violate the residents' statutory and contractual rights and breached their legal duty to adequately staff the Facilities. There are other questions of law and fact common to the Plaintiff Class which predominate over questions affecting only individual class members. Such common questions include, but are not limited to:

> a)    Whether the standard Admission Agreement required the Facilities to have sufficient staff to meet the care needs of the residents as required by state and federal laws and regulations;
>
> b)    Whether Ark. Code Ann. §§ 20-10-1201, et. seq., imposes minimum staffing requirements requiring the Facilities to have sufficient staff to meet the care needs of the residents;
>
> c)    Whether Defendants failed to meet the minimum staffing requirements of Ark. Code Ann. §§ 20-10-1201, et seq., and the Defendants' admission agreement by failing to provide sufficient staff to meet the care needs of the residents;
>
> d)    Whether failure to meet the minimum staffing requirements required by state and federal laws and regulations breaches the Defendants' admission agreement, Ark. Code Ann. §20-10-1201, et seq., and the Arkansas Deceptive Trade Practices Act;
>
> e)    Whether chronically understaffing the Facilities in violation of state and federal laws and regulations is a deceptive business practice and/or an unconscionable business practice and/or a violation of the Arkansas Deceptive Trade Practices Act;
>
> f)    Whether the Defendants owed a legal duty to the residents to staff the Facilities in compliance with state and federal laws and regulations;

g)   Whether failure to staff the Facilities in compliance with state and federal laws and regulations is a breach of the provider agreement;

h)   Whether the admission agreement's failure to disclose the Facilities's history of understaffing is an omission or concealment which constitutes a deceptive business practice and/or a violation of the Arkansas Deceptive Trade Practices Act;

i)   Whether the Defendants were unjustly enriched;

j)   Whether the Defendants engaged in a civil conspiracy to understaff the Facilities in violation of state and federal laws and regulations;

k)   Whether the Defendants entered into a conscious agreement to pursue a common plan or design to violate the Residents Rights Act and/or understaff the Facilities;

l)   Whether the Defendants pursued a common plan and design and acted in concert to understaff the Facilities;

m)   Whether the Defendants actions degraded the residents and stripped them of their dignity;

n)   Whether the Defendants were required to use the money they received from Medicare and Medicaid to provide necessary staffing to meet the care needs of the residents;

o)   If so, whether the Defendants used the money received from Medicare and Medicaid to provide adequate staff to meet the care needs of the residents;

p)   Whether the Defendants are required to comply with all state and federal staffing laws and regulations when they received money from Medicare and Medicaid;

q)   Whether the Defendants were in compliance with all state and federal staffing laws when they received money from Medicare and Medicaid;

r)   Whether the Defendants' actions were willful, wanton or demonstrated reckless disregard of the rights of the Plaintiffs; and

s)   Whether the Ponthie Defendants and the named individuals are control persons as defined in Ark. Code Ann. 4-88-113(d)(1) and

20

therefore jointly and severally liable for the damages suffered by
the Plaintiff Class for the Defendants' deceptive trade practices.

46.    The Plaintiffs will fairly and adequately protect the interest of the Plaintiff Class
and have familiarity with the allegations expressed herein and are able to assist in decision
making as to the conduct of this litigation.

47.    Plaintiffs' claims are typical of the claims of the class because the class
representative's claims arise from the Defendants' standard and routine practice of failing to
meet the minimum staffing requirements imposed by state law and their standard admission
agreement. The chronic understaffing at the Facilities made it impossible for the few staff who
were there to perform their tasks at a level which complied with the protections afforded by the
Residents' Rights Act and at the levels promised by the Defendants' Admission Agreement.

48.    By understaffing the Facilities, Defendants acted willfully, wantonly and in
reckless disregard of the residents' rights intentionally placing profits over people and knowingly
taking advantage of residents who were unable to protect their interests because of their physical
and mental infirmities. Systemic understaffing of the Facilities directly resulted in undignified
living conditions for the residents, a breach of the Admission Agreement, a breach of the
provider agreement, a violation of state and federal law, a breach of the Facilities's duties to
adequately staff the Facilities, and unjust enrichment of the Defendants. The injuries sustained
by the proposed class representative is typical of the class and further evidence understaffing at
the Facilities

49.    By understaffing the Facilities, Defendants placed profits over compliance with
state law the well-being of the residents. These decisions were made and implemented by the
owners, board members, management, employees and agents of Defendants acting in concert and
are an illegal, deceptive and unconscionable business practice. Since at least September 1, 2013,

the Defendants have, as a standard and routine business practice, violated state and federal laws and regulations in reckless disregard of the Plaintiffs' rights and knowing that the well-being of all residents would be adversely affected as detailed herein.

50.    Defendants failed to discharge their obligations of care to the named Plaintiffs and their loved ones with a conscious and reckless disregard for their individual rights and safety. At all times mentioned herein, Defendants, through their corporate officers and administrators, had knowledge of, ratified and/or otherwise authorized all of the acts and omissions that caused the injuries suffered by the Plaintiff class, as more fully set forth below. While a resident at the Facilities, Ozie Edwards sustained multiple injuries including, but not limited to, the following: (a) Malnutrition; (b) Dehydration; (c) Multiple infections; (d) Poor hygiene; and (e) Death. Defendants knew that their Facilities could not provide the minimum standard of care to the weak and vulnerable residents of the Facilities.

51.    As a direct and proximate result of the Defendants' conduct, the Plaintiffs and Plaintiff Class have suffered actual damage, both in terms of physical injuries, as detailed above, and damages for loss of dignity, mental anguish and economic damage. Moreover, the Plaintiffs, or someone acting on behalf of the Plaintiffs, provided payment in exchange for services which were not provided, which were not as represented by the Defendants' Admission Agreement, and did not the standards required by the Arkansas Residents' Rights Act.

52.    The Defendants, as the owners, agents, managers and operators of a private organization having the responsibility of protecting and caring for the residents, have direct, vicarious and joint and several liability for the acts and omissions giving rise to this complaint.

53.     Plaintiffs have retained counsel qualified, experienced and able to conduct the litigation, and Plaintiffs have made arrangements to cover the costs associated with this litigation.

54.     If each class member were required to pursue individual actions, it would be economically and judicially unfeasible. A class action is appropriate and the superior method for the fair and efficient adjudication of this controversy.

### COUNT ONE: VIOLATION OF THE DECEPTIVE TRADE PRACTICES ACT

55.     Plaintiffs incorporate the allegations contained in Paragraphs 1–54 as if fully set forth herein.

56.     At all times pertinent to this cause of action, Plaintiffs were "elder person[s]" as defined by the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-201(a). As an "elder person" within the meaning of the Deceptive Trade Practices Act, the Plaintiffs have a private cause of action to recover actual damages, punitive damages, and reasonable attorney's fees pursuant to Ark. Code Ann. § 4-88-204.

57.     At all relevant times, the Arkansas Deceptive Trade Practices Act, codified at Ark. Code Ann. 4-88-107(a) ("ADTPA") provides that it is unlawful to:

a)      Knowingly take advantage of a consumer who is reasonably unable to protect his or her interest because of:

i.      Physical infirmity; or

ii.     A similar factor; and

b)      Engage in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade.

58.     Ark. Code Ann. § 4-88-108 provides that, when utilized in connection with the sale or advertisement of any goods, services, or charitable solicitation, it shall be unlawful for

any person to (1) act, use or employ any deception, fraud or false pretense, or (2) conceal, suppress, or omit any material fact with intent that others rely on the concealment, suppression, or omission.

59.    The conduct of Defendants as described herein constitutes a deceptive practice in violation of the ADTPA. Defendants failed to inform Plaintiffs and the Plaintiff Class in Defendants' standard Admission Agreement that the Facilities routinely failed to meet minimum staffing requirements imposed by state and federal law which increased profits. Furthermore, Defendants represented themselves as providing services commensurate with the needs of the residents and in compliance with the requirements of Arkansas state law governing long-term care and nursing Facilities.

60.    By understaffing the Facilities, the Defendants knowingly took advantage of the most vulnerable consumers and those who were unable to protect themselves. Defendants' unfair and deceptive trade practices asserted herein are the type that the ADTPA is specifically designed to protect against and remedy.

61.    The Defendants' trade practices also are, and have been throughout the Class Period unconscionable, because the nursing home residents constitute a vulnerable population: they are elderly, ill, infirm, and often deteriorating. These residents often face the double burden of dependency and isolation. The Defendants accept these vulnerable residents for admission, and then knowingly fail to provide sufficient levels of staffing to provide the care required without disclosing in their admission agreement the Facilities' dreadful history of understaffing.

62.    In furtherance of their deceptive business practices, the Defendants: (1) billed and collected money from Medicare and Medicaid representing that they had complied with all laws, including all state and federal staffing laws and regulations, when Defendants knew they had not;

(2) did not use the funds received from Medicare and Medicaid to adequately staff the Facilities as they are required to do; and (3) continued to accept residents when they could not care for the residents currently in the Facilities.

63.    The Defendants also engaged in, and have engaged in throughout the Class Period, substantively unconscionable trade practices by understaffing the Facilities making it impossible to provide adequate care to residents even though it charged for services it could not provide.

64.    The Defendants knew that they were not meeting, and did not have sufficient staff to meet the Basic Care needs of their residents as mandated by state and federal laws and regulations.    The Defendants were indifferent to the consequences to the elderly resident population when intentionally understaffing the Facilities to increase profits.

65.    The Defendants further engaged in deceptive trade practices by infringing upon and depriving the Plaintiff Class of the rights guaranteed by Ark. Code Ann. §§ 20-10-1201, et seq. ("Protection of Long Term Care Facilities Residents' Act") including, but not limited to, the following:

      a)    The right to receive adequate and appropriate health care and protective and support services, including social services, mental health services, if available, planned recreational activities, and therapeutic and rehabilitative services consistent with the resident care plan for the Plaintiff Class, with established and recognized practice standards within the community, and with rules as adopted by federal and state agencies, such rights include:

           i.    The right to receive adequate and appropriate custodial service, defined as care for the Plaintiff Class which entailed observation of diet and sleeping habits and maintenance of a watchfulness over their general health, safety, and well-being; and

b) The right to appropriate observation, assessment, nursing diagnosis, planning, intervention, and evaluation of care by nursing staff;

c) The right to access to dental and other health-related services, recreational services, rehabilitative services, and social work services appropriate to the needs and conditions of the Plaintiff Class, and not directly furnished by the licensee;

d) The right to a wholesome and nourishing diet sufficient to meet generally accepted standards of proper nutrition, guided by standards recommended by nationally recognized professional groups and associations with knowledge of dietetics, and such therapeutic diets as may be prescribed by attending physicians;

e) The right to Facilities with premises and equipment, and conduct of its operations maintained in a safe and sanitary manner;

f) The right to be free from mental and physical abuse, and from physical and chemical restraints;

g) The right of the Plaintiff Class to have privacy of their bodies in treatment and in caring for their personal needs;

h) The right to the obligation of the Facilities to keep full records of the admissions and discharges of the Plaintiff Class and their medical and general health status, including:

    i. medical records;

    ii. personal and social history;

    iii. individual resident care plans, including, but not limited to, prescribed services, service frequency and duration, and service goals;

    iv. making it a criminal offense to fraudulently alter, deface, or falsify any medical or other long-term care Facilities record, or cause or procure any of these offenses to be committed; and

    v. The right to be treated courteously, fairly, and with the fullest measure of dignity.

66.    As described in part and above, the Defendants received repeated citations related to failures of Basic Care in Office of Long Term Care surveys. Upon information and belief, they received these deficiencies despite taking steps to increase staffing and prepare staff for surveys immediately preceding the arrival of state surveyors – steps that would lead surveyors to believe levels of care provided were higher than they actually were during non-survey times.

67.    The conduct of the Defendants, as described herein, constitutes a deceptive practice in violation of the Arkansas Deceptive Trade Practices Act. The Defendants engaged in unconscionable, false, and/or deceptive acts or practices in business, commerce and/or trade including, but not limited to, marketing themselves and holding themselves out to the public as being able to meet the needs of elder residents of the Facilities. The Defendants profited greatly as a result of their deceptive trade practices, but the Defendants were aware that the Facilities could not meet the needs of its residents.

68.    As a direct and proximate result of the Defendants' wrongful, willful and wanton conduct, Plaintiffs have suffered actual damages, including economic damages, compensatory damages and loss of dignity damages.

### COUNT TWO: BREACH OF THE ADMISSION AGREEMENT

69.    Plaintiffs incorporate the allegations contained in paragraphs 1–68 as if fully set forth herein.

70.    Before being admitted to the Facilities, residents, or those acting on their behalf, were required to enter into a resident Admission Agreement, whereby the Facilities agreed to provide nursing and personal care required for the Resident's known physical condition as required by law for the Resident's health, safety, grooming and well-being in exchange for valuable consideration. *See* **Exhibit D**.

71.    The residents, or those acting on their behalf, paid for or caused to be paid for, the goods, services, care and treatment, including personal or custodial care, and professional nursing care the Defendants promised to provide.

72.    The Defendants breached their contractual duties, both express and implied, by understaffing the Facilities and creating a situation whereby it was impossible for caregivers to provide the care and services as described in the agreement and as required by law for the Resident's health, safety and well-being, causing damage to the residents, including loss of dignity.

73.    As a result, the Plaintiffs are entitled to compensatory damages, and Plaintiffs assert a claim for judgment for all compensatory damages including the amount a jury determines is sufficient compensation for the loss of the benefit of promised services and care and treatment.

74.    Plaintiffs are entitled to seek punitive damages for breach of contract, because the Defendants knew or should have known, in the light of the surrounding circumstances, that their nonfeasance in breach of the Admission Agreement would naturally and probably result in injury or damage, yet the Defendants breached the agreement in reckless disregard of the consequences from which malice may be inferred.

## COUNT THREE: BREACH OF THE PROVIDER AGREEMENT

75.    Plaintiffs incorporate the allegations contained in paragraphs 1-74 as if fully set forth herein.

76.    Upon becoming a resident of any of the Facilities, the residents, many of whom were Medicare and/or Medicaid recipients, became third-party beneficiaries of the contract or

provider agreement between the Defendants and the state and federal governments, an example of which is attached as **Exhibit E**.

77.    For consideration duly paid by the residents, or on their behalf, the Defendants agreed to provide residents with personal and custodial care and professional nursing care in compliance with the requirements set forth in the provider agreements, as well as the minimum standards of care imposed by applicable law including the statutes and regulations set out herein. In addition, by entering into the agreement, the Defendants promised to "comply with all rules, regulations, changes in and additions thereto issued by the United States Department of Health and Human Services pertaining to nursing homes, and to comply with all rules, regulations, duly promulgated changes in and additions thereto issued by the State." The Defendants further agreed that "the rights and privileges of the residents [were] of primary concern to the parties" and covenanted to "protect and preserve" the rights of the residents. The parties to the contract agreed "that failure to act in a manner consistent with those rights and privileges shall constitute an immediate breach of agreement." *See* **Exhibit E**.

78.    As the name implies, the provider agreement exists to pay for and provide for resident, personal, or custodial care and professional nursing care. Additionally, the provider agreement between the Defendants and the state and federal government was clearly intended to benefit and protect the residents of the Facilities by requiring the Defendants to provide quality care consistent with federal and state statutes and regulations.

79.    The Defendants breached the provider agreement and committed multiple acts of nonfeasance in failing to adequately staff the Facilities and provide the care, goods, and services to industry standards, as required by law and as agreed, including but not limited to:

> a)    Failing to provide dietary services, including special diets, supplemental feedings, special delivery preparation, assistance,

29

and equipment required for preparing and dispensing oral feedings and special feeding devices;

b)   Failing to provide personal or custodial services and nursing care;

c)   Failing to implement policies and procedures so as to prevent infringement or deprivation of the Plaintiff Class's rights as residents of long term care Facilities;

d)   Failing to comply with protections, duties and obligations imposed by applicable state and federal statutes and regulations as alleged herein; and

e)   Failing to staff the Facilities with sufficient personnel to adequately meet the needs of the Plaintiff Class, failing to comply with the rules and regulations promulgated by the state and federal governments, and in failing to provide staff qualified to meet the needs of the residents.

80.   As a result of the Defendants' breach of the provider agreement, Plaintiffs assert a claim for judgment for all compensatory damages including the amount a jury determines is sufficient compensation for the loss of the benefit of promised services and care and treatment.

81.   The Defendants are also liable for all consequential damages, because the Defendants knew, or should have known, that breaches of the provider agreement would result in consequential damages to the Plaintiff Class, and, under the circumstances, the Defendants should have understood that it had agreed to assume responsibility for any consequential damages caused by their breaches of the provider agreement.

82.   Plaintiffs seek judgment for all foreseeable consequential damages, which flowed naturally from the failure of the Defendants to provide the care, goods, and services promised under the provider agreement, including but not limited to mental anguish and loss of dignity.

83.   Plaintiffs are entitled to seek punitive damages for breach of contract, because the Defendants knew or ought to have known, in the light of the surrounding circumstances, that their nonfeasance in breach of the provider agreement would naturally and probably result in

injury or damage, yet the Defendants breached the agreement in reckless disregard of the consequences from which malice may be inferred.

84.    A copy of the provider agreement is attached to this Complaint as **Exhibit E**.

## **COUNT FOUR:  CIVIL CONSPIRACY/ACTING IN CONCERT**

85.    Plaintiff incorporates the allegations contained in Paragraphs 1–84 as if fully set forth herein.

86.    The Facilities entered into various agreements, including but not limited to, consulting, administrative, property, clinical and other agreements with the Defendants, which were implemented and carried out by the Defendants in Arkansas as part of a common and integrated plan and design, whereby they conspired to understaff the Facilities in violation of state and federal laws and regulations for profit at the expense of the residents.

87.    In furtherance of their civil conspiracy and common plan and design of deceptive business practices, the Defendants billed and collected money from Medicare and Medicaid representing that they complied with all laws, including state and federal staffing laws and regulations, and which funds were required to be used to staff the Facilities to provide adequate care for the residents. Instead of using these funds to provide adequate care to the residents, the money was siphoned out of the Facilities pursuant to agreements between and among the Defendants for the benefit of the Defendants and the owners.

88.    The Defendants concealed the history of chronic understaffing at the Facilities from the residents in furtherance of their common plan, design and deceptive business practice to understaff the Facilities and recruit new residents and engaged in other acts which were improper as discussed herein and conducted in furtherance of their common plan and design to understaff

the Facilities in violation of state and federal laws and regulations for profit at the expense of the residents.

89.    The actions taken by the Defendants in furtherance of this common plan and design were unlawful, oppressive, deceptive and immoral in chronically understaffing the Facilities in violation of the Residents' Rights Act and the Arkansas Deceptive Trade Practices Act and carried out against the elderly and infirm. These actions justify relief under the doctrine of unjust enrichment as the Defendants received money they were not legally entitled to receive and should not be permitted to retain.

90.    As a direct and proximate result of the actions taken by the Defendants taken in furtherance of this common plan and design, the Plaintiff and the Plaintiff Class were harmed. The Defendants are jointly and severally liable for all compensatory and punitive damages against the Defendants including, but not limited to, economic damages and damages for loss of dignity to be determined by the jury, plus costs and all other relief to which Plaintiffs are entitled by law.

## COUNT FIVE: UNJUST ENRICHMENT

91.    Plaintiff incorporates the allegations contained in Paragraphs 1–90 as if fully set forth herein.

92.    In violation of the Residents' Rights Act, the Arkansas Deceptive Trade Practices Act and other state and federal laws, the Defendants conspired to understaff the Facilities and received payments from residents and payments made on behalf of residents which they were not entitled to receive. The Defendants were unjustly enriched by receiving money which they were not legally entitled to receive and should not be permitted to retain.

32

93.     The Defendants should not be permitted to unjustly enrich themselves at the expense of the Plaintiff and Plaintiff Class. Equity and good conscience requires the Defendants to make restitution and/or be disgorged of all funds received in violation of state and federal laws and regulations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of herself and on behalf of the Plaintiff Class prays for judgment against Defendants as follows:

a)     For damages, including economic, compensatory, mental anguish and loss of dignity, in an amount adequate to compensate the Plaintiffs for the injuries and damages sustained.

b)     For all actual, general and special damages caused by the alleged conduct of Defendants.

c)     For the costs of litigating this case.

d)     For attorney's fees pursuant to Ark. Code Ann. § 16-22-308 and Ark. Code Ann. § 4-88-204 and 113(f).

e)     For punitive damages sufficient to punish Defendants for their egregious and malicious misconduct in reckless disregard and conscious indifference to the consequences the residents and to deter Defendants and others from repeating such atrocities.

f)     Enjoining the Defendants from: (i) understaffing the Facilities; (ii) accepting residents at a time the Facilities are understaffed; (iii) accepting payments from any source, including Medicare and Medicaid, at any time in which the Facilities are not in full compliance with all state and federal laws and regulations; and (iv) billing for services not provided.

g)     For all other relief to which Plaintiffs are entitled.

Respectfully submitted,

The Plaintiffs and all others similarly situated

By: _Brian Reddick_

Brian D. Reddick (94057)
Brent L. Moss (95075)
Robert W. Francis (2007032)
Daniel K. Yim (2014202)
**Reddick Moss, PLLC**
One Information Way, Suite 105
Little Rock, Arkansas 72202
Telephone:    (501) 907-7790
Facsimile:    (501) 907-7793

and

H. Gregory Campbell (92001)
**Campbell Law Firm, P.A.**
One Information Way, Suite 110
Little Rock, AR 72202
Telephone:    (501) 372-5659
Facsimile:    (501) 374-8657

34

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the following counsel of record on this the 28th day of July, 2017:

Mark W. Dossett
Jeff Fletcher
Dale W. Brown
Andrew Tarvin
**Kutak Rock, LLP**
234 East Millsap Road, Suite 200
Fayetteville, Arkansas 72703

Amy Wilbourn
Vicki Bronson
**Conner & Winters, LLP**
4375 N. Vantage Dr., Suite 405
Fayetteville, AR 72703

Brian Reddick

Attorney for the Plaintiff

35

OUACHITA COUNTY CLERK

12:36:06+FILED

20CT'14

IN THE CIRCUIT COURT OF OUACHITA COUNTY, ARKANSAS
PROBATE DIVISION

IN THE MATTER OF THE ESTATE OF
OZIE LEE EDWARDS, DECEASED                              NO. PR-2014-125

### ORDER APPOINTING PERSONAL REPRESENTATIVE

The Petition of Addie Edwards for appointment of a personal representative in the estate of

Ozie Lee Edwards, deceased, is presented to the Court. Upon consideration of the Petition and the

facts and evidence in support of it, the Court finds:

    1.    No demand for notice of proceedings for the appointment of a personal representative

of the estate has been filed. The Petition is not opposed by any known person, and it may be heard

without notice.

    2.    Ozie Lee Edwards, who resided at Ouachita Nursing & Rehab Center, 1411 Country

Club Rd., Camden, Arkansas, died at Ouachita Nursing & Rehab Center, 1411 Country Club Rd.,

Camden, Arkansas, on November 11, 2013.

    3.    This Court has jurisdiction of this proceeding and venue properly lies in this County.

    4.    Addie Edwards is a proper person by law to serve as personal representative of the

estate.

    5.    It appears there are no unsecured claims against the decedent's estate.

    6.    The estate has no assets other than a potential personal injury/wrongful death action,

and bond, therefore, is waived at this time. The Court will revisit the issue of bond should the estate

acquire assets at any time.



EXHIBIT
A

IT IS THEREFORE ORDERED as follows:

a.    the administration of the estate is opened;

b.    Addie Edwards is appointed personal representative of the estate; and

c.    Letters of Administration shall be issued to this personal representative without the

requirement of a bond.

DATED this _30_ day of _September_, 2014.

_____
CIRCUIT JUDGE

Submitted by:

_____
J. Michael Lewis, Bar #92269
LEWIS & LEWIS
P. O. Box 20160
White Hall, AR 71612
Telephone No. (870) 247-2111
Attorneys for Estate

-2-

# Ouachita Nursing and Rehabilitation Center

Telephone: (870) 836-4111                                    FAX Number: (870) 836-5671

## I. FACILITY DATA

|  |  |  | Updated | 02/04/2015 |
|---|---|---|---|---|

| MAILING ADDRESS | | Administrator: | Jennie Jeanette Goss Hassan |
|---|---|---|---|
| | | Administrator License Number: | 2080 |
| 1411 Country Club Road | | Total Licensed Beds: | 142 |
| Camden, AR 71701 | | | |
| | | Life Safety Code Years: | 1981 |
| PHYSICAL LOCATION | | | |
| | | | |
| 1411 Country Club Road | | | |
| Camden, AR 71701 | | Certification: | Title XIX/XVIII |
| County: Ouachita #52 | | | |

| Facility Identification Numbers | | Certified Beds  142 | | Classification | |
|---|---|---|---|---|---|
| Federal Provider: 04-5207 | Prov/Supplier Cat: 02 | Medicaid: | 0 | NF: | |
| State License: 1020 | Fiscal Year: 12/31 | Medicare: | 0 | SNF: | |
| State Vendor: 0557 | Fiscal Intermediary: 15101 | Caid/Care: | 142 | NF/SNF: | X |
| MMIS Provider: 199086311 | | Private Beds: | 0 | ICF/MR: | |
| | | HomestyleBeds: | | ICF/MR10: | |

## II. OWNERSHIP AND FINANCIAL INTEREST

| Type of Entity: | Building Ownership |
|---|---|
| Limited Liability Company | |
| | Leased from: |
| | OHI Asset (AR) Camden, LLC |
| | c/o Omega Healthcare Investors, Inc. |
| | 200 International Circle, Suite 3500 |
| Tax ID #: 46-3337875 | Hunt Valley, MD 21030 |

### Ownership and Financial Interest

Camden Operations, LLC

Doing business as     Ouachita Nursing and Rehabilitation Center

Sub-Ten Holdings, LLC      100%*
P O Box 12187
Alexandria, LA 71315
318.443.8167

*Ross Ponthie, Member – 40%
Same address as above

          MasterTen, LLC – Prime tenant
          P O Box 12187
          Alexandria, LA 71315
          Camden Operations, LLC  – sub-tenant

     * Mark Thompson, Member   –  20%
     2230 S. MacArthur DR – Suite 9A
     Alexandria, LA 71301

*JEJ Investments, LLC, Member – 40%
2723 Alvamar Drive, Shreveport, LA 71106
[JEJ Investments, LLC is 100% owned by John Ponthie]

Effective 09/01/2013 – Change of Ownership
[Previous entity operator: Diversicare Leasing Corp. doing business as Ouachita Nursing and Rehabilitation Center]

**EXHIBIT**
tabbies
**B**

## Ouachita Nursing and Rehabilitation Center

Telephone: (870) 836-4111                                    FAX Number: (870) 836-5671

### I. FACILITY DATA                         Updated          10/01/2015

| MAILING ADDRESS | | |
| --- | --- | --- |

Administrator:                                    Jennie Jeanette Goss

Administrator License Number:                              2080

Total Licensed Beds:                                        142

**MAILING ADDRESS**

1411 Country Club Road
Camden, AR 71701

**PHYSICAL LOCATION**

1411 Country Club Road
Camden, AR 71701
County: Ouachita #52

Life Safety Code Years:                                    1981

Certification:                                    Title XIX/XVIII

| Facility Identification Numbers | | Certified Beds  142 | | Classification | |
| --- | --- | --- | --- | --- | --- |
| Federal Provider: 04-5207 | Prov/Supplier Cat: 02 | Medicaid: | 0 | NF: | |
| State License: 1070 | Fiscal Year: 12/31 | Medicare: | 0 | SNF: | |
| State Vendor: 0557 | Fiscal Intermediary: 00160 | Caid/Care: | 142 | NF/SNF: | X |
| MMIS Provider: 209661311 | | Private Beds: | 0 | ICF/MR: | |
| | | HomestyleBeds: | | ICF/MR10: | |

### II. OWNERSHIP AND FINANCIAL INTEREST

| Type of Entity: | Building Ownership |
| --- | --- |
| Corporation | Landlord: OHI Asset (AR) Camden, LLC c/o Omega Healthcare Investors, Inc. 200 International Circle, Suite 3500 Hunt Valley, MD 21030 |
| Tax ID #: 47-4341182 | |

#### Ownership and Financial Interest

Camden - Progressive Eldercare Services, Inc.

Doing business as      Ouachita Nursing and Rehabilitation Center

Jeanette Goss
President/Secretary/Treasurer
1411 Country Club Road
Camden, AR 71701

MasterTen, LLC [Prime Tenant]
P. O. Box 12187
Alexandria, LA 71315

Helen E. Aregood, Board Member
3020 Cherokee St.
Camden, AR 71701

Progressive Eldercare Services, Inc., Member
38 Warnock Springs Road
Magnolia, AR 71753

James S. Brooks, Board Member
1355 Hickman Rd.
Camden, AR 71701

Change of Ownership effective 09/01/2015 [Previous entity operator: Camden Operations, LLC* doing business as Ouachita Nursing and Rehabilitation Center *Sub-Ten Holdings, LLC 100%]

**EXHIBIT**

tabbies®

**C**

## NOTICE OF CHANGE IN OPERATIONAL CONTROL

1.     Effective September 1, 2015, Camden – Progressive Eldercare Services, Inc. d/b/a Ouachita Nursing and Rehabilitation Center will lease and operate the 142 bed facility now operated by Camden Operations, LLC d/b/a Ouachita Nursing and Rehabilitation Center and located at:

> 1411 Country Club Road
> Camden, AR 71701

2.     Camden Operations, LLC d/b/a Ouachita Nursing and Rehabilitation Center will relinquish control of the operations of the above-referenced long term care nursing facility as of September 1, 2015.

3.     This Notice of Operational Change may be signed in counterparts.

The foregoing terms and conditions are hereby accepted and approved by the undersigned as of the 1st day of August, 2015.

Camden Operations, LLC d/b/a
Ouachita Nursing and Rehabilitation Center
(Former owner / Operator)

By: its member Sub-Ten Holdings, LLC

Ross Ponthie, Member

Camden – Progressive Eldercare Services, Inc.
(New Operator)

By: Jeanette Gross, President

RECEIVED

AUG 2 5 2015

OLTC
LICENSURE AND CERTIFICATION

## ADMISSION AGREEMENT

### Ouachita Nursing & Rehab Center
1411 Country Club Road
Camden, AR 71701

The undersigned resident or resident's representative (collectively, the "Resident") hereby requests admission of ___Ozie Edwards___ [Name of Resident] to **Ouachita Nursing & Rehab Center** (the "Nursing Facility" or "Facility") for medical, nursing, and personal care. The Nursing Facility and the Resident agree to the following terms for the Resident's care.

### Section 1: FACILITY'S OBLIGATIONS

1.1    Care and Services

     a.    To admit and provide nursing care on a nondiscriminatory basis so that all residents receive benefits and services without regard to race, color, religion, or national origin.

     b.    To furnish a semi-private room, nursing and personal care, social services, linens, bedding, and other items required for the Resident's known physical condition or by law for the Resident's health, safety, grooming, and well-being.

     c.    To furnish dietary services, including physician-ordered special diets and special feeding devices.

     d.    To furnish laundry service for personal items not requiring dry cleaning, pressing, or special finishing upon request.

*Do you wish the Facility to do your personal laundry?*      Yes _____    No _✓_

     e.    To notify the Resident of any change(s) in the costs or availability of services prior to any changes.

     f.    To refund any unused portions of prepaid charges based on daily rate schedules.

     g.    To arrange for transfer of the Resident to the hospital when ordered by the Resident's physician and to notify the Resident of the transfer.

1.2    **Personal Funds.** If the Resident decides to deposit personal funds with the Facility, the Resident will provide the Facility with written authorization to open a Resident Trust Account. The Facility will report account activity to the Resident at least quarterly.

*Do you wish the Facility to manage your personal funds?*      Yes _____    No _✓_

1

1841-5698-1286 2



**EXHIBIT**

**D**

DEF-000537

1.3   Resident's Rights.  The Facility will explain Resident's Rights to the Resident on admission and periodically throughout the Resident's stay.  The Facility will give a copy of the Rights to the Resident on admission and whenever there is a change affecting the Resident's rights.

1.4   Restraints.  The Facility will use a restraining device on the Resident after completing an assessment of the Resident's medical condition if the assessment shows that the restraining device is necessary for the Resident's safety and well-being.  The Facility will use the least restrictive device possible to ensure safety while allowing the most freedom of movement. No restraining devices will be used without a physician's order and the Resident's permission to use the restraint.  Restraints could, however, be used in an emergency to ensure the safety of others, and a physician's order and the Resident's consent will be obtained as soon as practicable thereafter.

1.5   Medicare or Medicaid.  The Facility will inform the Resident about Medicare and Medicaid eligibility requirements and will assist the Resident with processing the forms necessary to obtain coverage.

*At the time of Admission, the resident does* X *, does not* ____ *qualify for Medicare benefits.*

*At the time of Admission, the Resident probably meets* ____ *, does not meet* X *criteria for Medicaid benefits.*

1.6   Physician and Dental Services.  The Facility will assist the Resident in obtaining the services of a licensed physician of the Resident's choice whenever necessary, or the services of another licensed physician, if Resident's personal physician is not available or if the designated personal physician so orders.

During the course of the Resident's stay at this Facility, the Resident understands that his or her physician and dentist will determine health care services for the diagnosis and treatment of the Resident's medical or dental conditions.  Subject to the Resident's right to refuse treatment, the Resident authorizes the persons listed below, or whomever they may designate, to order or administer any medications or treatments determined necessary or advisable during the term of this Agreement.

The Resident also authorizes emergency treatment and transfer to Medical Facility(ies) as determined necessary by the attending physician or the Director of Nurses of this Facility in situations where family is unavailable for consent.  In the event that the physician is not available, the Medical Director of this Facility, or whomever he or she may designate, will administer treatment as necessary until the time the attending physician is able to assume responsibility.

*Name of Attending Physician:* _____ DR. PRUITT _____

*Name of Dentist:* _____

2

1841-5088-1286  2

DEF-000538

1.7    Medications&ChoiceofPharmacy. The Facility will obtain and administer medications prescribed for the Resident by the attending physician. The Resident will be responsible for the cost of the medications when there is no Medicare or Medicaid reimbursement. The Resident may use the pharmacy of choice, so long as the pharmacy provides the medication to the Facility in a timely manner.

*Please indicate pharmacy preference:* _____ AllCare _____

1.8    Transportation. The Facility will arrange transportation to hospitals, medical clinics, and dentist's offices when the Resident's visit is medically necessary.    The Resident is responsible for transportation in all other cases.

1.9    Care Plan Meetings.   With the Resident's permission, family members may attend the Resident's care plan meetings, which are held at least quarterly. The Facility will provide written notification of the care plan meetings in advance.

*Do you (Resident/Responsible Party) wish to attend care plan meetings?*    Yes __✓__  No ____

*If yes, who do you authorize to attend these meetings?* ___ Ethel Williams ___

1.10   ItemsFurnishedbyFacility.  The Facility furnishes the following items:

    a.    Groomingaides:  shampoo, hand soap, liquid bath soap, comb, brush, toothbrush, toothpaste, toothettes, lemon glycerin swabs, denture cream, razor, razor blades, breath fresheners, mouthwashes, deodorants, disposable facial tissues, and sanitary napkins.

    b.    Items:  water pitcher, glass, tray, wash basin, emesis basin, denture cups, bedpan, urinal, thermometer, hospital-type gowns, hydrogen peroxide, applicators, isopropyl alcohol, cotton balls, tongue depressors; and over-the-counter drugs such as simple pain relievers, antacids, simple laxatives and suppositories, simple cough syrups, antidiarrheal medications, insulin and insulin needles, or any over-the-counter product ordered by the physician.

    c.    Equipment:  trapeze bars and overhead frames, foot boards, cradles, wheelchairs, and/or geriatric chairs, foot stools, adjustable crutches canes, walkers, bedside commode chairs, hot water bottles, heating pads, and ice bags. Residents may elect to purchase any of the above listed equipment for personal use only, as long as it is marked as personal property and included on the Resident's personal property inventory sheet.

    d.    Supplies.  simple first aid supplies, oxygen administration supplies, enema supplies, douche supplies, physician prescribed lotions, ointments, medications for treatment of skin breaks, medication administration equipment, equipment for simple tests and exams (sphygmomanometers, stethoscopes, clinitest, weighing scales, etc.), special

3

DEF-000539

dressings, special pads for incontinence, suction equipment, restraints, intravenous supplies, catheter supplies, and colostomy supplies.

e.   Additional services and supplies.  Additional services and supplies may be required by the Resident for which there is a reasonable charge, e.g., newspapers, cable TV, barber shop or beauty shop services, etc.

1.11   Photographs.  The Facility may take photographs of the Resident for identification purposes to aid in the Resident's treatment.  Photographs may also be taken during group activities or special events, such as birthdays.  With the Resident's consent, these photographs may be published in the newspaper or may be framed and placed on display in the Facility.

*May photographs be taken for use in the newspaper or display in the Facility?*
                                                            Yes _✓_   No ___

1.12   Name Preference.  The Facility's staff would like to address the Resident by his or her requested name of preference.
*Please indicate your name preference:*  " Moat "   " Ham Fait "

1.13   Advance Directive or Living Will.   The Facility provides Residents with information regarding the right to accept or refuse medical or surgical treatment and the right to document wishes on this topic in an Advance Directive.  Complaints concerning the Advance Directive requirements may be filed with the state survey and certification agency.

1.14   Transfer or Discharge.   When it becomes necessary to discharge the Resident, the Facility will provide a thirty (30) day advance written notice, except as provided within this paragraph.  Residents may be discharged only if warranted by the Resident's medical condition, for the safety or health of the Resident or other persons in the Facility, or upon non-payment of the Resident's financial obligations to the Facility.  The Nursing Facility may provide written notice of immediate discharge when the Resident poses a danger to the health or safety of himself or herself, or other persons in the Facility; the Resident's health improves sufficiently to allow for a more immediate discharge; an immediate discharge is required by the Resident's urgent medical needs; or the Resident has not resided in the Facility for thirty (30) days.  The Resident may appeal the Facility's discharge decision within seven (7) calendar days of the Notice by contacting the Department of Health and Human Services at (501) 682-8430.

Section 2:  RESIDENT'S OBLIGATIONS

2.1   Facility Rules and Policies.   To abide by the Facility's rules and policies established in connection with the operation and maintenance of the Facility.

2.2   Respect for Other Residents.  To respect the privacy, personal, and property rights of fellow residents in the Facility.

4

1843-5038-1286  2

DEF-000540

2.3    Financial Support.  To provide spending money, as needed, by the Resident.

2.4    Personal Effects.  To provide personal clothing and effects, properly and clearly labeled or marked, and in sufficient quantities to keep the Resident neat in dress and appearance.

2.5    Inventory of Belongings.  To provide a written and signed inventory of personal belongings on the Facility's inventory form at the time of admission and to update that inventory as items are acquired or discarded.  A copy of the inventory will be retained in the Resident's medical record.

2.6    Safekeeping of Valuables.  To arrange the safekeeping of the Resident's money and valuables with the Charge Nurse or the Administrator of the Facility.  The Facility is not otherwise responsible for the loss of money, valuables, or any personal effects.

2.7    Neat and Orderly Room.  To limit items brought into the Resident's room to no more than can be neatly stored in the wardrobe and bedside cabinet, to keep the Resident's personal effects (furniture, TV) in good condition and repair, and to remove furniture that is torn or malodorous from the Facility's premises.

2.8    Responsible Party.  To appoint one family member or other person to act as the Resident's responsible party in admission, care and treatment, and discharge decisions, and to designate one other contact person if the responsible party is not available.

*Do you have a Power of Attorney?*                                    Yes __✓__    No _____
      *(If yes, please provide Facility with a copy of the Document).*

*Do you have a legal guardian?*                                       Yes _____    No _✓_
      *(If yes, please provide the Facility with a copy of the Document).*

*Please name the responsible party and one alternate:* __Addie Edwards__
                                                        __Ethel Williams (Cousi__

2.9    Private Nurse, Attendants, or Sitters.  To accept financial and legal responsibility for private nurses, attendants, or sitters engaged by the responsible party for the Resident's benefit, and to understand that private nurses, attendants, and sitters will be expected to follow the Facility's rules and policies or be subject to dismissal for violations.  The Resident hereby releases the Facility, its owners, directors, agents, and employees, from all liabilities arising from the care given to the Resident by the private nurse, attendant, or sitter.

2.10   Financial Responsibility.  To pay the Facility's charges as provided in this Agreement.

1841-9088-1256  2

5

## Section 3: FINANCIAL UNDERSTANDINGS

3.1    Timely Payment.  At the time of admission, payment for services provided under this Agreement through the end of the current month is due and payable.  Thereafter, payment is due in advance by the first (1st) day of each month.  Failure of the Resident to pay the Facility by the tenth (10th) day of the month in which payment is due shall be sufficient grounds for the Facility to discharge the Resident.  The discharge of the resident shall be effective thirty (30) days after the Resident receives a discharge notice from the Facility.

3.2    Payment Guarantees.  The Resident agrees to the following Assignment of Income to the Facility, or the Resident's Representative grants the Nursing Facility the following personal Guarantee as evidenced by his or her signature below:

   a.    Assignment of Income:

      By my signature, I hereby assign all rights to such of my income from whatever source derived, as it exists now or as it may exist in the future, to the Facility as is necessary for payment of all charges incurred relating to my care.  This obligation shall include the payment of reasonable attorneys' fees if this obligation is placed into the hands of an attorney for collection.

      _____
      Signature of Resident or
      Resident's Legal Representative

            **OR**

   b.    Personal Guarantee:

      By my signature, I hereby *personally* guarantee all obligations of Resident under this Agreement, including, but not limited to, the payment of all charges billed by the Facility relating to the care of the Resident.  This obligation shall include the payment of reasonable attorneys' fees if this obligation is placed into the hands of an attorney for collection.

      *Addie Edwards*
      Signature of Resident's Representative

3.3    Daily Rate.  The basic daily rate for a private room is $ 182.00  and for a semi-private room is $ 162.00 .  The daily rate includes the goods and services listed in Paragraph 1.10 of this Agreement.  This rate may be adjusted upon prior written notice to the Resident, and such notice is incorporated into and made part of this Agreement.

3.4    Extra Charges.  The Resident's personal needs for items or services not customarily provided by the Facility are not covered in the basic daily rate and may be furnished by the Resident or

DEF-000542

paid by the Resident as an extra charge. These items or services may include private duty nursing, private room, beauty or barber shop services, brand name personal care items, false teeth, eyeglasses, or prosthetic devices. (Extra charges for items and services not included in the daily rate are set forth in an Attachment to this Agreement).

3.5    Expenses Incurred for Health and Welfare of Resident. The Resident will be billed for, and will pay promptly, those charges for ancillary services, supplies, and special equipment that are not included in the daily rate, but which the Resident's attending physician or the Facility determine, in their discretion, to be necessary for the health and welfare of the Resident. To the extent possible, the Facility will notify the Resident in advance that these charges will be incurred. Where these services or supplies are provided by third parties, such as medical attention by a physician or ambulance service, the Resident may be billed by the appropriate party. The Resident always has the right to refuse treatment or services.

3.6    Third Party Payor Programs. The Facility agrees to accept payment from Medicare, Medicaid, and insurance companies in lieu of or in addition to payment from the Resident, as the case may be. The Resident remains responsible for paying all co-payments, co-insurance, deductibles, and amounts and charges for items and services incurred by or on behalf of the Resident that the third party payors do not cover.

3.7    Government Payment. In the event government payment is denied or terminated, Resident agrees to pay all unpaid charges for care previously rendered. In the event of a termination of governmental payments, the charges for services rendered commencing with the date of the termination will be at the rate herein specified. If a Resident requiring government assistance is not approved for government assistance at the time of admission, the Resident agrees to pay the Facility at the rate listed herein until the Facility receives payment from the government agency. The Facility will refund any overpayments to the Resident by the fifteenth (15th) day of the month following the month of receipt of overpayment.

3.8    Bed-Hold Charge. If the Resident should leave the Facility, a daily bed-hold charge (in accordance with the Bed-Hold policy) will be made until the personal effects of the Resident are removed from the Facility or a stop bed-hold agreement is signed.

Section 4: FACILITY POLICIES AND PROCEDURES

4.1    Personal Property. Because the Facility is unable to exercise complete control over Residents' personal property, the Facility will not be liable for the loss, theft, or destruction of money, papers, jewels, or other personal property of the Resident or any other person except as delivered to the Charge Nurse or Administrator of the Facility for safekeeping as evidenced by a signed receipt for such property. The Facility suggests that arrangements for the safekeeping of this property be made prior to the admission of the Resident. Residents are permitted to retain and use personal possessions and appropriate clothing, as space permits. The Facility may refuse to accept any personal property with an estimated value in excess of Fifty Dollars ($50).

7

1813-5088-1286 2

DEF-000543

4.2     Prescriptions.  All medications must be prescribed by the Resident's physician, and administered by a licensed nurse in the Facility, unless the Resident has been care planned for self-administration.  The Facility will order all medication required by the Resident.

4.3     Smoking.  ~~This is a no tobacco facility.  Smoking and the use of any tobacco product is not permitted in the Facility or upon any of the Facility property.~~  The Resident accepts full responsibility and absolves the Facility, its personnel, and the attending physician of responsibility for any fires, burns, or other accidents occurring as a result of the Resident smoking while the Resident is in bed, in the Resident's room, or in any other area in the Facility.

4.4     Gratuities.  To ensure equality of care to our residents and to protect against abuse or exploitation, this Facility does not permit its staff to accept gratuities or favors from our residents, or their families or friends.  If the Resident or visitor desires to show appreciation for care and services, he or she is encouraged to do something that will benefit the Facility as a whole.

4.5     Telephones.  Each resident room has a standard telephone jack.  The resident or responsible party, however, is responsible for the installation of services and fees, and payment of the monthly bill.  The bill for telephone services should be addressed to the person who has accepted responsibility for payment.  If the Facility initiates a room change, it will arrange for transfer of the line.

4.6     Other Facility Policies.  The Admission Packet contains other important policies that guide your residency in this facility.  By signing this agreement, you are agreeing to be bound by these policies, which are incorporated by reference herein.

**Section 5: MISCELLANEOUS PROVISIONS**

5.1     Termination.  Either party may terminate this Agreement by giving written notice to the other party at the address(es) described below.  This Agreement shall remain in effect until the Resident is discharged.

5.2     Notice.  All notices, bills, and communications required, desired or permitted to be given hereunder shall be in writing and shall be deemed to have been duly given on the date received, if delivered personally, or on the third day after mailing, if sent by registered or certified mail, return receipt requested, postage prepaid, and addressed to the Facility at the address listed at the top of page one of this Agreement and to the Resident at the address set forth below, or to such other person at such location as either party hereto may subsequently designate in similar manner.

Addie Edwards

Name of Resident (Responsible Party for Notice)

725 Pearl St  Camden, Ave  71701

Address of Resident:  City        State        ZIP

8

1841-5688-1286 2

DEF-000544

5.3    Construction of Agreement.  This Agreement shall be interpreted, construed, and governed by and under the laws of the State of Arkansas, and the resident unconditionally submits to the jurisdiction of the courts located in the State of Arkansas in all matters relating to or arising from this Agreement.

5.4    Entire Understanding.  This Agreement, including its Attachments and Policies, Procedures, and Statements of Understanding of Facility, and any agreement to arbitrate disputes, received and acknowledged by the resident at any time on or after the date of this Agreement, all of which are incorporated by reference herein, contains the entire agreement between the parties and supersedes all prior agreements, arrangements, or oral representations as to all matters relating to the Resident and his or her care at the Facility. *This Agreement and all accompanying documents and agreements shall remain in full force and effect for all Resident's future stays in the facility, regardless of transfers to hospital, home, or other institutions, until superceded by any new Agreement.*

5.5    Modifications.  No modification of the terms and conditions of this Agreement shall be valid unless in writing and signed by both parties to this Agreement.

It is so agreed this __30__ day of __August__, 20_13_.

RESIDENT:

_____          *Eddie Edwards*
Signature of Resident                        Resident's Representative

WITNESS:

*Rebecca Kimball*
Signature of Witness

Ouachita Nursing & Rehab Center:

*Rebecca Kimball*
Signature of Facility's Representative

9

1811-5088-1286 2

DEF-000545

CONTRACT
## TO PARTICIPATE IN THE ARKANSAS NURSING HOME PROGRAM
### ADMINISTERED BY THE DIVISION OF ECONOMIC AND MEDICAL SERVICES
### OFFICE OF LONG TERM CARE
### UNDER TITLE XIX (MEDICAID)

This ___Facility___ agreement made and entered into this the _____ day of _____
(to be completed by DMS)          (to be completed by DMS)

by and between _____ hereinafter called Provider, and
(to be completed by DMS)

the Department of Economic and Medical Services, Office of Long Term Care hereinafter called State.

WITNESSTH:

I.    Provider agrees that its responsibilities hereunder shall be as follows:

A.   To keep all records, as set forth in applicable Federal and/or State regulations, and Long Term Care Provider Manuals, and any duly promulgated changes in or additions thereto, and to fully disclose the extent of all services provided to individuals receiving assistance under the State Plan.

B.   To make available for inspection all records herein specified to satisfy audit requirements under the program; to furnish all such records for audit conduction periodically by State or its designated agents and/or representatives of the Department of Human Services, and the Department of Health and Human Services of the United States of America or its designees or representatives. For all Medicaid recipients these records shall include, but not necessarily be limited to those records as defined in Section A above.

C.   Provider shall at all times provide State access to the facility, residents, and resident records. Provider expressly agrees not to hinder, impede, or otherwise restrict State from carrying out its official duties, and expressly agrees to reasonably assist State in carrying out its official duties. In this context, "official duties" include inspections, surveys and investigations and reviews as prescribed by State and Federal laws, rules and regulations, and shall allow "observation and recordings made and conducted relative to long term care facilities, long term care residents, and records of or possessed by facility and/or residents. 'Observation' includes the right and ability to move in or around the interior and/or exterior, including resident rooms of a long term care facility, unaccompanied (except upon request if the inspector[s]) at any time. 'Recordings' include photostatic copies, notes, writings, drawings, and photographs (whether still or motion, in accordance with Section 2 of Ark. Act 33 of 1989), and sound recordings."

D.   To accept only residents who have met the requirements of the duly promulgated Pre-Admission Screening Program and for whom the facility can provide all required and necessary services. Provider specifically herein agrees to insure availability of all medications prescribed by the resident's physician.

E.   To provide all services without discrimination on the grounds of race, color, national origin, or physical or mental disability within the provisions of Title VI of the Federal Civil Rights Act, and Section 504 of the Rehabilitation Act of 1973. Provider agrees herewith that it has been furnished with a copy of the LTC Provider Manual, and shall be bound by all provisions thereof, including any and all changes and/or additions thereto.

F.   To comply with all rules, regulations, changes in and additions thereto issued by the United States Department of Health and Human Services pertaining to nursing homes, and to comply with all rules, regulations, duly promulgated changes in and additions thereto issued by the State.

G.   To meet all requirements of applicable Life Safety Code and all State Fire and Safety Codes.

H.   Provider will not transfer or discharge any recipient without a minimum of 30 days advance notice to the individual or a responsible person. Provider may transfer or discharge a Medicaid recipient under the following circumstances:

1.   The transfer or discharge is necessary to meet the resident's welfare and the resident's welfare cannot be met in the facility;

2.   The transfer or discharge is appropriate because the resident's health has improved sufficiently so the resident no longer needs the services provided by the facility;

3.   The safety of the individuals in the facility is endangered;

4.   The health of individuals in the facility would otherwise be endangered;

5.   The resident has failed, after reasonable and appropriate notice, to pay (or to have paid under Title XIX or Title XVIII on the resident's behalf an allowable charge imposed by the facility for an item or service requested by the resident and for which a charge may be imposed consistent with federal and state laws and regulations; or

6.   The facility ceases to operate.

The notice of transfer or discharge must be made at least 30 days in advance of the resident's transfer or discharge except:

a.   In a case described in item H(3) or H(4) above;

b.   In a case described in item H(2) above where the resident's health improves sufficiently to allow for a more immediate transfer or discharge;

c.   In a case described in item H(1) above where a more immediate transfer or discharge is necessitated by the resident's urgent medical needs; or

d.   In a case where the resident has not resided in the facility for 30 days.

I.    Provider shall give 30 day notice to the State prior to any change of ownership including a change which contemplates or provides for the assumptions of existing liabilities by the new owner.

EMS-711 (R. 9/89)

EXHIBIT
E
tabbies®

1 of 2

J.  To bill State (Medicaid) only after the service has been provided.

K.  To accept Medicaid reimbursement rates determined by the State as full payment for all Medicaid eligible care and services required by the classification of each resident and rendered by the provider, and make no additional charges to the resident, or to accept any additional payment from the resident, relatives, or responsible parties for that service which is covered under the Medicaid Program.

L.  To promptly refund to the resident or responsible party any unused portion of recipient applied income collected in advance and not owed due to death, discharge or transfer. Recipient income is to be prorated on a per diem basis according to the number of days in the month.

M.  To promptly refund to a resident or other responsible person any deposit or entrance fee collected while awaiting approval for Medicaid eligibility to the extent those days are covered by Medicaid payments.

N.  To provide all services and specific items as defined in the Medical Assistance Reasonable Cost Related Reimbursement Manual for Long Term Care Facilities (MARCRRM-LTCF), or any additions thereto or subsequent manuals. Receipt of Medicaid per diem reimbursement rates is considered payment in full for services and items included in the MARCRRM.

O.  To accept assignment and file a claim in a timely and proper manner with all third party sources, and if said claim is collected from a third party, to reimburse Medicaid up to the amount Medicaid paid for said services.

P.  The $30 Personal Needs Allowance which is provided for by the Medicaid Program for personal expenditures of a resident cannot and shall not be used for any other purpose except as authorized in writing by the resident or responsible party.

Q.  To comply with all State and/or Federal regulations pertaining to resident personal funds and to provide the State access to patient account records or any other financial records maintained by the provider for benefit of the patient. The new owner must specify in writing which owner will be responsible for recipient Medicaid claims and facility account receivable balances resulting from dates of service prior to the ownership change.

Further Provider agrees that it will not prevent or interfere with the individual or responsible person, or the Office of Long Term Care in the transfer or discharging of a patient when same is appropriate.

II.  The State agrees that it shall have the following responsibilities hereunder:

A.  To make timely payments to Provider for the appropriate Medicaid services provided the eligible Medicaid recipients in accordance with the terms of the LTC Provider Manual or other appropriate regulations and procedures previously mentioned herein.

B.  To notify Provider of any changes of rules or regulations to be followed hereunder as promptly as is practicable at all times.

C.  To safeguard the confidentiality of any Medicaid records maintained for the State, its agents, and/or fiscal intermediary as specified in Federal and State regulations.

III.  Mutual Covenants, Duties, Responsibilities, and Undertakings

A.  State and Provider mutually agree to comply with all Federal and State laws, rules and regulations.

B.  State and Provider agree that the rights and privileges of the residents are of primary concern to the parties and the parties expressly agree and covenant to protect and preserve those rights and privileges and that failure to act in a manner consistent with those rights and privileges shall constitute an immediate breach of agreement and may result in immediate termination of this agreement without recourse.

C.  State and Provider agree and covenant that this written instrument constitutes the entirety of the agreement between both parties and no statement or representations not reduced to writing or incorporated herein by express reference shall be binding upon the parties and such statements or representations not incorporated herein by express reference or not contained herein shall constitute no part of this agreement.

IV.  This contract may be terminated in accordance with the following provisions:

A.  This contract may be terminated by either party by giving 30 days written notice to the other party.

B.  This contract may be terminated immediately by State for the following reasons:

1.  Federal sanction of Provider.

2.  Change of ownership.

3.  Violation of any provision herein contained.

4.  In accordance with termination procedures as set out in appropriate Federal and/or State regulations or rules by which Provider is bound hereunder.

| Provider | Division of Economic and Medical Services<br>Office of Long Term Care |
|---|---|
| By: _____<br>(Signature) | By: _____<br>(Signature) |
| Name: _____<br>(Type Name) | Name: _____Carol Shockley_____<br>(Type Name) |
| Title: _____Administrator_____ | Title: _____Director, LTC_____ |
| Date: _____ | Date: _____ |

EMS-711 (R. 9/89)

2 of 2